### III.   THE US AIRWAYS – AMERICA WEST MERGER

**A.      Overview of the Merger Agreement.**

On May 19, 2005, Group entered into an Agreement and Plan of Merger with America West, as amended, which is attached as Exhibit M to the Plan.  The Merger Agreement provides, subject to Plan approval,  for a merger transaction pursuant to which America West will merge with Barbell Acquisition Corp. ("Barbell"), a wholly-owned subsidiary of Group, and New Common Stock will be distributed to America West's shareholders, with the result of the Merger being that America West will become a wholly-owned subsidiary of Reorganized Group.

The management of both the Debtors and America West believe that the Merger is in the best interests of both companies' stakeholders, including creditors of the Debtors' bankruptcy estates.  The Merger would result in the creation of the first nationwide low-cost carrier.  The Debtors and America West would operate under a single brand name, "US Airways," and offer consumers a nationwide route network, with full labor and operational integration between the Debtors and America West anticipated to occur over a period of 24 months.

The Debtors believe that the Merger will create a number of synergies with resulting annual revenue increases and cost savings to Reorganized Group in the aggregate amount of over $600 million.  The Debtors anticipate that cost savings will result from shrinking unprofitable routes, redistributing excess capacity from the western United States to the East Coast, streamlining aircraft fleets (the companies contemplate a net reduction of 58 aircraft between the Debtors and America West), downgrading mainline aircraft to regional jets on certain routes, and better utilization of aircraft.  The Debtors expect that further cost savings will result from reductions in management overhead; elimination of overlap in airport facilities, airport labor, office space and real estate; and utilization of America West's in-house information technology department.  Finally, the Debtors and America West have similar labor costs, and there is a significant commonality in the companies' aircraft fleets.

The Merger will result in the fifth largest airline operating in the United States, with primary hubs in Charlotte, Philadelphia and Phoenix, and secondary hubs/focus cities in Pittsburgh, Las Vegas, New York-LaGuardia, Washington-Reagan National and Boston. America West and the Debtors believe that this combined presence in more cities will lead to increased revenue through the addition of new routes, including service to Hawaii, and through a broader network offering passengers improved connectivity between cities.  In addition to cost savings, the Merger is anticipated to increase liquidity by combining the balance sheets of the Debtors and America West and from the cash infusions provided by the equity investments of the Plan Investors, thereby improving the ability of the merged company to obtain credit providing the combined entity with access to currently restricted cash.

The Debtors believe that the Merger Agreement, coupled with the new investments from the Plan Investors, present the best business opportunity for the Debtors' reorganization and emergence from the Chapter 11 Cases.

**B.      America West and Its Business.**

America West, a Delaware corporation formed in 1996, is a holding company that owns all of the stock of America West Airlines, Inc. ("AWA"), a Delaware corporation formed in 1981.  AWA accounted for most of America West's revenues and expenses in 2004.  Based on 2004 operating revenues and ASMs, AWA is the eighth largest passenger airline and the second largest low-cost carrier in the United States.  AWA is the largest low-cost carrier that operates a hub-and-spoke network, with large hubs in both Phoenix and Las Vegas.  Since 2003, AWA has also offered limited point-to-point service in certain major transcontinental markets.  As of June 30, 2005, AWA operated a fleet of 143 aircraft with an average age of 10.9 years and served 63 destinations in North America, including eight in Mexico, three in Canada and one in Costa Rica.  Through regional alliance and code share arrangements with other airlines, AWA served an additional 52 destinations in North America.  In 2004, AWA had approximately 21.1 million passengers boarding its planes and generated revenues of approximately $2.3 billion.

The following table sets forth selected financial data for America West for each of the five fiscal years ended December 31, 2004, 2003, 2002, 2001 and 2000 and for the six month periods ended June 30, 2005 and 2004, respectively.  The selected consolidated financial data presented below is derived from America West's consolidated financial statements contained in America West's annual reports on Form 10-K for the years ended December 31, 2004, 2003, 2002, 2001 and 2000 and America West's unaudited consolidated financial statements contained in America West's quarterly report on Form 10-Q for the quarter ended June 30, 2005.  The selected consolidated financial data should be read in conjunction with the consolidated financial statements for the respective periods, the related notes and the related reports of America West's independent registered public accounting firms.  A copy of America West's annual report on Form 10-K for the fiscal year ended December 31, 2004 is attached hereto as Appendix G hereto, and a copy of America West's quarterly report on Form 10-Q for the period ended June 30, 2005 is attached hereto as Appendix H hereto.

| | Six months ended June 30, | | Year ended December 31, | | | | |
|---|---|---|---|---|---|---|---|
| | 2005 | 2004 | 2004 | 2003 | 2002 | 2001 | 2000 |
| | | | (in thousands except per share amounts) | | | | |
| Consolidated statements of operations data: | | | | | | | |
| Operating revenues [a] | $ 1,556,009 | $ 1,343,485 | $ 2,338,957 | $ 2,254,497 | $ 2,047,116 | $ 2,065,913 | $ 2,344,354 |
| Operating expenses [a] [b] | 1,475,653 | 1,302,581 | 2,382,728 | 2,232,362 | 2,206,540 | 2,476,594 | 2,356,991 |
| Operating income (loss) | 80,356 | 40,904 | (43,771) | 22,135 | (159,424) | (410,681) | (12,637) |
| Income (loss) before income taxes (benefit) and cumulative effect of change in accounting principle [c] | 47,485 | 9,098 | (88,993) | 57,534 | (214,757) | (324,387) | 24,743 |
| Income taxes (benefit) | — | — | 30 | 114 | (35,071) | (74,536) | 17,064 |
| Income (loss) before cumulative effect of change in accounting principle | 47,485 | 9,098 | (89,023) | 57,420 | (179,686) | (249,851) | 7,679 |
| Net income (loss) | 47,485 | 9,098 | (89,023) | 57,420 | (387,909) | (249,851) | 7,679 |
| Earnings (loss) per share before cumulative effect of change in accounting principle: | | | | | | | |
| Basic | 1.32 | 0.25 | (2.47) | 1.66 | (5.33) | (7.42) | 0.22 |
| Diluted | 0.92 | 0.17 | (2.47) | 1.26 | (5.33) | (7.42) | 0.22 |
| Net income (loss) per share: | | | | | | | |
| Basic | 1.32 | 0.25 | (2.47) | 1.66 | (11.50) | (7.42) | 0.22 |
| Diluted [d] | 0.92 | 0.17 | (2.47) | 1.26 | (11.50) | (7.42) | 0.22 |
| Shares used for computation: | | | | | | | |
| Basic | 36,015 | 35,928 | 36,026 | 34,551 | 33,723 | 33,670 | 35,139 |
| Diluted [d] | 62,551 | 52,070 | 36,026 | 56,113 | 33,723 | 33,670 | 35,688 |
| Consolidated balance sheet data (at end of period): | | | | | | | |
| Total assets | $ 1,604,817 | $ 1,645,017 | $ 1,475,264 | $ 1,614,385 | $ 1,438,953 | $ 1,469,218 | $ 1,568,515 |
| Long-term debt, less current maturities | 588,060 | 647,670 | 635,129 | 688,965 | 700,983 | 224,551 | 145,578 |
| Total stockholders' equity | 84,138 | 147,040 | 36,447 | 125,989 | 68,178 | 420,363 | 667,073 |

Source:  America West Holdings Corporation

(a)  Effective with the first quarter of 2005, America West changed the presentation of its regional alliance agreement with Mesa Airlines to the gross basis of presentation.  Previously, America West used the net basis of presentation.  The amounts below depict total operating revenues and total operating expenses under the gross basis of presentation:

| | Year ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2004 | 2003 | 2002 | 2001 | 2000 |
| | | | (in thousands) | | |
| Operating revenues | $ 2,711,530 | $ 2,541,471 | $ 2,309,162 | $ 2,273,339 | $ 2,522,553 |
| Operating expenses | 2,755,301 | 2,519,336 | 2,468,586 | 2,684,020 | 2,535,190 |

(b) The 2004 results include a $16.3 million net credit associated with the termination of the rate per engine hour agreement with

General Electric Engine Services for overhaul maintenance services on V2500-A1 engines, a $0.6 million credit related to the revision of the estimated costs associated with the sale and leaseback of certain aircraft recorded in the first quarter of 2002 and a $0.4 million credit related to the revision of estimated charges associated with the Columbus, Ohio hub closure originally recorded in the second quarter of 2003. These credits were partially offset by $1.9 million of net charges related to the return of certain Boeing 737-200 aircraft which includes termination payments of $2.1 million, the write-down of leasehold improvements and deferred rent of $2.8 million, offset by the net reversal of maintenance reserves of $3.0 million. The 2003 period includes $16.0 million of charges resulting from the elimination of AWA's hub operations in Columbus, Ohio ($11.1 million), the reduction-in-force of certain management, professional and administrative employees ($2.3 million), and the impairment of certain owned Boeing 737-200 aircraft that have been grounded ($2.6 million) offset by a $1.1 million reduction of charges due to a revision of the estimated costs related to the early termination of certain aircraft leases and a $0.5 million reduction related to the revision of estimated costs associated with the sale and leaseback of certain aircraft. The 2002 period includes $19.0 million of charges primarily related to the restructuring completed on January 18, 2002, resulting from the events of September 11, 2001. The 2001 period includes $141.6 million of special charges related to the impairment of reorganization value in excess of amounts allocable to identifiable assets and owned aircraft and engines, as well as the earlier-than-planned return of seven leased aircraft and severance expenses following a reduction-in-force in 2001. America West reclassified amounts related to settled fuel hedge transactions and mark-to-market adjustments on open hedge instruments from fuel expense to gain (loss) on derivative instruments, net. The amounts for the years ended December 31, 2004 and 2003 were an addition to fuel expense of $30.5 million and $10.7 million, respectively. For the years ended December 31, 2002 and 2001, the amounts reduced fuel expense by $0.7 million and $7.2 million, respectively.

(c) Nonoperating income (expense) in the 2004 period includes a $30.5 million net gain on derivative instruments, which included mark-to-market changes and settled transactions, and $1.3 million for the write-off of debt issue costs in connection with the refinancing of a term loan issued by General Electric Capital Corporation with an aggregate amount of $110.6 million. The 2003 period includes federal government assistance of $81.3 million recognized as nonoperating income under the Emergency Wartime Supplemental Appropriations Act and $8.5 million and $108.2 million recognized in 2002 and 2001, respectively, as nonoperating income under the Air Transportation Safety and System Stabilization Act. The 2003, 2002 and 2001 periods include a $10.7 million net gain, $0.7 million net loss and $7.2 million net loss on derivative instruments, respectively, including mark-to-market changes and settled transactions.

(d) America West diluted earnings per share for the year ended December 31, 2003 includes the impact related to the 7.25% notes under the "if-converted" methodology. The impact reduced diluted earnings per share by $0.03 from $1.29 to $1.26.

America West files annual, quarterly and current reports, proxy statements and other information with the SEC, which provide additional and more detailed information about America West, its management, stockholders and operations, and the historical trading prices of its common stock, than are contained in this Disclosure Statement. You can read and copy these reports, statements or other information at the SEC's Public Reference Room at Room 1580, 100 F Street, NE, Washington, D.C. 20549. America West's SEC filings are also available to the public from commercial document retrieval services and at the website maintained by the SEC at www.sec.gov. You can also find the SEC filings of America West on its website at www.americawest.com. Any such information is not considered to be part of, or incorporated by reference into, this Disclosure Statement.

C.    **Structure and Terms of the Merger Agreement.**

1.    *Closing and Effective Time of the Merger.*

The closing of the Merger will occur on the fifth business day after the satisfaction or waiver of all of the closing conditions provided in the Merger Agreement, except for those conditions that, by their terms, are to be satisfied at the closing (but subject to the satisfaction or waiver of those conditions), or on such other date as America West and Group may agree in writing. As soon as practicable following the closing, America West and Group will deliver an executed and acknowledged certificate of merger to the Secretary of State of the State of Delaware. At that time, or at such later time as may be agreed by the parties in writing and specified in the certificate of merger, the Merger will become effective.

2.    *Officers and Directors of Reorganized Group*

After the Merger, the following individuals will be recommended to the board of directors of Reorganized Group for positions on the executive team:

**W. Douglas Parker,** Age 43. Chairman of the Board, President and Chief Executive Officer of America West and AWA and has served as a director of America West since 1999. Mr. Parker has served as Chairman of the Board, President and Chief Executive Officer of the America West and as Chairman of

the Board and Chief Executive Officer of AWA since September 2001. Mr. Parker joined America West as Senior Vice President and Chief Financial Officer in June 1995. He was elected Executive Vice President of America West and Executive Vice President — Corporate Group of AWA in April 1999. He was elected President of AWA in May 2000 and Chief Operating Officer of AWA in December 2000. Mr. Parker will be recommended to the board of directors of Reorganized Group to serve as Chairman and Chief Executive Officer.

**Bruce R. Lakefield,** Age 61. President and Chief Executive Officer and a director of Group and USAI. Mr. Lakefield served as Chairman and Chief Executive Officer of Lehman Brothers International from 1995 until 1999. He has served as a Senior Advisor to the Investment Policy Committee of HGK Asset Management since 2000. Mr. Lakefield serves as a Non-Executive Director of Constellation Corporation PLC and a member of the Board of Directors of Magic Media, Inc. He is a member of the Strategy and Finance Committee of Group's Board of Directors. Mr. Lakefield will be recommended to the board of directors of Reorganized Group to serve as Vice Chairman.

**Alan W. Crellin,** Age 58. Mr. Crellin joined Group in 1988 as a result of the acquisition of Pacific Southwest Airlines. He was promoted to serve as Vice President — Ground Services of Group in 1995. Mr. Crellin served as Senior Vice President — Customer Service of Group from 2000 until his election as Executive Vice President — Operations in January 2002. Prior to joining Group, Mr. Crellin held a variety of management positions with Pacific Southwest Airlines from 1971 to 1988, including Vice President — Customer Service. Mr. Crellin will be recommended to the board of directors of Reorganized Group to be responsible for operations, including safety, flight operations, maintenance, airports and inflight services at Reorganized Group, and will retain his current title.

**J. Scott Kirby,** Age 37. Currently Executive Vice President — Sales and Marketing of AWA. Mr. Kirby joined AWA as Senior Director — Schedules and Planning in October 1995. In October 1997, Mr. Kirby was elected to the position of Vice President — Planning and in May 1998, he was elected to the position of Vice President — Revenue Management. In January 2000, he was elected to the positions of Senior Vice President — E-Business and Technology of AWA. He was elected to his current position in September 2001. He will be recommended to the board of directors of Reorganized Group to be responsible for revenue management, information technologies, scheduling/planning, marketing, sales, alliances, distribution and reservations at Reorganized Group, and will retain his current title.

**Jeffrey D. McClelland,** Age 45. Executive Vice President and Chief Operating Officer of AWA. Mr. McClelland joined AWA as Senior Vice President — Operations in September 1999. He was elected Executive Vice President — Operations in September 2001 and was elected Chief Operating Officer in November 2002. From 1991 until 1999, Mr. McClelland worked at Northwest Airlines, most recently as Senior Vice President — Finance and Controller. He will be recommended to the board of directors of Reorganized Group to become Executive Vice President and Chief Administrative Officer at Reorganized Group.

**Derek J. Kerr,** Age 40. Senior Vice President and Chief Financial Officer of AWA and America West. Mr. Kerr joined AWA as Senior Director — Financial Planning in April 1996. He was elected to the position of Vice President — Financial Planning and Analysis in May 1998. In February 2002, Mr. Kerr was elected Senior Vice President — Financial Planning and Analysis. He was elected to his current position in September 2002. He will be recommended to the board of directors of Reorganized Group to retain his title and to report to Jeffrey McClelland.

**James E. Walsh III,** Age 57. Senior Vice President and General Counsel of AWA. Mr. Walsh joined AWA as Senior Vice President and General Counsel in August 2004. Prior to joining AWA, Mr. Walsh was Senior Vice President & General Counsel of Fairchild Dornier Corporation. Prior to joining Fairchild in 1991, Mr. Walsh spent 12 years at American Airlines in various positions including Vice President of Purchasing & Inventory Control and later Vice President of Law. He will be recommended to the board of directors of Reorganized Group to retain his title and to report to Jeffrey McClelland.

**C.A. Howlett,** Age 61. Senior Vice President — Public Affairs of AWA and America West. Mr. Howlett joined AWA as Vice President — Public Affairs in January 1995. On January 1, 1997, he was elected Vice President — Public Affairs of Holdings. He was elected to his current positions in February 1999. He will be recommended to the board of directors of Reorganized Group to retain his title and to report to Doug Parker.

**Elise R. Eberwein,** Age 39. Vice President — Corporate Communications of AWA. Ms. Eberwein joined AWA in September 2003. Prior to joining AWA Ms. Eberwein held various communication positions for three other airlines, including Denver based Frontier Airlines where she served as Vice President, Communications from 2000 until she joined AWA. She will be recommended to the board of directors of Reorganized Group to retain her title and to report to Doug Parker.

3.        *The Merger Consideration.*

At the effective time of the Merger, each share of America West Class A common stock issued and outstanding immediately prior to the effective time (other than any shares of America West Class A common stock owned by Group, America West or any of their respective subsidiaries, which shares are not beneficially owned by third parties) will be converted into the right to receive 0.5362 of a share of New Common Stock, together with the right, if any, to receive cash in lieu of fractional shares of New Common Stock. At the effective time of the Merger, each share of America West Class B common stock issued and outstanding immediately prior to the effective time (other than any shares of America West Class B common stock owned by Group, America West or any of their respective subsidiaries, which shares are not beneficially owned by third parties) will be converted into the right to receive 0.4125 of a share of New Common Stock, together with the right, if any, to receive cash in lieu of fractional shares of New Common Stock. In connection with the Merger, Group has filed a registration statement on Form S-4 under the Securities Act to register the shares of New Common Stock to be issued to holders of America West Class A common stock and America West Class B common stock in the Merger (the "S-4 Registration Statement"). A copy of the prospectus/proxy statement comprising a part of the S-4 Registration Statement is attached to the Disclosure Statement as Appendix I.

Shares of America West common stock owned by Group, America West or any of their respective subsidiaries, except for shares that are beneficially owned by third parties, will be canceled and retired without payment of any consideration therefor and will cease to exist.

4.        *Effect of the Merger on America West's Labor and Benefits.*

Group has agreed that it will cause America West after the Merger to honor all America West compensation and benefit plans, other than collective bargaining agreements, in accordance with their terms as in effect immediately before the effective time of the Merger, subject to any amendment or termination of those plans that may be permitted by the terms of those plans and applicable law.

Subject to the terms of any applicable collective bargaining agreement, Reorganized Group will cause any Reorganized Group compensation and benefit plans that cover the employees of America West and its subsidiaries who are employed by Reorganized Group or any of its subsidiaries at or after the effective time of the Merger, which are referred to as continuing employees, to treat the employment and service of the continuing employees with America West and its subsidiaries and any predecessor employers through the date the Merger closes as employment and service with Reorganized Group and its subsidiaries for eligibility and vesting purposes, but not benefit accrual purposes under any defined benefit pension plan, under the Reorganized Group compensation and benefit plans. Subject to the terms of any applicable collective bargaining agreement, the continuing employees and their dependents and beneficiaries will not be required for the calendar year that includes the closing date of the Merger to satisfy any deductible, co-payment, out-of pocket maximum or similar requirements under any Reorganized Group compensation and benefit plan that provides medical, dental and other welfare benefits to the continuing employees and their beneficiaries to the extent of amounts previously credited for those purposes under the medical, dental and other welfare benefit plans of America West and its subsidiaries that covered the continuing employees prior to the closing date of the Merger, and any waiting periods, pre-existing condition exclusions and

10

requirements to show evidence of good health contained in that Reorganized Group compensation and benefit plan will not apply with respect to the continuing employees and their dependents and beneficiaries, except to the extent such waiting periods, exclusions or requirements were applicable under the America West compensation and benefit plans at the effective time of the Merger.

5.    *Approvals Arising in Connection with the Merger.*

(a)    *United States Antitrust*

The Merger is subject to review by the Antitrust Division of the U.S. Department of Justice (the "Antitrust Division"), under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, (the "HSR Act"). Under the HSR Act, America West and Group are required to make pre-merger notification filings at the expiration or early termination of the statutory waiting period prior to completing the Merger. On May 23, 2005, America West and Group each filed a Premerger Notification and Report Form with the Antitrust Division and the U.S. Federal Trade Commission (the "FTC"). The initial waiting period expired on June 23, 2005, without America West or Group having received notice of a second request.

There can be no assurance that other government agencies, including state attorneys general, or a private party, could not also initiate action to challenge the Merger before or after it is completed. Any such challenge to the Merger could result in restrictions or conditions that would have a material adverse effect on the combined company if the Merger is completed. These restrictions and conditions could include operating restrictions, or the divestiture, spin-off or the holding separate of assets or businesses. Under the terms of the Merger Agreement, America West and Group, if requested by America West, are required to commit to any divestitures, licenses or hold separate or similar arrangements with respect to its assets or conduct of business arrangements if that divestiture, license, holding separate or arrangement is a condition to obtain any approval from any governmental entity in order to complete the merger and would not have a material adverse effect on the combined company. Group may condition any divestiture, license or hold separate or similar arrangement upon the completion of the Merger. No additional stockholder approval is expected to be required or sought for any decision by America West or Group, after the America West special meeting, to agree to any terms and conditions necessary to resolve any regulatory objections to the Merger.

Certain of the Plan Investors are also required to file notifications under the HSR Act and obtain regulatory approvals. The waiting periods applicable to those Plan Investors expired on or before June 27, 2005.

(b)    *Other Regulatory Approvals*

America West and Group are regulated by various federal, state and foreign regulatory authorities that exercise broad powers, generally governing activities such as operations, safety, financial reporting, security and certain mergers, consolidations and acquisitions. The airline industry is subject to possible regulatory and legislative changes that may affect the economics of the industry by requiring changes in operating practices or by affecting the cost of providing services.

In addition to the required filings under the HSR Act, completion of the Merger is conditioned on America West and Group supplying or obtaining certain notices, reports, filings, consents, registrations, approvals, permits or authorizations with, from or to the U.S. Department of Transportation ("DOT"), the Federal Aviation Administration ("FAA"), the Federal Communications Commission ("FCC"), the Department of Homeland Security and the Air Transportation Stabilization Board (the "ATSB").

America West and Group must also either notify or obtain consent from certain foreign regulatory agencies. Pursuant to the terms of the Merger Agreement, Group and America West are required to file a notification with, and obtain approval from, the German Federal Cartel Office or Bundeskartellamt. Such approval was granted in June 2005.

    (c)        *Approvals of the Air Transportation Stabilization Board*

        Pursuant to a loan agreement partially guaranteed by the ATSB (the "AWA ATSB Loan"), America West will require the consent of the ATSB to complete the Merger. On January 18, 2002, AWA closed the AWA ATSB Loan, a $429 million loan supported by a $380 million guarantee provided by the ATSB. America West fully and unconditionally guaranteed the payment of all principal, premium, interest and other obligations outstanding under the AWA ATSB Loan, and has pledged the stock of AWA to secure its obligations under such guarantee. The loan balance is currently $300.3 million. Principal amounts under the AWA ATSB Loan are due in ten installments of $42.9 million on each March 31 and September 30, commencing on March 31, 2004 and ending on September 30, 2008. Principal amounts outstanding under the AWA ATSB Loan bear interest at a rate per annum equal to LIBOR plus 40 basis points, and the portion of the AWA ATSB Loan guaranteed by the ATSB is subject to a guarantee fee of 8% per year.

        The AWA ATSB Loan requires that AWA maintain a minimum unrestricted cash balance of $100 million. In addition, the loan contains customary affirmative covenants and the following negative covenants: restrictions on liens, investments, restricted payments, fundamental changes, asset sales and acquisitions, the creation of new subsidiaries, sale and leasebacks, transactions with affiliates, the conduct of business, mergers or consolidations, issuances and dispositions of capital stock of subsidiaries, and amendments to other indebtedness. The AWA ATSB Loan contains customary events of default, including payment defaults, cross-defaults, breach of covenants, bankruptcy and insolvency defaults and judgment defaults.

        Subject to certain exceptions, America West is required to prepay the AWA ATSB Loan upon a change in control and may be required to prepay portions of the loan if America West's employee compensation costs exceed a certain threshold.

        As part of its reorganization under the prior bankruptcy, USAI also received a $900 million loan guarantee under the Air Transportation Safety and System Stabilization Act from the ATSB in connection with a $1 billion term loan financing that was funded on March 31, 2003. Group required this loan and related guarantee in order to provide the additional liquidity necessary to carry out its 2003 plan of reorganization. USAI is the primary obligor under the ATSB Loan, which is guaranteed by Group and each of its other domestic subsidiaries. The ATSB Loan is secured by substantially all of the present and future assets of the Debtors not otherwise encumbered (including certain cash and investment accounts, previously unencumbered aircraft, aircraft engines, spare parts, flight simulators, real property, takeoff and landing slots, ground equipment and accounts receivable), other than certain specified assets, including assets which are subject to other financing agreements. See Section V.C.1 of this Disclosure Statement for more information about the ATSB Loan.

        On July 22, 2005, the Debtors, America West and the ATSB reached an agreement in principle regarding modifications to the ATSB Loan and to the AWA ATSB Loan. Upon the consummation of such modifications on the Effective Date, which will also constitute the treatment for the ATSB's Claims against the Debtors in the Chapter 11 Cases, the ATSB will waive its right to require the prepayment in full of the the AWA ATSB Loan in connection with the Merger. Further detail regarding the terms of the agreement in principle among the Debtors, America West and the ATSB is included below at Section V.C.1.

    6.        *Major Conditions to Consummation of the Merger.*

    (a)        *Conditions to Each Party's Obligations to Effect the Merger*

        The respective obligations of each of Group, Barbell and America West to complete the Merger are conditioned upon the satisfaction or waiver prior to the effective time of the Merger of each of the following conditions:

- the Merger Agreement must have been duly adopted by holders of a majority of the outstanding shares of America West common stock entitled to vote on the matter in

accordance with applicable law and America West's certificate of incorporation and bylaws;

- all approvals and authorizations required to be obtained from the ATSB, DOT and FAA for the completion of the Merger must have been obtained;

- all other governmental consents required to be obtained from any governmental entities for the completion of the Merger must have been obtained (subject to certain exceptions);

- all other governmental consents the failure of which to make or obtain would, individually or in the aggregate, provide a reasonable basis to conclude that America West or its directors or officers would be subject to the risk of criminal liability, must have been made or obtained;

- no governmental entity of competent jurisdiction must have enacted, issued, promulgated, enforced or entered any order or law that is in effect and restrains, enjoins, makes illegal or otherwise prohibits completion of the Merger or the other transactions contemplated by the Merger Agreement, except for orders of governmental entities outside the United States as would not, individually or in the aggregate, reasonably be expected to have a specified material adverse effect and which do not provide a reasonable basis to conclude that America West, Group or their respective directors or officers would be subject to the risk of criminal liability;

- the registration statement relating to the shares of New Common Stock to be issued pursuant to the Merger Agreement must have been declared effective by the SEC under the Securities Act and no stop order suspending its effectiveness will have been issued by the SEC and no proceedings for that purpose will have been initiated or threatened by the SEC;

- the Plan, in form and substance reasonably acceptable to each of Group and America West, must have been confirmed by the Court pursuant to a confirmation order in form and substance reasonably acceptable to each of Group and America West, and such confirmation order must have become a final order;

- in connection with the emergence of Group from bankruptcy and the completion of the Plan, Group must have received from the Plan Investors on or before the effective time of the Merger, cash equity investments of not less than $375 million, such equity investments to be made substantially on the basis set forth in the Investment Agreements; and

- all agreements and Court orders entered into, modified or otherwise effected pursuant to or in connection with the Merger Agreement or the Plan must be in form and substance reasonably acceptable to each of Group and America West.

    *(b)        Conditions to Obligations of Group*

The obligations of Group to effect the Merger are subject to the satisfaction or waiver by Group at or prior to the effective time of the Merger of certain conditions, including the following:

- each of the representations and warranties made by America West in the Merger Agreement must be true and correct in all respects as of the date of the Merger Agreement and as of the closing date as though made on and as of the closing date (except to the extent any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date) except where the failure of that representation and warranty to be true and correct would not, individually or in the aggregate, reasonably be expected to have a

specified material adverse effect on America West, and Group must have received a certificate as to the foregoing from the chief executive officer or chief financial officer of America West;

- America West must have performed in all material respects all obligations required to be performed by it under the Merger Agreement at or prior to the closing date, and Group must have received a certificate as to the foregoing from the chief executive officer or chief financial officer of America West;

- no governmental entity of competent jurisdiction must have instituted (or if instituted, must not have withdrawn) any suit, action or proceeding seeking any order which would, in the reasonable judgment of Group, individually or in the aggregate, be reasonably likely to result in the failure of the condition described in the fifth bullet point under Section III.C.6(a) above;

- America West must have obtained the consent or approval of each person whose consent or approval will be required under any material contract to which America West or any of its subsidiaries is a party in connection with the transactions contemplated by the Merger Agreement, except where the failure to obtain such consent or approval, individually or in the aggregate, would not reasonably be expected to result in a specified material adverse effect on America West; and

- Group must have received the opinion of Arnold & Porter LLP, counsel to Group, in form and substance reasonably satisfactory to Group, dated the closing date, substantially to the effect that the Merger will be treated for federal income tax purposes as a reorganization within the meaning of Section 368(a) of the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code").

    *(c)*      *Conditions to Obligations of America West*

The obligations of America West to effect the Merger are subject to the satisfaction or waiver by America West at or prior to the effective time of the Merger of certain conditions, including the following:

- each of the representations and warranties made by Group in the Merger Agreement must be true and correct in all respects as of the date of the Merger Agreement and as of the closing date as though made on and as of the closing date (except to the extent any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date) except where the failure of such representations and warranties to be true and correct would not, individually or in the aggregate, reasonably be expected to have a specified material adverse effect on Group, and America West must have received a certificate as to the foregoing from the chief executive officer or chief financial officer of Group;

- each of Group and Barbell must have performed in all material respects all obligations required to be performed by it under the Merger Agreement at or prior to the closing date, and America West must have received a certificate as to the foregoing from the chief executive officer or chief financial officer of Group and Barbell;

- no governmental entity of competent jurisdiction must have instituted (or if instituted, must not have withdrawn) any suit, action or proceeding seeking any order which would, in the reasonable judgment of America West, individually or in the aggregate, be reasonably likely to result in the failure of the condition described in the fifth bullet point under Section III.C.6(a) above;

- Group must have obtained the consent or approval of each person whose consent or approval will be required under any material contract to which Group or any of its subsidiaries is a party in connection with the transactions contemplated by the Merger

14

Agreement, except where the failure to obtain such consent or approval, individually or in the aggregate, would not reasonably be expected to result in a specified material adverse effect on Group;

- America West must have received the opinion of Skadden, Arps, Slate, Meagher & Flom LLP, counsel to America West, in form and substance reasonably satisfactory to America West, dated the closing date, substantially to the effect that the Merger will be treated for federal income tax purposes as a reorganization within the meaning of Section 368(a) of the Internal Revenue Code; and

- immediately prior to the effective time of the Merger, there must not exist more than $10 million of Administrative Claims, including contingent liabilities, arising out of or related to any Group compensation and benefit plan that is subject to Section 302 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") or Section 412 of the Internal Revenue Code, other than any claims relating to amounts incurred in the ordinary course of Group's business.

7.      *Representations, Warranties, Covenants and Agreements.*

The Merger Agreement contains customary and substantially reciprocal representations and warranties by each of Group and America West. Parties-in-interest are referred to the Merger Agreement, a copy of which is attached as an exhibit to the Plan, for a complete statement of the parties' representations and warranties. The assertions embodied in those representations and warranties are qualified by information in confidential disclosure letters that Group and America West exchanged in connection with the signing of the Merger Agreement. While Group and America West do not believe that the disclosure letters contain information that the securities laws require Group and America West to publicly disclose other than information that has already been so disclosed, the disclosure letters may contain information that modifies, qualifies and creates exceptions to the representations and warranties in the Merger Agreement. Accordingly, holders of Claims and Interests should not rely on any of those representations and warranties as characterizations of the actual state of facts because they may be modified in important responses by the underlying disclosure letters. Moreover, information concerning the subject matter of the representations and warranties may have changed since the date of the Merger Agreement.

The Merger Agreement contains covenants and agreements by the parties to conduct their businesses and the businesses of their respective subsidiaries in the ordinary and usual course pending consummation of the Merger, and to maintain existing relations and goodwill with governmental entities, customers, suppliers, distributors, creditors, lessors, employees and business associates and keep available the services of present employees and agents of the parties and their respective subsidiaries. The Merger Agreement also contains certain negative covenants, including but not limited to an agreement by the parties not to knowingly take or permit any of their respective subsidiaries to take any action or refrain from taking any action that would be reasonably and foreseeably likely to prevent the closing conditions in the Merger Agreement not to be satisfied. Parties-in-interest are referred to the Merger Agreement for a complete description of the parties' covenants and agreements.

8.      *Termination of the Merger Agreement.*

(a)      *Termination by Mutual Consent*

The Merger Agreement may be terminated and the Merger may be abandoned at any time prior to the effective time of the Merger by action taken by the board of directors of the terminating party or parties by mutual written consent of America West and Group, whether before or after the adoption of the Merger Agreement by America West stockholders or the entry of the order confirming the Plan.

(b)      *Termination by either America West or Group*

Either America West or Group may terminate the merger under the following circumstances:

15

- the Merger is not completed by October 31, 2005, whether such date is before or after the adoption of the Merger Agreement by America West's stockholders or the entry of the order confirming the Plan, unless the closing conditions described in the second, third, fourth, sixth and seventh bullet points under Section III.C.6(a) above have not been satisfied by October 31, 2005, in which case the termination date may be extended from time to time by either Group or America West one or more times to a date not beyond December 31, 2005;

- the adoption of the Merger Agreement by America West's stockholders is not obtained at the stockholders meeting or at any adjournment or postponement of such meeting;

- any order of a governmental entity permanently restraining, enjoining or otherwise prohibiting the completion of the Merger becomes final and non-appealable, except for any orders the existence of which would not result in the failure of the closing condition described in the fifth bullet point under Section III.C.6(a) above (whether before or after the adoption of the Merger Agreement by America West's stockholders).

The foregoing rights to terminate the Merger Agreement will not be available to any party that has breached its obligations under the Merger Agreement in any manner that will have proximately contributed to the occurrence of the failure of a condition to the completion of the Merger.

     *(c)*     *Termination by America West*

The Merger Agreement may be terminated and the Merger may be abandoned at any time prior to the effective time of the Merger by America West if, whether before or after the adoption of the Merger Agreement by America West's stockholders:

- without the consent of America West, Group enters into or seeks authority from the Court to enter into (or does not object to efforts by any other party to have Group enter into) a binding written agreement concerning any qualified competing plan proposal;

- the America West board of directors authorizes America West, subject to complying with the terms of the Merger Agreement, to enter into a binding written agreement concerning a transaction that constitutes a superior proposal;

- there is a breach of any representation, warranty, covenant or agreement made by Group or Barbell in the Merger Agreement, or any representation or warranty becomes untrue or incorrect after the execution of the Merger Agreement, such that closing conditions to America West's obligation to effect the Merger would not be satisfied and such breach or failure to be true and correct is not curable within 60 days of America West providing notice of such breach or failure to Group;

- Group knowingly, materially and not inadvertently breaches any of its obligations under the Merger Agreement relating to acquisition proposals; or

- Group withdraws the Plan after it is filed with the Court, Group ceases to seek actively to have the Plan confirmed by the Court (or does not actively contest efforts by another person to cause the Plan not to be so confirmed) or 20 days after the Court enters an order denying confirmation of the Plan.

     *(d)*     *Termination by Group*

The Merger Agreement may be terminated and the Merger may be abandoned at any time prior to the effective time of the Merger by Group if, whether before or after the adoption of the Merger Agreement by America West's stockholders:

- the board of directors of America West withdraws, modifies or qualifies, or agrees to withdraw, modify or qualify, in fact or in substance, its adoption of the Merger Agreement or its recommendation of the Merger in a manner adverse to Group;

- America West enters into a binding written agreement concerning a transaction that constitutes a superior proposal;

- Group, by duly authorized action, is authorized to enter into a binding written agreement concerning a transaction that constitutes an approved proposal;

- there is a breach of any representation, warranty, covenant or agreement made by America West, or any such representation or warranty becomes untrue or incorrect after the execution of the Merger Agreement, such that closing conditions to Group's obligation to effect the Merger would not be satisfied and such breach or failure to be true or correct is not curable within 60 days of Group providing notice of such breach or failure to America West;

- by the later of 120 days after the date of the Merger Agreement or 60 days after effectiveness of the registration statement to be filed under the Securities Act with respect to the shares of New Common Stock to be issued in the Merger, America West's stockholders meeting is not held, or the vote of America West's stockholders is not taken, unless America West has used its reasonable best efforts to convene the stockholders meeting and hold that vote by the later of such dates; or

- America West knowingly, materially and not inadvertently breaches its obligations under the Merger Agreement relating to acquisition proposals.

### (e)     Effect of Termination

If the Merger Agreement is terminated and the Merger is abandoned as described above, the Merger Agreement will be void and of no effect, with no liability on the part of any party to the Merger Agreement, except that certain designated provisions of the Merger Agreement, including the payment of fees and expenses, the confidential treatment of information and, if applicable, the termination fee described below will survive the termination. Termination of the Merger Agreement does not relieve or release either party from liabilities or damages arising out of the party's willful breach of any provision of the Merger Agreement.

### (f)     Termination Fees and Expenses

The Merger Agreement and the Procedures provide for payment of a termination fee in the amount of $15 million (inclusive of expenses) by America West to Group (the "Group Termination Fee") or by Group to America West (the "America West Termination Fee"). Unlike many situations, in which a break-up or termination fee is negotiated only for the benefit of the nondebtor "stalking horse" bidder, in this case the termination fee between the Debtors and America West is effectively equal and bilateral. Each party has invested substantial time and resources in the negotiation of the Merger Agreement. In pursuing the Merger Agreement, each party may have chosen to forgo the opportunity to explore other potential transactions, and each party has legitimate economic interests in having the other party close the Merger Agreement.

### (i)     The Group Termination Fee

America West will promptly, but in no event later than two days after the date of termination, pay to Group the Group Termination Fee, if:

- a bona fide acquisition proposal relating to at least 40% of the assets or equity interests of America West and its subsidiaries taken as a whole, is made to America West or any of

its subsidiaries or its stockholders and that proposal becomes publicly known, or any person publicly announces an intention, whether or not conditional, to make such a proposal with respect to America West or any of its subsidiaries, and that proposal or announced intention are not withdrawn at the time of the America West stockholders meeting, and either Group or America West terminates the Merger Agreement because the adoption of the Merger Agreement by America West's stockholders was not obtained at the stockholders meeting or at any adjournment or postponement of that meeting;

- Group terminates the Merger Agreement because by the later of 120 days after the date of the Merger Agreement or 60 days after effectiveness of the relevant registration statement, America West's stockholders meeting has not been held, or the vote of America West's stockholders has not been taken unless America West has used its reasonable best efforts to convene the stockholders meeting and hold the vote by the later of those dates;

- Group terminates the Merger Agreement because the board of directors of America West withdraws, modifies or qualifies, or agrees to withdraw, modify or qualify, in fact or in substance, its adoption of the Merger Agreement or its recommendation of the Merger in a manner adverse to Group;

- Group terminates the Merger Agreement because America West enters into a binding written agreement concerning a transaction that constitutes a superior proposal;

- Group terminates the Merger Agreement because America West knowingly and materially and not inadvertently breaches its obligations under the Merger Agreement relating to acquisition proposals;

- Group terminates the Merger Agreement because there is any knowing, material and not inadvertent breach of any covenant or agreement made by America West such that closing conditions to Group's obligation to effect the Merger would not be satisfied and that breach is not curable within 60 days of Group providing notice of the breach or failure to America West; or

- America West terminates the Merger Agreement because its board of directors authorizes America West to enter into a binding written agreement concerning a transaction that constitutes a superior proposal.

No termination fee will be payable to Group in the case described in the first bullet point above unless and until:

- any person other than Group acquires, by purchase, sale, assignment, lease, transfer or otherwise, in one transaction or any series of related transactions, within 18 months of that termination, a majority of the voting power of America West's outstanding securities or all or substantially all of the assets of America West or enters into an agreement with America West for such an acquisition within 18 months of that termination; or

- a merger, consolidation or similar business combination is completed between America West or one of its subsidiaries and such an acquiring party within that 18 month period.

If America West fails to promptly pay the Group Termination Fee and related expenses and, in order to obtain that payment, Group or Barbell commences a lawsuit which results in judgment against America West for the Group Termination Fee or related expenses, then America West will pay Group or Barbell its costs and expenses, including attorneys' fees, in connection with the lawsuit with interest on the delinquent Group Termination Fee at Citibank's prime rate effective at the time the Group Termination Fee was due. If the Group Termination Fee and/or out-of-pocket expenses are paid by America West, those amounts will be Group's and Barbell's sole and exclusive remedy for monetary damages under the Merger Agreement.

(ii)    *The America West Termination Fee*

Group will promptly, but in no event later than two days after the date of termination, pay to America West the America West Fee, if:

- America West terminates the Merger Agreement because Group, without the consent of America West, enters into or seeks authority from the Court to enter into, or does not object to efforts by any other party to have Group enter into, a binding written agreement concerning any qualified competing plan proposal;

- America West terminates the Merger Agreement because Group knowingly and materially and not inadvertently breaches its obligations under the Merger Agreement relating to acquisition proposals;

- America West terminates the Merger Agreement because Group withdraws the Plan after it has been filed with the Court, Group ceases to seek actively to have the Plan confirmed by the Court, or does not actively contest efforts by another person to cause the Plan not to be so confirmed, or 20 days after the Court enters an order denying confirmation of the Plan;

- Group terminates the Merger Agreement because its board of directors authorizes Group to enter into a binding written agreement concerning a transaction that constitutes an approved proposal; or

- America West terminates the Merger Agreement because there is any knowing, material and not inadvertent breach of any covenant or agreement made by Group such that closing conditions to America West's obligation to effect the Merger would not be satisfied and that breach is not curable within 60 days of America West providing notice of that breach or failure to Group.

If Group fails to promptly pay the America West Termination Fee and related expenses and, in order to obtain that payment, America West commences a lawsuit which results in judgment against Group for the America West Termination Fee or related expenses, then Group will pay America West its costs and expenses, including attorneys' fees, in connection with the lawsuit with interest on the delinquent America West Termination Fee at Citibank's prime rate effective at the time the America West Termination Fee was due. If the America West Termination Fee and/or out-of-pocket expenses are paid by Group, those amounts will be America West's sole and exclusive remedy for monetary damages under the Merger Agreement. However, notwithstanding the preceding sentence, in the event that the Merger Agreement is validly terminated by America West in the case described in the second bullet point above, then in addition to Group paying the America West Termination Fee, America West is also entitled to seek any other additional remedy at law or equity, including, but not limited to, injunctive relief from the Court and damages sustained by America West (to the extent the amount of those damages exceeds $15 million).

(iii)    *Bankruptcy Treatment of the America West Termination Fee*

In event that America West becomes entitled to be paid the America West Termination Fee, the Bidding Procedures Order provides that such claim will be treated as an administrative priority expense pursuant to Sections 503(b) and 507(a)(1) of the Bankruptcy Code, without the need for any application, motion or further Court order, payable within two business days of the event triggering the payment, in accordance with the terms of the Merger Agreement. If the America West Termination Fee is paid to America West, then America West shall not be entitled to assert any other claim against the Debtors or their estates related to the Merger Agreement; provided, however, that if the Debtors "knowingly and materially and not inadvertently" breached any of their obligations under Section 4.4 of the Merger Agreement (primarily relative to the exclusivity of the transaction) America West may, at its option,

pursuant to Section 6.5(d) of the Merger Agreement, attempt to prove and recover damages in excess of the termination fee as well as seek injunctive or other equitable relief.

**D.      Equity Investments from the Plan Investors**

An integral part of the Merger is the investment of $565 million in new equity by the six Plan Investors: Eastshore Aviation, LLC ("Eastshore"), ACE Aviation Holdings Inc. ("ACE"), Par Investment Partners, L.P. ("Par"), Peninsula Investment Partners, L.P. ("Peninsula"), Wellington Management Company, LLP (as investment advisor to each investor listed on Schedule 1 to the Wellington Investment Agreement) ("Wellington"), Tudor Proprietary Trading L.L.C., and Tudor Investment Corp. (as investment advisor to each investor listed on Schedule 1 to the Tudor Investment Agreement, other than Tudor Proprietary Trading L.L.C.,) ("Tudor").

Eastshore is an investment entity affiliate of Air Wisconsin that has extended junior debtor-in-possession financing to the Debtors in the amount of $125 million, which is convertible to equity in the form of 8,333,333 shares of New Common Stock upon consummation of the Merger and the Effective Date. ACE is the corporate parent of Air Canada and its affiliates, and will invest $75 million in exchange for 5,000,000 shares of New Common Stock. Par is a Boston-based equity fund that controls a $1 billion portfolio. Par will invest not less than $100,000,005 in exchange for 6,768,485 shares of New Common Stock. Peninsula is a Virginia-based investment firm that will invest not less than $49,999,995 in exchange for 3,333,333 shares of New Common Stock. A group of investors under the management of Wellington, a Boston-based asset management firm, will invest $149,999,850 in exchange for 9,090,900 shares of New Common Stock. A group of investors under the management of Tudor, a Connecticut-based asset management firm, will invest $65,000,001 in exchange for 3,939,394 shares of New Common Stock. The Debtors' agreements with each of the Plan Investors are described below.

_1._      _Eastshore Junior Debtor-in-Possession Financing and Investment Transactions._

_(a)_      _Junior Debtor-in-Possession Financing_

On February 18, 2005, the Debtors entered into the Junior Debtor-in-Possession Credit Facility Agreement (the "Eastshore Financing Agreement") with Eastshore, an investment entity affiliate of Air Wisconsin Airlines Corp. ("Air Wisconsin"). The agreement provides for USAI, as Borrower, with the other Debtors as guarantors, to borrow a total of $125 million from Eastshore in three tranches of $75 million, $25 million and $25 million, respectively. The first tranche of $75 million was advanced to USAI on March 1, 2005, following entry of the Bankruptcy Court's order approving the Eastshore Financing Agreement on February 28, 2005, the second tranche of $25 million was advanced on April 4, 2005 and the Debtors intend to draw the third tranche of $25 million in accordance with the terms and conditions of the Eastshore Financing Agreement in August 2005.

The Eastshore Financing Agreement provides that borrowings thereunder will be collateralized by a lien on all assets of the Debtors currently securing the Debtors' obligations to the ATSB Lenders under the ATSB Loan and the ATSB Cash Collateral Order, junior only to such liens of the ATSB Lenders thereon. The Eastshore Financing Agreement further provides that in the event that the Debtors fail to prepay the Eastshore Financing Agreement as provided for therein, the $125 million loan will be repaid with shares of New Common Stock (the "Shares Repayment Alternative").

In consideration of Eastshore's entry into and performance under the Eastshore Financing Agreement, USAI entered into a Jet Services Agreement with Air Wisconsin, whereby the Debtors agreed to accept up to 70 CRJ-200 fifty seat regional jets for flying in the Debtors' system.

The Debtors and Eastshore subsequently reached an agreement on an amendment to the Eastshore Financing Agreement (the "Junior DIP Amendment") and on May 19, 2005, entered into the Eastshore Investment Agreement described below. The Junior DIP Amendment, for the most part, amends the Eastshore Financing Agreement to make appropriate changes resulting from the Merger and the agreements

with the other Plan Investors described in this Section III.D and removes certain of the conditions relating to Shares Repayment Alternative and replaces those conditions with the Eastshore Investment Agreement.

(b)  <em>The Eastshore Investment Agreement</em>

In connection with the Shares Repayment Alternative, the Debtors, America West and Eastshore are parties to an investment agreement (the "Eastshore Investment Agreement"), which was contemplated by the Eastshore Financing Agreement. The Eastshore Investment Agreement provides that upon the Effective Date and concurrent with the closing of the Merger, pursuant to the Shares Repayment Alternative, Group will issue to Eastshore 8,333,333 shares of New Common Stock, and Eastshore will have the right to designate one member of the Board of Directors of Reorganized Group.

The Eastshore Investment Agreement contains customary representations and warranties. Eastshore may terminate the Eastshore Investment Agreement if: (i) closing of the Merger Agreement and the Investment Agreements has not occurred on or before December 31, 2005; (ii) the Merger Agreement shall have been terminated in accordance with its terms on or before December 31, 2005; (iii) Group or America West breaches any material representation, warranty, covenant or agreement under the Eastshore Investment Agreement in any material respect and such breach remains uncured for 30 days following written notice by Eastshore to Group and America West; (iv) any of the conditions to Eastshore's obligations under the Eastshore Investment Agreement is not capable of being satisfied; (v) Group enters into a written agreement or letter of intent or agreement in principle providing for an alternative proposal; or (vi) the Court orders Group to terminate the Eastshore Investment Agreement in order to accept an alternative proposal.

In connection with the Eastshore Transaction, the Debtors have agreed to reimburse Eastshore for its reasonable out-of-pocket expenses in an amount not to exceed $350,000, including the reasonable fees, charges and disbursements of Eastshore's counsel, plus filing fees incurred in connection with any required filings under the HSR Act.

2.  <em>The ACE Agreements.</em>

Group and ACE are parties to an investment agreement (the "ACE Investment Agreement"). In addition, America West, Group and ACE (or subsidiaries of ACE) are parties to four separate memoranda of understanding relating to definitive commercial agreements to be entered into on market terms in an effort to capitalize on synergies that exist among America West, Group and ACE (the "ACE Synergy Agreements").

(a)  <em>The ACE Synergy Agreements</em>

Through the ACE Synergy Agreements, America West, Group and ACE will each obtain various benefits as a result of services, goods, or traffic provided by the other. The ACE Synergy Agreements will reflect the following memoranda of understanding:

- A memorandum of understanding among Air Canada Technical Services ("ACTS"), AWA and USAI in anticipation of definitive agreements under which ACTS will, consistent with prior existing constraints, have the opportunity to provide for a term of five years all aircraft engine, aircraft component, and aircraft heavy maintenance for AWA and USAI to the extent that it can do so on a competitive basis versus other providers taking into consideration price, terms and conditions. As part of these arrangements, ACTS will have a right of first offer with respect to maintenance related facilities or equipment to be sold by AWA or USAI. The parties will also enter into an agreement under which ACTS will subcontract with AWA and USAI to provide on-call aircraft maintenance services to Air Canada in the United States and AWA and USAI will contract with ACTS to provide each of them with on-call aircraft maintenance services in Canada.

21