- A memorandum of understanding among ACE, America West and Group under which, in the event that Reorganized Group plans to increase the number of 70 or 90 seat regional jet U.S. – Canada trans-border flights operated as US Airways Express or America West Express, then Air Canada Jazz will have the right, for a period of five years from the date of the closing, to provide those flights using its 70 or 90 seat jet aircraft provided that Air Canada Jazz is competitive on price, terms and conditions and subject to entry into a definitive agreement thereon comparable to those in effect with carriers operating as US Airways Express or America West Express as well as obtaining necessary regulatory and labor approvals.

- A memorandum of understanding among ACE, AWA and USAI in anticipation of and subject to entry into definitive agreements for five-year terms, but not beyond five years from the date of the closing, under which each of AWA and USAI may provide certain airport facilities and ground handling services in the United States to ACE and under which ACE may provide certain ground handling services in Canada to AWA and USAI.

- A memorandum of understanding among ACE, AWA and USAI in anticipation of a definitive agreement under which each will operate flights under the others' codes, commonly known as a "code share agreement."

Although certain aspects of the ACE Synergy Agreements may be implemented prior to the consummation of the Merger, all of these agreements will be terminable by the Debtors and America West if ACE does not make an investment of $75 million into the Reorganized Debtors. Although the code share agreement is subject to regulatory approval, and the investment by ACE is not conditioned on obtaining such regulatory approval, the Debtors believe that it is highly likely that such approval will be obtained.

*(b)    The ACE Investment Agreement*

The ACE Investment Agreement provides that upon the effective date of the Plan and concurrent with the closing of the Merger, ACE will invest not less than $75 million in Reorganized Group (the "ACE Investment"). In exchange for the ACE Investment, Reorganized Group will issue to ACE 5,000,000 shares of New Common Stock, and ACE will have the right to designate one member of the Board of Directors of Reorganized Group, subject to certain conditions.

The ACE Investment Agreement contains customary representations and warranties, and funding by ACE will be subject to customary closing conditions and satisfaction or waiver of certain specific closing conditions. The Debtors have agreed to reimburse ACE for its reasonable out-of-pocket expenses incurred in connection with the ACE Agreements, as set forth in the ACE Investment Agreement, in an amount not to exceed $350,000 plus filing fees incurred in connection with any required filings under the HSR Act.

ACE may terminate the ACE Investment Agreement if: (i) closing of the Merger Agreement and the Investment Agreements has not occurred on or before December 31, 2005; (ii) the Merger Agreement has been terminated in accordance with its terms on or before December 31, 2005; (iii) Group or America West breaches any material representation, warranty, covenant or agreement under the ACE Investment Agreement in any material respect and such breach remains uncured for 30 days following written notice by ACE to Group and America West; (iv) any of the conditions to ACE's obligations under the ACE Investment Agreement is not capable of being satisfied; (v) Group enters into a written agreement or letter of intent or agreement in principle providing for an alternative proposal; or (vi) the Court orders Group to terminate the ACE Investment Agreement in order to accept an alternative proposal.

If (i) the transactions contemplated by the ACE Investment Agreement are not consummated, (ii) ACE is not in breach of the ACE Investment Agreement, and (iii) an alternative transaction is consummated, ACE will be entitled to receive a break-up fee equal to $2,250,000 (the "ACE Break-Up Fee").

   3.   *The Par Investment Agreement.*

The Debtors, America West and Par are parties to an investment agreement (the "Par Investment Agreement"). The Par Investment Agreement provides that upon the Effective Date and concurrent with the closing of the Merger, Par will invest not less than $100,000,005 in Reorganized Group (the "Par Investment"). In exchange for the Par Investment, Reorganized Group will issue to Par 6,768,485 shares of New Common Stock, and Par will have the right to designate one member of the Board of Directors of Reorganized Group.

The Par Investment Agreement contains customary representations and warranties, and funding by Par will be subject to customary closing conditions and satisfaction and waiver of certain specific closing conditions. The Debtors have agreed to reimburse Par for its reasonable out-of-pocket expenses incurred in connection with the Par Transaction, as set forth in the Par Investment Agreement, in an amount not to exceed $350,000 plus filing fees incurred in connection with any required filings under the HSR Act.[6]

Par may terminate the Par Investment if: (i) closing of the Merger Agreement and the Investment Agreements has not occurred on or before December 31, 2005; (ii) the Merger Agreement has been terminated in accordance with its terms on or before December 31, 2005; (iii) Group or America West breaches any material representation, warranty, covenant or agreement under the Par Investment Agreement in any material respect and such breach remains uncured for 30 days following written notice by Par to Group and America West; (iv) any of the conditions to Par's obligations under the Par Investment Agreement is not capable of being satisfied; (v) Group enters into a written agreement or letter of intent or agreement in principle providing for an alternative proposal; or (vi) the Court orders Group to terminate the Par Investment Agreement in order to accept an alternative proposal.

As set forth in the Par Investment Agreement, if (i) the transactions contemplated by the Par Investment Agreement are not consummated, (ii) Par is not in breach of the Par Investment Agreement, and (iii) an alternative transaction is consummated pursuant to a plan of reorganization, Par will be entitled to receive a break-up fee equal to $3,000,000 (the "Par Break-Up Fee").

   4.   *The Peninsula Investment Agreement.*

The Debtors, America West and Peninsula are parties to an investment agreement (the "Peninsula Investment Agreement"). The Peninsula Investment Agreement provides that upon the Effective Date and concurrent with the closing of the Merger, Peninsula will invest not less than $49,999,995 in Reorganized Group (the "Peninsula Investment"). In exchange for the Peninsula Investment, Reorganized Group will issue to Peninsula 3,333,333 shares of New Common Stock.

The Peninsula Investment Agreement contains customary representations and warranties, and funding by Peninsula will be subject to customary closing conditions and satisfaction and waiver of certain specific closing conditions. The Debtors have agreed to reimburse Peninsula for its reasonable out-of-pocket expenses relating to the enforcement of Peninsula's rights under the Term Sheet dated May 9, 2005, the Peninsula Investment Agreement, and/or the Stockholders Agreement (described below), plus filing fees incurred in connection with any required filings under the HSR Act.[7]

---

[6] In connection with the Par Investment Agreement, Par and America West entered into a Participation Agreement that provides for sharing of additional stock allocable to America West in the event that Par is replaced by a different financial investor.

[7] In connection with the Peninsula Investment Agreement, Peninsula and America West entered into a Participation Agreement that provides for sharing of additional stock allocable to America West in the event that Peninsula is replaced by a different financial investor.

23

Peninsula may terminate the Peninsula Transaction if: (i) closing of the Merger Agreement and the Investment Agreements has not occurred on or before December 31, 2005; (ii) the Merger Agreement has been terminated in accordance with its terms on or before December 31, 2005; (iii) Group or America West breaches any material representation, warranty, covenant or agreement under the Peninsula Investment Agreement in any material respect and such breach remains uncured for 30 days following written notice by Peninsula to Group and America West; (iv) any of the conditions to Peninsula's obligations under the Peninsula Investment Agreement is not capable of being satisfied; (v) Group enters into a written agreement or letter of intent or agreement in principle providing for an Alternative Proposal; or (vi) the Court orders Group to terminate the Peninsula Investment Agreement in order to accept an Alternative Proposal.

As set forth in the Peninsula Investment Agreement, if (i) the transactions contemplated by the Peninsula Investment Agreement are not consummated, (ii) Peninsula is not in breach of the Peninsula Investment Agreement, and (iii) an alternative transaction is consummated pursuant to a plan of reorganization, Peninsula will be entitled to receive a break-up fee equal to $1,500,000 (the "Peninsula Break-Up Fee," and collectively with the America West Termination Fee, the Group Termination Fee, the Par Break-Up Fee, and the ACE Break-Up Fee, the "Break-Up Fees").

5.   *The Wellington Investment Agreement.*

The Debtors, America West, and Wellington are parties to an investment agreement (the "Wellington Investment Agreement") which provides for several investor funds to make an aggregate equity investment of $150 million in exchange for 9,090,900 shares of New Common Stock. The terms of the Wellington Investment Agreement, including but not limited to the parties' covenants, representations and warranties, are substantially similar to the investment agreements between Group and each of ACE, Eastshore, Par and Peninsula (the "Other Investment Agreements"), which are described above. The Other Investment Agreements, as well as certain additional agreements or term sheets to provide liquidity for purposes of the Plan, are conditioned upon a minimum equity raise of $375 million or $500 million, depending on the particular arrangement. Accordingly, the additional $150 million commitment from Wellington would allow the Debtors to meet their minimum equity raise obligations under all such agreements.

The Wellington Investment Agreement differs from the Other Investment Agreements in the following material respects:

- Per Share Purchase Price: Wellington will purchase new common stock at a per share purchase price of $16.50 per share, compared to the $15.00 per share price set forth in the Other Investment Agreements.

- Board Representation: Wellington will not be entitled to designate a director to Reorganized Group's board of directors.

- Break-Up Fee: Wellington will not be entitled to payment of a break-up fee.

- Expense Reimbursement: The Debtors have agreed to reimburse certain of Wellington's expenses in connection with the Wellington Investment in an amount not to exceed the sum of (i) $150,000 plus (ii) filing fees incurred in connection with filings under the HSR Act.

Other terms of the Wellington Investment Agreement differ from the terms of the Other Investment Agreements only to the extent necessary to reflect the amount of the Wellington Investment. As noted above, the Wellington investment will be included as part of the Debtors' Plan funding proposal. Accordingly, the investor funds under the Wellington Investment Agreement will be deemed to be and will be treated as Plan Investors, subject to the specific provisions of the Wellington Investment Agreement.

6. *The Tudor Investment Agreement.*

The Debtors, America West, Tudor Proprietary Trading, L.L.C. and Tudor are parties to an investment agreement (the "Tudor Investment Agreement") which provides for Tudor Proprietary Trading, L.L.C. and certain investors for which Tudor acts as investment adviser to make an aggregate equity investment of $65 million in exchange for 3,939,394 shares of New Common Stock. The terms of the Tudor Investment Agreement, including the parties' covenants, representations and warranties, are substantially similar to the Wellington Investment Agreement, which is described above. Other terms of the Tudor Investment Agreement differ from the terms of the Wellington Investment Agreement only to the extent necessary to reflect the amount of the Tudor investment and to properly reflect the terms of the Letter Agreement (as defined below). As noted above, the Tudor investment will be included as part of the Debtors' Plan funding proposal. Accordingly, the investor funds under the Tudor Investment Agreement will be treated as Plan Investors, subject to the specific provisions of the Tudor Investment Agreement.

7. *The Stockholders Agreement.*

The Investment Agreements contemplate that, at the closing of the Merger, each Plan Investor and Group will enter into the Stockholders Agreement. The Stockholders Agreement will provide that, subject to certain exceptions, each Plan Investor will agree not to transfer any of the shares of New Common Stock acquired pursuant to the Investment Agreements until six months following the closing under the Investment Agreements and that Reorganized Group will provide certain customary registration rights to the Plan Investors. The Stockholders Agreement will also provide for the appointment of up to three individuals designated by certain of the Plan Investors to be appointed to the board of directors of Reorganized Group as of the effective time of the Merger for a three-year term. In the case of ACE, the Stockholders Agreement will provide that (i) for so long as ACE holds at least 66.67% of the number of shares of New Common Stock acquired pursuant to its Investment Agreement, referred to as the ACE director threshold, ACE will be entitled to designate a director nominee for successive three-year terms, and (ii) if ACE falls below the ACE director threshold, ACE will cause its director designee to resign from the board of directors. In the case of the Plan Investors other than ACE who are entitled as of the effective time of the Merger to designate a director to the board of directors of Reorganized Group, the Stockholders Agreement will provide that (i) for so long as that Investor holds at least 35% of the number of shares of New Common Stock acquired pursuant to its Investment Agreement, referred to as the designating investor threshold, that Plan Investors will be entitled to designate a director nominee for successive three-year terms, and (ii) if any such Plan Investors falls below the designating director threshold, the designee of that Plan Investors will serve the remainder of that designee's term as a director, but that Plan Investors will no longer have the right to designate a director nominee under the Stockholders Agreement.

8. *The Letter Agreement*

On July 7, 2005, Group, America West, Barbell and each of the Plan Investors (other than Tudor), entered into a letter agreement (the "Letter Agreement"), attached to the Plan as <u>Exhibit W</u>, amending the Merger Agreement and the Investment Agreements (other than the Tudor Investment Agreement, which already contains the applicable provisions discussed below). The key provisions of the Letter Agreement are as follows:

(1) Clarification that Wellington and Tudor are considered "Equity Investors" and that each of the Wellington Investment Agreement and Tudor Investment Agreement are considered "Financing Commitments" for purposes of the Merger Agreement.

(2) Clarification of the provisions of the Merger Agreement and the ACE Investment Agreement with respect to the appointment of directors of Group at the effective time of the Merger, to clarify that if, prior to the closing, another investor agrees to invest more than $75 million, becomes entitled to designate a director and wishes to do so, ACE will waive its right to designate a director to accommodate the new equity investor.

(3) Amendment of the merger exchange ratio for the America West Class A common stock from 0.5306 to 0.5362 and the merger exchange ratio for the America West Class B common stock from 0.4082 to 0.4125 to give effect to the adjustment provided for below with respect to the Wellington Investment Agreement. In addition, the number of shares expected to be outstanding upon the closing of the Merger Agreement and effectiveness of the Plan is amended from 47,475,729 to 59,642,591 to reflect the investments by Wellington and Tudor.

(4) Amendment of Section 4.20 of the Merger Agreement relating to the circumstances under which additional shares would be issued to Par and Peninsula if Group and America West enter into an alternative transaction to the Merger in which Par and Peninsula are not permitted to invest. In addition, the Letter Agreement specifies that as a result of the Wellington Investment Agreement, upon closing of the investment under the Wellington Investment Agreement, additional shares of common stock will be allocated to the creditors of Group, the stockholders of America West, and Par, in order to allocate among these parties the increased value implied by the $16.50 per share price paid by Wellington (as opposed to the $15.00 per share price paid by other Plan Investors (other than Tudor)).

(5) The covenant of Group in the Investment Agreements not to issue or agree to issue additional equity securities of Group prior to the closing of the Investment Agreements is amended to reflect, among other things, that no such equity securities will be issued other than New Common Stock: (a) issued in a private offering, other than a rights offering to existing stakeholders of Group and America West, after July 7, 2005 at a price of not less than $16.50 a share and up to an aggregate amount of $85,000,000; (b) issued by Group prior to the effective date of the Merger for proceeds not to exceed the difference between $565,000,000 plus the amount raised in (5)(a) and $800,000,000 (which may be pursuant to a rights offering to existing stakeholders of Group and America West) at a price per share of no less than $16.50. The sole use of the proceeds raised in excess of $650,000,000 (whether pursuant to (5)(a) or (b)) shall be the repurchase of certain equity securities of Group at a repurchase price that implies a per share value of New Common Stock of no more than $16.50 per share. However, such proceeds in excess of $650,000,000 and up to $725,000,000 may be used for general corporate purposes if at least two-thirds of the Plan Investors (in terms of equity investment committed to Group) agree by written consent. Such proceeds in excess of $725,000,000 and up to $800,000,000 may be used for general corporate purposes if at least three-quarters of the Plan Investors (in terms of equity investment committed to Group) agree by written consent. Any repurchase of equity securities of the Plan Investors by Group is subject to certain conditions, including a right of first offer in favor of Eastshore for the first $50,000,000 of any such repurchase.

(6) Group may authorize and reserve for issuance under Group's equity incentive plans a number of shares of New Common Stock not to exceed 12.5% of the outstanding shares of New Common Stock on a fully diluted basis on the effective date of the Merger, provided that any awards of such shares made before the second anniversary of the effective date of the Merger (a) if in the form of options, have certain price restrictions, (b) if in the form of restricted stock, will reduce the number of such reserved shares by three for each share of restricted stock issued, and (c) in either case shall not be effective unless approved or ratified by the board of directors of Group as constituted from and after the effective date of the Merger.

(7) Group agreed to grant to each of the Plan Investors other than Tudor an option that gives the Plan Investor the right to purchase at $15.00 per share up to the number of additional shares of common stock equal to that Plan Investor's Option Amount divided by $15.00. The "Option Amount" is an amount derived by multiplying an agreed upon amount for each Plan Investor by a fraction, the numerator of which is the amount of equity raised from Tudor plus the amount of equity raised after July 7, 2005 pursuant to any equity investments and the Stock Offering up to an aggregate for the numerator of $150 million, and the denominator of which is $150 million. Each option is transferable, in whole or in part, among the Plan Investors. The Letter Agreement also provides that upon the expiration of the option, Group will make an offer to Eastshore, in an amount equal to one-third of the proceeds received from exercise of the options (together with the exercise of the option pursuant to the Tudor Agreement and any similar option granted to any other equity investors who invest after July 7, 2005), to repurchase shares of New Common Stock held by Eastshore at a purchase price of $15.00 per share, and Eastshore will have the right, but not the

26

obligation, to accept that offer to repurchase in whole or in part for a period of at least 30 days after the receipt of the offer.

In addition, certain schedules of the Merger Agreement are amended by the Letter Agreement to reflect the investments under the Wellington Investment Agreement and the Tudor Investment Agreement.

The following table sets forth certain information regarding the potential ownership of New Common Stock following the Merger and consummation of the Plan. The table sets forth the potential ownership (1) on a primary basis, (2) reflecting the impact of certain securities that are dilutive at the buy-in price paid by the Plan Investors, and (3) on a fully diluted basis assuming all equity securities are exercised or converted. This information is provided to describe what security holders or groups of security holders may beneficially own significant amounts of New Common Stock. Because many of the variables underlying the assumptions used to develop this table are out of the control of the Debtors or America West, it is impossible to predict what the ownership interest of any particular security holder or group will be in New Common Stock following the Merger. Parties-in-interest should read carefully the footnotes to this table in order to understand the many assumptions underlying the information in the table. The following information does not include any shares issued in the Stock Offering or in connection with the options to purchase additional shares of New Common Stock granted to the Plan Investors under the Letter Agreement.

| Group | Primary Shares | | Anticipated Fully Diluted Shares (1) | | Fully Diluted Shares (2) | |
|---|---|---|---|---|---|---|
| | Shares | % | Shares | % | Shares | % |
| New Convertible Note (3) | -- | -- | -- | -- | 5,224,660 | 6% |
| Group creditors (4) | 8,212,121 | 14% | 8,212,121 | 12% | 8,212,121 | 9% |
| Group Total | 8,212,121 | 14% | 8,212,121 | 12% | 13,436,781 | 15.5% |
| **America West** (5) | | | | | | |
| Class A shares outstanding (6) | 460,686 | 1% | 460,686 | 1% | 460,686 | 1% |
| Class B shares outstanding (7) | 14,577,229 | 24% | 14,577,229 | 21% | 14,577,229 | 17% |
| 7.25% convertible note (8) | -- | -- | 5,606,196 | 8% | 5,606,196 | 6% |
| Warrants (9) | -- | -- | 4,542,319 | 6% | 8,122,682 | 9% |
| Options (10) | -- | -- | 735,880 | 1% | 4,201,611 | 5% |
| 7.5% convertible notes (11) | -- | -- | -- | -- | 3,860,162 | 4% |
| America West Total | 15,037,915 | 25% | 25,922,310 | 37% | 36,828,566 | 42% |
| **Plan Investors** | | | | | | |
| Eastshore | 8,333,333 | 14% | 8,333,333 | 12% | 8,333,333 | 10% |
| Par (12) | 6,768,485 | 11% | 6,768,485 | 10% | 6,768,485 | 8% |
| ACE | 5,000,000 | 8% | 5,000,000 | 7% | 5,000,000 | 6% |
| Peninsula | 3,333,333 | 6% | 3,333,333 | 5% | 3,333,333 | 4% |
| Wellington (13) | 9,090,900 | 15% | 9,090,900 | 13% | 9,090,900 | 10% |
| Tudor (14) | 3,939,394 | 7% | 3,939,394 | 6% | 3,939,394 | 5% |
| Total Plan Investors | 36,465,445 | 61% | 36,465,445 | 52% | 36,465,445 | 42% |
| **Total** | **59,715,481** | **100%** | **70,599,876** | **100%** | **86,730,792** | **100%** |

Percentages may not total 100% due to rounding

(1) This column includes the primary shares outstanding plus the dilutive impact of only those dilutive securities that are dilutive at the per share price paid by the Plan Investors, including the America West 7.25% convertible notes and America West warrants and exercisable options. America West dilutive securities represent fully diluted shares using the treasury stock method of accounting (i.e. assuming proceeds are used to repurchase outstanding shares) assuming a price of $16.50 per share of New Common Stock (the price paid by the most recent Plan Investor) and a conversion factor of 0.4125 of a share of New Common Stock for each share of America West Class B common stock.

(2) Fully diluted shares represent primary shares outstanding plus additional shares assuming all convertible notes, options and warrants are converted or exercised for shares of New Common Stock. America West dilutive securities represent fully diluted gross shares and a conversion factor of 0.4125 of a share of New Common Stock for each such share of America West Class B common stock.

(3) The $125 million GE convertible notes are convertible at a price that will be determined at a future date. The contractual conversion price will be 40 to 50% premium to the average of the closing price of New Common Stock for the first 60 days of trading following emergence from bankruptcy. Shares are estimated assuming conversion at a 45% premium and assuming a 60 day average price per share of New Common Stock of $16.50.

(4) Includes shares of New Common Stock issuable to ALPA. See Section VIII.C.21. The total shares of New Common Stock shown in the table will not be issued as of completion of the Merger, because not all of the creditors' claims will be finally resolved at that time. While the total number of shares of New Common Stock available to creditors will be fixed, it is impossible to determine when the claims process will be finalized. Shares allocated to certain Group creditors includes an allotment of excess shares resulting from the $150 million Wellington investment at $16.50 per share of New Common Stock.

(5) Share count of America West Class A and Class B common shares, warrants and options include a pro-rata allotment of 261,818 excess shares resulting from the $150 million Wellington investment at $16.50 per share of New Common Stock.

(6) Class A common shares outstanding at closing is based on 859,117 shares of America West Class A common stock outstanding and a conversion rate of 0.5362 of a share of New Common Stock per share of America West Class A common stock.

(7) Class B common shares outstanding at closing is based on 35,339,900 shares of America West Class B common stock outstanding as of August 1, 2005 and a conversion rate of 0.4125 shares of New Common Stock per share of America West Class B common stock.

(8) America West's 7.25% convertible notes are convertible at $10.73 per share of America West Class B common stock and contain a change-of-control feature that allows the noteholders to put the notes for all outstanding principal and accrued interest, totaling $87.9 million based on an assumed closing date of September 30, 2005. America West may satisfy the put with equity at a price per share that is 95% of the market price of New Common Shares. This market price is assumed to be $16.50 per share of New Common Stock, which would result in 5,606,196 shares being issued to the noteholders.

(9) Assumes that America West warrants are exercised at a strike price of $7.27 per share of New Common Stock. At the assumed closing price of $16.50 per share of New Common Stock, under the treasury stock method of accounting, the warrants would be exercisable for 4,542,319 shares.

(10) America West options are shown on a fully diluted basis assuming all options are exercised for shares of New Common Stock. At August 1, 2005, America West had 10,186,060 outstanding options with a weighted average exercise price of $9.54 per share of America West Class B common stock. At the assumed closing price of $16.50 per share of New Common Stock, under the treasury stock method of accounting, the options would be exercisable for 735,880 shares.

(11) Assumes conversion of the America West 7.5% convertible notes at a conversion price of $29.09 per share of New Common Stock.

(12) Assumes that 101,818 excess shares resulting from the Wellington per share price of $16.50 per share of New Common Stock are allocated to Par, per its Investment Agreement, in addition to the 6,666,667 shares allocated for Par's primary investment of $100 million at $15.00 per share of New Common Stock.

(13) Represents a group of investors under the management of Wellington Management Company, LLP, a Boston-based investment firm.

(14) Represents Tudor Proprietary Trading, L.L.C. and a group of investors for which Tudor Investment Corp., a Connecticut-based asset management firm, acts as investment adviser.

E.     **The Proposed Stock Offering**

Group may engage in a proposed stock offering of up to $150 million pursuant to a registration statement on Form S-1 under the Securities Act. If Group determines to effect the Stock Offering, it may make a portion of such offering available to holders of shares of America West's Class A and Class B common stock and to certain unsecured creditors of the Debtors entitled to vote on the Plan. In the latter case, any participation by unsecured creditors of the Debtors could be based on their allowed claims for voting purposes. The procedures by which unsecured creditors of the Debtors may seek to establish a temporary allowance of their Claims for voting purposes are set forth in Section 9.8.a of the Plan. Accordingly, any unsecured creditors of the Debtors whose Claims have not been Allowed prior to the date hereof may wish to avail themselves of the procedures set forth in Section 9.8.a of the Plan with respect to temporary allowance of their Claims for voting purposes in order to obtain eligibility to participate in the Stock Offering should Group decide to consummate the Stock Offering and make a portion of it available to the Debtors' unsecured creditors.

Completion of the Merger and effectiveness of the Plan are not conditioned on completion of the Stock Offering. For purposes of voting on the Plan, holders of Claims in Class 9 should assume that Group will not engage in the Stock Offering.

F.  **Combined Company Following the Merger**

  *1.   Overview.*

Following the implementation of the Plan, including the Merger and the new equity investments and other related transactions, the Reorganized Debtors and America West will operate under the single brand name of US Airways through their two principal operating subsidiaries, USAI and AWA. The Debtors and America West expect to integrate these two subsidiaries into one operation over the 24 months. Reorganized Group will constitute the fifth largest airline operating in the United States as measured by domestic RPMs and by ASMs. Reorganized Group will have primary hubs in Charlotte, Philadelphia and Phoenix, and secondary hubs/focus cities in Pittsburgh, Las Vegas, New York, Washington, D.C. and Boston. After the merger, Reorganized Group will be a low-cost airline offering scheduled passenger service on approximately 3,600 flights daily to 229 cities in the United States, Canada, Mexico, the Caribbean, and Europe. Reorganized Group will operate 360 mainline jets and will be supported by its regional airline subsidiaries and affiliates operating as US Airways Express, which will operate approximately 241 regional jets, of which 83 will be aircraft with 70 or more seats, and approximately 112 turboprops. The labor contracts and business operations of PSA and Piedmont will not be integrated into the mainline operations. The Reorganized Debtors intend to continue to keep PSA and Piedmont as separate subsidiaries just as they currently exist.

The Debtors and America West expect that Reorganized Group will have one of the most competitive cost structures in the airline industry due to cost cutting measures initiated by both companies over the last three years. The Debtors' restructuring activities in their current and prior Chapter 11 bankruptcy proceedings have specifically targeted cost reductions in four main areas. First, the Debtors have achieved important reductions in labor, pension and benefit costs resulting in ratified collective bargaining agreements representing over $2 billion of annual cost savings. Second, the Debtors have put restructuring initiatives in place to reduce overhead, including management payroll, and have revamped its schedule to improve aircraft utilization. Third, the Debtors have renegotiated various contractual obligations, including those related to aircraft, real estate and suppliers, and implemented cost savings such as lowering catering costs. Lastly, the Debtors rationalized their fleet through the elimination of older, less efficient aircraft, the introduction of large regional jet aircraft with low trip costs to better match capacity with demand, and the reduction of the number of mainline aircraft types in order to lower maintenance, inventory and pilot training costs.

Separately, America West has also been able to greatly reduce its operating expenses as a percentage of revenues since 2002. America West instituted programs to reduce management payroll, clerical payroll, travel agency based commissions, incentive programs and override commissions. It has reduced capital expenditures and discretionary expenses, and lowered catering costs. Other initiatives include increasing point-to-point flying at minimal additional costs using aircraft that would otherwise be parked at a gate, which increases daily utilization of aircraft.

In addition to the cost saving initiatives already undertaken by the Debtors and America West, the combination of America West and Group will result in significant annual revenue and cost synergies of approximately $600 million that would be unachievable without completing the Merger. These synergies derive from three principal sources. In anticipation of the Merger, Group has negotiated a reduction in its existing fleet so that the fleet of the combined company suits the expected network. Reorganized Group will be able to schedule the combined fleet to better match aircraft size with consumer demand. By scheduling the reduced fleet more efficiently and by adding new, low-fare service to Hawaii, the Debtors and America West expect to create approximately $175 million in annual operating synergies. They also expect to realize additional annual cost synergies of approximately $250 million by reducing administrative overhead, consolidating information technology systems and combining facilities. Lastly, by becoming one nationwide, low-cost carrier with a global reach that provides more choice for consumers and an improved ability to connect, the Debtors and America West expect to realize approximately $175 million in additional annual revenue.

Group and its subsidiaries currently employ approximately 29,400 people, and America West and its subsidiaries currently employ approximately 14,000 people. After seniority lists have been integrated for each of the combined airlines' unionized labor groups, Reorganized Group expects a single labor contract to apply to each of those groups.

Reorganized Group is expected to operate a mainline fleet of 360 planes (supported by approximately 241 regional jets and approximately 112 turboprops that provide passenger feed into the mainline system), down from a total of 411 mainline aircraft operated by the two airlines as of June 30, 2005. Group projects removing 47 aircraft by the end of 2006. Reorganized Group is also expected to take delivery by the end of February 2006 of seven Airbus A320 family aircraft previously ordered by AWA. Airbus has also agreed to reconfirm 30 narrow body A320-family aircraft deliveries and reschedule those deliveries from the 2006 to 2008 period to the 2009 to 2010 period. To rationalize international flying, Reorganized Group anticipates working with Airbus to begin transitioning to an all-Airbus widebody fleet of A350 aircraft in 2011.

The Debtors and America West believe the Merger will create one of the industry's most financially stable airlines with approximately $1.5 billion in new liquidity coming from equity investments, the proposed Stock Offering, new cash infusions, commercial partners, asset sales and the release of currently restricted cash.

In addition to $565 million of new equity from the Plan Investors and an additional $150 million of equity financing that may be raised from the Stock Offering, Reorganized Group will receive approximately $700 million of cash infusions from commercial partners, including approximately $455 million from affinity credit card partners and the $250 million line of credit to be provided by Airbus, approximately $100 million from asset-based financings or sales of aircraft, net after prepayments of the ATSB Loan, and approximately $170 million from release of certain cash reserves that are currently restricted but that should be released as a part of the Plan.

Attached as Appendix J to this Disclosure Statement are the unaudited pro forma condensed combined financial statements of Reorganized Group developed in accordance with SEC requirements. The pro forma financial statements give effect to the Merger and to the Debtors' emergence from the Chapter 11 Cases as if such events occurred as of June 30, 2005 with respect to the pro forma condensed combined balance sheet included therein and as of January 1, 2004 with respect to the pro forma condensed combined statement of operations for the year ended December 31, 2004 and for the six months ended June 30, 2005 included therein. Holders of Claims are urged to read carefully the notes included in Appendix J that accompany such financial statements.

2.    *Business Strategy.*

(a)    *Provide Excellent Value to Customers*

Reorganized Group plans to standardize customer service initiatives system-wise and provide a competitive, simplified pricing structure that Reorganized Group expects will provide customers with an excellent value when compared to other low-cost carriers as well as legacy mainline carriers. Reorganized Group is committed to building a successful airline by taking care of its customers and believes that this focus on excellent customer service in every aspect of operations, including personnel, flight equipment, in-flight and ancillary amenities, on-time performance, flight completion ratios and baggage handling, will strengthen customer loyalty, provide excellent value to customers and attract new customers. Further, it is expected that the amenities provided to customer, such as a frequent flyer program, airport clubs, assigned seating and a First Class cabin, will differentiate Reorganized Group from other low-cost carriers.

(b)    *Continue to Reduce Operating Costs*

After the Merger, Reorganized Group will focus on achieving cost reduction synergies that it expects to realize from the Merger. Key areas where cost reductions can be achieved as a result of the Merger include overhead costs, in-sourcing of information technology solutions where America West has

existing capabilities, airport savings through better use of gates and employees in airports both America West and Group serve today, and eliminating redundant facilities such as office space and hangars. It is expected that these initiatives will achieve approximately $250 million in annual savings once fully implemented. In addition, Reorganized Group also plans to increase aircraft use to increase flying and reduce unit costs.

(c)     *Leverage Broader Route Network and Rationalize Fleet*

Reorganized Group is expected to achieve annual savings of approximately $175 million from rationalizing its fleet, rescheduling its operations, and adding new, low-fare service to Hawaii. As a result of the Merger, Reorganized Group plans to combine the current regional strengths of both America West on the West Coast and Group on the East Coast to provide a comprehensive product offering more attractive to customers. Reorganized Group also plans to make more efficient use of its nationwide network by coordinating the schedules to and from the hubs and secondary hubs/focus cities of both airlines to create a significantly greater number of flight connections across the route network. Similarly, Reorganized Group will be able to optimize the utilization of its aircraft and employees. For instance, aircraft of one airline that today would have to sit idle awaiting the next scheduled departure could be utilized after the Merger along existing routes of the other airline to increase daily utilization.

In anticipation of the Merger, Group has negotiated a reduction to its existing fleet so that the fleet of Reorganized Group suits the expected route network and so that the introduction of new aircraft will be timed to coincide with the expiration of existing aircraft leases. Reorganized Group will also seek to reschedule the combined fleet to better match aircraft size with consumer demand. For example, in some markets that Group currently serves with a Boeing 737 aircraft, that service is expected to be replaced with a 90-seat regional jet that is currently operated in America West's system. In addition, new America West aircraft are expected to be placed into service on flights out of current Group hubs. Furthermore, Boeing 757 aircraft service is expected to be initiated to Hawaii, which neither airline currently serves. These changes are expected to generate revenue benefits of approximately $175 million.

(d)     *Prudent Integration of America West's and Group's Operations*

While management will move quickly to try to provide a seamless integration for consumers, Reorganized Group expects to achieve full labor and operational integration of AWA and USAI over a 24 month period. It is expected that this timeframe will allow Reorganized Group to resolve the critical labor and systems issues necessary to achieve full integration. Reorganized Group will operate under a single brand name of US Airways while AWA and USAI maintain separate operating certificates for this 24 month period. Group and America West believe that the majority of the synergy value can be realized through the rapid integration of routes, schedules, pricing, other marketing initiatives and overhead reductions.

## IV.   DESCRIPTION OF THE DEBTORS

**A.     Overview of Business Operations**

Group is a corporation organized under the laws of the State of Delaware. Group's executive offices are located at 2345 Crystal Drive, Arlington, Virginia 22227. Group's internet address is www.usairways.com.

Group files annual, quarterly and current reports, proxy statements and other information with the SEC, which provide additional information about Group, its management, stockholders and operations, and the historical trading prices of its common stock, than are contained in this Disclosure Statement. You can read and copy these reports, statements or other information at the SEC's Public Reference Room at Room 1580, 100 F Street, NE, Washington, D.C. 20549. Group's SEC filings are also available to the public from commercial document retrieval services and at the website maintained by the SEC at www.sec.gov. You can also find the SEC filings of Group on its website at www.usairways.com. Any such information is not considered to be part of, or incorporated by reference into, this Disclosure Statement.

Subsequent to its emergence from bankruptcy in 2003, Group's Class A common stock began trading on the Nasdaq National Market under the symbol "UAIR." On September 22, 2004 as a result of the Chapter 11 Cases, the Class A Common Stock was delisted from the Nasdaq National Market. Since that date, Group's Class A Common Stock has traded on the Nasdaq over-the-counter market under the symbol "UAIRQ."

Group's primary business activity is the operation of a major network air carrier through its ownership of the common stock of US Airways, Inc. ("USAI"), Piedmont Airlines, Inc., PSA Airlines, Inc., Material Services Company, Inc., Airways Assurance Limited, and, until July 1, 2004, Allegheny Airlines, Inc. Effective July 1, 2004, Allegheny Airlines merged with Piedmont Airlines, with Piedmont Airlines as the surviving entity.

As discussed in more detail below, on September 12, 2004, Group and its domestic subsidiaries, which account for substantially all of the operations of Group, commenced the Chapter 11 Cases.

USAI, which is also a corporation organized under the laws of the State of Delaware, is Group's principal operating subsidiary. USAI is a certificated air carrier engaged primarily in the business of transporting passengers, property and mail. USAI enplaned approximately 42 million passengers in 2004 and was the seventh largest U.S. air carrier based on ASMs. As of June 30, 2005, USAI operated 268 jet aircraft and 25 regional jet aircraft and provided regularly scheduled service at 101 airports in the continental United States, Canada, the Caribbean, Latin America and Europe.

Certain air carriers have code share arrangements with USAI to operate under the trade name US Airways Express. Typically, under a code share arrangement, one air carrier places its designator code and sells tickets on the flights of another air carrier, referred to as its code share partner. US Airways Express carriers are an integral component of USAI's operating network. Due to the relatively small local traffic base at some of its hubs, USAI has historically relied heavily on feed traffic from its US Airways Express affiliates, which carry passengers from low-density markets that are uneconomical for USAI to serve with large jets, to USAI's hubs. As of June 30, 2005, the US Airways Express network operated 181 regional jet aircraft and 109 turboprop aircraft and served 133 airports in the continental United States, Canada and the Bahamas, including 51 airports also served by USAI. During 2004, US Airways Express air carriers enplaned approximately 15.2 million passengers, approximately 48% of whom connected to Group's flights. Of these 15.2 million passengers, approximately 6.2 million were enplaned by Group's wholly owned regional airlines, approximately 7.4 million were enplaned by third-party carriers operating under capacity purchase agreements and approximately 1.6 million were enplaned by carriers operating under prorate agreements, as described below.

The US Airways Express code share arrangements are either in the form of capacity purchase or prorate agreements. The two wholly owned regional airlines and the regional jet affiliate operators are capacity purchase relationships. PSA operated 49 regional jets as of June 30, 2005, while Piedmont operated 59 turboprop aircraft as of June 30, 2005. The regional jet affiliates with capacity purchase agreements are Chautauqua Airlines, Inc., which operated 35 regional jets as US Airways Express as of June 30, 2005; Mesa Airlines, Inc., which operated 59 regional jets as US Airways Express as of June 30, 2005; and Trans States Airlines, Inc., which operated 13 regional jets as US Airways Express as of June 30, 2005. Air Wisconsin Airlines Corporation will also begin operating 70 regional jets under a capacity purchase agreement in August 2005. The capacity purchase agreements provide that all revenues, including passenger, mail and freight revenues, go to USAI. In return, USAI agrees to pay predetermined fees to these airlines for operating an agreed upon number of aircraft, without regard to the number of passengers on board. In addition, these agreements provide that certain variable costs, such as fuel and airport landing fees, will be reimbursed 100% by USAI. USAI controls marketing, scheduling, ticketing, pricing and seat inventories. The regional jet capacity purchase agreements have expirations from 2008 to 2013 and provide for optional extensions at Group's discretion. Certain other regional jet agreements are expected to be amended as a result of the Air Wisconsin agreement. The carriers with prorate agreements are non-owned turboprop operators and include all or a portion of the turboprop operations of Colgan Airlines, Inc., which operated 28 turboprops as US Airways Express as of June 30, 2005, Trans States Airlines, Inc., which operated 8 turboprops as US Airways Express as of June 30, 2005, and Air Midwest, Inc., which operated 14 turboprops as US Airways Express as of June 30, 2005. The prorate agreements

provide for affiliate carriers to pay certain service fees to USAI as well as to receive a prorated share of revenue for connecting customers. USAI is responsible for pricing and marketing of connecting services to and from the prorate carrier. The prorate carrier is responsible for pricing and marketing the local, point to point markets, and is responsible for all costs incurred operating the aircraft. All US Airways Express carriers use USAI's reservation systems, and have logos, service marks, aircraft paint schemes and uniforms similar to those of USAI.

In April 2004, MidAtlantic Airways, USAI's new regional jet division, began operating as part of the US Airways Express network. As of June 30, 2005, MidAtlantic Airways operated 25 Embraer ERJ-170 regional jets with 72 seats. MidAtlantic Airways served approximately one million passengers in 2004. On June 23, 2005, USAI exercised its option under its agreement with Republic Airways Holdings, Inc. ("Republic") and Wexford Capital LLC to sell the assets of MidAtlantic Airways, including the regional jets, a flight simulator and certain commuter slots at Ronald Reagan Washington National Airport and New York LaGuardia International Airport. If the sale is completed, Republic will operate the aircraft as a US Airways Express carrier under a capacity purchase agreement and will lease the slots back to USAI.

Group's major connecting hubs are at airports in Charlotte and Philadelphia. Group also has substantial operations at Boston's Logan International Airport, New York's LaGuardia International Airport, Pittsburgh International Airport, and Washington D.C.'s Ronald Reagan Washington National Airport. Measured by departures, USAI is among the largest at each of the foregoing airports. USAI is also a leading airline from the Northeast United States to Florida. USAI's East coast-based hubs, combined with its strong presence at many East coast airports, have made it among the largest intra-East coast carriers, comprising approximately 30% of the industry's intra-East coast revenues based on the most recent industry revenue data available.

For the years ended December 31, 2004, 2003 and 2002, passenger revenues accounted for approximately 89%, 90% and 90%, respectively, of Group's consolidated operating revenues. Cargo revenues and other sources accounted for 11%, 10% and 10% of Group's consolidated operating revenues in 2004, 2003 and 2002, respectively. Group's results are seasonal with operating results typically highest in the second and third quarters due to USAI's combination of business traffic and North-South leisure traffic in the eastern United States during those periods.

Material Services Company, Inc. and Airways Assurance Limited operate in support of Group's airline subsidiaries in areas such as the procurement of aviation fuel and insurance.

B.      **Airline Industry and the Debtors' Position in the Marketplace**

Most of the markets in which Group's airline subsidiaries and affiliates operate are highly competitive. These airline subsidiaries and affiliates compete to varying degrees with other air carriers and with other forms of transportation. USAI competes with at least one major airline on most of its routes between major cities. Airlines, including USAI, typically use discount fares and other promotions to stimulate traffic during normally slack travel periods to generate cash flow and to maximize revenue per available seat mile. Discount and promotional fares are often non-refundable and may be subject to various restrictions such as minimum stay requirements, advance ticketing, limited seating and change fees. USAI has often elected to match discount or promotional fares initiated by other air carriers in certain markets in order to compete in those markets. Competition between air carriers also involves certain route structure characteristics, such as flight frequencies, availability of nonstop flights, markets served and the time certain flights are operated. To a lesser extent, competition can involve other products, such as frequent flyer programs and airport clubs.

The Debtors consider the growth of low-fare, low-cost competition to be their foremost competitive threat. Recent years have seen the entrance and growth of low-fare, low-cost competitors in many of the markets in which Group's airline subsidiaries and affiliates operate. These competitors, based on low costs of operations and low-fare structures, include Southwest Airlines, AirTran Airways and JetBlue Airways. Southwest Airlines has steadily increased operations within the Eastern United States since first offering service in this region in late 1993. In May 2004, Southwest began service at the

Philadelphia International Airport, a hub airport for USAI. Southwest also began service from Pittsburgh International Airport, a former hub, in May 2005. AirTran and JetBlue also have growing presences in the Eastern United States. In January 2005, Delta Air Lines, Inc. announced a broad low-fare pricing scheme. Group anticipates the continued growth of low-fare competition in the industry in the future.

A substantial portion of the flights of Group's airline subsidiaries and affiliates are to or from cities in the Eastern United States. Accordingly, severe weather, air traffic control problems and downturns in the economy in the Eastern United States adversely affect Group's results of operations and financial condition. With their concentration in the Eastern United States, the airline subsidiaries' and affiliates' average stage length, or trip distance, is shorter than those of other major airlines. This makes Group more susceptible than other major airlines to competition from surface transportation, such as automobiles and trains. The increased airport security charges and procedures have also had a disproportionate impact on short-haul travel, which constitutes a significant portion of flying for Group's airline subsidiaries and affiliates. Additional terrorist attacks or fear of these attacks, even if not made directly on the airline industry, including elevated national threat warnings, negatively affect the Debtors and the airline industry.

In recent years, Group's profitability was significantly eroded by competitive pressures, including the incursion of regional jets, the expansion of low-fare, low-cost carriers and the entry of additional carriers into its operating territories, including key focus cities and hubs; unfavorable economic trends; and rising fuel and labor costs. The May 2000 proposed merger of United Airlines and Group was designed to address this profitability erosion by adding Group into a global network. During the period in which the merger was pending, Group was effectively precluded from restructuring its operations as a stand-alone carrier. That period ended in the termination of the merger agreement in late July 2001 after the merger failed to receive approval from the U.S. Department of Justice. Following the merger termination, Group embarked on a phased, stand-alone restructuring plan to address the problems facing its airline subsidiaries and affiliates; however, this plan was preempted almost immediately by the September 11th terrorist attacks, which were then followed by the filing for Chapter 11 in the prior bankruptcy in August 2002.

C.   **Marketing Agreements with Other Airlines**

Group has entered into a number of bilateral and multilateral alliances with other airlines to provide customers with more choices and to access markets worldwide that Group does not serve directly. In May 2004, USAI joined the Star Alliance, the world's largest airline alliance, with 16 member airlines serving 795 destinations in 139 countries. Membership in the Star Alliance further enhances the value of Group's domestic and international route network by allowing customers access to the global marketplace. Expanded benefits for customers include network expansion through code share service, benefits under USAI's frequent traveler program, Dividend Miles, airport lounge access, convenient single-ticket pricing, and one-stop check-in and coordinated baggage handling.

USAI also has comprehensive marketing agreements with United Airlines, a member of the Star Alliance, which began in July 2002. United Airlines, as well as its parent company, UAL Corporation, and certain of its affiliates, filed for protection under Chapter 11 of the Bankruptcy Code on December 9, 2002 in the United States Bankruptcy Court for the Northern District of Illinois (Chicago Division). United Airlines immediately requested Bankruptcy Court authority to assume these agreements and the court granted United Airlines' request. USAI also has marketing agreements with Lufthansa, Spanair, bmi and other Star Alliance carriers, as well as with several smaller regional carriers in the Caribbean operating collectively as the GoCaribbean Network.

D.   **Industry Regulation and Airport Access**

Group's airline subsidiaries operate under certificates of public convenience and necessity or commuter authority issued by the U.S. Department of Transportation. The DOT may alter, amend, modify or suspend these certificates if the public convenience and necessity so require, or may revoke the certificates for failure to comply with the terms and conditions of the certificates. Airlines are also regulated by the FAA, a division of the DOT, primarily in the areas of flight operations, maintenance, ground facilities and other technical matters. Pursuant to these regulations, Group's airline subsidiaries

have FAA-approved maintenance programs for each type of aircraft they operate that provide for the ongoing maintenance of these aircraft, ranging from periodic routine inspections to major overhauls. From time to time, the FAA issues airworthiness directives and other regulations affecting Group's airline subsidiaries or one or more of the aircraft types they operate. In recent years, for example, the FAA has issued or proposed these mandates relating to, among other things, enhanced ground proximity warning systems, fuselage pressure bulkhead reinforcement, fuselage lap joint inspection rework, increased inspections and maintenance procedures to be conducted on certain aircraft, increased cockpit security, fuel tank flammability reductions and domestic reduced vertical separation.

The DOT allows local airport authorities to implement procedures designed to abate special noise problems provided that these procedures do not unreasonably interfere with interstate or foreign commerce or the national transportation system. Certain locales, including Boston, Washington, D.C., Chicago, San Diego and San Francisco, among others, have established airport restrictions to limit noise, including restrictions on aircraft types to be used and limits on the number of hourly or daily operations or the time of these operations. In some instances these restrictions have caused curtailments in services or increases in operating costs and these restrictions could limit the ability of Group to expand its operations at the affected airports. Authorities at other airports may consider adopting similar noise regulations.

The airline industry is also subject to increasingly stringent federal, state and local laws protecting the environment. Future regulatory developments and actions could affect operations and increase operating costs for the airline industry, including Group's airline subsidiaries.

Group's airline subsidiaries are obligated to collect a federal excise tax on domestic and international air transportation, commonly referred to as the ticket tax. Group's airline subsidiaries collect these taxes, along with certain other U.S. and foreign taxes and user fees on air transportation, and pass through the collected amounts to the appropriate governmental agencies. Although these taxes are not operating expenses of Group, they represent an additional cost to Group's customers.

The Aviation and Transportation Security Act was enacted in November 2001. Under the Aviation and Transportation Security Act, substantially all aspects of civil aviation passenger security screening were federalized and a new Transportation Security Administration ("TSA"), under the DOT was created. TSA was then transferred to the Department of Homeland Security pursuant to the Homeland Security Act of 2002. The Aviation and Transportation Security Act, among other matters, mandates: improved flight deck security; carriage at no charge of federal air marshals; enhanced security screening of passengers, baggage, cargo, mail, employees and vendors; enhanced security training; fingerprint-based background checks of all employees and vendor employees with access to secure areas of airports pursuant to regulations issued in connection with the Aviation and Transportation Security Act; and the provision of passenger data to U.S. Customs.

Funding for TSA is provided, in part, by a fee collected by air carriers from their passengers of $2.50 per flight segment, but not more than $10.00 per round trip. From time to time, legislation is proposed to increase this fee. Implementation of the requirements of the Aviation and Transportation Security Act have resulted and will continue to result in increased costs for Group and its passengers and has and will likely continue to result in service disruptions and delays.

Most major U.S. airports impose passenger facility charges. The ability of airlines to contest increases in these charges is restricted by federal legislation, DOT regulations and judicial decisions. Legislation enacted in 2000 permitted airports to increase passenger facility charges effective April 1, 2001. With certain exceptions, air carriers pass these charges on to passengers. However, the ability of Group to pass-through security fees and passenger facility charges to its customers is subject to various factors, including market conditions and competitive factors.

The FAA has designated John F. Kennedy International Airport, LaGuardia International Airport and Washington Ronald Reagan National Airport as "high-density traffic airports" and has limited the number of departure and arrival slots available to air carriers at those airports. In April 2000, legislation was enacted that eliminates slot restrictions in 2007 at LaGuardia International Airport and Kennedy Airport. Among other things, the legislation encouraged the development of air service to smaller

35

communities from slot-controlled airports. During the interim period while slot restrictions remained in effect at LaGuardia International Airport, airlines could apply for slot exemptions to serve smaller communities using aircraft with a maximum seating capacity of less than 71. In connection with this legislation, Group and several other airlines increased service from LaGuardia International Airport, which led to excessive flight delays. In response to these delays, the FAA implemented a slot lottery system in December 2000 limiting the number of new flights at LaGuardia International Airport. As a result, several airlines, including Group, were required to reduce the number of flights added at LaGuardia International Airport in connection with this legislation. The resulting allocation of slots from the slot lottery system was initially scheduled to expire on September 15, 2001, but on August 3, 2001, the FAA announced an extension until October 26, 2002. On July 8, 2002, the FAA announced another extension until October 30, 2004, and subsequently announced a further extension through January 1, 2007. As a result of the 2007 slot elimination, the FAA has indicated an intent to rethink its approach to regulating operations at LaGuardia International Airport. Several proposals, including auctions, congestion pricing and other market-based solutions, are being considered along with more traditional regulatory approaches.

At Washington Ronald Reagan National Airport an additional eleven roundtrips were awarded by the DOT, pursuant to the Vision 100–Century of Aviation Reauthorization Act, which created additional slots for distribution by the DOT. Although USAI participated in the proceeding and was awarded slots, most of the slots were awarded to new entrant carriers.

Where the FAA has seen congestion and delay increases, it has stepped in and worked with the carriers to freeze operations at current or somewhat reduced levels. Specifically, incumbent carriers, including USAI, are not permitted to increase operations at Chicago O'Hare Airport as a result of an agreement reached between the FAA and these airlines in August 2004. This agreement has been extended through the Fall 2005. Currently, a rulemaking on extending the agreement with some modifications is underway at the FAA. USAI has actively participated in the rulemaking. A broader rulemaking to address congestion at other crowded airports could be forthcoming sometime in 2005 or 2006.

The availability of international routes to domestic air carriers is regulated by agreements between the United States and foreign governments. Changes in U.S. or foreign government aviation policy could result in the alteration or termination of these agreements and affect USAI's international operations.

E.  **Employees**

As of June 30, 2005, on a full-time equivalent basis, Group and its subsidiaries employed approximately 29,400 active employees, or 27,300 employees on a full-time equivalent basis. USAI employed approximately 23,700 active employees including approximately 7,500 station personnel, 5,300 flight attendants, 2,700 mechanics and related employees, 3,200 pilots, 1,300 reservations personnel and 3,700 personnel in administrative and miscellaneous job categories. Group's remaining subsidiaries employed 5,700 employees including approximately 3,150 station personnel, 1,000 pilots, 600 flight attendants, 450 mechanics and related employees and 500 personnel in administrative and miscellaneous job categories.

As of June 30, 2005, approximately 78% of Group's active employees were covered by collective bargaining agreements with various labor unions.

The status of USAI's labor agreements with its major employee groups as of June 30, 2005 is as follows:

| Union (1) | Class or Craft | Employees (2) | Date Contract Amendable |
|---|---|---|---|
| ALPA | Pilots | 3,200 | December 31, 2009 |
| IAMAW | Mechanics and related employees | 2,700 | December 31, 2009 |
| IAMAW | Fleet service employees | 4,100 | December 31, 2009 |
| CWA | Passenger service employees | 4,700 | December 31, 2011 |
| AFA | Flight attendants | 5,300 | December 21, 2011 |
| TWU | Dispatchers and other | 200 | December 31, 2009 and |

36

December 31, 2011

| (1) | ALPA | Air Line Pilots Association |
| | IAMAW | International Association of Machinists and Aerospace Workers |
| | CWA | Communications Workers of America |
| | AFA | Association of Flight Attendants-Communications Workers of America |
| | TWU | Transport Workers Union |

(2) Approximate number of active employees covered by the contract.

### F.   Aviation Fuel

Aviation fuel is typically Group's second largest expense. Because the operations of the airline are dependent upon aviation fuel, increases in aviation fuel costs could materially and adversely affect liquidity, results of operations and financial condition. The following table shows Group's aircraft fuel consumption and costs for 2002-2004:

| Year | Gallons (in millions) | Average price per gallon (1) | Aviation fuel expense (1) (in millions) | Percentage of Total Operating Expenses |
|---|---|---|---|---|
| 2004 | 973 | $ 1.129 | $1,099 | 14.7% |
| 2003 | 936 | 0.887 | 830 | 11.7% |
| 2002 | 1,047 | 0.747 | 782 | 9.4% |

(1) Includes fuel taxes and the impact of fuel hedges.

For the first six months of 2005, the average price per gallon increased to $1.59, and aviation fuel as a percentage of total operating expenses was 23.4%.

Prices and availability of all petroleum products are subject to political, economic and market factors that are generally outside of Group's control. Accordingly, the price and availability of aviation fuel, as well as other petroleum products, can be unpredictable. Prices may be affected by many factors, including the impact of political instability on crude production, especially in Russia and OPEC countries; unexpected changes to the availability of petroleum products due to disruptions in distribution systems or refineries; unpredicted increases to oil demand due to weather or the pace of economic growth; inventory levels of crude, refined products and natural gas; and other factors, such as the relative fluctuation between the U.S. dollar and other major currencies and influence of speculative positions on the futures exchanges.

To reduce the exposure to changes in fuel prices, Group periodically enters into certain fixed price swaps, collar structures and other similar derivative contracts. Group's current financial position and credit rating negatively affect its ability to hedge fuel in the future.

### G.   Airline Ticket Distribution

The now common usage of electronic tickets within North America, and the rapid expansion in Europe and the rest of the world, has allowed for the streamlining of processes and the increased efficiency of customer servicing and support. Group began to support the issuance of electronic tickets in 1996. During 2004, electronic tickets represented 96% of all tickets issued to customers flying USAI. The addition of a $50 surcharge to most customers requiring paper tickets has allowed Group to continue to support the exceptional requests, while offsetting any cost variance associated with the issuance and postal fulfillment of paper tickets. Airlines based in North America have recently proposed a requested mandate that airlines move to 100% electronic ticketing over the next few years, which will only serve to enhance customer service and control costs for ticketing services supported by the airline and distribution partners.

The shift of consumer bookings from traditional travel agents, airline ticket offices and reservation centers to online travel agent sites, such as Orbitz, Travelocity, Expedia and others, as well as airline direct websites, such as usairways.com, continues to grow within the industry. Historically, traditional and online travel agencies used global distribution systems, or GDSs, such as Sabre, to obtain their fare and inventory

data from airlines. Bookings made through these agencies result in a fee, referred to as the GDS fee, that is charged to the airline. Bookings made directly with the airline, through its reservation call centers or website, do not incur a GDS fee. The growth of the airline direct websites and travel agent sites that connect directly to airline host systems, effectively by-passing the traditional connection via GDSs, helps Group reduce distribution costs from the channels of distribution on the internet. In the first six months of 2005, USAI received over 34% of its sales from internet sites. USAI's direct website, usairways.com, comprised over 13% of its sales, while the rest of the internet sites accounted for the remaining 20% of its sales.

Due to the continued pressure on legacy airlines to lower distribution fees more aggressively than anytime in the past in order to compete with low-cost airlines, many "newcomers" have entered the distribution industry. New low-cost GDSs, such as ITA Software, G2 Switchworks, Navitaire and others, are providing airlines with alternative economic models to do business with traditional travel agents. These new low-cost GDSs substantially reduce the fees charged to airlines by this distribution channel.

In an effort to further reduce distribution costs through internal channels, USAI and other airlines have instituted service fees for interaction in channels requiring specialized service such as reservation call centers ($5.00 per ticket), Airline Ticket Offices ($10.00 per ticket) and City Ticket Offices ($10.00 per ticket), while continuing to offer free service via the airlines' websites. The goals of these service fees are to reduce the cost to provide customer service as required by the traveler and promote the continued goal of shifting customers to Group's lowest cost distribution channel, usairways.com. For the first six months of 2005, internal channels of distribution account for approximately 24% of all Group sales.

In July 2004, the DOT eliminated most regulations governing GDSs. Airlines and GDSs continue to have open dialogue regarding possible cost savings.

### H.   Frequent Traveler Program

USAI operates a frequent traveler program known as Dividend Miles under which participants earn mileage credits for each paid flight segment on USAI, US Airways Shuttle, US Airways Express, Star Alliance carriers, and certain other airlines that participate in the program. Participants flying on First Class or Envoy class tickets receive additional mileage credits. Participants can also receive mileage credits through special promotions periodically offered by USAI and may also earn mileage credits by utilizing certain credit cards and purchasing services from various non-airline partners. Mileage credits can be redeemed for various free, discounted, or upgraded travel awards on USAI, Star Alliance carriers or other participating airlines.

USAI and the other participating airline partners limit the number of seats allocated per flight for award recipients by using various inventory management techniques. Award travel for all but the highest-level Dividend Miles participants is generally not permitted on blackout dates, which correspond to certain holiday periods or peak travel dates. USAI reserves the right to terminate Dividend Miles or portions of the program at any time. Program rules, partners, special offers, blackout dates, awards and requisite mileage levels for awards are subject to change.

### I.   Insurance

Group and its subsidiaries maintain insurance of the types and in amounts deemed adequate to protect themselves and their property. Principal coverage includes liability for injury to members of the public, including passengers; damage to property of Group, its subsidiaries and others; loss of or damage to flight equipment, whether on the ground or in flight; fire and extended coverage; directors and officers; fiduciary; and workers' compensation and employer's liability.

In addition to customary deductibles, Group self-insures for all or a portion of its losses from claims related to environmental liabilities and medical insurance for employees.

Since September 11, 2001, Group and other airlines have been unable to obtain coverage for liability to persons other than employees and passengers for claims resulting from acts of terrorism, war or

similar events, referred to as war risk coverage, at reasonable rates from the commercial insurance market. USAI has, as have most other U.S. airlines, therefore purchased its war risk coverage through a special program administered by the FAA. The Emergency Wartime Supplemental Appropriations Act extended this insurance protection until August 2005. The Secretary of Transportation may extend this policy until December 31, 2005. If the federal insurance program terminates, Group would likely face a material increase in the cost of war risk coverage, and because of competitive pressures in the industry, Group's ability to pass this additional cost to passengers would be limited.

There can be no assurances that Group can maintain insurance coverages and costs at its current levels.

**J.   Properties**

   *1.   Flight Equipment.*

As of June 30, 2005, USAI operated the following jet and regional jet aircraft:

| Type | Average Seat Capacity | Average Age (years) | Owned (1) | Leased (2) | Total |
|---|---|---|---|---|---|
| Airbus A330 | 266 | 4.9 | 9 | — | 9 |
| Boeing 767-200ER | 203 | 16.0 | 4 | 6 | 10 |
| Boeing 757-200 | 193 | 14.7 | — | 31 | 31 |
| Airbus A321 | 169 | 4.1 | 15 | 13 | 28 |
| Boeing 737-400 | 144 | 15.3 | 3 | 40 | 43 |
| Airbus A320 | 142 | 5.7 | 8 | 16 | 24 |
| Boeing 737-300 | 126 | 18.3 | 7 | 55 | 62 |
| Airbus A319 | 120 | 5.4 | 12 | 49 | 61 |
|  |  | 11.3 | 58 | 210 | 268 |
| EMB-170 | 72 | 1.0 | 10 | 15 | 25 |

(1) All owned aircraft are pledged as collateral for various secured financing agreements.
(2) The terms of the leases expire between 2005 and 2023.

As of June 30, 2005, Group's wholly owned regional airline subsidiaries operated the following turboprop and regional jet aircraft:

| Type | Average Seat Capacity | Average Age (years) | Owned | Leased (1) | Total |
|---|---|---|---|---|---|
| CRJ-700 | 70 | 0.6 | 7 | 7 | 14 |
| CRJ-200 | 50 | 1.3 | 12 | 23 | 35 |
| De Havilland Dash 8-300 | 50 | 13.5 | – | 12 | 12 |
| De Havilland Dash 8-100 | 37 | 15.2 | 31 | 7 | 38 |
| De Havilland Dash 8-200 | 37 | 7.7 | – | 9 | 9 |
|  |  | 7.5 | 50 | 58 | 108 |

(1) The terms of the leases expire between 2005 and 2021.

As of December 31, 2004, Group had 19 A320-family aircraft on firm order scheduled for delivery in the years 2008 through 2010. Group also had ten A330-200 aircraft on firm order scheduled for delivery in the years 2008 and 2009. Subsequently, in connection with the Merger, a Memorandum of Understanding was executed on May 18, 2005 between Airbus, Group, USAI and AWA (the "Airbus MOU") which provides for a $250 million line of credit from Airbus upon the satisfaction of various conditions precedent (including the completion of the Merger and the emergence of USAI from bankruptcy), the rescheduling of USAI's A320-family and A330-200 delivery commitments, and an order of 20 A350 aircraft, for which Airbus has agreed to provide backstop financing for a substantial number of aircraft, subject to certain terms and conditions. USAI's A320-family aircraft are now scheduled for

39

delivery in 2009 and 2010. USAI's A330-200 aircraft are scheduled for delivery in 2009 and 2010, and new A350 aircraft deliveries are currently scheduled to occur during the period 2011 through 2013. The Airbus MOU eliminates cancellation penalties on Group's orders for the ten A330-200 aircraft, provided that Reorganized Group has met certain predelivery payment obligations under the A350 order.

Pursuant to the regional jet leasing term sheet of the Master Memorandum of Understanding approved by the Court on December 17, 2004, GECC or its affiliates agreed to provide lease financing for up to 31 regional jet aircraft. The aircraft to be financed will consist of 70- to 100-seat regional jet aircraft manufactured by Bombardier Inc. ("Bombardier") and/or Empresa Brasileira de Aeronautica SA ("Embraer") in a mix and subject to other terms to be agreed mutually by GECC and USAI. Under the Master Memorandum of Understanding, GECC leased six Bombardier CRJ-700s to USAI in the first quarter of 2005, with terms expiring on the earlier of Group's emergence from Chapter 11 and June 30, 2005, which leases will be converted to long-term leases. Subsequent to closing on the six Bombardier CRJ-700 aircraft, GECC and Group agreed, pursuant to the Master Merger Memorandum of Understanding, approved by the Bankruptcy Court on June 23, 3005, ("GE Merger MOU") to eliminate the obligation of GECC to provide the remaining regional jet financing directly to Group, although GE agreed to provide single investor and operating lease financing to Republic Airways for the three EMB-170 aircraft already on order, and for ten EMB-170/190/195 aircraft for delivery to acceptable third-party carriers, which aircraft will be flown by those carriers for the benefit of Group. The Master Memorandum of Understanding is described in greater detail in Section VII.D.5 of this Disclosure Statement.

In December 2004, Group reached aircraft leasing and financing agreements with Embraer and Bombardier, which were approved by the Court in January 2005. Pursuant to the agreement reached with Embraer, USAI purchased and took delivery of three EMB-170 aircraft in January 2005 and committed to purchase and take delivery of three additional EMB-170 aircraft by March 31, 2005. USAI did not take delivery of the second three aircraft in March 2005. As a result, damages accrue from and after April 1, 2005 until the delivery of the aircraft at the rate of $162,795 per month per aircraft. If the aircraft are not delivered by August 31, 2005, Embraer's obligation to deliver these aircraft will terminate and its damages with respect to the undelivered aircraft may be as much as $10 million for all three aircraft (rather than at the rate of $162,795 per month per aircraft), with Embraer having the right to apply any remaining purchase deposits against Embraer's aggregate damages. Group is currently working to secure financing for these aircraft. Group's agreements with Embraer and Bombardier are described in greater detail in Section VII.D.6 of this Disclosure Statement.

Group maintains inventories of spare engines, spare parts, accessories and other maintenance supplies sufficient to meet its operating requirements.

As of June 30, 2005, Group owned the following aircraft that were not considered part of its operating fleet presented in the tables above. These aircraft were either parked at storage facilities or, as shown in the far right column, leased or subleased to third parties or related parties.

| Type | Average Age (years) | Owned | Leased/ Subleased |
|---|---|---|---|
| De Havilland Dash 8 | 15.1 | 3 | — |
| Douglas DC-9-30 | 24.7 | 6 | 6 |
|  |  | 9 | 6 |

As discussed above, USAI has code share agreements in the form of capacity purchase agreements with certain US Airways Express regional jet affiliate operators. Collectively, these regional jet affiliate operators flew 107 50-seat regional jet aircraft as part of US Airways Express as of June 30, 2005.

USAI is a participant in the Civil Reserve Air Fleet, a voluntary program administered by the Air Mobility Command. The General Services Administration of the U.S. government requires that airlines participate in Civil Reserve Air Fleet in order to receive U.S. government business. USAI's commitment under Civil Reserve Air Fleet is to provide up to its entire widebody fleet of ten 767-200ER aircraft and nine A330-300 aircraft in support of military missions. USAI is reimbursed at compensatory rates when

aircraft are activated under Civil Reserve Air Fleet. USAI is reimbursed during peacetime proportionally to its commitment.

USAI's 767-200ER aircraft are committed to the Aeromed Program of the Civil Reserve Air Fleet. Under this program, the aircraft are converted to flying hospitals for transportation of injured troops. USAI, Delta Air Lines and United Airlines are participants in the Aeromed Program. Participation in this program provides increased U.S. government revenues for USAI. Since the Civil Reserve Air Fleet activation of 2003, USAI has not provided "voluntary" lift to Air Mobility Command, due to operational limitations.

   2.   *Ground Facilities.*

USAI leases the majority of its ground facilities, including executive and administrative offices in Arlington, Virginia near Washington Ronald Reagan National Airport; its principal operating, overhaul and maintenance bases at the Pittsburgh International Airport and Charlotte/Douglas International Airports; training facilities in Pittsburgh and Charlotte; central reservations offices in Pittsburgh and Winston-Salem, North Carolina; and line maintenance bases and local ticket, cargo and administrative offices throughout its system.

USAI owns a training facility in Winston-Salem and previously owned a reservation facility in Orlando. The Orlando facility was closed on January 10, 2003 and was sold in May 2005. The Pittsburgh reservations call and service center was closed in July 2005 and consolidated into one location in Winston-Salem.

   3.   *Terminal Construction Projects.*

Group uses public airports for its flight operations under lease arrangements with the government entities that own or control these airports. Airport authorities frequently require airlines to execute long-term leases to assist in obtaining financing for terminal and facility construction. Any future requirements for new or improved airport facilities and passenger terminals at airports at which Group operates could result in additional expenditures and long-term commitments.

In 1998, USAI reached an agreement with the Philadelphia Authority for Industrial Development and the City of Philadelphia to construct a new international terminal and a new US Airways Express terminal at the Philadelphia International Airport, one of Group's connecting hubs and USAI's principal international gateway. The international terminal includes 12 gates for widebody aircraft and new federal customs and immigration facilities. The international terminal gates were put into operation in May 2003 and the ticket lobby opened in September 2003. The US Airways Express facility, completed in June 2001, can accommodate 38 regional aircraft.

**K.   Financial Statements and Recent Financial Results**

Set forth in Appendices E and F hereto are Group's annual report on Form 10-K for the fiscal year ended December 31, 2004, which includes audited financial statements on a consolidated basis for the years ended December 31, 2004 and 2003, including consolidated balance sheets, statements of operations, and statements of cash flows on a consolidated basis for those years, and Group's quarterly report for the period ended June 30, 2005, which includes unaudited financial statements on a consolidated basis for the three and six months ended June 30, 2005 and 2004.

## V.   PREPETITION CAPITAL STRUCTURE OF THE DEBTORS

On the Petition Date, the Debtors other than Group were all subsidiaries of Group and Group's capital structure consisted primarily of its Class A common stock, which was listed on NASDAQ under the ticker symbol "UAIR," Class B common stock, several classes of preferred stock, and short-term and long-term debt consisting of equipment financing agreements, airport facility debt and capital lease obligations, as described below.