## A.    Group's Stock

| Type of Stock | Authorized Shares | Shares Outstanding |
|---|---|---|
| Class A Common Stock | 200,000,000 shares | 52,145,360 shares (excluding 752,224 shares held in treasury) |
| Class B Common Stock | 5,000,000 shares | All 5,000,000 shares of Class B common stock outstanding were held by Retirement Systems of Alabama Holdings LLC ("RSA") |
| Class A Preferred Stock | 25,000,000 shares | 18,915,820 shares of Class A Preferred Stock were outstanding of which (i) 2,016,819 shares were held by RSA, (ii) 2,186,390 shares were held by Group's management, (iii) 3,817,500 shares were held by GE, (iv) 7,635,000 shares were held by ATSB, (v) 3,048,030 shares were held by unsecured creditors from the Prior Bankruptcy (as defined below), and (vi) 212,081 shares were held by Bank of America |
| Class B Preferred Stock | 250,000 shares | 75,000 shares of Class B Preferred Stock were outstanding and held by RSA |
| Class C Preferred Stock | 10 shares authorized for issuance in four (4) series to certain representatives of employees subject to collective bargaining agreements | All 10 shares of Class C Preferred Stock were outstanding of which (i) one (1) share of Series 1 Class C Preferred Stock was held by ALPA, (ii) one (1) share of Series 2 Class C Preferred Stock was held by IAMAW, (iii) three (3) shares of Series 3 Class C Preferred Stock were held by TWU, (iv) four (4) shares of Series 3 Class C Preferred Stock were held by AFA, and (v) one (1) share of Series 4 Class C Preferred Stock was held by the CWA |
| Preferred Stock (unclassified) | 24,749,990 shares | None |

## B.    Group's Warrants

On the Petition Date, there were 4,750,000 shares of Class A Common Stock and 2,220,570 each of Class A-1 Warrants and shares of Class A Preferred Stock authorized to be granted to the Debtors' management and 500,000 options to purchase Class A Common Stock authorized to be granted to the Debtors' non-employee directors. On the Petition Date, 4,247,945 shares of Class A Common Stock, 2,186,390 each of Class A-1 Warrants and Class A Preferred Stock and 466,640 options to purchase Class A Common Stock were outstanding under prior grants to the Debtors' management. Additionally, an aggregate of 88,589 options to purchase Class A Common Stock were outstanding under grants to Group's non-employee directors.

The following table summarizes the activity of the Debtors' stock options and warrants since emerging from their prior bankruptcy:

| | Stock Options | Weighted Avg. Exercise Price | Warrants | Weighted Avg. Exercise Price |
|---|---|---|---|---|
| Granted | 50,000 | $  7.34 | 2,227,576 | $  7.42 |
| Canceled | – | – | (11,050) | 7.42 |
| Balance at December 31, 2003 | 50,000 | 7.34 | 2,216,526 | 7.42 |
| Granted | 513,037 | 1.53 | 56,123 | 7.42 |
| Canceled | (114,250) | 1.77 | (154,059) | 7.42 |
| Balance at December 31, 2004 | 448,787 | $  2.11 | 2,118,490 | $  7.42 |

**C.    Debt**

    *1.    ATSB Debt.*

As part of its reorganization under the Prior Bankruptcy, USAI received a $900 million Guarantee under the Air Transportation Safety and System Stabilization Act from the ATSB in connection with a $1 billion term loan financing (the "ATSB Loan") that was funded by certain lenders under the ATSB Loan on March 31, 2003. USAI is the primary obligor under the ATSB Loan, which is guaranteed by Group and each of Group's other domestic subsidiaries. The ATSB Loan is secured by substantially all of the present and future assets of the Debtors not otherwise encumbered (including certain cash and investments accounts, previously unencumbered aircraft, aircraft engines, spare parts, flight simulators, real property, takeoff and landing slots, ground equipment and accounts receivable), other than certain specified assets, including assets which are subject to other financing agreements. On the Petition Date, approximately $718 million was outstanding under the ATSB Loan and as of June 30, 2005 the outstanding principal balance of the ATSB Loan was $708 million.

On July 22, 2005, the Debtors and America West reached an agreement in principle the "ATSB Term Sheet") with the ATSB regarding amendments to the ATSB Loan and to the AWA ATSB Loan. The implementation of the amendments to the ATSB Loan will constitute the treatment to be afforded under the Plan to the ATSB Loan Claims against each of the Debtors. As part of the consummation of the amendments to the ATSB Loan and the AWA ATSB Loan, the ATSB will waive its right under the AWA ATSB Loan to cause such loan to be prepaid in full in connection with the Merger.

Principal terms of the ATSB Term Sheet relating to the ATSB Loan include the following, among others:

- USAI shall prepay the ATSB Loan from the net cash proceeds of specified sales of assets in an amount equal to the greater of (i) $125 million or (ii) 60% of such net cash proceeds. In the event that the amount by which the ATSB Loan is prepaid equals or exceeds $150 million, no further scheduled amortizations of the ATSB Loan shall occur until September 30, 2007. Thereafter, the ATSB Loan shall be repaid in seven semi-annual installments through September 2010. The first installment payment will be in the amount of $89 million, the next two payments will be in the amount of $64 million and the remainder of the payments will be in the amount of $84 million. If the net cash proceeds of the specified sales of assets do not cause the ATSB Loan to be prepaid by an amount of $150 million or more, USAI shall pay the difference between (i) the amount by which the ATSB Loan was prepaid from such net cash proceeds and (ii) $150 million on March 31, 2007;

- The ATSB Loan shall be subject to mandatory prepayment with specified amounts of the proceeds (i) of certain issuances of debt or equity securities of the Reorganized Debtors or America West after the Effective Date (but not including any of the proceeds from the issuance of New Common Stock to the Plan Investors, the issuance of the New Convertible Note or the proceeds to be received from Airbus under the line of credit to be entered into in connection with the treatment of the Airbus Claim), (ii) from the sale of certain assets not subject to the mandatory prepayment provisions above, and (iii) from the sale of the collateral securing the ATSB Loan. In addition, the ATSB Loan shall be subject to mandatory prepayment from excess cash flow, if any, in the event of certain deficiencies in the value of the collateral securing the ATSB Loan and the AWA ATSB Loan. Except with respect to asset

sales and collateral value deficiencies, such prepayments shall be made on a pro rata basis with prepayments under the AWA ATSB Loan;

- The ATSB Loan shall bear interest at a spread over the cost of funds of the lenders for the portion thereof that is guaranteed by the ATSB and at LIBOR plus 6.00% for the portion that is not guaranteed by the ATSB. In addition, USAI shall pay the ATSB a guarantee fee of 6.00% on the outstanding principal balance of the ATSB guaranteed portion of the ATSB Loan;

- The ATSB Loan shall be secured by a first priority lien on all otherwise unencumbered assets of USAI and America West, including cash and cash equivalents, subject to certain exceptions;

- USAI will agree to certain affirmative and negative covenants, including minimum unrestricted cash and cash equivalents of consolidated Reorganized Group, and a fixed charge coverage ratio.

Principal terms of the ATSB Term Sheet relating to the AWA ATSB Loan include the following, among others:

- The AWA ATSB Loan shall be repaid as currently scheduled in seven equal semi-annual installments of $42.9 million with the final installment due in September 2008;

- The AWA ATSB Loan shall be subject to mandatory prepayment with specified amounts of the proceeds (i) of certain issuances of debt or equity securities of the Reorganized Debtors or America West after the Effective Date (but not including any of the proceeds from the issuance of New Common Stock to the Plan Investors, the issuance of the New Convertible Note or the proceeds to be received from Airbus under the line of credit to be entered into in connection with the treatment of the Airbus Claim), (ii) from the sale of certain assets not subject to the mandatory prepayment provisions above, or (iii) from the sale of the collateral securing the ATSB Loan. In addition, the AWA ATSB Loan shall be subject to mandatory prepayment from excess cash flow, if any, in the event of certain deficiencies in the value of the collateral securing the ATSB Loan. Except with respect to asset sales and collateral value deficiencies, such prepayments shall be made on a pro rata basis with prepayments under the ATSB Loan;

- The AWA ATSB Loan shall bear interest at LIBOR plus 0.40%. In addition, AWA shall pay the ATSB and the lenders and the counter-guarantors of the AWA ATSB Loan a guarantee fee of 8.00% on the outstanding principal balance of the ATSB guaranteed portion of the AWA ATSB Loan, such guarantee fee to increase by 0.05% annually;

- The AWA ATSB Loan shall be secured by a second priority lien on all assets of USAI and America West that secure the ATSB Loan, including cash and cash equivalents, subject to certain exceptions;

- AWA will agree to certain affirmative and negative covenants, including minimum unrestricted cash and cash equivalents of consolidated Reorganized Group, and a fixed charge coverage ratio;

- Warrants to purchase AWA Common Stock issued to the ATSB and the lenders and the counter-guarantors under the AWA ATSB Loan shall be converted into warrants to acquire New Common Stock.

Conditions to the consummation of the ATSB Term Sheet include, among others: the consummation of the Plan, including the investment by the Plan Investors or other persons in an aggregate amount of not less than $565 million; the closing of specified asset sales of at least $125 million by the Effective Date; Reorganized Group having unrestricted liquidity of at least $1.25 billion; and all other material agreements contemplated by the Plan, including the GECC Master MOU and the Airbus Term Sheet, having been completed.

Both the ATSB Loan and the AWA ATSB Loan will be modified in accordance with the ATSB Term Sheet prior to or on the Effective Date and such modified documents will be filed with the Bankruptcy Court and the SEC within ten (10) business days after the occurrence of the Effective Date.

2.    *GE Facilities.*

In November 2001, USAI obtained a $404 million credit facility from General Electric Credit Corporation ("GECC") (the "2001 GE Credit Facility"). To secure its obligations under the 2001 GE Credit Facility, USAI pledged as collateral its interest in 11 A320-family aircraft and 28 spare engines. In connection with the Prior Bankruptcy, Group reached a settlement with GECC and its affiliates (collectively, "GE"), that resolved substantially all aircraft, aircraft engine and loan-related issues. In connection therewith, USAI obtained additional financing from GECC in the form of a liquidity facility of up to $360 million (the "2003 GE Liquidity Facility"). Many of the Debtors' obligations to GECC, or affiliates of GECC, are generally cross-collateralized and cross-defaulted with other obligations owed by any Debtor to GECC or any of its affiliates (collectively, the "GE Obligations"). As discussed in greater detail below in Section VII.D.5, the Debtors and GE recently closed a series of Bankruptcy Court-approved transactions, including a sale-leaseback transaction and the entry into an amended and restated 2001 GE credit facility agreement, which, among other things, address the Debtors' liabilities with respect to these facilities.

3.    *Equipment Financing Arrangements.*

As of the Petition Date, the Debtors were parties to a significant number of equipment financing agreements, with installments due thereunder throughout the period from 2004 to 2022. These obligations, aggregating approximately $1.95 billion, are collateralized by aircraft and engines.

4.    *Other Debt.*

On the Petition Date, the Debtors had approximately $7.93 billion in future minimum lease payments under noncancellable operating leases for aircraft, engines and ground facilities.

In September 2000, the City of Charlotte issued $35 million of special facility revenue bonds, the proceeds of which were used to pay the cost of design, acquisition, construction and equipping of certain airport related facilities to be leased to USAI at the Charlotte/Douglas International Airport. On the Petition Date, Group had recorded a capital lease obligation, net of discount, related to these special facility revenue bonds of $20.7 million.

In the fourth quarter of 1999, USAI entered into an agreement with the Massachusetts Port Authority ("MassPort") to guarantee the principal and interest payments in connection with $33 million of revenue bonds issued by MassPort and the $49 million MassPort Special Facilities Revenue Bonds, Series 1996A. The proceeds of the bonds were used to finance the improvement and expansion of certain passenger terminal facilities which were leased to USAI at Boston's Logan International Airport. On the Petition Date, Group had recorded a capital lease obligation, net of discount, related to these revenue bonds of $27.6 million.

The Debtors were also parties to a number of long term contracts and leases, the rejection of which in the Chapter 11 Cases could give rise to substantial additional claims.

## VI.    CORPORATE STRUCTURE OF THE DEBTORS

### A.    Current Corporate Structure

1.    *Capital Stock.*

The capital structure of the Debtors is as described above in Section V.

On the Effective Date, the existing capital stock of Group, as well as the Warrants and all existing stock options to purchase capital stock of Group, will be cancelled and new common stock, par value $0.01 per share (the "New Common Stock") of Reorganized Group will be issued, as described herein and in the

Plan. Group is the parent company and sole stockholder of USAI, the three other Debtors (PSA, Piedmont and Material Services), Barbell Acquisition Corp., which will be merged with and into America West in the Merger, and one foreign insurance related subsidiary (Airways Assurance), which is not a Debtor.

**B.    Management of the Debtors**

       *1.    Board of Directors.*

       The current Board of Directors is comprised of 14 directors, the majority of which are designated by RSA, pursuant to the agreement reached in the Prior Bankruptcy.

       *2.    Officers.*

       The current management team of Group and USAI is composed of highly capable and seasoned professionals with substantial airline industry experience. The following individuals are the executive officers of Group and USAI as of August 2, 2005:

| **Name** | **Position** |
| --- | --- |
| Bruce R. Lakefield | President and Chief Executive Officer, Group and USAI |
| Ronald E. Stanley | Executive Vice President and Chief Financial Officer, Group and USAI |
| Alan W. Crellin | Executive Vice President – Operations, USAI |
| Elizabeth K. Lanier | Executive Vice President – Corporate Affairs, General Counsel and Secretary, Group and USAI |
| Jerrold A. Glass | Executive Vice President – Chief Human Resources Officer, USAI |
| Anita P. Beier | Senior Vice President – Finance and Controller, Group and USAI |
| Christopher L. Chiames | Senior Vice President – Corporate Affairs of USAI |
| Andrew P. Nocella | Senior Vice President – Planning of USAI |
| John Prestifilippo | Senior Vice President – Maintenance of USAI |

       Mr. Lakefield is President and Chief Executive Officer and a director of Group and USAI. Mr. Lakefield served as Chairman and Chief Executive Officer of Lehman Brothers International from 1995 until 1999. He has served as a Senior Advisor to the Investment Policy Committee of HGK Asset Management since 2000. Mr. Lakefield serves as a non-executive director of Constellation Corporation PLC and a member of the Board of Directors of Magic Media, Inc. He is a member of the Strategy and Finance Committee of Group's Board of Directors.

       Mr. Stanley is the current Executive Vice President and Chief Financial Officer of Group and USAI, in which position he has served since October 2004. Mr. Stanley has served as a director of Scholefield, Turnbull & Partners, a business travel consulting firm based in London, England since 2000. Mr. Stanley also serves as a director of Decatur Foundry, Inc., a private company. Mr. Stanley served as Chief Operating Officer and a member of the Executive Committee and Board of Directors of HSBC Equator from 2000 until 2002. He served as Senior Vice President & General Manager of Royal Bank of Canada ("RBC") Group, Chairman and CEO of Royal Bank of Canada Europe Limited and a member of the Executive Committee of RBC Dominion Securities from 1995 to 1999. He is also a director of USAI.

       Mr. Crellin joined USAI in 1988 as a result of the acquisition of Pacific Southwest Airlines. He was promoted to serve as Vice President – Ground Services of USAI in 1995. Mr. Crellin served as Senior Vice President – Customer Service of USAI from 2000 until his election as Executive Vice President – Operations in January 2002. Prior to joining USAI, Mr. Crellin held a variety of management positions with Pacific Southwest Airlines from 1971 to 1988, including Vice President – Customer Service.

       Ms. Lanier joined Group and USAI in March 2003 as Executive Vice President – Corporate Affairs and General Counsel, and was appointed as Secretary of Group and USAI in January 2004. Previously, Ms. Lanier was Senior Vice President – General Counsel for Trizec Properties, Inc. from April

to December 2002, and prior to that, Vice President – General Counsel for General Electric Power Systems from 1998 to 2002, and Vice President and Chief of Staff for Cinergy Corporation from 1996 to 1998.  Ms. Lanier has been a member of the board of directors of Patina Oil & Gas Corporation since 1998.  She serves as a member of the audit committee and chair of the corporate governance and nominating committee of Patina.  Ms. Lanier previously was associated with Davis Polk & Wardwell and was an associate and partner of Frost & Jacobs, now Frost Brown Todd, LLC.

Mr. Glass joined USAI in April 2002 as Senior Vice President – Employee Relations and was promoted to Executive Vice President – Chief Human Resources Officer on April 18, 2005.  Mr. Glass is a recognized expert in airline and railroad labor and employee relations issues.  Mr. Glass joined USAI from J. Glass and Associates, of which he was the founder and where he served as President from 1989 until April 2002.  At USAI, he is responsible for labor relations, human resources policy and development, compensation, corporate learning and development, recruiting and benefits.

Ms. Beier joined USAI in June 1999 from CSX Corporation as Vice President – Finance and Controller.  In May 2004, Ms. Beier was promoted to Senior Vice President – Finance and Controller, and she is responsible for the management of all accounting functions for Group and its subsidiaries and for monitoring the restructuring of Group and USAI.  At CSX Corporation, Ms. Beier held a number of positions in financial management, including Vice President – Financial Planning.  Prior to being named Vice President–Financial Planning at CSX Corporation in September 1998, Ms. Beier was Chief Financial Officer of American Commercial Lines in 1997-1998.  Ms. Beier served in a variety of financial positions in economic and financial analysis, budgeting and accounting at CSX Corporation from 1981 to 1997.

Mr. Chiames joined USAI in May 2002 as Senior Vice President – Corporate Affairs. Mr. Chiames is responsible for USAI's government relations and corporate communications functions. Mr. Chiames has almost 15 years of airline industry experience, including leadership of Burson-Marsteller's transportation and tourism public affairs practice from 2001 to 2002 and Managing Director of Public Relations at American Airlines, Inc. from 1996 to 2001.

Mr. Nocella joined USAI in April 2002 as Vice President –Planning and Scheduling.  He served as Vice President – Revenue Management and Pricing of USAI from December 2002 to June 2003.  Mr. Nocella served as Vice President – Network and Revenue Management from June 2003 until his election as Senior Vice President – Planning in January 2005.  At USAI, he is responsible for route planning, scheduling, pricing and yield management functions.  Prior to joining USAI, Mr. Nocella served as Vice President, Planning and Scheduling of America West Airlines from April 1997 to April 2002 and in several management positions at Continental Airlines from December 1993 to March 1997.

Mr. Prestifilippo joined USAI in August 2002 as Senior Vice President – Maintenance.  With nearly 20 years of airline maintenance management experience, Mr. Prestifilippo previously held the position of Vice President – Technical Services and Operations for Continental Express Airlines from 1986 to 2001 and other senior-level management positions for Continental Express and Continental Airlines.

**C.     Current Debtors Other Than Group and USAI**

The following list identifies the officers and directors of each of the Debtors other than Group and USAI:

*1.     PSA Airlines, Inc.*

| OFFICERS: | Name | Position |
| --- | --- | --- |
| | Keith D. Houk | President & Chief Executive Officer |
| | Timothy G. Keuscher | Vice President – Operations |
| | Kevin Reinhalter | Vice President – Maintenance |
| | Brian E. Foont | Secretary |

DIRECTORS:    Keith D. Houk
Andrew P. Nocella
Ronald E. Stanley

2.    *Piedmont Airlines, Inc.*

| OFFICERS: | Name | Position |
|---|---|---|
| | Stephen R. Farrow | President & Chief Executive Officer |
| | Michael J. Scrobola | Vice President – Flight Operations |
| | Eric H. Morgan | Vice President – Customer Service |
| | Peter R. Barry | Vice President – Maintenance |
| | Scott J. Strohm | Vice President – Finance |
| | Terry J. Petrun | Vice President – Administration |
| | Brian E. Foont | Secretary |

DIRECTORS:    Stephen R. Farrow
Andrew P. Nocella
Ronald E. Stanley

3.    *Material Services Company, Inc.*

| OFFICERS: | Name | Position |
|---|---|---|
| | Ronald E. Stanley | President & Chief Executive Officer |
| | Terry J. Petrun | Vice President – Purchasing |
| | Scott J. Strohm | Vice President – Finance & Treasurer |
| | Brian E. Foont | Secretary |

DIRECTORS:    Stephen R. Farrow
Keith D. Houk
Ronald E. Stanley

## VII.    THE CHAPTER 11 CASES

### A.    Events Leading Up to the Chapter 11 Cases

From 1996 through 1999, the Debtors generated over $2 billion in net profits.  The last profitable fiscal year for the Debtors was 1999.  In recent years, the Debtors' profitability was significantly eroded by competitive pressures (including the incursion of both regional jets and low-cost carriers into the Debtors' operating territories, discussed above), unfavorable economic trends, and rising fuel and labor costs.

USAI was one of the airlines most significantly affected by the events of September 11th.  Not only were the Debtors' operations shut down entirely for three days in September, but Ronald Reagan Washington National Airport, at which USAI is the largest carrier, was closed until October 4, 2001.  Service was not fully restored until May 2002.  In addition, the East Coast in general has been the part of the country most affected in the aftermath of the attacks.  The Debtors compete heavily with trains and automobiles as a result of their short-haul network and, as such, have been more affected than other airlines by this competition.  The increased airport security charges and procedures have also had a disproportionate impact on short-haul travel.

Each of the Debtors in these cases had previously filed a voluntary petition for relief under Chapter 11 on August 11, 2002.  The Debtors emerged from the Prior Bankruptcy under the First Amended Joint Plan of Reorganization of US Airways Group, Inc. and Affiliated Debtors and Debtors-in-Possession, As Modified (the "2003 Plan"), which was confirmed pursuant to an order of the Bankruptcy Court on March 18, 2003 and became effective on March 31, 2003.

Before emerging from the Prior Bankruptcy in 2003, the Debtors examined every phase of their contracts and operations and had significantly reduced costs. The Debtors had reduced mainline capacity, realigned the network to maximize yield, initiated a business plan to use more regional jets, procured financing for these aircraft and expanded their alliances with other carriers. Since emerging from the Prior Bankruptcy, the Debtors continued to incur substantial losses from operations. For calendar year 2003, the Debtors' operating revenues were $6.85 billion, operating loss was $251 million, and net income was $1.46 billion including the emergence gain of $1.92 billion. For the calendar year 2004, the Debtors' operating revenues were $7.12 billion, operating loss was $378 million, net loss was $611 million and loss per common share was $11.19. The primary factors contributing to these losses include the reduction in domestic industry unit revenue and significant increases in fuel prices. The downward pressure on domestic industry revenue was a result of the rapid growth of low-fare, low-cost airlines, the increasing transparency of fares through Internet sources and other changes in fare structures that resulted in substantially lower fares for many business and leisure travelers. The competitive environment continued to intensify throughout 2004, particularly in key markets such as Philadelphia, Washington, D.C., Boston and New York.

As it became apparent that the Debtors would not survive if they continued to operate under the business plan that had formed the basis for the plan of reorganization in the Prior Bankruptcy, the Debtors began to develop the Transformation Plan. A key element of the Transformation Plan was significant reductions in labor costs through changes to the Debtors' collective bargaining agreements. The Debtors aggressively sought the necessary agreements to allow full implementation of the Transformation Plan without the need for filing new Chapter 11 Cases, but were unable to do so in a timely manner. As a result of the recurring losses, declining available cash and risk of defaults or cross defaults under certain key financing and operating agreements, it was necessary for the Debtors to file voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code.

On September 12, 2004, the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Virginia, Alexandria Division (Case Nos. 04-13819-SSM through 04-13823-SSM). The Debtors continue to operate their businesses as debtors-in-possession under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court.

**B.      Failure of Reorganization after Prior Bankruptcy**

In 2002, the airline industry was still reeling from the effects of September 11, 2001, and the financial impact of the events of September 11th on the Debtors was exacerbated by the extended closure of Ronald Reagan Washington National Airport. There was, however, a set of generally accepted industry expectations. It was broadly accepted that industry revenues, while then depressed, would rebound as the economy recovered from the terrorist attacks. Based on these expectations, the Debtors and their stakeholders all believed that the cost reductions, structural changes and revenue initiatives undertaken pursuant to the reorganization plan in the Prior Bankruptcy would enable the Debtors to return to reasonable profitability and competitiveness. The Debtors projected that the combination of their actions in the restructuring and the universally projected rebound in industry revenue would result in increases in pre-tax income of Group and its subsidiaries from a loss of $225 million in 2003 to a profit of $660 million in 2009.

The Debtors completed each of the steps they had identified in the reorganization plan in the Prior Bankruptcy to enhance revenues and reduce costs. A review of the Debtors' mainline financial projections contained in the plan as of March 2003, compared with the status of the same data points as of the end of the year 2004, demonstrates that the Debtors implemented the prior plan as contemplated.

|  | Prior Bankruptcy Projections for 2004 | Actual 2004 Results |
|---|---|---|
| Fleet Size | 279 | 281 |
| Capacity (ASMs) (billions) | 53.7 | 53.2 |
| Revenue passenger miles (billions) | 39.4 | 40.0 |
| Cities served | 87 | 89 |
| Labor cost (per ASM) | 4.2¢ | 4.0¢ |
| Load factor (mainline) | 73.3% | 75.1% |
| Total cost (per ASM) (excl. fuel and unusual items) | 10.1¢ | 9.5¢ |
| Total operating expenses (excl. fuel) (millions) | $5,237 | $5,047 |

In virtually every category of cost savings, the Debtors met or exceeded the goals of the reorganization plan in the Prior Bankruptcy. Had revenue results similarly conformed to plan, the Debtors would have been positioned to be a profitable enterprise. But, as it turned out, the Debtors' forecasts were too optimistic about the revenue environment in which they would have to compete. The two primary reasons the reorganization plan in the Prior Bankruptcy did not succeed were higher than predicted fuel costs and lower revenues. The Debtors' projections for mainline were as follows:

|  | Prior Bankruptcy- Projections for 2004 | 2004 Results |
|---|---|---|
| Fuel price (per gallon) | 80.5¢ | 112.08¢ (net of hedging) |
| Passenger revenue (per available seat mile) | 10.4¢ | 9.3¢ |
| Yield | 14.1¢ | 12.4¢ |
| Total passenger revenue (in millions) | $5,567 | $4,966 |

While fuel prices accelerated the current bankruptcy filing, it was the decline in domestic passenger unit revenues, not fuel prices, that was the central problem. The growth of low-cost carriers and the low-cost carriers' increase in pricing power in the domestic market had a profound structural impact on the airline industry. The Debtors did not anticipate the magnitude of this structural shift.

Industry revenue is down, even though passenger travel is up. The reason revenue is down while passenger travel is up is pricing. Although low-cost carriers currently represent only about 26% of industry capacity, the low-cost carriers achieved pricing power in the general market as a result of their explosive growth. With their movement into new markets, and the growth of the Internet as a source of fare and scheduling information, low-cost carriers now establish price levels in most of the markets in which the Debtors and other legacy carriers fly. This development, although positive for consumers, has had a persistent and deleterious effect on the revenue side of the Debtors' businesses and represents a new paradigm in the airline industry. Passenger levels are increasing, but the legacy carriers, such as the Debtors, are still losing money.

C.    **Efforts to Implement the Transformation Plan**

Throughout the spring and summer of 2004, the Debtors communicated with key stakeholders and the public their plan to transform into a low cost carrier, making it a fully competitive and profitable airline (the "Transformation Plan"). Group undertook substantial efforts to implement the Transformation Plan, which was built on several aspects of proven success in the airline industry. Specifically, Group has undertaken the following initiatives:

- Lower labor costs. These include decreased rates of pay and benefits, increased productivity, as well as a narrowing of the scope of work that must be performed under union contracts. USAI has achieved significant productivity enhancements with its internal workforce,

particularly its pilots and flight attendants, through significant changes to longstanding work rules. In addition, USAI obtained scope of work changes that allowed for significant outsourcing to competitive third party providers of work formerly performed internally, particularly in the areas of passenger reservations, aircraft cleaning and aircraft heavy maintenance.

- Lower, simplified pricing and lower distribution costs. USAI has already taken steps to simplify its fares by introducing its GoFares pricing plan in many markets served from Philadelphia, Washington, D.C., and Fort Lauderdale, and has stated its intent to expand that pricing plan across its system in conjunction with achieving lower costs. A redesigned website and more airport technology will also lower distribution costs, enhance customer service and improve airport processing.

- Enhanced low-cost product offering. Group customers will continue to benefit from a combination of product offerings that is unique among low-cost carriers, including two-class service, international flights to Canada, the Caribbean, Latin America and Europe, service to airports that business travelers prefer, access to a global network via the Star Alliance, a premium frequent flyer program and competitive onboard service.

- Network enhancements. Leveraging its strong positions in major Northeast markets, USAI intends to use its airport slot and facilities assets to offer nonstop service to more major business and leisure destinations. Pittsburgh is no longer a hub and service has been reduced in accordance with previously announced operational changes. Fort Lauderdale is being expanded to handle additional Latin America service. Operations at Charlotte have been expanded, and new routes from Washington Ronald Reagan National Airport have been introduced. In addition, changes are being made to the scheduling practices at Philadelphia to improve reliability, adding new destinations in the Caribbean and Latin America as well as seasonal service to Barcelona, Spain and Venice, Italy introduced in May 2005.

- Lower unit operating costs. In conjunction with more point-to-point flying, USAI is flying its fleet more hours per day than formerly as it decreases the time aircraft sit on the ground at hubs, waiting for connecting passengers. Productivity increases have been gained through this more efficient scheduling in conjunction with the contractual labor changes.

D.    **Significant Events During the Bankruptcy Cases**

1.    *Bankruptcy Filing.*

The Debtors filed for relief under Chapter 11 of the Bankruptcy Code on September 12, 2004. Since the Petition Date, the Debtors have continued to operate as debtors-in-possession subject to the supervision of the Court in accordance with the Bankruptcy Code. An immediate effect of the filing of the Debtors' bankruptcy petitions was the imposition of the automatic stay under Section 362(a) of the Bankruptcy Code which, with limited exceptions, enjoined the commencement or continuation of all collection efforts by creditors, the enforcement of liens against property of the Debtors and the continuation of litigation against the Debtors. This relief provided the Debtors with the "breathing room" necessary to assess and reorganize their businesses.

2.    *First Day Orders.*

The Debtors filed numerous motions on the Petition Date seeking the relief provided by certain first day orders. First day orders are intended to ensure a seamless transition between a debtor's prepetition and postpetition business operations by approving certain normal business conduct that may not be specifically authorized under the Bankruptcy Code or as to which the Bankruptcy Code requires prior approval by the bankruptcy court. On the Petition Date, the Court entered an order scheduling hearings on the first day motions to be held on September 13, 2004 and entered bridge orders granting the Debtors limited relief on certain of the first day motions pending such hearing. At the hearing held on

September 13, 2004 (the "First Day Hearing"), the Bankruptcy Court granted the Debtors' first day motions for various relief designed to stabilize the Debtors' business operations and business relationships with customers, vendors, employees and others. The first day orders in the Chapter 11 Cases authorized the Debtors to, among other things:

- substantially maintain their existing bank accounts and operation of their cash management system;

- reject certain unexpired real property leases and establish procedures relating thereto;

- honor prepetition obligations to the Debtors' customers and to continue customer programs and practices in the ordinary course of business;

- pay prepetition obligations to foreign vendors, foreign service providers and foreign governments;

- pay certain outside maintenance providers, shippers and contractors in satisfaction of perfected or potential mechanics', materialmens', or similar liens or interests and other claims and honor certain related contracts in the ordinary course of business;

- pay certain prepetition employee wages, salaries, benefits and continue employee benefit programs in the ordinary course of business and directing all banks to honor certain prepetition checks for payment of prepetition wage, salary and benefit obligations;

- pay prepetition sales, use, trust fund and related tax obligations;

- apply prepetition payments to prepetition and/or postpetition fuel supply contracts, honor other fuel, supply, distribution, and storage contracts and continue participation in fuel consortia;

- assume executory contracts relating to clearing house agreements, ARC agreements, BSP agreements, cargo settlement agreements, UATP agreements, and ATPCO agreements and honor certain obligations related to such agreements and related bilateral interline agreements, alliance agreements, code share agreements, global distribution (reservation) systems agreements, service agreements, travel agency agreements, online services agreements, dividend miles agreements, and cargo agreements in the ordinary course of business;

- reject certain leased aircraft equipment; and

- retain the following professionals to serve on behalf of the Debtors in the Chapter 11 Cases: Arnold & Porter LLP as primary bankruptcy counsel; Seabury Aviation Advisors Inc. as aviation, financial and restructuring advisors and consultants; McGuire Woods LLP as local bankruptcy counsel; O'Melveny & Meyers LLP as special labor counsel; FTI Consulting, Inc. as Restructuring Advisors and consultants; and KPMG LLP as Auditors and Tax Advisors.

These first day orders had the desired effect of allowing the Debtors to have a smooth entry into the Chapter 11 process.

> 3.      *Other Significant Bankruptcy Court Actions.*

In addition to the orders approving the first day motions and the other matters described above, the Debtors have sought and obtained certain orders from the Bankruptcy Court that are of particular

importance in the operation of the Debtors' businesses or in the administration of the Chapter 11 Cases. Included among such orders are the following:

- Extension of Time to Assume or Reject Nonresidential Real Property Leases. The Bankruptcy Court extended the deadline under 11 U.S.C. § 365(d)(4) for the Debtors to assume or reject nonresidential leases through the earlier of August 31, 2005 or the date of confirmation of a plan of reorganization.

- Extension of Time to Remove Actions. The Bankruptcy Court extended the time within which the Debtors may remove actions pursuant to 28 U.S.C. § 1452 and Federal Rule of Bankruptcy Procedure 9027(a)(2) through and including the later to occur of (i) April 30, 2005 or (ii) 30 days after entry of an order terminating the automatic stay with respect to the particular action sought to be removed.

- Aircraft Rejection/Abandonment Motions. In addition to the motion filed by the Debtors on the Petition Date, the Debtors subsequently filed additional motions (the "Postpetition Rejection/Abandonment Motions") seeking the authority to reject or abandon certain, but not necessarily all, additional aircraft and engines from larger pools of aircraft identified on exhibits to the Postpetition Rejection/Abandonment Motions. The Debtors have rejected numerous additional aircraft since the Petition Date.

- Procedures for Lifting the Automatic Stay with respect to Certain Claims. On November 22, 2004, the Bankruptcy Court entered an order authorizing the Debtors to enter into stipulations to modify the automatic stay to allow certain claims, primarily personal injury claimants, to proceed to settlement or judgment of such claims solely with respect to available insurance proceeds.

- Labor and Benefits Matters. The Bankruptcy Court entered certain orders with respect to USAI's collective bargaining agreements with its labor unions, benefit plans and retiree benefits, which are discussed in Section VII.D.9 below.

- Exclusivity. Pursuant to an order entered on January 27, 2005, the Bankruptcy Court extended the Debtors' exclusive period to propose a plan of reorganization (the "Filing Period") through March 31, 2005, and to solicit acceptances of such plan (the "Solicitation Period") through June 30, 2005. Subsequently, by an order entered on April 1, 2005, the Court extended the Filing Period through and including May 31, 2005 and extending the Solicitation Period through and including August 31, 2005, and by an order entered on June 23, 2005, the Filing Period was extended through and including August 31, 2005 and the Solicitation Period was extended through and including October 31, 2005.

- Credit Card Agreements. Credit card sales represent the substantial majority of the Debtors' total gross receipts. The Debtors have various agreements with credit card processors to collect and process credit card receivables. Pursuant to these various agreements, the parties specify a discount rate that reduces the amount of credit card receivables that are paid by processors to the Debtors. In addition, the agreements specify the amount of reserve that the processors can maintain. As the largest component of the Debtors' revenues, credit card sales are an absolutely essential component of the Debtors' business. Accordingly, the Debtors moved for several orders authorizing the Debtors to assume, as modified, contracts with their credit card processors. Specifically the Bankruptcy Court, in four separate orders, authorized the Debtors to assume modified credit card processing agreements with (i) Diners Club International Ltd., (ii) American Express Travel Related Services Company, Inc., (iii) Discover Financial Services, Inc. and (iv) Bank of America, N.A.

- Section 1110 Agreements and Stipulations. The Bankruptcy Court entered an order authorizing: (i) the Debtors to enter into agreements pursuant to Section 1110(a)(2) of the Bankruptcy Code ("1110 Agreements") confirming their undertaking to perform all obligations under certain leases and secured financings (the "Aircraft Agreements") relating to aircraft and other equipment that may be subject to Section 1110 of the Bankruptcy Code (collectively, the "Aircraft Equipment"); (ii) the Debtors to make such payments, and to take such actions, as may be necessary to cure defaults and retain protection of the automatic stay with respect to such Aircraft Equipment; and (iii) the Debtors to enter into stipulations pursuant to Section 1110(b) of the Bankruptcy Code with the Debtors' aircraft lessors and financiers that may qualify for protections under Section 1110 of the Bankruptcy Code (collectively, the "Aircraft Creditors") to extend the time to perform obligations required under Section 1110 of the Bankruptcy Code, all such agreements being subject to final approval of the Bankruptcy Court.

- Rejection of Real Property Leases. In addition to leases rejected as part of the First Day Hearing, the Debtors were also granted authority to reject a number of real property leases that were no longer necessary to the Debtors' continued business operations, including the following: PSA rejected a terminal lease at the Toledo Express Airport in Toledo, Ohio; Piedmont rejected a terminal lease at St. Joseph's County Airport in South Bend, Indiana; and USAI rejected a city ticket office lease in Annapolis, Maryland and a lease and use agreement at Chicago Midway Airport.

- Sale of Assets to the City of Philadelphia and Authorization for Setoff of Prepetition Debts. On February 18, 2005, the Bankruptcy Court entered an order approving the Debtors' agreement with the City of Philadelphia for the sale and leaseback by the Debtors of thirty (30) jet bridges and all machinery and equipment attached to the jet bridges or necessary for the operation of the jet bridges currently owned by the Debtors and located at gates in Terminals B and C of the Philadelphia International Airport. As a result of the transaction, the Debtors will receive approximately $5.2 million in credits issued by the City of Philadelphia to the Debtors, which credits will be applied, in lieu of cash, against obligations due and owing by the Debtors to the City of Philadelphia on account of goods, services and rent. Additionally, the Bankruptcy Court granted the City of Philadelphia relief from the automatic stay to exercise its right to setoff its prepetition claim against USAI of approximately $3.9 million against a prepetition credit owed to USAI of approximately $7.6 million, leaving USAI with net credits of over $3.7 million to be applied by USAI against the Debtors' obligations in respect of rent, fees and other charges owing to the City of Philadelphia.

- Aircraft and Equipment Financings. The Debtors have devoted significant time and effort to evaluating their numerous aircraft and equipment debt and lease financings and rationalizing their fleet. The Debtors have engaged in extensive negotiations with their various Aircraft Creditors with respect to the Debtors' fleet requirements in order, *inter alia,* to restructure their aircraft obligations consistent with market rates and otherwise to obtain significant additional cost savings. Most notably, pursuant to the GE Master MOU, as defined and discussed more specifically in Section VII.D.5 below, the Bankruptcy Court entered an order on December 17, 2004 approving a global aircraft finance restructuring agreement among the Debtors and GECC, the Debtors' largest Aircraft Creditor, which provides the Debtors with critical short-term liquidity, reduced debt, lower aircraft ownership costs, and enhanced engine maintenance services and leases for new regional jets, while preserving the vast majority of the Debtors' mainline fleet. On June 23, 2005, the Bankruptcy Court entered an order approving certain arrangements, modifications and supplements to the GE Master MOU. The Bankruptcy Court has also entered orders approving agreements among the Debtors and its other key Aircraft Creditors, including Airbus North America Sales Inc., ("Airbus"), Bombardier, Embraer, and SNECMA.

- Fuel Hedging Agreements. Recognizing the Debtors' large consumption of jet fuel in connection with their business activities and the potential risk-management benefits that would inure to the Debtors' bankruptcy estates if allowed to hedge fuel transactions, the Bankruptcy Court authorized the Debtors, subject to the prior written consent of the ATSB Lenders, to enter into and provide collateral for transactions pursuant to an aviation fuel hedging program for purposes of hedging against changes in fuel prices.

- Junior Debtor-in-Possession Financing. As described in Section III.D.1 above, on February 28, 2005, the Court entered an order authorizing the Debtors to enter into the Eastshore Financing Agreement.

- Bidding Procedures. As discussed in Section VII.D.11, on May 31, 2005, The Court approved an order approving procedures for the consideration of plan funding proposals, approving the form and manner of notice of competing offer procedures, and approving break up fees and related provisions.

- Transaction Retention Program. The Bankruptcy Court entered an order on June 15, 2005 authorizing the Debtors to implement (i) amended and restated severance policies for managing directors and covered employees below the level of managing director, and (ii) their Retention Payment Program.

4.     *Use of Cash Collateral.*

In order to continue their business operations, meet their payroll and other necessary, ordinary business expenditures, acquire goods and services and otherwise preserve the value of the Estates, on the Petition Date, the Debtors moved the Bankruptcy Court for the entry of bridge, interim, final, and supplemental orders authorizing the Debtors' use of the cash collateral of the ATSB Lenders (the "ATSB Cash Collateral"). In connection with the filing of the Chapter 11 Cases, the ATSB Lenders agreed to the Debtors' continued use of ATSB Cash Collateral on an interim basis, which agreement was approved by the Bankruptcy Court pursuant to an Interim Order entered on September 13, 2004. The Bankruptcy Court thereafter approved three subsequent agreements reached among the Debtors and the ATSB Lenders extending the Debtors' ability to use the ATSB Cash Collateral, first through January 14, 2005, then through June 30, 2005, and a series of interim extensions through August 19, 2005 subject to certain conditions and limitations more specifically set forth in such agreements (such orders authorizing the Debtors' continuing use of ATSB Cash Collateral are collectively referred to herein as the "ATSB Cash Collateral Order"). Under the ATSB Cash Collateral Order, the Debtors continue to have access to ATSB Cash Collateral in support of their daily business operations, subject to the requirement that they maintain an agreed-upon minimum amount of cash on hand each week. This weekly minimum cash requirement declines from approximately $500 million at the end of January 2005 to approximately $340 million on June 30, 2005. The interim agreement that will expire on August 19, 2005 currently requires, among other conditions, a weekly minimum unrestricted cash balance of $325 million. The Debtors are in negotiations with the ATSB to extend the current cash collateral agreement through the end of October 2005, with an adjustment to the minimum cash requirement to reflect the Debtors' expected cash requirements. The Debtors must also maintain and achieve certain cumulative earnings levels during the period of the Debtors' permitted use of ATSB Cash Collateral, and must otherwise comply with certain additional covenants and restrictions set forth in the ATSB Cash Collateral Order. The Debtors have a reasonable expectation that, on or before August 19, 2005, the ATSB Lenders will consent, subject to certain conditions, to the Debtors' use of ATSB Cash Collateral into October.

5.     *GE Master Memorandum of Understanding.*

In November 2004, Group reached a comprehensive agreement with GE as described in the Master Memorandum of Understanding and related term sheets (the "Master Memorandum of Understanding," and as amended, supplemented and modified from time to time, including where the

context requires, by the GE Merger MOU, as defined below, the "GE Master MOU") that was approved by the Bankruptcy Court on December 17, 2004. The Master Memorandum of Understanding and the transactions contemplated by the term sheets attached thereto, provided the Debtors with short-term liquidity, reduced debt, lower aircraft ownership costs, enhanced engine maintenance services and operating leases for new regional jets, while preserving the vast majority of USAI's mainline fleet owned or otherwise financed by GE. The key aspects of the Master Memorandum of Understanding are as follows: (i) agreements providing for continued use of certain Airbus, Boeing and regional jet aircraft, and the return to GECC of certain other Airbus and Boeing aircraft, (ii) the creation of a bridge facility of up to approximately $56 million for use by the Debtors during the pendency of these Chapter 11 Cases, (iii) the purchase by GECC, and immediate lease back to USAI, of (a) the assets securing the 2001 GE Credit Facility, the 2003 GE Liquidity Facility, and other GE Obligations, consisting of 11 Airbus aircraft, 28 spare engines and the engine stands, and (b) 10 regional jet aircraft currently mortgaged-debt financed by GECC, (iv) a restructuring of the balance of the 2001 GE Credit Facility, with an additional permitted draw thereunder, subject to the pledge of certain additional collateral to secure the 2001 GE Credit Facility, (v) the commitment of GECC, subject to financial tests and other conditions, to provide leases for up to 31 additional regional jet aircraft, (vi) the modification of USAI's engine maintenance agreements with GEAE, and (viii) upon emergence from bankruptcy, the issuance of convertible notes in the aggregate principal amount of $125 million.

In connection with the Merger, the Debtors and America West have renegotiated certain of their respective existing agreements, and entered into new agreements, with GE. These agreements are set forth in a comprehensive agreement with GE and certain of its affiliates in the GE Merger MOU. In part, the GE Merger MOU modified and supplemented the agreements reached between the Debtors and GE in the Master Memorandum of Understanding.

In relevant part, a summary of the key terms of the GE Master MOU are as follows:

(a)     *Bridge Facility*

The bridge facility entered into between Group and GECC pursuant to the Master Memorandum of Understanding on December 20, 2004 will continue in effect during the pendency of the Chapter 11 Cases. The bridge facility provides for a loan in the amount of up to approximately $56 million, which has been drawn down. The bridge facility bears interest at the rate of LIBOR plus 4.25%, matures on the date the Debtors emerge from their Chapter 11 Cases, and is payable in cash or, upon maturity, by issuance of the $125 million of convertible notes, as described below. The bridge facility is cross-collateralized and cross-defaulted with all other GE Obligations owed by any of the Debtors to GE, and is entitled to administrative expense claim status in the Chapter 11 Cases, with priority over all other administrative claims other than for aircraft financing, which are *pari passu*, and subordinate only to (i) the super-priority administrative expense claim of the ATSB Lenders under the ATSB Loan, (ii) post-petition wages and benefits, and (iii) any new money debtor-in-possession financing.

(b)     *2001 GE Credit Facility*

Following the application of the proceeds realized from the consummation of the sale-leaseback transaction described in paragraph (d) below, the remaining balance due on the 2001 GE Credit Facility was approximately $7.1 million. Subsequently, the Debtors and GE entered into the amended and restated 2001 GE credit facility agreement, dated as of July 15, 2005, pursuant to which USAI borrowed an additional loan, which, together with remaining balance due on the 2001 GE Credit Facility following the consummation of the sale-leaseback transaction, resulted in a total principal outstanding balance thereunder of approximately $28.225 million. The principal balance outstanding under the amended and restated 2001 GE Credit Facility bears interest at LIBOR plus 4.25%, and is repayable over eight quarters commencing September 2005, provided that if the Merger occurs, amortization will commence in September 2006 with a final maturity in 2010. The amended and restated 2001 GE credit facility agreement is secured by a third lien on three CRJ-700 aircraft and a second lien on one CRJ-700 aircraft (in each case, subject to the inter-creditor agreements entered into by the senior lien holders and GE), and a first lien on one CF34 spare engine owned by USAI, with the aggregate of any senior liens on the collateral not to exceed $62 million.

GE will release its liens on the four CRJ aircraft in connection with the sale of all of the aircraft for a repayment on the loan of an agreed upon amount. Although USAI's entry into the amended and restated 2001 GE credit facility agreement does not constitute an assumption of such agreement, USAI is required to reinstate the amended and restated 2001 GE credit facility agreement and related guaranty by Group in connection with the Debtors' emergence from the Chapter 11 Cases.

(c)    GE Aircraft Transactions

The Master Memorandum of Understanding contemplated a series of transactions intended to provide the Debtors with additional liquidity and lower aircraft ownership costs. Pursuant to the GE Merger MOU, certain of these transactions were modified, with the parties also reaching new agreements regarding the restructuring of lease payments relative to certain aircraft and the early redelivery of additional aircraft. Under the GE Master MOU the parties reached the following agreements:

(i)    With respect to certain B737-300, B757 and B737-400 aircraft, Group agreed, pursuant to the Master Memorandum of Understanding and applicable Section 1110 agreements, to pay and perform all of its obligations under the applicable leases for those aircraft during the pendency of the Chapter 11 Cases, with a "true-up" payment to be made with respect to the B737-300 and B757 aircraft for accrued rent owing on June 30, 2005, at an assumed lease rental rate per aircraft, pro-rated for partial months. From and after the Debtors' emergence from bankruptcy, the average monthly rent on the B737-300, B757 and B737-400 aircraft would be at reduced rates per month, provided that Reorganized Group could further reduce the postpetition rent for the B737-400 aircraft by either paying GE cash or issuing the convertible notes of the reorganized US Airways, Inc. in an agreed upon amount. Under the GE Merger MOU, GE has agreed that, following the "true-up" payment being made, as determined as of June 30, 2005, with respect to the B737-300 and B757 aircraft, the rent payments due on the B737-300, B757 and B737-400 aircraft will be adjusted to the agreed upon reduced rates effective as of July 1, 2005, even though the Debtors have not yet emerged from bankruptcy, and, with respect to the B737-400 aircraft, without the agreed upon cash payment or the issuance of the required amount of convertible notes. Each of the leases for these Boeing aircraft, as modified, will be assumed by the Debtors, provided that, if the Debtors fail to emerge from bankruptcy, only rent, return conditions and deferred rent (being the difference between current contractual rentals and the amended lease rentals) payable through the later of October 31, 2005 or the return of the aircraft will be entitled to administrative expense status, with all other claims under those leases, including rejection damages, being unsecured pre-petition claims. In the event that the Debtors fail to complete the Merger, the terms for the Boeing leases, including the rental rates, return conditions and expiry dates, will revert to their original terms (with the debtors receiving credit for all previously paid rent), subject to administrative expense status, as set forth above, and Group will again have the benefit of the provisions of the Master Memorandum of Understanding in respect of the Boeing aircraft.

(ii)    With respect to 23 CRJ-200 aircraft, GE agreed to restructure the timing of the rental payments under the leases applicable to the aircraft to reduce the quarterly rent payments for a period of 30 months following the Debtors' emergence from bankruptcy. The amount of the rent reductions will be deferred and added to the rents payable under the applicable leases over a 24 month period immediately following the 30 month deferral, such that the lessors' lease economics are maintained. Fourteen of the leases for the CRJ-200 aircraft will also be extended for an additional three months.

(iii)    Under the Master Memorandum of Understanding, the Debtors agreed to enter into short-term leases with respect to 16 CRJ aircraft, consisting of nine CRJ-200 aircraft and seven CRJ-700 aircraft, with those leases to be converted to long-term leases in connection with the Debtors' emergence from the Chapter 11 Cases. Pursuant to the GE Merger MOU, the Debtors agreed to enter into the contemplated long-term leases, with

57

those leases being postpetition agreements, subject to administrative expense status only for rent payable through the later of October 31, 2005 and the return of the aircraft and return conditions, with all other claims under such leases, including rejection damages, being unsecured prepetition claims.

(iv)     Pursuant to the Master Memorandum of Understanding, Group agreed to modify the expiry dates for the leases relative to ten A319/A320 aircraft in order to provide for the early redelivery of the associated aircraft to GE, and also agreed to modify the expiry dates of the single investor documentation relating to certain Boeing aircraft, in both cases with redelivery conditions to be agreed upon. GE agreed to waive cross-default provisions and consent to the foreclosure of its interest in five B737-400 aircraft without any resulting claims in order to facilitate the Debtors' restructuring of the lease financing with respect to the aircraft with SNECMA, which restructuring occurred in February 2005. As a result of the GE Merger MOU, in addition to the ten A319/A320 aircraft referred to above, Group agreed on the terms and conditions for the early return of 41 aircraft and up to six spare engines, with related return condition concessions to facilitate these redeliveries, all as follows:

(a)     With respect to six A319/320 aircraft that are subject to the sale-leaseback transaction, and one B737-300 aircraft, the applicable leases will be amended to modify the expiry dates under the leases to provide for their early termination and return of the subject aircraft to GE during the last six months of 2005. The amendments to the applicable leases and the early return of the aircraft will be effectuated without regard to the completion of the Merger or the occurrence of an event of default.

(b)     The leases for five B737-300s currently operated by the Debtors will be amended to provide for their termination, and attendant early redelivery of the subject aircraft between July 2005 and October 31, 2005, provided that, as of the date of each such termination and redelivery, no event of default has occurred and is continuing and there has been no public announcement by Group or America West, any SEC filing or any governmental authority pronouncement, which evidences that any significant term or condition of the Merger will not be complied with or that an applicable milestone as provided for in the GE Merger MOU will not be met.

(c)     Leases in respect of an additional 29 Boeing aircraft from Group's fleet will be amended to modify the expiry dates under the leases so as to provide for their early termination and accompanying early return of the subject aircraft to GE between 2005 and 2009, subject to completion of the Merger. With respect to 11 of the Boeing aircraft, however, which will be scheduled for removal from service during 2009 pursuant to the applicable amended leases, Group will grant GE an option exercisable on or before October 31, 2006 to further modify the expiry dates of those leases to provide for the removal of those aircraft during an earlier period, from July 2007 through July 2008, unless Group has, as of September 30, 2006, achieved an agreed upon corporate credit rating or satisfied certain financial covenant tests.

(d)     In connection with the removal of the above-referenced Boeing aircraft from Group's fleet, Group will be permitted to terminate an agreed upon number of the spare engine leases entered into by the Debtors pursuant to the sale-leaseback transaction, from time to time, as and when an agreed upon number of those aircraft have been redelivered to GE.

(e)     To facilitate the early redelivery of the Airbus aircraft from Group's fleet, GE has agreed to grant certain return condition concessions relative to

these aircraft. Prior to the Debtors' emergence from their Chapter 11 Cases, GE and Group have agreed to net (i) any redelivery payment obligations payable by GE to the Debtors against (ii) any redelivery payment obligations payable by the debtors to GE relative to redelivered aircraft, and to the extent that any net balance is owing to the Debtors by GE, the balance will be payable to the debtors upon Group's emergence from the Chapter 11 Cases.

(v)    Under the Master Memorandum of Understanding, Group and GE reached an agreement with respect to five engine repair and maintenance agreements, and certain other matters. This agreement included, among other things, the agreement of Group to assume three of the agreements, subject to a limitation on possible administrative expense claims, and also provided for GE's agreement to: forgive and release USAI from certain prepetition obligations; defer certain payment obligations arising under these agreements; extend one maintenance agreement; continue certain existing deferrals; and determine the treatment of certain removal charges.

(vi)    Pursuant to the GE Merger MOU, Group and GE further agreed, among other things, to:

(a)    forgive certain removal charges relative to CFM56-3 engines, in addition to those removal charges to be forgiven pursuant to the GE Master MOU;

(b)    provide USAI with the right to remove certain CFM56-3 engines otherwise subject to agreements with GE Engine Services, with all removal credits owing to the Debtors in connection with those agreements to be applied against outstanding amounts otherwise owing to GE Engine Services by the Debtors under the term note issued to GE Engine Services pursuant to the GE Master MOU;

(c)    modify the Debtors' obligations with respect to deferred obligations (as defined in the Master Memorandum of Understanding) to provide that those obligations will be payable in two installments, due on each of June 30, 2005 and September 30, 2005;

(d)    extend the term of the CFM56-5 engine maintenance agreement with GE Engine Services, with the Debtors waiving certain conversion rights; and

(e)    modify the CFM56-3 engine maintenance agreement to provide for an agreement upon minimum monthly payments on account of accrued engine flight hours;

(f)    a last right of offer for GE Engine Services with respect to any follow-on engine maintenance agreement for the debtors' CF6-80C2 fleet;

(g)    certain arrangements relative to engine selection in the event Group elects to assume an existing A320 aircraft purchase agreement between Airbus and Group upon its emergence from the Chapter 11 Cases; and

(h)    certain arrangements relative to engine selection in the event Reorganized Group, following the Merger, proceeds to take delivery of certain A350 aircraft from Airbus.

(d)    *Sale-Leaseback Transaction*

In late June 2005, the Debtors and GE consummated the sale-leaseback transaction contemplated by the GE Master MOU. Pursuant to the sale-leaseback transaction, the Debtors sold all of the collateral securing the 2001 GE Credit Facility, the 2003 GE Liquidity Facility and certain of the GE Engine Services maintenance agreements, consisting of 11 Airbus aircraft and 28 spare engines, together with ten CRJ aircraft, to affiliates of GE for approximately $633 million, with USAI immediately leasing back the aircraft and engines under agreed upon operating leases at market rates. The lease terms for each aircraft and spare engine commenced upon the closing of the sale of such aircraft and spare engine, and expire at various times. The sale proceeds realized from the sale-leaseback transaction were applied to repay the 2003 GE Liquidity Facility, the mortgage financing associated with the CRJ aircraft and a portion of the 2001 GE Credit Facility. The operating leases are cross-defaulted with all other GE obligations, other than excepted obligations, and are subject to return conditions as agreed to by the parties.

(e)    *Regional Jet Leasing*

Pursuant to the Master Memorandum of Understanding, GE agreed to provide lease financing for up to 31 regional jet aircraft, to consist of 70- to 100-seat regional jet aircraft in a mix and on terms to be agreed to between Group and GE. During the first quarter of 2005, GE provided lease financing for six CRJ-700 aircraft, with terms expiring on the earlier of the Debtors' emergence from bankruptcy and June 30, 2005. Under the terms and conditions of the GE Merger MOU, Group and GE have agreed to convert the leases for the six CRJ aircraft into long-term leases, with the long-term leases being post-petition agreements, subject to a limitation on administrative expense status to rent payable through October 31, 2005 (or a later date agreed to by the parties) and return condition obligations. The GE Merger MOU also eliminates any further obligation on GE to provide regional jet financing directly to Group, but GE has agreed to provide single investor or operating leases to third party carriers meeting financial tests and otherwise acceptable to GE for ten EMB-170/190/195 aircraft to be delivered between 2007 and 2008, on a schedule and terms to be agreed on by the parties and subject to manufacturer support. GE will also provide single investor or operating lease financing to Republic Airways for three EMB-170 aircraft referred to below that are currently committed to be delivered to the debtors, subject to manufacturer support and other terms and conditions acceptable to GE. Finally, to facilitate a transaction agreed to between Group and Republic Airways, GE will also consent to the assignment to Republic Airways of up to 15 EMB-170 leases, subject to manufacturer support and other conditions acceptable to GE.

(f)    *Convertible Notes*

Pursuant to the Master Memorandum of Understanding, the Debtors agreed that upon its emergence from their Chapter 11 Cases, as consideration for conversion of the bridge facility, forgiveness and release of USAI from certain prepetition obligations, deferral of certain payment obligations and amendments to future maintenance agreements, entering into the Master Memorandum of Understanding, an affiliate of GECC will receive convertible notes of Reorganized USAI in the aggregate principal amount of $125 million. The convertible notes will be convertible at any time, at the holders' election, into shares of New Common Stock of Reorganized Group at a conversion price equal to the product of (x) 140%-150% (at USAI's option) and (y) the average closing price of New Common Stock for the sixty consecutive trading days following emergence from bankruptcy and the listing of New Common Stock on NASDAQ or a national stock exchange. The convertible notes will bear interest at a rate to be determined no later than thirty days prior to the Debtors' scheduled date of emergence from bankruptcy and interest will be payable semi-annually, in arrears, and will mature in 2020. USAI will be permitted to redeem some or all of the convertible notes at any time on or after the fifth anniversary of their issuance, at a redemption price payable in cash or, subject to certain conditions, New Common Stock. Holders of the convertible notes may require USAI to repurchase all or a portion of their convertible notes on the fifth and tenth anniversary of the issuance of the notes at 100% of the principal amount of the convertible notes, plus accrued and unpaid interest to the date of repurchase, payable, at USAI's election, in cash or New Common Stock. The convertible notes will be senior unsecured obligations and will rank equally in right of payment with all

existing and future unsecured senior obligations of Reorganized USAI. The convertible notes will be guaranteed by Reorganized Group.

      6.    *Aircraft Financings.*

      In addition to the fleet restructuring resulting from the GE Master MOU, the Debtors restructured their financing arrangements with certain significant Aircraft Creditors, including, most notably, Embraer, Bombardier and Airbus.

      (a)    *Embraer*

      Upon the commencement of the Chapter 11 Cases, Embraer ceased delivery of regional jets to the Debtors under that certain Purchase Agreement DCT-021/03 (as amended, modified and supplemented from time to time, the "Purchase Agreement") between Embraer and the Debtors. In addition, Embraer was, as of the Petition Date, holding approximately $52 million of pre-delivery cash deposits (the "EMB PDPs") advanced by the Debtors to Embraer on account of aircraft deliveries originally scheduled under the Purchase Agreement.

      In December 2004, the Debtors reached an aircraft leasing and financing agreement with Embraer, which was approved by the Bankruptcy Court in January 2005. Pursuant to the agreement reached with Embraer, the Debtors purchased and took delivery of three ERJ-170 aircraft in January 2005, and undertook to purchase and take delivery of three additional ERJ-170 aircraft by March 31, 2005, which six aircraft (the "Six EJR-170s") were originally scheduled under the Purchase Agreement for delivery between the Petition Date and December 31, 2004. The purchase of the first three ERJ-170s delivered in January 2005 was financed by Embraer through a mortgage loan facility and the application of approximately $17.0 million of EMB PDPs held by Embraer. USAI did not take delivery by March 31, 2005 of the remaining three ERJ-170 aircraft. As a result, damages accrue on account of the Debtors' failure to take delivery of such aircraft from and after April 1, 2005 at the rate of $162,795 per month per aircraft until the delivery of the aircraft. If the aircraft are not delivered by August 31, 2005, Embraer's obligation to deliver the final three ERJ-170 aircraft will terminate and Embraer's damages with respect to such undelivered aircraft will be determined pursuant to the Purchase Agreement and may be as much as $10 million (rather than the rate of $162,795 per month per aircraft), as reduced by application of the $4.2 million of EMB PDPs previously applied against such damages as set forth below, with Embraer having the right to apply any then remaining EMB PDPs on account of Embraer's aggregate damages. Group is currently working to arrange financing for these aircraft and has secured GE's agreement to provide that financing under the GE Merger MOU. Although the Debtors believe that unless they assume the Purchase Agreement pursuant to Section 365 of the Bankruptcy Code, no further obligations shall arise on the part of either the Debtors or Embraer with respect to the purchase and delivery of any additional aircraft, other than those obligations related to the purchase and delivery of the final three ERJ-170s, Embraer has filed a proof of claim for potential rejection damages in the event that the Debtors reject the remaining deliveries under the Purchase Agreement and has notified the Debtors that it disagrees with the construction of the Purchase Agreement relied upon by the Debtors.

      The Debtors and Embraer have also agreed to (i) establish a reserve fund from the EMB PDPs in the approximate amount of $11.5 million to be applied in the amounts and on the dates as and when payments are due during the period from October 1, 2004 through July 31, 2005 under certain loans made by Embraer in connection with the seven ERJ-170s purchased by the Debtors pursuant to the Purchase Agreement prior to the Petition Date, and (ii) apply approximately $4.2 million of EMB PDPs on account of damages arising incident to the failure of the Debtors to take delivery of the Six ERJ-170s as originally scheduled under the Purchase Agreement. If the Debtors assume the Purchase Agreement, or upon the occurrence of certain other events, Embraer and the Debtors have further agreed to negotiate a new delivery schedule, and in such event Embraer has agreed to apply any remaining Embraer PDPs in connection with the delivery of the aircraft subject to such delivery schedule. In the event that the Debtors reject the Purchase Agreement, Embraer shall be entitled to retain any remaining balance of EMB PDPs on account of any damages arising from the Debtors' rejection of the Purchase Agreement.

    (b)     *Bombardier*

        (i)    *CRJ-701 Aircraft*

      Upon the commencement of the Chapter 11 Cases, Bombardier ceased delivery of regional jets to the Debtors under that certain Master Purchase Agreement, dated May 9, 2003, between the Debtors and Bombardier (as amended, modified and supplemented from time to time, the "Master Purchase Agreement"). In addition, Bombardier was, as of the Petition Date, holding approximately $37 million of pre-delivery cash deposits (the "BBD PDPs") advanced by the Debtors on account of aircraft deliveries scheduled under the Master Purchase Agreement. Under the restructuring agreement reached with Bombardier, and evidenced by that certain 1110 Agreement and Order Regarding Section 1110 Compliance with Respect to Certain Canadair Regional Jets on December 1, 2004 (the "CRJ 1110 Agreement"), (i) approximately $3.7 million of BBD PDPs were applied against and in full satisfaction of the then existing defaults and cure obligations of the Debtors in connection with the Debtors' Section 1110(a)(2) election relative to certain CRJ-701 aircraft then being operated by the Debtors, (ii) $3 million of BBD PDPs were applied by Bombardier against and in full satisfaction of all costs, expenses, losses, and damages associated with reconfiguring certain CRJ-701 aircraft deemed undelivered in breach of the Master Purchase Agreement, and (iii) approximately $28 million of BBD PDPs were made available by Bombardier toward the acquisition of three new CRJ-701 aircraft, provided such aircraft was acquired by the Debtors in January 2005. To that end, the Debtors subsequently arranged for financing with DVB Bank AG in an amount, which, together with the $28 million of available BBD PDPs and $2 million of the Debtors' available cash, allowed the Debtors to acquire such aircraft by the end of January 2005. The CRJ 1110 Agreement further provides that for so long as said agreement remains in effect and the Debtors do not terminate the Master Purchase Agreement no obligations will arise on the part of the Debtors or Bombardier with respect to the purchase and delivery of any aircraft under the Master Purchase Agreement or any documents related thereto.

        (ii)    *Dash-8 Aircraft*

      The Debtors and Bombardier reached an agreement with respect to the twenty-four (24) aircraft lease or sublease agreements (as amended, modified or supplemented from time to time, the "BBD Aircraft Agreements") to which they are a party and pursuant to which the Debtors lease certain Dash-8 Aircraft. Under the terms of the agreement reached with Bombardier and evidenced by that certain 1110 Agreement and Order Regarding Section 1110 Compliance with Respect to Certain Dash-8 Aircraft, dated November 29, 2004, Bombardier applied certain credit notes issued under the BBD Aircraft Agreements against the Debtors' Section 1110(a)(2) cure obligations. Bombardier also agreed that for so long as the Dash-8 1110 Agreement is in effect and the Debtors are in compliance with their obligations thereunder, the Debtors are required to pay only the "net" amount from time to time owing by the Debtors to Bombardier on account of the Debtors' payment obligations under the BBD Aircraft Agreements after giving effect to the application of the credit notes issuable to the Debtors by Bombardier in connection with such payment obligations. The parties further agreed that any credit notes that may have been issued under the BBD Aircraft Agreements prior to the Petition Date will not be used for payments by the Debtors to Bombardier for any obligation owed to Bombardier by the Debtors under the BBD Aircraft Agreements or any other agreement the parties may have entered.

    (c)     *Airbus*

      As of December 31, 2004, Group had 19 A320-family aircraft on firm order scheduled for delivery in the years 2007 through 2009. Group also had ten A330-200 aircraft on firm order scheduled for delivery in the years 2007 through 2009. On February 3, 2005, the Bankruptcy Court approved Group's agreement with Airbus providing for, among other things, delivery of the 19 A320 family aircraft in years 2008 through 2010, and delivery of the ten A330-200 aircraft in years 2008 through 2009.

      The Airbus MOU includes, among other things: (a) adjustments to the delivery schedules for the narrow-body and wide-body aircraft, and an agreement by Group to assume the related purchase agreements in connection with its emergence from Chapter 11; (b) a new order for 20 A350 wide-body

aircraft, subject to Group's right to convert up to ten A350 orders to A330 orders, and backstop financing commitment by Airbus with respect to a substantial number of the A350 aircraft; (c) elimination of cancellation penalties on Group's existing order for ten A330-200 aircraft, provided that Reorganized Group has met certain predelivery payment obligations under the A350 order; and (d) a term loan of up to $250 million, of which $213 million can be used for general corporate purposes.

As of June 30, 2005, Airbus held purchase deposits of $50 million related to Group's order for ten A330-200 aircraft, which, under the Airbus MOU, will be applied in part as a non-refundable restructuring fee on account of the agreements reached relating to the A330-200's, and in part as purchase deposits on account of the A350 orders and the rescheduled A330-200 orders.

    7.    *Appointment of Creditors' Committee.*

On September 21, 2004, the United States Trustee for the Eastern District of Virginia appointed the following persons or entities to the Official Committee of Unsecured Creditors of the Debtors (the "Creditors' Committee"): Airbus North American Holdings, Inc.; Air Line Pilots Association International; Electronic Data Systems Corporation; Wachovia Bank National Association; International Association of Machinists and Aerospace Workers'; Association of Flight Attendants; LSG Sky Chefs, Inc.; Pension Benefit Guaranty Corporation; US Bank National Association; Sabre, Inc.; Bombardier Aerospace; Communications Workers of America, AFL-CIO; and General Electric. The Creditors' Committee is represented by Otterbourg, Steindler, Houston & Rosen, P.C., with offices located in New York City. Co-Counsel to the Creditors' Committee is the law firm of Vorys, Sater, Seymour and Pease LLP of Alexandria, Virginia. The Creditors' Committee employed Giuliani Capital Advisors LLC, as financial advisors, Taurus F.C. as merger and acquisition advisors, and MergeGlobal, Inc. as airline advisors.

    8.    *Appointment of Retiree Committee.*

At the Petition Date, the Debtors had in excess of 10,800 current retirees receiving medical and other benefits, and the Debtors' financial obligations to fund such medical benefits were substantial, estimated to be $69 million for 2005 and $72.6 million for 2006. As part of the Transformation Plan, the Debtors sought to substantially reduce their obligations with respect to retiree medical benefits, and in connection with such efforts, the Debtors filed a Motion with the Court for the appointment of a committee to represent the interests of retirees who are not otherwise represented by union representatives in the Chapter 11 Cases. The Debtors sought the appointment of a single retiree committee to serve as the authorized representative to represent the interests of nonunion retirees and those union retirees whose union elected not to serve as the authorized representative for retiree members. On October 29, 2004, the Bankruptcy Court entered an order forming a single retiree committee, the Official Committee of Retired Employees of USAI (the "Retiree Committee") to serve as the "authorized representative" of the ALPA Retirees, the AFA Retirees, the CWA Retirees, and the Debtors' Non-union Retirees. The IAMAW and TWU represented their current retirees. The following five members were appointed to serve on the Retiree Committee: ALPA Retirees Member, Thomas G. Davis; AFA Retirees Member, Judith M. Schmidt; CWA Retirees Member, Judy W. Dreyer; Non-Union Retirees Member, James E. Lloyd; and Non-Union Retirees Member, Gerald Carrusi. The Retiree Committee employed Thelen Reid & Priest LLP as counsel, Alvarez & Marsal, LLC as financial advisors and Watson Wyatt & Company as actuarial consultants to the Retiree Committee. The Debtors immediately began negotiations with the Retiree Committee about reducing the cost of current retiree benefits. The results of those negotiations were embodied in the terms of a settlement described below.

    9.    *Labor, Pension and Benefit Matters.*

        (a)    *Modifications of CBAs and Benefit Plans*

Already in extreme financial distress, the Debtors recognized from the outset of their bankruptcy cases that if immediate steps were not taken to make substantial reductions in labor costs, the Debtors would have insufficient cash, without regard to possible further deterioration in their revenue below

projections as a result of further increases in fuel costs, to continue to operate beyond January 2005. Without substantial reductions in labor costs, the Debtors projected that they would be forced to undertake massive layoffs and potential liquidation by mid-February 2005. Based on such facts, on September 24, 2004, USAI moved pursuant to Section 1113(e) of the Bankruptcy Code for interim relief from its collective bargaining agreements ("CBAs") with ALPA, AFA, CWA, IAMAW and TWU. USAI sought through such relief immediate interim modifications in the CBAs that would reduce wages by 23 percent, reduce certain retirement contributions, and make certain other modifications in the work rules in USAI's CBAs resulting in an aggregate reduction in labor costs of approximately $38 million per month. The Debtors estimated that such modifications, if imposed through March 31, 2005, along with approximately $5 million per month in non-labor costs savings, would likely provide the cost reductions necessary for the Debtors to successfully maintain their business operations through the end of the first quarter of 2005.

The Bankruptcy Court conducted hearings on USAI's request for Interim Relief on October 7, 12, 14 and 15, 2004, and thereafter ruled that interim modifications to USAI's CBAs were essential to the Debtors' continuing in business and authorized USAI to make a number of modifications to the CBAs, including reduction in base pay rates of 21 percent, reduction in required employer contributions to certain pension plans and employee 401(k) plans, and waiving USAI's contractual obligations to maintain minimum numbers of aircraft (hereinafter the "Interim Relief").

While USAI's Motion for Interim Relief was pending before the Court, it reached consensual modifications to a number of CBAs. It consensually modified three CBAs with the TWU: the TWU Dispatchers, Flight Crew Training Instructors and Flight Simulator Engineers. USAI had attempted to negotiate modifications to the CBAs with the TWU prior to the commencement of these Chapter 11 Cases and those efforts continued and intensified subsequent to the bankruptcy filing, with the TWU's membership ratifying the modifications to the CBAs in September and October, 2004. The modifications to the TWU's CBAs provide for cash savings in the form of reductions in pay and benefits, and modifications to certain work rules which helped provide USAI with flexibility to implement the Transformation Plan. In all, the modifications to the TWU's CBAs provided USAI with an estimated $6.6 million in annual cost savings. The Court approved the modifications to the TWU's CBAs by entry of a consent order on October 27, 2004.

Additionally, USAI reached consensual modifications to USAI's CBA with ALPA that will result in approximately $300 million in annual savings in 2005 with increased savings in future years. The consensual agreement was reached after extensive arms-length negotiations which involved trade-offs in each of the four areas covered by the CBA – pay, productivity, benefits and scope. The modifications provide cash savings in the form of reductions in pay and benefits that will provide immediate and long term cash savings to USAI. The agreement also provides modifications of certain work rules that, over time, will generate significant additional cash savings. The Court approved the modifications to the ALPA CBA by a consent order entered on October 27, 2004.

Due to the severity of the Debtors' remaining cost disadvantage with respect to the low-cost carriers, on November 12, 2004, the Debtors filed a motion seeking (1) permanent relief from USAI's CBAs with their labor unions which had not agreed to long-term cost reductions, (2) a reduction in retiree benefits, and (3) a termination of three defined benefit pension plans (the "Permanent Relief Motion"). A seven day evidentiary trial on the Permanent Relief Motion was held in December 2004 and early January 2005, during which time USAI continued its efforts to (1) negotiate modifications to the CBAs with its labor unions that had not already agreed to such modifications, and (2) negotiate reductions to retiree health benefits with the Retiree Committee and the IAMAW with the hope of consensually achieving the necessary labor cost savings under the Transformation Plan.

During the pendency of the Permanent Relief Motion, USAI and CWA reached a tentative agreement regarding consensual modifications to the CBA between the two parties, which tentative agreement was subsequently ratified by the requisite membership of CWA on December 23, 2004, and approved by the Bankruptcy Court on January 6, 2005. As a result, USAI will achieve approximately $130 million in annual cost savings. Similarly, USAI and the AFA reached a tentative agreement on December 16, 2004, regarding the creation of a new CBA between the parties, which tentative agreement was ratified

by AFA's membership on January 5, 2005, and approved by the Bankruptcy Court on January 11, 2005. USAI's new CBA with the AFA will provide USAI with approximately $94 million in average annual cost savings.

As of the date of the Bankruptcy Court's ruling on the Permanent Relief Motion on January 6, 2005, USAI had successfully achieved ratified agreements providing for consensual, permanent modifications to their existing CBAs or providing for a new collective bargaining agreement with all but one of their unions, the IAMAW. The IAMAW previously had agreed to distribute USAI's most recent proposal for new CBAs to its membership for ratification, but that ratification vote was not scheduled to occur until January 21, 2005. Accordingly, the Bankruptcy Court entered an order granting the relief sought in the Permanent Relief Motion as it applied to the IAMAW and authorized USAI to reject the CBAs with the IAMAW, subject to the parties' agreement to maintain the status quo pending the outcome of the IAMAW's ratification vote.

On January 21, 2005, the IAMAW's membership ratified USAI's proposal for new CBAs, and the Debtors subsequently filed a motion seeking this Court's approval of the ratified proposal (the "IAMAW Consent Motion"). On February 3, 2005, the Bankruptcy Court entered an order granting the relief requested in the IAMAW Consent Motion, thereby providing USAI with approximately $271 million in average annual cost savings on a going forward basis.

On January 6, 2005, the Bankruptcy Court also entered an order authorizing USAI's requested distress termination of certain of its mainline defined benefit pension plans (the "Distress Termination Order"). The Distress Termination Order authorized the Debtors to terminate (1) the Retirement Plan for Flight Attendants in the Service of US Airways, Inc., (2) the Pension Plan for Employees of U.S. Airways, Inc., Who Are Represented by the International Association of Machinists and Aerospace Workers, and (3) the Retirement Plan for Certain Employees of US Airways, Inc. USAI's termination of the foregoing plans will provide USAI with approximately $947 million of cost savings over the course of the next five years.

In addition to the foregoing modifications to USAI's CBAs (which contained reductions in retiree benefits for future retirees) and the distress termination of USAI's defined benefit pension plans, USAI also was able to consensually negotiate with the authorized representatives of the current retirees, including the Retiree Committee, and obtain the Bankruptcy Court's authority to implement various cost-saving modifications to the benefit packages provided to certain retiree work groups, including retired members of ALPA, CWA, and AFA, as well as certain non-unionized retirees. USAI also obtained, and the Bankruptcy Court subsequently approved, a similar, consensual agreement with the retirees represented by the IAMAW. This settlement produced savings of approximately $36 million per year.

Thus, by mid-January, 2005, USAI had achieved a reduction in annual labor, retiree and pension costs of more than one billion dollars per year.

In connection with the modifications and terminations of the Debtors' benefit plans and the statutory assumption by the PBGC of certain obligations under those plans to the beneficiaries thereunder, the PBGC has filed priority Claims totaling approximately $203 million. Such Claims are for pension plan minimum funding obligations under ERISA. The PBGC also has filed unsecured Claims totaling approximately $2.45 billion for pension plan unfunded benefit liabilities under ERISA. Because the PBGC has asserted these amounts on a joint and several basis against each of the Debtors, the aggregate amount of the PBGC's Claims in the Chapter 11 Cases exceeds $13 billion, although the PBGC would be limited to a single recovery in any distribution. The PBGC also has asserted certain other unliquidated and/or contingent Claims against the Debtors for pension-related liabilities. Pursuant to the Plan, the PBGC shall receive as treatment for its Claims, Cash in the amount of $13.5 million, an unsecured promissory note in the amount of $10 million, issued by Reorganized USAI and guaranteed by Reorganized Group, payable on the seventh anniversary of the Effective Date, which note shall bear interest at a rate of 6% per annum, and seventy percent (70%) of the Unsecured Creditors Stock, or such other treatment as shall be agreed by the parties or ordered by the Bankruptcy Court.