# EXHIBIT 10

IN THE COURT OF CHANCERY FOR THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| BANK OF AMERICA, N.A. (USA),<br><br>                      Plaintiff,<br><br>          v.<br><br>US AIRWAYS, INC., US AIRWAYS GROUP,<br>INC., and AMERICA WEST AIRLINES, INC.,<br><br>                    Defendants. | Civil Action No. 1713-N |

## NOTICE OF MOTION

TO:    David C. McBride, Esquire         America West Airlines, Inc.
           Young Conaway Stargatt & Taylor   c/o The Corporation Trust Company
           1000 West Street, 17th Floor            1209 Orange Street
           Wilmington, DE 19899             Wilmington, DE 19801

           Kenneth J. Nachbar, Esquire
           Morris Nichols Arsht & Tunnell
           1201 N. Market Street
           Wilmington, DE 19899

        PLEASE TAKE NOTICE that Plaintiff will present its Motion For Partial Summary Judgment On The Issue Of Liability On Its Claim For Breach Of Contract Against Defendant US Airways, Inc., to the Court at a time of earliest convenience to the Court and counsel.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

By: _____

Richard L. Horwitz (#2246)

CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Kevin R. Shannon (#3137)
Brian C. Ralston (#3770)
Hercules Plaza, 6th Floor
1313 N. Market Street
P.O. Box 951
Wilmington, DE 19899

Dated: November 3, 2005
704863

Attorneys for Plaintiff

2

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| BANK OF AMERICA, N.A. (USA),<br><br>         Plaintiff,<br><br>    v.<br><br>US AIRWAYS, INC., US AIRWAYS GROUP,<br>INC., and AMERICA WEST AIRLINES, INC.,<br><br>         Defendants. | Civil Action No. 1713-N |

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff Bank of America, N.A. (USA) ("Bank of America"), hereby moves for

partial summary judgment as to Bank of America's claim that US Airways, Inc. has breached a

Co-Branded Card Agreement, dated as of May 20, 2003. The grounds for this motion are set

forth in Plaintiff's Memorandum filed simultaneously herewith.

POTTER ANDERSON & CORROON LLP

By: _____

OF COUNSEL:

CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Dated: November 3, 2005
704863

Richard L. Horwitz (#2246)
Kevin R. Shannon (#3137)
Brian C. Ralston (#3770)
Hercules Plaza, 6th Floor
1313 N. Market Street
P.O. Box 951
Wilmington, DE 19899

Attorneys for Plaintiff

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

---

BANK OF AMERICA, N.A. (USA),

Plaintiff,

v.

US AIRWAYS, INC., US AIRWAYS GROUP, INC., and AMERICA WEST AIRLINES, INC.,

Defendants.

---

Civil Action No. 1713-N

## O R D E R

Upon Plaintiff's motion and for good cause shown, IT IS HEREBY ORDERED this _____ day of _____, 2005, that Plaintiff's Motion For Partial Summary Judgment On The Issue Of Liability On Its Claim For Breach Of Contract Against Defendant US Airways, Inc., is GRANTED.

_____
Vice Chancellor

704863

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of November, 2005, a copy of the within document was served upon the following parties in the following manner:

<u>Via E-file</u>

Kenneth J. Nachbar, Esquire
Morris Nichols Arsht & Tunnell
1201 North Market Street
Wilmington, DE 19801

David C. McBride, Esquire
Young Conaway Stargatt & Taylor LLP
1000 West Street, 17th Floor
Wilmington, DE 19899

<u>By Hand</u>

America West Airlines, Inc.
c/o The Corporation Trust Company
1209 Orange Street
Wilmington, DE 19801

_____
Brian C. Ralston (I.D. No. 3770)

IN THE COURT OF CHANCERY FOR THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

---

BANK OF AMERICA, N.A. (USA),

                                     Plaintiff,

                vs.

US AIRWAYS, INC., US AIRWAYS GROUP, INC. and AMERICA WEST AIRLINES, INC.,

                              Defendants,

                and

JUNIPER BANK,

                              Intervenor.

Case No. 1713-N

---

**MEMORANDUM OF PLAINTIFF BANK OF AMERICA IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF LIABILITY ON ITS CLAIM FOR BREACH OF CONTRACT AGAINST DEFENDANT US AIRWAYS, INC.**

OF COUNSEL:

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler
David R. Marriott
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019

Dated: November 3, 2005

POTTER ANDERSON & CORROON LLP
Richard L. Horwitz (#2246)
Kevin R. Shannon (#3137)
Brian C. Ralston (#3770)
Hercules Plaza
1313 N. Market Street
P.O. Box 951
Wilmington, DE 19899
(302) 984-6000

Attorneys for Plaintiff

## TABLE OF CONTENTS

Page No.

Preliminary Statement................................................................................................. 1

Statement of Undisputed Facts ................................................................................... 2

    A.    The Co-Branded Card Agreement .................................................................. 2

    B.    The Agreement's Exclusivity Provision ......................................................... 3

    C.    US Airways' Breaches of the Agreement........................................................ 4

    D.    The Merger Provision ..................................................................................... 6

Summary Judgment Standard ...................................................................................... 7

Argument ..................................................................................................................... 7

Conclusion ................................................................................................................... 12

# TABLE OF AUTHORITIES

Page No.

## CASES

*Bryan v. Moore,*
    863 A.2d 258 (Del. Ch. 2004) ..................................................................7

*Caudill v. Wise Rambler, Inc ,*
    168 S.E.2d 257 (Va. 1969) .......................................................................7

*Countryside Orthopaedics, P.C. v. Peyton,*
    541 S.E.2d 279 (Va. 2001) .......................................................................8

*Gotham Partners, L.P. v. Hallwood Realty Partners,*
    2000 WL 1476663 (Del. Ch.) ...................................................................7

*Hitachi Credit Am. Corp v. Signet Bank,*
    166 F.3d 614 (4th Cir. 1999) ...................................................................11

*Lindsay v. McEnearney Assocs., Inc.,*
    531 S.E.2d 573 (Va. 2000) ......................................................................11

*Loppert v. WindsorTech, Inc ,*
    865 A.2d 1282 (Del. Ch. 2004) .................................................................7

*Paulette v. Paulette,*
    2000 WL 196788 (Va. Ct. App.) ...............................................................7

*Rash v. Hilb,*
    67 S.E.2d 791 (Va. 1996) ..........................................................................8

*Weathernews Americas, Inc. v. Inter net U.S., Ltd.,*
    2005 WL 832236 (Va. Cir. Ct.) ...............................................................11

*Westminster Investing Corp. v. Lamps Unlimited, Inc.,*
    379 S.E.2d 316 (Va. 1989) ........................................................................7

## RULES

CH. CT. R. 56(c) ...........................................................................................7

Plaintiff Bank of America, N.A. (USA) ("Bank of America") respectfully submits this memorandum in support of its motion, pursuant to Rule 56(a) of the Delaware Chancery Court Rules, for partial summary judgment on the issue of liability on its claim for breach of contract against Defendant US Airways, Inc. ("US Airways").

## PRELIMINARY STATEMENT

This is an action by Bank of America to enforce its rights under its co-branded card agreement with US Airways dated May 20, 2003 (the "Agreement"). The Agreement restates, amends and extends the parties' previous agreement, dated December 4, 2000 (the "2000 Agreement"), establishing and maintaining a co-branded credit card program for the benefit of US Airways' frequent flyers and customers. As demonstrated herein, there exists no issue of material fact relating to US Airways' breach of the Agreement.

The Agreement explicitly provides that, during its term, US Airways shall not permit or license anyone other than Bank of America to issue a credit card to consumers; issue or market a competing card; or enter into, solicit, offer, negotiate or otherwise attempt to enter an agreement with a third party that would permit such third party to issue or market a competing credit card. However, US Airways has negotiated and entered into an agreement with Juniper Bank ("Juniper") to issue and market a competing card, has permitted or licensed Juniper to issue the competing card and has been marketing that card. US Airways has publicly admitted these actions by stating on its website that it "signed an agreement with Barclays Bank [Juniper's parent company] to be the provider of the new US Airways Dividend Miles credit card"; that the Bank of America/US Airways card will be "phased out over the next two years"; and that "the new Barclays Bank US Airways Dividend Miles credit card will be the card going forward".

Accordingly, summary judgment should be entered in favor of Bank of America on the issue of US Airways' liability for breach of the Agreement. Expedited resolution of this issue is required because Juniper plans to issue its competing card beginning on January 1, 2006.

## STATEMENT OF UNDISPUTED FACTS[1]

A    The Co-Branded Card Agreement

1.    Bank of America and US Airways executed the Agreement as of May 20, 2003. (Agreement at 1 (Ex. 1).) The term of the Agreement, which is governed by Virginia law (id. § 8.9.8), ends on December 3, 2008, unless renewed. (Id. at 1.)

2.    The Agreement restates, amends and extends the 2000 Agreement, establishing and maintaining a co-branded credit card program for the benefit of US Airways' frequent flyers and customers. (Id.; 2000 Agreement (Ex. 2).)

3.    Under the Agreement, Bank of America issues a US Airways co-branded credit card (the "Card") to consumers who reside in the United States. (Agreement §§ 2, 5.2.1 (Ex. 1).) Holders of the Card earn miles in US Airways' frequent flyer program, Dividend Miles. (Id. § 2.1.1 and Exs. A, A1 annexed thereto.)

4.    Bank of America entered into a similar co-branded credit card agreement, dated January 1, 2001, with America West Airlines ("America West"). (America West

---

[1]    Exhibits referenced herein are cited as "Ex. __" and submitted with the Affidavit of Brian C. Ralston in Support of Plaintiff's Motion For Partial Summary Judgment on the Issue of Liability on Its Claim for Breach of Contract Against Defendant US Airways, Inc., dated November 3, 2005, which is being filed simultaneously herewith.

2

Agreement (Ex. 3.).)  Under the America West Agreement, Bank of America is the sole issuer of

America West cards from January 1, 2001 to December 31, 2005. (*Id.* §§ 6, 9.)

        B.    The Agreement's Exclusivity Provision

        5.    The Agreement requires US Airways to give Bank of America exclusivity

during the term of the Agreement.  The relevant provision (the "Exclusivity Provision") states:

SECTION 5: <u>EXCLUSIVITY</u>

        * * *

5.2.1 Bank Sole Card Issuer for US Airways

(a) Generally

During the term of this Agreement, Bank [of America] shall be the only Person
that US Airways permits or licenses, directly or indirectly, to issue a US Airways
Card to consumers who reside in the United States of America.  US Airways shall
not issue or market a Competing Card.  In addition, US Airways shall not enter
into, solicit, offer, negotiate or otherwise attempt to enter into any agreement with
a third party that would permit such third party to issue or market a Competing
Card.

(Agreement § 5 (Ex. 1).)

        6.    Pursuant to this provision, Bank of America is the only person or entity

that US Airways may permit or license, directly or indirectly, to issue a US Airways card; US

Airways may not issue or market a co-branded card that competes with the Card; and US

Airways may not enter into, solicit, offer, negotiate or otherwise attempt to enter into an

agreement with a third party that would result in issuing or marketing a co-branded card that

competes with the Card.  (Agreement § 5.2.1 (Ex. 1).)

<div align="center">3</div>

7.   The Exclusivity Provision is a material term of the Agreement.

(Agreement (Ex. 1) at 3 ("'Breach' means a party's failure to observe, keep or perform any material term or condition of this Agreement including . . . the failure to strictly comply with [the Exclusivity Provision of] Section[] 5").)

C.   US Airways' Breaches of the Agreement

8.   Despite the Exclusivity Provision, US Airways' parent, US Airways Group, Inc. ("US Airways Group"), negotiated and, on August 8, 2005, entered into an agreement with Juniper and America West (the "Juniper Agreement" (Ex. 4)), authorizing Juniper, a wholly-owned subsidiary of Barclays Bank, to offer and market a co-branded card program for the company surviving the merger of US Airways Group and America West Holdings Corp. (the "Merger").

9.   US Airways Group negotiated and/or entered into the Juniper Agreement for, with and on behalf of US Airways, whose consent, performance and participation are required under the Juniper Agreement. (Juniper Agreement §§ 2(p), (v) (Ex. 4); Agreement § 8.8.1(vii) (Ex. 1).) US Airways Group acted as US Airways' agent in entering into the Juniper Agreement; US Airways authorized, ratified and knowingly benefited from the Juniper Agreement. (US Airways Group, Inc., and US Airways, Inc., Current Report (Form 8-K) ("Form 8-K"), at Item 1.01 (Aug. 12, 2005) (Ex. 5).)

10.   The Juniper Agreement purports to amend an agreement between Juniper and America West dated January 25, 2005 ("Juniper/America West Agreement" (Ex. 6)), and assigns that agreement to US Airways Group. (Juniper Agreement at § 3 (Ex. 4) (providing that

4

"Juniper hereby consents, on a one-time basis to the assignment of the Original Agreement as amended hereby to US Airways Group").) The Juniper Agreement became effective on September 27, 2005. (*See* Juniper Agreement at 3 (Ex. 4); Press Release, US Airways Group, Inc., Reorganized US Airways Group, Inc. Completes Merger With America West Airlines (Sept. 27, 2005) (Ex. 7).)

11.    Pursuant to the Juniper Agreement, Juniper is permitted or licensed (during the term of the Agreement) to issue a US Airways card. (Juniper/America West Agreement § 3.1 (Ex. 6); Juniper Agreement § 3 (Ex. 4).) The Juniper Agreement expressly grants Juniper a license to use US Airways' marks to promote a co-branded card in competition with the Card. (Juniper Agreement § 2(p) (Ex. 4); Juniper/America West Agreement § 8.2 (Ex. 6).) Unless US Airways is required to abide by the Exclusivity Provision, Juniper will issue a Juniper/US Airways card to compete with the Bank of America/US Airways card beginning on January 1, 2006. (US Airways website (Ex. 8).)

12.    US Airways has marketed (and is marketing) the Juniper/US Airways card. For example, on its website, US Airways states that "the new US Airways has signed an agreement with Barclays Bank to be the provider of the new US Airways Dividend Miles credit card"; the Bank of America/US Airways card will be "phased out over the next two years"; and "the new Barclays Bank US Airways Dividend Miles credit card will be the card going forward". (*Id.*)

13.    US Airways also states on its website that, beginning January 1, 2006: "[a]ll members will earn Dividend Miles when using the Barclays Bank US Airways Dividend

5

Miles credit card"; "[m]embers will be receiving information in the mail in the near future detailing the benefits of the [the Barclays Bank card]"; before deciding to switch to a Bank of America card, "members may want to wait for details on the Barclays Bank credit card"; and "the Barclays Bank credit card will be the card for the new US Airways". (*Id.*)

     D.   The Merger Provision

     14.   The Agreement contains a merger provision that would allow US Airways, in certain circumstances, to maintain a co-branded card (with an issuer other than Bank of America) that would compete with the Card. (Agreement § 5.2.2 (Ex. 1).)

     15.   However, the merger provision applies only in the event of a merger involving US Airways (or any of its affiliates) and a third party that has an active frequent flyer program with an issuer other than Bank of America.[2] (*Id.*)

     16.   Here, at the time of the Merger, US Airways' merger partner America West did not have an existing frequent flyer program with an issuer other than Bank of America. In fact, America West Airlines had (and still has) a contract with Bank of America pursuant to which it must deal exclusively with Bank of America until the end of 2005. (America West

---

[2]     Section 5.2.2 of the Agreement provides: "In the event of a Merger involving US Airways or any of its Affiliates and a third party that has a contract with a Card issuer other than Bank to issue a Competing Card, the US Airways Surviving Entity may provide the Bank with one of the two written notices described below". (*Id.*) Those written notices describe two options: (i) termination of the Competing Program (*i.e.*, the program of US Airways' merger partner) or (ii) "Program Parity", pursuant to which both programs – Bank of America's Card program and the merger partner's program – are continued. (*Id.*, § 5.2.2 (a)(i) & (ii).) Both options are premised on the assumption that the merger partner's program is active and existing; the option to terminate or continue a *non-existent* program would be nonsensical.

6

Agreement §§ 6, 9 (Ex. 3) ) America West is party to the Juniper Agreement, pursuant to which

Juniper is authorized to issue a card that competes with the Card, but even the Juniper

Agreement does not allow America West to do so until January 1, 2006. (Juniper Agreement

§ 2(o) (Ex. 4); Juniper/America West Agreement § 5.1 (Ex. 6).)

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where, as here, "there is no genuine issue as to

any material fact and that the moving party is entitled to a judgment as a matter of law." CH. CT.

R. 56(c); *see Bryan v Moore*, 863 A.2d 258, 260 n.2 (Del. Ch. 2004) (granting summary

judgment on breach of contract claim); *Loppert v WindsorTech, Inc.*, 865 A.2d 1282, 1284

(Del. Ch. 2004) (same); *Gotham Partners, L.P. v Hallwood Realty Partners*, 2000 WL 1476663,

at *8 (Del. Ch.) (describing summary judgment standard (Ex. A hereto)).

## ARGUMENT

### US AIRWAYS HAS BREACHED THE EXCLUSIVITY PROVISION OF THE AGREEMENT AND BANK OF AMERICA IS ENTITLED TO JUDGMENT AS A MATTER OF LAW AS TO LIABILITY.

The Agreement is governed by Virginia law. (Agreement § 8.9.8 (Ex. 1).) Under

Virginia law, a claim for breach of contract exists where a defendant has a legal obligation to the

plaintiff, the defendant violates this obligation, and the violation causes injury to the plaintiff.

*See Caudill v. Wise Rambler, Inc*, 168 S.E.2d 257, 259 (Va. 1969); *Westminster Investing Corp.*

*v Lamps Unlimited, Inc*, 379 S.E.2d 316, 317 (Va. 1989); *Paulette v. Paulette*, 2000 WL

196788, at *2 (Va. Ct. App.) (Ex. B hereto)).

7

The Agreement affords Bank of America exclusivity with respect to the issuance of a US Airways card until December 3, 2008. (Agreement at 1, § 5.2.1 (Ex. 1).) The Exclusivity Provision of the Agreement, which is a material term of the Agreement (*id* at 3), expressly provides:

> During the term of this Agreement, Bank [of America] shall be the only Person that US Airways permits or licenses, directly or indirectly, to issue a US Airways Card to consumers who reside in the United States of America. US Airways shall not issue or market a Competing Card. In addition, US Airways shall not enter into, solicit, offer, negotiate or otherwise attempt to enter into any agreement with a third party that would permit such third party to issue or market a Competing Card.

(*Id* § 5.2.1.) Despite this language, which is plain on its face, US Airways has run afoul of the Exclusivity Provision in at least three respects and thereby breached the Agreement. *See Rash v Hilb*, 467 S.E.2d 791, 794 (Va. 1996) (affirming decision finding breach of contract based on violation of covenant not to compete); *Countryside Orthopaedics, P.C. v. Peyton*, 541 S.E.2d 279, 286 (Va. 2001) (same regarding failure to perform under stock transfer agreement).

First, US Airways has permitted and/or licensed Juniper to issue a US Airways card to consumers during the term of the Agreement. The Juniper Agreement, which was executed and became effective during the term of the Agreement, expressly grants Juniper a license to use US Airways' marks to promote a co-branded card in competition with the Card. (*See* Form 8-K (Ex. 5) at Item 1.01 ("Juniper will offer and market an airline mileage award credit card program . . . through the use of a co-branded credit card"); *see also* US Airways website (Ex. 8) ("[B]eginning January 1, 2006, all members will earn Dividend Miles when using the Barclays Bank US Airways Dividend Miles credit card" and "all members will earn

8

Dividend Miles when using the Barclays Bank US Airways Dividend Miles credit card").) There is no genuine issue of material fact that US Airways has attempted to permit, agreed to permit and permitted Juniper to issue and market a US Airways card in competition with the Card.

Second, US Airways has marketed the Juniper/US Airways card. For instance, US Airways has stated on its website that "the new US Airways has signed an agreement with Barclays Bank to be the provider of the new US Airways Dividend Miles Credit card" (*id*), and that "[m]embers will be receiving information in the mail in the near future detailing the benefits of the [the Barclays Bank card]". (*Id*) In fact, US Airways is expressly promoting the Juniper card over and at the expense of the Card. In an obvious effort to steer members of its frequent traveler program away from the Card, US Airways states on its website that, before deciding to switch to a Bank of America card, "members may want to wait for details on the Barclays Bank credit card"; the Card will be "phased out over the next two years"; and "the Barclays Bank credit card will be the card for the new US Airways". (*Id*)

Third, US Airways Group negotiated and/or executed the Juniper Agreement for, with, or on behalf of US Airways. Although US Airways is not itself party to the Juniper Agreement, the plain language of the Juniper Agreement requires US Airways' consent, performance and participation. (Juniper Agreement §§ 2(p), (v) (Ex. 4); Agreement § 8.8.1(vii) (Ex. 1).) In fact, on its website, US Airways states that it "signed an agreement with Barclays Bank [Juniper's parent company] to be the provider of the new US Airways Dividend Miles credit card". (US Airways website (Ex. 8).) There is no genuine issue of material fact that US Airways Group acted as US Airways' agent in negotiating and entering into the Agreement; it

9

plainly authorized, ratified and knowingly benefited from the Juniper Agreement. (Juniper

Agreement §§ 2(p), (v) (Ex. 4); Agreement § 8.8.1 (vii) (Ex. 1); Form 8-K at Item 1.01 (Ex 5).)

US Airways cannot seriously contend otherwise.[3]

       Based upon the Juniper Agreement and Juniper's intervention papers,

US Airways appears to seek to justify its breaches as permissible on the basis of the Merger.

(*See* Juniper Agreement § 2(v) (Ex. 4); Mem. in Supp. of Juniper's Mot. to Intervene at 1

(Ex. 9).)  The Agreement contains a merger provision that would allow US Airways, in certain

circumstances, to maintain a co-branded card (with an issuer other than Bank of America) that

would compete with the Card.  (Agreement § 5.2.2 (Ex. 1).)  However, that provision is

inapplicable to the Merger and unavailable to excuse US Airways' breaches.  (*Id*)  According to

the plain language of the Agreement, the merger provision applies only in the event of a merger

involving US Airways (or any of its affiliates) and a third party that has an existing frequent flyer

program with a card issuer (other than Bank of America).  (*Id*)  Even then, the merger provision

operates only to allow US Airways the option of continuing the existing frequent traveler

program of the third party, not of establishing a new frequent flyer program with an issuer other

than Bank of America.[4]  (*Id*)  Here, at the time of the Merger, US Airways' merger partner did

not have an existing frequent flyer program with an issuer other than Bank of America.  In fact,

America West Airlines, had (and still has) a contract with Bank of America pursuant to which it

---

[3]     Juniper represents in its intervention papers that Juniper and US Airways Group sought to
structure their agreement to avoid a breach of the Agreement, which would make no sense unless
Juniper and US Airways Group believed US Airways and US Airways Group were bound by the
Agreement.  (Mem. in Supp. of Juniper's Mot. To Intervene at 1 (Ex. 9).)

[4]     *See supra* p. 6, ¶ 15 and note 2.

10

must deal exclusively with Bank of America until the end of 2005. (America West Agreement §§ 6, 9 (Ex. 3).) America West is party to the Juniper Agreement, pursuant to which Juniper is authorized to issue a card that competes with the Card, but the Juniper Agreement does not allow it to do so until January 1, 2006. (Juniper Agreement § 2(o) (Ex. 4); Juniper/America West Agreement § 5.1 (Ex. 6).) Moreover, as described above, US Airways' breaches amount to much more than simply continuing an existing frequent traveler program. (*See supra* pp. 8-9.)

Courts have entered, or affirmed, summary judgment in similar circumstances, where, as here, there was no genuine issue of material fact, and the moving party was entitled to judgment as a matter of law. *See Lindsay v. McEnearney Assocs., Inc.*, 531 S.E.2d 573, 575-76 (Va. 2000) (affirming summary judgment on claim for breach of contract); *Hitachi Credit Am Corp. v. Signet Bank*, 166 F.3d 614, 624, 633 (4th Cir. 1999) (affirming summary judgment in favor of plaintiff's breach of contract claim under Virginia law); *Weathernews Americas, Inc. v. Inter net U.S., Ltd*, 2005 WL 832236, at *2 (Va. Cir. Ct.) (granting summary judgment on plaintiff's breach of contract claim (Ex. C hereto)).

Accordingly, Bank of America respectfully submits that summary judgment should be entered in its favor on the issue of US Airways' breach of the Exclusivity Provision in the Agreement (which is covered by Count I of the Complaint).

11

## CONCLUSION

For the foregoing reasons, Bank of America respectfully requests that this Court grant its motion for partial summary judgment on the issue of liability for breach of contract against US Airways (under Count I of the complaint).

POTTER ANDERSON & CORROON LLP

By: _____

Richard L. Horwitz (#2246)
Kevin R. Shannon (#3137)
Brian C. Ralston (#3770)
Hercules Plaza, 6th Floor
1313 N. Market Street
P.O. Box 951
Wilmington, DE 19899
(302) 984-6000

*Attorneys for Plaintiff*

OF COUNSEL:

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler
David R. Marriott
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019

Dated: November 3, 2005

706137

12

# EXHIBIT A

Westlaw.

Not Reported in A.2d                                                                              Page 1
Not Reported in A.2d, 2000 WL 1476663 (Del.Ch.), 27 Del. J. Corp. L. 247
(Cite as: 2000 WL 1476663 (Del.Ch.))

H
UNPUBLISHED OPINION CHECK COURT RULES
BEFORE CITING

Court of Chancery of Delaware
GOTHAM PARTNERS, L.P., a New York Limited
Partnership, Plaintiff,
v.
HALLWOOD REALTY PARTNERS, L.P., Hallwood
Realty Corporation, and the the
Hallwood Group Incorporated, Anthony J. Gumbiner, Brian
M. Troup, William F
Forsyth, Edward T. Story, and UDO H. Walther,
Defendants.
No. CIV.A.15754.

Submitted: Aug. 30, 2000.
Decided: Sept. 27, 2000

Edward M. McNally and Lewis H. Lazarus, Esquires, of
Morris, James, Hitchens & Williams, Wilmington,
Delaware; of Counsel: Philip H. Schaeffer, Dwight A.
Healy, Karen M. Asner, David G. Hille, Esquires, of White
& Case, New York, New York, Attorneys for Plaintiff.

Michael D. Goldman, Stephen C. Norman, Matthew E.
Fischer, Esquires, of Potter Anderson & Corroon,
Wilmington, Delaware; Attorneys for Defendants Hallwood
Realty Corporation, The Hallwood Group Incorporated,
Anthony J. Gumbiner, Brian M. Troup and William L.
Guzzetti

John H. Small, Elizabeth M. McGeever, and Sheldon K.
Rennie, Esquires, of Prickett, Jones & Elliott, Wilmington,
Delaware, Attorneys for Defendants Alan G. Crisp, William
F. Forsyth, Edward T. Story, and Udo H. Walther

MEMORANDUM OPINION

STRINE, Vice Chancellor

*1 This is the latest decision in this case brought by plaintiff
Gotham Partners, L.P. challenging a series of transactions
that Gotham alleges were designed to place a control block
of limited partnership units in the hands of the parent
corporation of a limited partnership's general partner at an
unfair price [FN1] The various defendants affiliated with

the corporate general partner, including the directors of the
general partner and the general partner's corporate parent,
have brought a motion for summary judgment

> FN1. See Gotham Partners, L.P. v Hallwood
> Realty Partners, L.P. ("Gotham I "), Del. Ch., C.A.
> No 15754, mem. op., Steele, V.C. (Nov. 10, 1998)
> (denying motion to dismiss for failure to make
> pre-suit demand); see also Gotham Partners, L.P.
> v Hallwood Realty Partners, L.P., Del. Ch., C.A.
> No 15578, mem. op., Steele, V.C. (Apr. 29, 1998)
> (opinion in related books and record case); Gotham
> Partners, L.P. v Hallwood Realty Partners, L.P.,
> Del. Ch., C.A. No 15578, let. op., Steele, V.C.
> (Oct. 18, 1999) (same).

In this opinion, I conclude that:
1) the record contains facts from which one could
conclude that the challenged transactions were undertaken
in breach of the partnership agreement governing the
partnership Therefore, I deny the defendants motion for
summary judgment as to Gotham's breach of contract
claim;
2) the partnership agreement sets forth the standards that
govern transactions between the partnership and general
partner affiliates, and such contractual standards and not
default fiduciary standards form the measure by which the
general partner's conduct must be evaluated at trial Thus,
summary judgment on the breach of fiduciary duty count
against the General Partner is granted Nonetheless,
because it is unclear whether certain other defendants
would be culpable for breach of fiduciary duty or some
form of aiding and abetting liability if they purposely
caused the general partner to breach its contractual duties,
I do not grant summary judgment as to the fiduciary duty
claims against them;
3) there is a triable doubt regarding the good faith of those
defendants whose economic interests were dependent on
the good will of the general partner's parent corporation
and thus those defendants are not entitled to summary
judgment on the basis of the exculpatory provisions of §
17-1101(d)(1) of the Delaware Revised Uniform Limited
Partnership Act ("DRULPA") [FN2] the partnership
agreement; and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

Westlaw.

Not Reported in A 2d                                                                    Page 2
Not Reported in A.2d, 2000 WL 1476663 (Del Ch ), 27 Del J Corp L. 247
(Cite as: 2000 WL 1476663 (Del.Ch.))

FN2. 6 *Del. C.* § 17-1101(d)(1)

4) those defendants who were simply directors of the
general partner and thus required to balance the interests
of limited partners against the interests of the general
partner's affiliate did not, in the absence of any evidence
compromising their good faith or independence, have a
conflict of interest sufficient to support a claim for the
breach of duty of loyalty against them As such, the
exculpatory provision of the partnership agreement
barring claims against directors for lack of due care
entitles those defendants to summary judgment

### I *The Defendants*

For purposes of this motion, a proper grouping of the
defendants is important. At the center of this case is nominal
defendant Hallwood Realty Partners, L P. (the
"Partnership"), which owns office buildings and industrial
parks The Partnership's units are publicly traded on the
American Stock Exchange ("AMEX")

All of the other defendants are aligned by their relationship
to the Partnership, through the Partnership's General
Partner, defendant Hallwood Realty Corporation ("the
General Partner")

*2 The first group of defendants I will define are those
defendants who are affiliated not only with the General
Partner, but also with the General Partner's sole owner and
parent corporation, defendant Hallwood Group Incorporated
("HGI"). These defendants include not only HGI and the
General Partner, but also three individual defendants:
Anthony J. Gumbiner; Brian M. Troup; and William L.
Guzzetti At the relevant time, Gumbiner was HGI's
Chairman of the Board, Chief Executive Officer, and
director, and held the identical positions at the General
Partner Similarly, William L. Guzzetti was Executive Vice
President at HGI, and the General Partner's President, Chief
Operating Officer, and director Finally, defendant Troup
was President, Chief Operating Officer, and director of HGI
as well as a director of the General Partner It also appears
that Gumbiner, and Troup held the major equity stakes in
HGI

Because all of these defendants have a substantial economic

stake in HGI, they have aligned themselves in arguing this
motion Their relationships with HGI support an inference
that they had a self-interest to advantage HGI in any
transaction it entered with the Partnership Thus, during the
rest of this opinion I refer to this group as the "HGI
Defendants." Where it is necessary to identify those
directors of the General Partner who were officers of HGI, I
identify them as the "HGI Directors "

Another group of defendants stands in a different position.
These defendants are the four members of the General
Partner's board who do not serve as an officer or director of
HGI: Alan C. Crisp; William F Forsyth; Edward T Story;
and Udo H. Walther. For purposes of deciding this motion,
it suffices to say that Gotham has failed to produce evidence
that any of these defendants was beholden to HGI or to any
of the HGI Directors such that they could not have exercised
an independent business judgment as a director of the
General Partner Similarly, it is sufficient to note that there
is evidence that some or all of these directors devoted less
than adequate care to examining the transactions at issue in
this case, but that a due care claim is unavailable against
these defendants due to an exculpatory provision in § 7 06
of the Partnership Agreement Thus, the crucial issue
regarding these defendants will be the implications of the
fact that they had (arguably conflicting) fiduciary
obligations to both the Partnership and to the General
Partner (and its sole owner, HGI) For purposes of
identification, I identify these defendants as the "Non-HGI
Directors "

### II *The Challenged Transactions*

Gotham challenges a series of transactions (the "Challenged
Transactions" or "Transactions") undertaken by the
Partnership in 1995:

• *The "Reverse Split"*—A March 1995 reverse unit split in
which five pre-Split units of the Partnership were
exchanged for a new single post-Split unit.
In connection with the Reverse Split, HGI purchased
30,000 post-Split units at $11 88 a unit, which was the
market-based price used to compensate unitholders for
their fractional units.
*3 Although the defendants claim the 30,000 figure was
selected as an estimate of the fractional units to be

© 2005 Thomson/West. No Claim to Orig U S Govt Works.

Westlaw.

Not Reported in A.2d                                                                                           Page 3
Not Reported in A.2d, 2000 WL 1476663 (Del.Ch.), 27 Del. J. Corp. L. 247
(Cite as: 2000 WL 1476663 (Del.Ch.))

generated by the Split, the estimate missed the mark Only 14,694 fractional units were created by the Split, an amount less than half of the 30,000 units HGI acquired The Reverse Split was expected to and did generate a large increase in the number of unitholders who held blocks of fewer than 100 units

• The "Option Plan"—A March 1995 stock option plan that granted 86,000 options to officers and employees of the General Partner, including Gumbiner, Guzzetti, and Troup

The options granted equalled nearly 5.0% of the equity of the Partnership and the Partnership committed over $1 million to loan money to the optionees to fund their purchases under the Plan

• The "Odd-Lot Offer"—A June 1995 odd-lot tender offer in which the Partnership bought 293,539 post-Split units in blocks of less than 100 units from June 5, 1995 to July 10, 1995 [FN3]

FN3. Norman Aff., Ex. 45, at 23

The Partnership then sold the units it purchased in the Odd-Lot Offer to HGI. The units cost HGI $4.1 million, or slightly less than $14.00 per unit. The price paid by HGI tracked the price the Partnership paid to tendering stockholders, which was based on a market price formula. An odd-lot tender offer by an issuer like the Partnership is exempt from many of the federal disclosure regulations that govern other tender offers. Thus the disclosures made in connection with the Odd-Lot Offer were all contained on a single page in which the Partnership made clear that it was making no recommendation as to price and that HGI wished "to purchase the Units acquired by the Partnership pursuant to the Offer in order to increase its ownership interest in the Partnership." [FN4]

FN4. Healy Aff., Ex. 15

III  The Competing Arguments Of The Parties
A  Gotham's Claims Against The Defendants
Gotham alleges that the Challenged Transactions were designed by the General Partner as a method to entrench its owner, HGI, by placing a large number of units in HGI's hands at an unfairly low price In support of that claim, Gotham points out that HGI ended up with 24.7% of the

Partnership's units at the end of the Transactions When the options are added in, HGI controlled nearly 29.4% of the Partnership's units Because the Partnership Agreement provides that a two-thirds vote of unitholders is necessary to remove the General Partner, Gotham alleges that the Transactions gave HGI the effective power to stymie a removal vote

Not only that, Gotham claims that the General Partner timed the Transactions so as to enable HGI to grab up a control block at a depressed price Possessing evidence that the real estate market had improved and that the Partnership's own performance was quite promising, but knowing that the market had not yet recognized those factors in valuing the Partnership's units, [FN5] HGI, according to Gotham, seized the opportunity to snap up a control block on the pretext that the Partnership itself could not afford to finance the Challenged Transactions Yet, Gotham claims, the Transactions were easily financeable by the Partnership itself. In support of this argument, Gotham notes that: (i) the General Partner never even attempted to finance the Challenged Transactions; (ii) the Partnership sold HGI twice as many units as were required to effect the Split; (iii) the General Partner was comfortable committing a quarter of the resources needed to purchase the units in the Transactions to fund the Option Plan; (iv) the Partnership had a healthy amount of cash on hand; (v) the General Partner obtained a firm commitment to refinance the entire debt of the Partnership within a month of the Odd-Lot Offer; [FN6] and (vi) the General Partner committed the Partnership to a unit repurchase plan in December 1995 (the "Repurchase Plan")

FN5. See, e.g., id. Exs. 11, 12

FN6. The refinancing actually closed in September 1995, but had been under negotiation while the Odd-Lot Offer was on-going.

*4 In further support of its argument, Gotham notes that while purporting to accomplish the major Transaction at issue—the Odd-Lot Offer—as an issuance of securities, there is no record evidence that the General Partner in fact issued new securities to HGI in that Transaction Rather, it appears that the General Partner simply resold the units it purchased

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1476663 (Del.Ch.), 27 Del. J. Corp. L. 247
(Cite as: 2000 WL 1476663 (Del.Ch.))

Page 4

in the Offer to HGI

As a result, Gotham contends that the Odd-Lot Offer was clearly subject to §§ 7.05 and 7.10(a) of the Partnership Agreement. Section 7.05 states that the Partnership "is *expressly permitted to enter into transactions with the General Partner or any affiliate thereof provided that the terms of any such transaction are substantially equivalent to terms obtainable by the Partnership from a comparable unaffiliated third party.*" [FN7] Section 7.10(a), meanwhile, states that the General Partner shall "form an Audit Committee . comprised of two members of the board of directors who are not affiliated with the General Partner or its Affiliates except by reason of such directorship. *The function[ ] of the Audit Committee shall be to review and approve    transactions between the Partnership and the General Partner and any of its Affiliates.*" [FN8]

> FN7. (emphasis added).

> FN8. (emphasis added).

Gotham contends that both sections of the Partnership Agreement were breached. As to § 7.05, Gotham notes that an internal asset valuation (the "Net Asset Valuation") prepared by the General Partner for the year ending December 31, 1994 valued the Partnership's net asset value per unit at $58--four to five times the prices paid by HGI for units in the Transactions [FN9] It also points to expert affidavits it has submitted expressing the view that the block purchased by HGI could have sold for a higher price in the market, as well as the fact that the Partnership bought back units at twice the price HGI paid just a year later pursuant to the Repurchase Plan [FN10]

> FN9. Healy Aff., Ex. 12

> FN10. Norman Aff. Ex. 9, at 22, Ex. 51.

As to § 7.10(a), Gotham notes the undisputed fact that the Audit Committee never met separately to "review and approve" the Challenged Transactions At the three brief meetings held to approve the Transactions, the closest the Audit Committee members got to compliance with § 7.10(a) was the fact that they voted to approve certain of the Transactions with the HGI Directors abstaining At no time,

however, did the Audit Committee convene as an independent body, nor did it retain any outside advisors, but contented itself with relying upon management and outside advisors who owed their compensation to the General Partner and/or HGI

Therefore, Gotham alleges that the General Partner breached its duties under the Partnership Agreement (the "Contract Claim") Gotham also contends that the General Partner and the HGI Directors breached the fiduciary duties of loyalty and care that they owed to the Partnership's unitholders (the "Breach of Fiduciary Duty Claim"). HGI is alleged to have aided and abetted these breaches of duty

### B. *The Basis For The Defendants' Motion For Summary Judgment*

*5 The defendants, of course, tell quite a different tale in support of their motion for summary judgment. They argue that the record is clear that the Challenged Transactions were undertaken for a proper Partnership purpose and fully comported with the terms of the Partnership Agreement

With regards to substance, the defendants note that the Partnership was not in the best of financial health as of October 1994, when the Transactions were first approved in principle by the General Partner. The early 1990s had been a rough period for real estate partnerships including the Partnership at issue in this case. The Partnership's units were trading at around $2 a pre-Split unit, and the Partnership had failed in efforts to obtain a significant debt restructuring or capital infusion. By conducting a reverse split and an odd-lot tender offer, the Partnership would bolster the market price of units by increasing the unit price into the double digits, offer liquidity to small holders without brokerage costs, reduce the administrative costs the Partnership incurred to communicate with holders of small blocks, and avoid any risk of having its units delisted (the units having traded near the minimum dollar a unit AMEX listing level in late 1993)

Moreover, the defendants argue that the price paid by HGI was fair because it tracked the market price that the Partnership paid in the Split and the Odd-Lot Offer. In this regard, the defendants to some extent disclaim the Partnership's own internal Net Asset Valuation, claiming

© 2005 Thomson/West No Claim to Orig. U.S. Govt. Works

Westlaw.

Not Reported in A 2d                                                                                           Page 5
Not Reported in A 2d, 2000 WL 1476663 (Del Ch ), 27 Del J Corp L 247
(Cite as: 2000 WL 1476663 (Del.Ch.))

that it was simply something prepared for tax reporting
purposes [FN11] and cannot be taken seriously as an
authentic value of the Partnership's assets

> FN11. Defs Reply Br. at 33 & n 17 (stating that
> calculations were performed exclusively for tax
> reporting purposes and were not intended to reflect,
> and did not reflect, an estimate of the actual or fair
> market value of the properties)

Most significantly, however, the defendants note that their
procedural defense also answers the fair price point
According to the defendants, the shares that were purchased
by HGI and its affiliates in the Challenged Transactions all
constituted "issuances" of new Partnership units and not
mere "resales" of units purchased by the Partnership on the
market

As a result, the defendants contend that § 9.01 of the
Partnership Agreement clearly governed the Transactions to
the total exclusion of §§ 7.05 and 7.10(a) Section 9.01
provides in pertinent part that:

(a) Subject to Sections 9 01(b) and (c) hereof, the General
Partner is authorized to cause the Partnership to issue
Units at any time or from time to time to the General
Partner, to Limited Partners or to other Persons ... without
any consent or approval of the Limited Partners or
Assignees ... *Subject to Section 9 01(b) hereof, the
General Partner shall have sole and complete discretion
in determining the rights, powers, preferences, and duties
... and the consideration and terms and conditions with
respect to any future issuance of Units ...*
(b) The General Partner or any Affiliate thereof may, but
is not obligated to, make Capital Contributions to the
Partnership in the form of cash or other property in
exchange for Units *Except as set forth above, the number
of Units issued to the General Partner or any such
Affiliate in exchange for any Capital Contribution shall
not exceed the Net Agreed Value of the contributed
property or the amount of cash, as the case may be,
divided by the Unit Price of a Unit as of the day of such
issuance* [FN12]

> FN12. Partnership Agreement § 9 01 (emphasis
> added)

*6 The defendants claim that the Transactions were in fact
carried out as issuances under § 9 01 and that the price paid
by HGI complied with the floor set by § 9.01(b) for
issuances to affiliates of the General Partner Noting that,
subject to this floor price, § 9 01(a) vests "sole and
complete" discretion to set the terms of issuances, the
defendants claim that the plain language of the Partnership
Agreement precludes the operation of §§ 7.05 and 7.10(a)
In further support of this argument, the defendants note that
§ 7 10(c) provides:

Whenever in this Agreement ... the General Partner is
permitted or required to make a decision (i) *in its "sole
discretion" or "discretion" or under a similar grant of
authority or latitude, the General Partner shall be entitled
to consider only such interests and factors as it desires
and shall have no duty or obligation to give any
consideration to any interest of or factors affecting the
Partnership, ... the Limited Partners or the Assignees. or
(ii) in its "good faith" or under another express standard,
the General Partner shall act under such express
standard and shall not be subject to any other or different
standards imposed by this Agreement. ... or any other
agreement contemplated herein or therein Each Limited
Partner or Assignee hereby agrees that any standard of
care or duty imposed in this Agreement. ... or any other
agreement contemplated herein or under the Delaware
RULPA or any other applicable law. rule or regulation
shall be modified, waived or limited in each case as
required to permit the General Partner to act under this
Agreement, ... or any other agreement contemplated
herein and to make any decision pursuant to the authority
prescribed in this Section 7 10(c) so long as such action
or decision does not constitute willful misconduct and is
reasonably believed by the General Partner to be
consistent with the overall purposes of the Partnership*

To superimpose either the substantive requirement of § 7 05
or the procedural requirement of § 7 10(a) on § 9 01
Transactions, the defendants contend, would conflict with
the clear mandate of § 7 10(b) by fettering the General
Partner's complete discretion with conflicting substantive
and procedural "standards" and by requiring it to consider
"interests of .. or factors .. affecting the Limited Partners "
[FN13] Rather, the only duty of the General Partner was to

© 2005 Thomson/West No Claim to Orig U S Govt Works

Westlaw.

Not Reported in A 2d                                                                   Page 6
Not Reported in A 2d, 2000 WL 1476663 (Del Ch ), 27 Del J Corp L 247
(Cite as: 2000 WL 1476663 (Del.Ch.))

ensure that HGI paid a price in compliance with § 9 01(b) and that duty was carried out

> FN13. *Id* (emphasis added)

Furthermore, the defendants contend that they are entitled to summary judgment regardless of whether the Challenged Transactions were consummated in breach of the Partnership Agreement They raise three affirmative defenses in support of this contention

First, the defendants contend that at worst they relied on a good faith misinterpretation of the Partnership Agreement in concluding that § 9 01 governed the Transactions to the exclusion of §§ 7 05 and 7 10(a) Thus, they argue, § 17-1101(d) of the DRULPA provides them with immunity from liability That section states:

\*7 To the extent that, at law or in equity, a partner or other person has duties (including fiduciary duties) and liabilities relating thereto to a limited partnership or to another partner, (1) any such partner or other person acting under a partnership agreement shall not be liable to the limited partnership or to any such other partner for the partner's or other person's good faith reliance on the provisions of such partnership a greement  [FN14]

> FN14. *6 Del. C. § 17-1101(d)(1)*

Relatedly, the Non-HGI Directors also rely upon § 17-1101(d)(2) of DRULPA, which permits a partnership agreement to limit the liabilities of partners even further [FN15] Section 7 06 of the Partnership Agreement utilizes that flexibility by stating as follows:

> FN15. *6 Del. C. § 17-1101(d)(2)*

*Liability of General Partner to the Partnership and Limited Partners or Assignees*
The General Partner, its Affiliates and all officers, directors, partners, employees and agents of the General Partner and its Affiliates shall not be liable to the Partnership, any Limited Partner, Assignee or any other Person who has acquired an interest to the Partnership for any losses sustained or liabilities incurred, including monetary damages, as a result of any act or omission, unless such act or omission constitutes (a) a breach of any

duty of loyalty to the Partnership, (b) an act or omission in bad faith which involves intentional misconduct or a knowing violation of law, or (c) a transaction from which an improper personal benefit is derived  [FN16]

> FN16. (emphasis in original)

Finally, all the defendants proffer their alleged good faith reliance upon advice of counsel as an independent defense Under § 7 08(b) of the Partnership Agreement:

> The General Partner may consult with legal counsel selected by it, and any opinion of any such Person as to matters that the General Partner reasonably believes to be within its professional or expert competence (including, without limitation, any opinion of legal counsel to the effect that the Partnership would "more likely than not" prevail with respect to any matter) shall be full and complete authorization and protection with respect to any action taken, suffered or omitted by the General Partner hereunder in good faith and in accordance with such opinion

As to all these defenses, the defendants claim that the record is indisputably clear that they had been advised by counsel that § 9 01 governed these Transactions, that they had never been advised by counsel that § 7 05 or § 7 10(a) applied, and that there is no evidence casting doubt on the good faith of any of them in structuring the Transactions in compliance with § 9 01 and not §§ 7 05 and 7 10(a)

With regard to these affirmative defenses, the Non-HGI Directors distance themselves a bit from their fellow defendants The Non-HGI Directors note that unlike HGI or its officers, they had no reason to be other than a faithful broker in ensuring that the Transactions were fair to all Partnership constituencies, in particular to the unitholders other than to HGI That is, the Non-HGI Directors argue that even were I to conclude that there is evidence in the record that casts a triable doubt over the good faith of the HGI Defendants and precludes an award of summary judgment to those defendants, there is nothing in the record that compromises their own good faith

### III *The Order In Which The Issues Will Be Resolved*
\*8 I will address the defendants' arguments in the following

© 2005 Thomson/West No Claim to Orig U S Govt Works

Westlaw.

Not Reported in A 2d
Not Reported in A 2d, 2000 WL 1476663 (Del Ch ), 27 Del J Corp L. 247
(Cite as: 2000 WL 1476663 (Del.Ch.))

order. The opinion will first examine whether the defendants are entitled to summary judgment on Gotham's Contract Claim I will then address whether there is any room left by the Partnership Agreement for the application of general fiduciary duty principles to analyze the General Partner's conduct in the Challenged Transactions, and thus whether Gotham's Fiduciary Duty Claim withstands summary judgment Then I will tackle Gotham's self-styled "Fraud Claim," which involves a rather convoluted twist on its Contract and Fiduciary Duty Claims

After that, I will examine separately the affirmative defenses raised by the HGI Defendants and the Non-HGI Directors

IV *The Applicable Procedural Standards*
To prevail on their motion, the defendants must persuade me that upon a review of the evidence in the light most favorable to Gotham, no genuine issues of material fact exist that preclude the entry of judgment for the defendants [FN17] An important element of discretion is left to the trial court in applying Rule 56, which enables the court to deny "summary judgment if it decides that a more thorough development of the record would clarify the law or its application " [FN18] In discussing the various claims, I have consciously avoided deciding the numerous subsidiary factual skirmishes between the parties in the 223 pages of briefs they filed, and concentrate on the major questions that will determine whether a trial is necessary Given the procedural posture, I focus in particular on the admissible evidence that bolsters Gotham's claims

> FN17. Ct. Ch R 56(e); *Brown v. Ocean Drilling & Exploration Co.,* Del.Supr., 403 A.2d 1114, 1115 (1979).

> FN18. *In re Dairy Mart Convenience Stores Inc ,* Del Ch , Cons C A. No 14713, mem op at 31, Chandler, C (May 24, 1999) (*citing Alexander Indus.Inc. v. Hill,* Del.Supr., 211 A.2d 917, 918 (1965); *Ebersole v. Lowengrub,* Del.Supr., 180 A.2d 467 (1962)).

A *Gotham's Contract Claim*
In addressing the Contract Claim, I apply Delaware's well-established contract interpretation principles, which

direct the court in the first instance to discern the meaning of a contract and the intent of the parties from the language they used, as read from the perspective of a hypothetical, objective third party [FN19] It is only when that approach does not yield an unambiguous result that the court will resort to secondary techniques of construction In the limited partnership context, those secondary methods fall into two primary categories Where a limited partnership agreement was drafted exclusively by the general partner, the court will interpret ambiguities against the drafter, rather than examine extrinsic evidence [FN20] But if a limited partnership agreement was the product of negotiations among the parties, the court will resolve an ambiguity by examining relevant extrinsic evidence [FN21] The Partnership Agreement here appears to fall into the former category and was exclusively crafted by the General Partner

> FN19. *U S West, Inc v Time Warner Inc ,* Del Ch , C A No 14555, mem op at 21, Allen, C (June 6, 1996).

> FN20. M.J LUBAROFF & P M ALTMAN, LUBAROFF & ALTMAN ON DELAWARE LIMITED PARTNERSHIPS (hereinafter "LUBAROFF & ALTMAN") § 11 1, at 11-3-11- 4 (Supp.2000) (*citing SI Management L.P. v. Winninger,* Del.Supr., 707 A.2d 37, 43 (1998); *Arvida/JMB Partners, L P v Vanderbilt Income & Growth Associates, L L C.,* Del Ch , C A No 15238, mem op at 11, Balick, V C (May 23, 1997), *aff'd,* 712 A .2d 475 (1998) (ORDER))

> FN21. *Id* at 11-3 (*citing U S West v Time Warner, Inc ,* mem op )

The defendants' position that summary judgment should be granted on Gotham's Contract Claim centers on its view that § 9 01 applies to all of the Challenged Transactions, including the Odd-Lot Offer, which was the Transaction in which HGI acquired most of its Partnership units Without belaboring what will be a major issue at trial, I conclude that a grant of summary judgment on this issue is inappropriate for two reasons

\*9 The most important is that there is abundant record

© 2005 Thomson/West No Claim to Orig U S Govt Works

Westlaw.

Not Reported in A.2d                                                    Page 8
Not Reported in A.2d, 2000 WL 1476663 (Del.Ch.), 27 Del. J. Corp. L. 247
(Cite as: 2000 WL 1476663 (Del.Ch.))

evidence that supports Gotham's assertion that the Odd-Lot Offer did not involve an issuance of units governed by § 9.01. This evidence is consistent with the Offer as being a transaction in which the Partnership purchased the units it purchased from tendering unitholders and simply resold those same units to HGI. In fact, most of the documents created by the defendants and their agents in connection with the Offer describe the Transaction in just such terms. Moreover, the record is devoid of any evidence that shows when the Odd-Lot Offer-related units were "issued" to HGI or that the Partnership calculated the floor price in § 9.01(b) by reference to such (unknown) date of issuance, as is required by that provision.

As such, the Transaction might well be found to fall under the plain terms of § 7.09 of the Partnership Agreement, which provides as follows:

Section 7.09 *Purchase or Sale of Units* The General Partner may, on behalf of and for the account of the Partnership, purchase or otherwise acquire Units and, following any such purchase or acquisition, may sell or otherwise dispose of such Units in accordance with applicable law. In addition to the foregoing, the General Partner and its Affiliates from time to time also may purchase or otherwise acquire Units other than from the Partnership for their own account and may, subject to the provisions of Section 13.03 hereof, sell or otherwise dispose of such Units [FN22].

> FN22. For many reasons discussed at oral argument, I reject: 1) the defendants' argument that § 7.09 did not provide clear authorization, as required by § 17-702(d) of DRULPA, for the General Partner to purchase units on behalf of the Partnership, hold them for the account of the Partnership, and then sell them later; and 2) Gotham's argument that the second sentence of § 7.09 implicitly precludes the General Partner from purchasing units from the Partnership itself.

If the Transaction was accomplished under authority of § 7.09 and not § 9.01, then there seems to be little doubt that both § 7.05 and § 7.10(a) would apply. Because there is a triable question regarding whether the price paid by HGI was equivalent to what a third party would have paid and

because it is clear that the Audit Committee did not meet to review and approve the Transaction, the defendants' motion for summary judgment must be denied.

A second reason exists why summary judgment is unwarranted. To the extent § 9.01 applies to the units purchased by HGI in the Reverse Split, the options issued in the Option Plan, and even to the units purchased in the Odd-Lot Offer, I am not convinced that the Partnership Agreement unambiguously precludes the operation of § 7.10(a)'s Audit Committee approval requirement.

I agree with the defendants that there is no way to reconcile the substantive fair price requirement of § 7.05 with § 9.01(a)'s provision granting the General Partner the substantive discretion to issue shares to itself or affiliates on terms it establishes subject to the floor set by § 9.01(b). By contrast, however, it is conceivable to reconcile the requirement of Audit Committee "review and approval" with the discretion accorded the General Partner by § 9.01. The Audit Committee, after all, is not a separate entity from the General Partner. The Audit Committee is created by and is a constituent part of the General Partner itself. The defendants have not convinced me at this stage that the procedural requirement in § 7.10(a) that the General Partner's own Audit Committee review and approve transactions between the Partnership and the General Partner or its affiliates is inconsistent with the substantive grant of discretion to the General Partner in § 9.01. The fact that § 7.10(a) might require the General Partner to follow a certain process in "exercising its sole and complete discretion" does not so clearly create a "different standard" as to necessarily preclude a joint operation of § 7.10(a) and § 9.01 with respect to issuance to affiliates of the General Partner. [FN23] Indeed, it may have been thought by the drafters that the floor price in § 9.01(b) and the procedural protections of § 7.10(a) were sufficient to protect the unitholders from overreaching by the General Partner so as to eliminate the need to subject issuances to § 7.05.

> FN23. In fairness, I note that there are other factors weighing in favor of the defendants' argument, including the fact that § 9.01(a) expressly states that the powers it sets forth are subject to §§ 9.01(b) and (c) and does not refer to § 7.10(a). As

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1476663 (Del.Ch.), 27 Del. J. Corp. L. 247
(Cite as: 2000 WL 1476663 (Del.Ch.))

Page 9

Gotham points out, however, § 9.01 nowhere expressly excludes operation of § 7.10(a), a section of the Agreement that clearly purports to have a fairly wide scope of intended operation. In other places in the Agreement, moreover, the Agreement expressly states when particular sections modify or exclude the operation of generally applicable sections. E.g., Agreement §§ 13.01(a) & 16.03 (both starting with the phrase "Except as otherwise provided in Sections ..."). Therefore, I balk at relying on this method of resolution without the benefit of a trial and further briefing that might shed greater light on the precise contexts in which these different approaches were used in the Agreement.

*10 Likewise, because I am not convinced that § 7.10(a) is irreconcilable with § 9.01, I will not resort to resolution of the claim on the basis that § 9.01 is the more specific provision and must trump a more general provision of the Agreement. Without certainty that the two provisions were not meant to operate in tandem, the court cannot resort to that rule of contract construction. [FN24]

FN24. Sonitrol Holding Co. v. Marceau Investissements, Del. Supr., 607 A.2d 1177, 1184 (1992)

Lastly, because Gotham has not moved for summary judgment, I need not address the potential applicability of the principle that contractual ambiguities should be construed against the drafter, in this case, the General Partner. Nor should Gotham read this opinion as precluding a ruling in the defendants' favor on these interpretive issues after trial. For now, I merely conclude that there is sufficient uncertainty regarding § 9.01's applicability and the implications of its applicability on the operation of § 7.10(a) as to preclude an award of summary judgment for the defendants on Gotham's Contract Claim. [FN25]

FN25. In re Marriott Hotel Properties II Limited Partnership Unitholders Litig. ("Marriott III"), Del. Ch., Cons.C.A. No 14961, mem. op. at 19, Lamb, V.C. (Jan. 24, 2000) ("if 'a more thorough development of the record would clarify the law or

its application,' the court may, in its discretion, deny summary judgment") (quoting In re Dairy Mart Convenience Stores, Inc. Deriv. Litig. Del Ch., Cons.C.A. No. 14713, mem. op. at 31, Chandler, C. (May 24, 1999)) Cf. US West v Time Warner, Inc., Del. Ch., C.A. No 14555, mem. op. at 21 n. 10, Allen, C. (June 6, 1996) (in determining whether the language of a contract is ambiguous, it is sometimes necessary to understand the context and business circumstances in which the contract was created)

B. The Breach Of Fiduciary Duty Claim

The identical conduct that Gotham complains breached the Agreement is said by it to have breached fiduciary duties owed by the defendants to the unitholders. Thus, this court once again faces an effort by a plaintiff in the limited partnership context to bring to the fore the default rules that operate when a limited partnership agreement fails to define the duties and liabilities of the partners. [FN26]

FN26. LUBAROFF & ALTMAN § 11.2.6 at 11-26.7 ("When any level of dissatisfaction concerning a matter relating to the limited partnership occurs, people are quick to complain about what has occurred in terms of a breach of fiduciary duty. While such duties do exist, it is not proper to assert or rely on such duties as a means of rewriting a partnership agreement ... [T]he agreement of partners concerning what the duties between them are should control. Courts and partners and their advisors should avoid making the mistake of thinking that, on the basis of generalized or even specific statements of duties which are contrary to the specific provisions of a partnership agreement, it is appropriate to rewrite the understanding of partners as set forth in the partnership agreement.").

Absent a contrary provision in the partnership agreement, the general partner of a Delaware limited partnership owes the traditional fiduciary duties of loyalty and care to the Partnership and its partners. [FN27] But § 17-1101(d)(2) of DRULPA expressly authorizes the elimination, modification, or enhancement of these fiduciary duties in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works



Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1476663 (Del.Ch.), 27 Del. J. Corp. L. 247
(Cite as: 2000 WL 1476663 (Del.Ch.))

Page 10

the written agreement governing the limited partnership [FN28] "When a particular limited partnership has plainly opted out of the statutory default scheme, judicial review must look to the limited partnership's distinct doctrinal foundation in contract law." [FN29] Therefore, where the Partnership Agreement provides the standard that will govern the duty owed by a General Partner to its partners in self-dealing transactions, it is the contractual standard and not the default fiduciary duty of loyalty's fairness standard that exclusively controls. [FN30]

> FN27. *Sonet v. Timber Company, L.P.,* Del. Ch., 722 A.2d 319, 322 (1998); E.P. WELCH & A.J. TUREZYN, FOLK ON THE DELAWARE GENERAL CORPORATION LAW (hereinafter "FOLK"), Pt. V Limited Partnerships (Robert S. Saunders) § 17-403.5 at LP-IV-37-38 (2000) (general partner of L.P. owes fiduciary duties to limited partnership unless such duties are modified by the partnership agreement).

> FN28. *Sonet,* 722 A.2d at 323.

> FN29. *Id.*

> FN30. *In re Marriott Hotel Properties II Limited Partnership Unitholders Litigation* ("*Marriott I* "), Del. Ch., Cons C.A. No. 14961, mem. op. at 11, Allen, C. (June 12, 1996) ("[W]here the parties have a more or less elaborated statement of their rights and duties, absent fraud, those rights and duties, where they apply by their terms, and not the vague language of a default fiduciary duty, will form the metric for determining breach of duty."); *In re Cencom Cable Income Partners, L.P. Litig.,* Del. Ch., Cons C.A. No. 14634, mem. op. at 10, Steele, V.C. (Feb. 15, 1996) (DRULPA "recognizes [that] partners may modify fiduciary duties through contract. In other words, whether a general partner operates in good faith, with due care, or with requisite loyalty may be determined by the consistency with which the general partner adheres to its contractual obligations. Put another way, the limited partnership agreement may authorize actions creating a 'safe harbor' for the

general partner under circumstances that might otherwise be questionable or impose a stricter standard of scrutiny than the norm.")

Here, the defendants have convinced me that the Partnership Agreement leaves no room for the application of common law fiduciary duty principles to measure the General Partner's conduct. The Partnership Agreement is hardly a model of clarity. Indeed, it is filled with provisions that appear to render illusory protections that other provisions accord the unitholders. But there is no doubt that the Agreement attempts to set forth the duties owed by the General Partner in self-dealing transactions between the Partnership and General Partner affiliates in a comprehensive manner. The provisions of the Agreement that articulate these duties fully encompass Gotham's claims.

*11 For example, if the defendants are correct that § 9.01 of the Agreement applies to the exclusion of §§ 7.05 and 7.10(a), then the parties to the Agreement have consciously chosen to apply another standard than "fairness" to issuances of securities to the General Partner or its affiliates. There is simply no way to square a duty of generalized fairness with the sole and complete discretion [FN31] accorded to the General Partner under that reading of the contract.

> FN31. A discretion that is subject, of course, to the floor price set in § 9.01(b).

Furthermore, because the sole and complete discretion possessed by the General Partner under that reading is as broad as it is, it would also subsume any concern that the number of units issued would have an entrenching effect, even though the Agreement does provide the limited partners with the right to remove the General Partner by a two-thirds vote. However harsh it sounds, I find no way to square a corporate law-derived *Revlon* [FN32] claim with contractual provisions that give the General Partner "sole and complete" discretion to issue units to itself *and* to decide whether to admit unitholders as voting limited partners [FN33] These provisions are inconsistent with an expectation by unitholders that the General Partner would govern the Partnership subject to the identical strictures that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

Westlaw.

Not Reported in A.2d                                                                      Page 11
Not Reported in A.2d, 2000 WL 1476663 (Del.Ch.), 27 Del. J. Corp. L. 247
(Cite as: 2000 WL 1476663 (Del.Ch.))

apply to corporate boards in managing change of control situations But there are in keeping with a contractual expectation on the part of the General Partner that it would have substantial authority to maintain its position, subject to only such constraints as are imposed by the contract itself

FN32. *Revlon, Inc. v. MacAndrews & Forbes Holdings,* Del.Supr., 506 A.2d 173 (1985)

FN33. Partnership Agreement § 13 05

In fact, the original offering prospectus for the Partnership advised investors in very plain terms that this was so:

The decision to admit an Assignee will be in the sole discretion of [the General Partner]. As a result, [the General Partner] will be able to prevent non-limited partners from voting for its removal by preventing Assignees from becoming limited partners [FN34]

FN34. See Norman Aff, Ex 2

In the *Marriott Hotel* limited partnership cases, the investment of power of this nature in a general partner was found by this court to be at odds with an expectancy of a control premium on the part of unitholders [FN35]

FN35. *See In re Marriott I,* mem op at 15 (June 12, 1996); *In re Marriott Hotel Properties II Limited Partnership Unitholders Litig.* ("*Marriott II*") Cons C.A. No. 14961, mem. op at 10-12, Lamb, V C (Sept. 17, 1997) While it is true that the Marriott cases apparently involved a partnership agreement with no removal provision, the lack of such a removal provision was but one of several features that was found inconsistent with *Revlon's* applicability Most important among those was the general partner's ability to defeat an insurgency by the simple measure of denying the insurgent admission as a limited partner *See Marriott II,* mem op at 10-11 (Vice Chancellor Lamb discussing the fact that Chancellor Allen had correctly concluded that the absolute discretion the general partner had over admission decisions was "entirely inconsistent" with the existence of *Revlon* duties)

The reasoning of those cases applies here and bars the use of generalized *Revlon* principles. If § 9 01 applies to the exclusion of §§ 7 05 and 7 10(a), then Gotham can prevail only by showing, per § 7 10(c), that the Transactions resulted from "willful misconduct" by the defendants or were not "reasonably believed . to be consistent with the overall purposes of the Partnership "

Similarly, if Gotham is correct about the interpretation of the Agreement, the Agreement's provisions cover any ground that might be occupied by backdrop fiduciary duties Assuming § 7 05 applies to the Challenged Transactions, the validity of those Transactions would be measured by its terms, which in substance match the entire fairness standard. [FN36] An identical result pertains to the extent that § 7.05 does not apply (because all or some of the Transactions were accomplished under § 9 01) but that § 7 10(a) does In that scenario, Gotham might be entitled (subject to the affirmative defenses of the defendants) to relief for the failure of the defendants to comply with § 7 10(a)'s terms But it would be inconsistent with the plain terms of the contract to superimpose a generalized fairness duty on § 9 01

FN36. *Sonet,* 722 A.2d at 324 n. 12 (applying agreement provisions to exclusion of fiduciary duty principles while recognizing that some of the agreement's provisions were "in some sense . an explicit acceptance of the default duty of loyalty and fair dealing .")

*12 Therefore, as I understand this case, Gotham's ability to obtain relief will rise or fall with its Contract Claim If it loses its Contract Claim, its Fiduciary Duty Claim falls as well. If it wins its Contract Claim, then it will have in substance proven that the General Partner was subject, by contract, to a fairness standard akin to the common law one applicable to self-dealing transactions by fiduciaries In either event, the Partnership Agreement, and not default rules of fiduciary duty, control [FN37] As such, defendants' motion to dismiss Gotham's Fiduciary Duty Claim is granted as against the General Partner

FN37. Any interstitial issues in this case are best dealt with through cautious application of the

© 2005 Thomson/West. No Claim to Orig U S Govt. Works.



Not Reported in A 2d                                                                 Page 12
Not Reported in A 2d, 2000 WL 1476663 (Del Ch ), 27 Del J Corp L 247
(Cite as: 2000 WL 1476663 (Del.Ch.))

implied covenant of good faith and fair dealing If the General Partner's behavior cannot be said to violate an express term of the Agreement or an implied covenant to that Agreement, the court should be all the more reticent to conclude that the conduct was invalid on fiduciary grounds

I leave open the following issue that was not addressed by the parties The fiduciary duties owed by directors of a corporate general partner to the limited partnership under DRULPA have yet to be fully defined. In view of the teaching of cases like *In re USA Cafes, L P Litigation*, [FN38] I am not confident that the HGI Directors might not be culpable for breach of fiduciary duty or as aider and abettors if they intentionally caused the General Partner to violate the Partnership Agreement Likewise, if HGI purposefully induced a breach of contract by the General Partner, I cannot confidently conclude that it has no exposure Thus, while I am certain that the liability of all the defendants will turn primarily on whether the General Partner complied with the Agreement, questions of fiduciary liability regarding the other HGI Defendants exist that I am presently unprepared to answer

FN38. Del. Ch., 600 A.2d 43 (1991)

C *Gotham's Fraud Claim*
Gotham's Fraud Claim is pled in the following conclusory manner:

COUNT XI--FRAUD
* * *

191  Defendants owe the Partnership and the Limited Partners a fiduciary duty of full and fair disclosure
192  The General Partner misrepresented or concealed from the Partnership and the Limited Partners the true value of the Partnership's assets and the real reason for the transactions alleged above
193  The General Partner acted with intent to deceive or with reckless disregard for the truth
194  The Partnership relied to its detriment on such misrepresentations and facts which the General Partner knew to be false, causing injury to the Partnership and the Limited Partners [FN39]

FN39. Am Comp ¶¶ 191-194

During briefing, Gotham sought to flesh out this vague claim Hence, it now contends that there are two specific items of information that should have been disclosed (the "Allegedly Material Facts") First, Gotham claims the General Partner should have disclosed the Net Asset Valuation that showed a value per unit well in excess of the Odd-Lot Offer purchase price Second, Gotham distances itself from its complaint's claim that it was improper for the General Partner not to make a self-flagellating disclosure about its "real reasons " [FN40] Gotham now claims that the General Partner should have disclosed factual information describing the effect that the resale of the Units to HGI contemplated in the Odd-Lot Offer could have had on HGI's equity share in the Partnership and thus on the unitholders' ability to remove the General Partner pursuant to the two-thirds removal provision

FN40. *Loudon v. Archer Daniels-Midland Co.*, Del.Supr., 700 A.2d 135, 143 (1996) (self-flagellating disclosures are not mandated)

*13  But even with this additional meat on the bone, Gotham's Fraud Claim fails as a matter of law One obvious problem with Gotham's claim is that it is unclear to whom Gotham is contending that disclosure of the Allegedly Material Facts should have been made In this regard, it is critical that Gotham's disclosure claim rests on a fraud theory and not on the duty of disclosure owed in certain circumstances by fiduciaries

That is, Gotham does not purport to bring this action on behalf of unitholders who sold in the Odd-Lot Offer on the basis that the General Partner breached any fiduciary duty of disclosure owed to them As a result, any argument that the General Partner had the duty to disclose all the material facts bearing on the value of the Partnership units it sought to purchase in that Offer is unavailing to Gotham [FN41] Gotham simply cannot claim any harm to it or the unitholders who did not tender from that lack of disclosure Rather, any harm to the non-tendering unitholders resulted not from the Odd-Lot Offer itself but from the terms and entrenching effect of the resale of the purchased units to HGI The resale was not approved by the unitholders It was

Westlaw.

Not Reported in A.2d                                                                                                                    Page 13
Not Reported in A.2d, 2000 WL 1476663 (Del.Ch.), 27 Del. J. Corp. L. 247
(Cite as: 2000 WL 1476663 (Del.Ch.))

approved by the General Partner

> FN41. *See In re Marriott I* mem. op. at 20 ("It is unquestioned that, in extending an offer to the limited partners to buy their limited partnership units the general partner owes a duty of full disclosure of material information respecting the business and value of the partnership which is in its possession."). I note that this statement in *Marriott I* does not address an offer by the limited partnership itself. If it were applied mechanistically to an offer by a limited partnership, such an application would appear to substantially limit any benefit to Delaware limited partnerships from the relaxed requirements apparently afforded to odd-lot tender offerors under federal law. In this case, there is no question that the Partnership made no attempt to make such full disclosure. Because if this case were brought on behalf of selling unitholders a nice question of law would have been presented regarding: i) the Delaware disclosure requirements applicable in a circumstance when federal law specifically contemplates quite limited disclosures; and ii) whether the Offer was in fact one by the Partnership, the direct purchaser and conduit, or the General Partner, the ultimate purchaser.

As a result, Gotham has failed to present evidence that would support a finding that it or any other non-tendering unitholder relied to its detriment on information omitted from the Odd-Lot Offer information sheet. Because a showing of detrimental reliance is required to prove a fraud claim, Gotham's claim fails as a matter of law. [FN42]

> FN42. The elements of common law fraud are: 1) deliberate concealment of a material past or present fact, or silence in the face of a duty to speak; 2) scienter; 3) an intent to induce reliance; 4) causation; and 5) damages resulting from the concealment. *Nicolet, Inc. v. Nutt,* Del.Supr., 525 A.2d 146, 149 (1987). Taken together, elements 3), 4), and 5) require the plaintiff to show that it detrimentally relied upon the defendant's disclosures.

Recognizing this flaw in its claim, Gotham refined its fraud theory at oral argument. At that time, Gotham contended that its claim is that the Partnership itself was somehow defrauded by the failure of at least certain of the HGI Directors or HGI agents to disclose the Allegedly Material Facts to the full board of the General Partner. But this argument does not obviate a grant of summary judgment.

As the record now stands, there is no evidence from which one can infer that this *particular* alleged "fraud on the board" occurred. Nothing in the record suggests that the Non-HGI Directors voted to approve the Challenged Transactions in ignorance of the value of the Partnership's assets. [FN43] While the General Partner's full board may not have considered the Net Asset Valuation in connection with these Transactions, there is no record evidence from which one can infer that the directors were unaware of the approximate value of the Partnership assets they were entrusted to manage. Nor is there a record basis to support an inference that the HGI Directors consciously decided not to make the Net Asset Valuation part of the board's deliberations. Moreover, the board packages, in connection with the Challenged Transactions, contained information regarding the effect the resales to HGI were likely to have on HGI's equity stake in the Partnership. [FN44] Therefore, Gotham has failed to generate a triable issue that the Non-HGI Directors were deliberately misled into supporting the Transactions by non-disclosures of the Allegedly Material Facts by other directors and officers of the General Partner. [FN45]

> FN43. In contrast, there is evidence that suggests that they had no real knowledge of the Partnership's ability to secure financing for the sales at that time, or the likely effect the Split would have on the relationship between the net asset value of the Partnership and the market price of Partnership units.

> FN44. Healy Ex. 16, at HR 28168; *see also* Kailer Dep. at 252-253.

> FN45. I therefore do not reach the defendants' other reasons why the Fraud Claim fails, including their argument that the Allegedly Material Facts

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                    Page 14
Not Reported in A.2d, 2000 WL 1476663 (Del.Ch.), 27 Del. J. Corp. L. 247
(Cite as: 2000 WL 1476663 (Del.Ch.))

were in fact immaterial

*14 Granting summary judgment on Gotham's elusive Fraud Claim does not, of course, render irrelevant the quality of the communications that occurred among directors and officers of the General Partner. Suppose evidence emerges at trial that certain of the HGI Defendants: (i) purposely misled the Non-HGI Directors about (a) the underlying value of the Partnership units or (b) the ability of the Partnership to get a higher price for the units than HGI was willing to pay, (ii) in order to induce the Non-HGI Directors to approve a sale to HGI at an unfair price. If so, that proof will be compelling evidence of a violation by the culpable defendants, even if the restrictive "willful misconduct" liability provision of § 7.10(c) of the Agreement is the measure of liability against the General Partner. Likewise, if Gotham shows that HGI had a secret plan to snatch up a large number of units that could entrench it at a bargain price before an expected up-turn in the market and did not disclose that plan to the Non-HGI Directors, that will also be evidence of willful misconduct. Such a showing will be even more powerful, of course, if the more stringent requirements of §§ 7.05 and 7.10(a) apply to the Challenged Transactions.

### C. The Affirmative Defenses Asserted By The HGI Defendants

The HGI Defendants argue that they are entitled to summary judgment even if the Challenged Transactions were consummated in a manner that breached the Partnership Agreement. This argument is based on what the HGI Defendants claim is the clear and undisputed evidence that they relied in good faith on the terms of the Partnership Agreement in implementing the Transactions, a conclusion buttressed by the advice given to them by the General Partner's counsel, Alan Kailer.

For the following reasons, the HGI Defendants have not persuaded me that they are entitled to summary judgment.

Initially, I note that there is evidence in the record that is at odds with the conclusion that the HGI Defendants acted in good faith. Start with the strong self-interest that HGI had in the Challenged Transactions. It is no small thing for the parent of a General Partner to quintuple its stake in a partnership, especially if by doing so it was putting itself in an excellent position to block a removal vote. If it could do so at a low price through Transactions that gave it all the benefits of a direct tender offer but with few of the securities law obligations that would have attended a direct tender offer, so much the better.

HGI's self-interest is coupled with record evidence that casts doubt on the HGI Defendants' explanation as to why the Challenged Transactions were undertaken in the manner they were. For example, the HGI Defendants claim that the Partnership could not finance the purchase of the units sold to HGI in connection with the Challenged Transactions. Yet they rely upon stale efforts to obtain much greater financing in 1991 and 1992 as the primary evidence to support that claim and concede that they never attempted to look for financing for the Challenged Transactions themselves. In addition, there is room for doubt regarding their belief that the Partnership's own balance sheet would not have permitted it to finance the purchases, especially because the General Partner obligated the Partnership to fund the Option Plan and all the transaction costs in connection with the Transactions. The fact that the Partnership was able to refinance its whole balance sheet shortly after the Odd-Lot Tender Offer closed adds to this doubt.

*15 Similarly, the HGI Defendants' claim that the real estate market was in the dumps in 1995 and that no one would have wished to buy into the Partnership at the time of the Challenged Transactions is, at best, debatable. At worst, it is flatly inconsistent with contemporaneous documents created by officers of the General Partner. The objective circumstances as revealed by the record do not exclude the possibility that the General Partner knew that the market was undervaluing the Partnership's units at the time of the Challenged Transactions, that the Partnership's prospects were quite promising, and that it was an advantageous time for HGI to increase its stake in and control over the Partnership at a bargain price. The chronology of events in the year of the Transactions is consistent with that possibility. In the first half of 1995, the General Partner concluded that the Partnership could not afford to fund the $4.4 million to make the purchases in the Challenged Transactions. Thus HGI bought those units for its own

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A 2d                                                    Page 15
Not Reported in A 2d, 2000 WL 1476663 (Del Ch ), 27 Del J Corp L 247
(Cite as: 2000 WL 1476663 (Del.Ch.))

account. But a mere five months after the Challenged Transactions closed, the Partnership decided to engage in the Repurchase Program, during which it later bought units at an average price nearly twice that paid by HGI in the Transactions

Contributing to my conclusion that there is a triable issue regarding good faith is the lack of any strong reason for the Odd-Lot Offer to have been undertaken when it was. Significantly, the Odd-Lot Offer was the Transaction in which HGI obtained most of its units Although the Offer did offer liquidity to unitholders with small blocks without the obligation to pay brokerage fees, it was also made at a time when the market had not yet begun to value the units of the Partnership in a manner more in keeping with the assets it owned Put simply, it is quite plausible that HGI realized that it was a good time to buy, but not to sell Partnership units And the administrative cost savings likely to be achieved by reducing the number of mailings to unitholders with small blocks were so insubstantial that: (1) the General Partner's board was not presented with any written estimate of the savings; and (2) it would take several years before the savings would exceed the costs of implementing the Transaction itself. Given these factors, why not have waited until the Partnership itself could fund the purchases so that all unitholders who chose not to sell could reap the price-bolstering benefits of the Offer?

By raising these concerns, I do not mean to imply that there was no rational business purpose for the Odd-Lot Offer. Rather, I do so because the rather tepid benefits of that Transaction to the non-HGI unitholders and the timing of the Transaction help create doubt regarding the HGI Defendants' motive for recommending that Transaction

Thus, in view of the record evidence that suggests that HGI not only had a motive to advance its own interests at the expense of the other unitholders but in fact achieved that very result, HGI has failed to persuade me that there is no need for a trial to evaluate its good faith defense, a defense which HGI bears the burden to prove.

*16 In view of the triable doubt that exists regarding HGI's good faith in undertaking the Transactions, I decline to grant summary judgment to the HGI Defendants on the basis of §

17-1101(d)(1) of DRULPA, which exculpates any person who relies in good faith on the provisions of a partnership agreement from liabilities for breach of duties existing "at law or in equity "

As written, § 17-1101(d)(1) appears to have quite broad application For example, the statute quite clearly states that it applies to all claims for breach of duty at law or in equity "including" a claim for breach of fiduciary duties The inclusion of fiduciary duty claims in this manner logically suggests that the statute reaches other claims, such as claims for breach of contract. Likewise, as R Del. C. § 102(b)(7), § 17-1101(d)(1) of DRULPA applies to all "liabilities" and not just to claims for monetary damages This suggests that the statute may be read to bar rescissionary relief. For all these reasons, the defendants argue that the statutory exculpatory provision applies to exonerate even a breach of the partnership agreement itself so long as the breach was due solely to a good faith misreading of the partnership agreement

Gotham retorts that, read this way, § 17-1101(d)(1) sanctions abuse because a general partner can exploit ambiguities in the partnership agreement to advance its own self-interest. Gotham also notes that the statute has, to date, apparently not been applied in any decision to exculpate a general partner against a claim for breach of a partnership agreement

For the following reasons, I decline to make a definitive ruling about the scope of the statute at this point in the case. Initially, I note that the decisional law interpreting § 17-1101(d)(1) is slight. While there are decisions applying the statute to bar claims for breach fiduciary duty, [FN46] the parties have cited only one case in which a Delaware court has discussed the applicability of the statute to a claim for breach of contract In Continental Ins Co v Rutledge & Co , [FN47] this court indicated that § 17-1101(d)(1) would bar a breach of contract action in a situation where the general partner had made a good faith misreading of an ambiguous contract provision The court held that the statute would not, however, exculpate a breach of an unambiguous contractual provision Because the contract provision at issue in that case was unambiguous, the court refused the defendants' attempt to use § 17-1101(d)(1) to bar

© 2005 Thomson/West No Claim to Orig. U S Govt Works

Westlaw.

Not Reported in A 2d
Not Reported in A 2d, 2000 WL 1476663 (Del Ch ), 27 Del J Corp L 247
(Cite as: 2000 WL 1476663 (Del.Ch.))

the plaintiffs' breach of contract claim

> FN46. *U S Cellular Inv Co of Allentown v Bell
> Atlantic Mobile Systems, Inc*, Del. Ch , C A No
> 12984, mem op , Berger, V C (March 11, 1994),
> generally supports the defendants' position, but
> highlights the fact that the emphasis of practice
> under § 17-1101(d)(1) has thus far focussed on
> breach of fiduciary duty claims In that case, then
> Vice Chancellor Berger did not dismiss a breach of
> contract claim against a corporate general partner
> because the agreement was ambiguous and could
> be construed to bar the conduct about which the
> plaintiff complained *Id.* at 3-5 Nonetheless, on the
> basis of § 17-1101(d)(1) she dismissed the breach
> of fiduciary duty claim against the general
> partner--which was based on the same
> conduct--because the complaint did not plead facts
> that supported an inference that the general
> partner's contract interpretation was made in bad
> faith *Id* at 5 The Supreme Court affirmed and
> stated:
>
> The Court of Chancery's dismissal of the fiduciary
> duty claim was based on the failure of [plaintiff] to
> plead that [the general partner] acted in bad faith
> A general partner acting in good faith reliance on
> the provisions of the partnership agreement is
> shielded from liability for breach of fiduciary duty
> *6 Del. C.* § 17-1101(d) The complaint as it now
> reads is consistent with the interpretation that [the
> general partner] believed its actions were permitted
> under the Agreement, i e , that [it] took its action in
> good faith.. [The complaint] does not assert that
> [the general partner] acted in knowing breach of
> the Agreement The 1994 order therefore properly
> dismissed the complaint as failing to state a cause
> of action under Delaware law
> *U.S. Cellular Inv. Co. of Allentown v. Bell Atlantic
> Mobile Systems, Inc., Del.Supr., 677 A.2d 497, 504
> (1996).*
> It is interesting that neither the Supreme Court nor
> this court resolved the breach of contract claim
> against the general partner on the basis of §
> 17-1101(d)(1) Most likely that is because no

argument was made along those lines, but even so
it is at least eye-brow raising that neither this court
nor the Supreme Court adverted to the potentially
broader applicability of § 17-1101(d)(1) in the
case In this respect, respected commentators on
DRULPA center their discussion of §
17-1101(d)(1) solely on breach of fiduciary claims
and not on claims based on breach of the
partnership agreement itself, even though the
statute itself addresses liabilities at "law or in
equity " FOLK § 17-1101 4 at LP-XI-21 ("Section
17-1101(d)(1) provides a safe harbor against
claims of breach of fiduciary duty for general
partners who act in good faith reliance on the
partnership agreement In other words, a general
partner cannot be liable to a partner for breach of
fiduciary duties when the general partner relied in
good faith on the provisions of the partnership
agreement Accordingly, a claim for breach of
fiduciary duty may be dismissed for failure to state
a claim where it does not allege a knowing breach
of the partnership agreement."); LUBAROFF &
ALTMAN § 11 2.6 (focussing discussion of §
17-1101(d)(1) on claims for breach of fiduciary
duty).

> FN47. Del. Ch., 750 A.2d 1219, 1240 (2000)

The *Rutledge* interpretation might pose an interesting
question in this case, depending on the facts Suppose that
the sales to HGI in connection with the Odd-Lot Offer are
ultimately found not to have involved an issuance As such,
they would not fall under § 9 01, but § 7 09, and be
governed by § 7 05 and § 7 10(a) Assume further that I
conclude that the General Partner's board believed that new
units would be issued to HGI but that they were not because
of an administrative error In that scenario, the agreement's
terms would not be ambiguous, but the circumstances would
seem to present a good case for the invocation of the statute
to bar liability

*17 In view of the sparseness of our case law on the statute
to date and the importance of the competing public policies
at stake, [FN48] I prefer to examine these questions on a full
record. Although the statutory text and the caselaw provide

© 2005 Thomson/West No Claim to Orig. U S Govt Works

Westlaw.

Not Reported in A.2d                                                          Page 17
Not Reported in A.2d, 2000 WL 1476663 (Del.Ch.), 27 Del. J. Corp. L. 247
(Cite as: 2000 WL 1476663 (Del.Ch.))

me with a jumping off point, the parties have not burdened me with any of the legislative history of § 17-1101(d)(1) and it seems to me to be prudent to consider such history before opining about the statute's full scope. [FN49] I am also interested in receiving more detailed attention to the issue of whether § 17-1101(d)(1)'s definition of liability extends only to monetary damages, or whether it also extends, as the defendants argue, to bar an order of rescission necessary to rectify a breach of a partnership agreement. [FN50]

> FN48. Note that the defendants' reading of § 17-1101(d)(1) diminishes the pro-unitholder effect of recent decisions holding that ambiguities in general partner-drafted partnership agreements must be resolved in favor of the unitholders. A collateral consequence may well be an increase in requests for injunctive relief to halt potential breaches before they occur and become potentially irremediable.

> FN49. I note in this regard the cautious approach recently taken by this court in applying § 18-1101 of the Delaware Limited Liability Company Act, 6 Del. C. § 18-1101, which is virtually identical to § 17-1101(d)(1) of DRULPA. The court refused to use the statute to prevent relief to a member whose interest in the LLC had been taken away allegedly based on a good faith interpretation of the LLC agreement. The court found that there was no provision in the agreement on which a good faith basis for the defendants' actions could be said to rest, a finding sufficient to bar the defendants' use of the statute. Nonetheless, the court provided an additional statute-based reason for its decision:
> Further, I must view the cited provision allowing members of an LLC to rely in good faith on the terms of the operating agreement in the context in which it appears in the statute, and with regard to the general tenor of the statute as a whole. This provision is intended, for example, to make clear that an apparent limit on liability for breach of fiduciary duty is to be interpreted broadly. I have no doubt that the legislature never intended this

provision to allow the members of an LLC to misappropriate property from another member and avoid returning that property or otherwise compensating the wronged member.
Walker v. Resource Dev. Co., Del. Ch., C.A. No. 1843-S, mem. op. at 40-41, Lamb, V.C. (Aug. 29, 2000).

> FN50. By its own terms § 17-1101(d)(1) of DRULPA appears to sweep more widely than 8 Del. C. § 102(b)(7), which expressly addresses only "liability ... for monetary damages."

My reticence to speak definitively at this juncture is overridingly influenced by my view that there is a substantial fact question regarding whether the good faith element of the statute is satisfied. Even if the defendants are correct that § 17-1101(d)(1) bars any relief for breach of contract unless the plaintiff can prove a knowing breach, the HGI Defendants have not convinced me that Gotham will be unable to prove such a breach.

I conclude so despite the HGI Defendants' additional claim that they relied in good faith on the advice of Kailer that they could effect the Transactions so long as they complied with the floor price in § 9.01(b). The written work product Kailer gave to the General Partner's board indicates that the Transactions were subject to § 9.01, but did not discuss whether § 7.05 or § 7.10(a) were applicable.

But Kailer did not advise the defendants that they were free to undertake the Transactions without considering other factors so long as the § 9.01(b) floor price was met. Kailer in fact testified that he advised the board that they had to make an informed decision that the transactions were "fair" and "in the best interests of the partnership." [FN51] Kailer was careful not to opine on the substantive merits of the Transactions but simply to inform the board that the General Partner had the authority to approve them if the board concluded that the Transactions met these criteria. Likewise, Kailer testified that the directors who were not affiliated with HGI should make the decision about the sales to HGI. [FN52] But he did not specifically address whether Audit Committee review and approval was required. [FN53]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works



Not Reported in A.2d                                                      Page 18
Not Reported in A.2d, 2000 WL 1476663 (Del.Ch.), 27 Del. J. Corp. L. 247
(Cite as: 2000 WL 1476663 (Del.Ch.))

FN51. Kailer Dep. at 306; *see also* Gumbiner Dep at 570

FN52. Kailer Dep. at 275, 314

FN53. *Id.* at 261-262

Under § 7.08 of the Partnership Agreement, the General Partner is only exculpated when it relies on counsel in good faith and acts in accordance with counsel's opinion. As noted previously, there is a triable doubt regarding the HGI Defendants' good faith, a doubt that is fair to impute to the General Partner as an entity. That doubt extends to: 1) whether the General Partner in fact implemented the transactions under § 9.01 at all pursuant to Kailer's advice; and 2) whether the General Partner acted in accordance with Kailer's advice that it could approve the Transactions only if it concluded that the Transactions were fair and in the best interests of the Partnership. I address these doubts in order.

*18 It is obvious that HGI had a substantial interest in structuring the Transactions in a manner that would avoid the strict fair price requirements of § 7.05 of the Agreement. One way of doing that was to craft the Transactions as an "issuance" of units to HGI rather than as a simple resale of existing units to it. Although the General Partner vigorously asserts that the units acquired by HGI in the Transactions were in fact "issued" to it, there is little evidence to support that assertion as to the shares HGI acquired in connection with the Odd-Lot Offer. Certainly, the Partnership did not account for the Odd-Lot-related sale to HGI as an issuance and the record is devoid of any evidence as to when the issuance occurred. Given the substantial self-interest HGI had in avoiding the application of § 7.05, the fact that there is a real question about whether the General Partner actually consummated the Odd-Lot Offer-related sale to HGI as an issuance raises the further question of whether the General Partner was simply looking for a pretext to avoid paying a fair price. While the defendants would claim that any failure to strictly comply with § 9.01 can be attributed to an honest mistake, the record as it stands does not rule out a less savory explanation.

Similarly, if the General Partner structured the Transactions to place over 20% of the units in HGI's hands at a low price

even though the General Partner's officers knew that the Partnership could have financed those purchases itself, one could reasonably conclude that the General Partner did not comply in good faith with Kailer's advice that the General Partner had to determine that the Transactions were "fair" and in the "best interests of the Partnership."

I note another issue that troubles me. The defendants refused to disclose any advice that Kailer gave to officers of the General Partner that did not go to the full board of the General Partner. At an office conference that was not transcribed, then-Vice Chancellor, now Justice Steele refused to order the disclosure of such advice. It is not apparent to me whether the court knew then that the defendants would be relying so substantially upon advice of counsel as an affirmative defense. I invite the parties to revisit this issue before trial based on concerns that are best expressed by way of a hypothetical.

Suppose that Kailer gave advice to officers of the General Partner that suggested that it was unclear whether the Transactions were subject to § 7.05 and § 7.10(a) and that he could not say with certainty that § 9.01 applied to their exclusion. If Kailer then provided the full board with bullet points that do not even mention § 7.05 or § 7.10(a), would that not cast doubt on the good faith reliance of the General Partner--as the responsible entity--on counsel? Would the knowing exploitation of an ambiguity in a partnership agreement by the General Partner with the aid of a lawyer be consistent with the good faith requirement of § 7.08 of the Partnership Agreement and § 17-1101(d)(1) of DRULPA?

*19 This issue bleeds into another concern raised by Gotham. Gotham points out that Kailer had a long-standing attorney-client relationship with HGI. They also note that the only lawyer who apparently did any work for HGI in connection with the Transactions was Kailer himself, the very lawyer who was supposed to be representing the Partnership. While the defendants claim that Kailer merely prepared implementing board resolutions for HGI and that performing that task did not make him HGI's lawyer in connection with the sales, the fact that the defendants have blocked inquiry into the full scope of Kailer's advice in connection with the Transactions precludes the court from

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

Westlaw.

Not Reported in A.2d                                                                                          Page 19
Not Reported in A.2d, 2000 WL 1476663 (Del.Ch.), 27 Del. J. Corp. L. 247
(Cite as: 2000 WL 1476663 (Del.Ch.))

accepting their contention that Kailer was not simultaneously both HGI's and the Partnership's lawyer in the Transactions

While § 7.08 of the Agreement invests the General Partner with the flexibility to rely in good faith upon a lawyer of its own choosing, the defendants have not persuaded me that the possibility that Kailer had two conflicting masters does not bear on the question of good faith reliance. The record evidence does not rule out the possibility that the major sale to HGI was shoehorned into § 9.01 to avoid the application of § 7.05, an avoidance that benefited HGI to the exclusion of the other unitholders. Then that sale was quite possibly not even carried out as an issuance. If those possibilities are later found to have in fact occurred, the awkward position Kailer seems to have occupied as advisor to two clients with conflicting aims would contribute to concerns about the good faith with which the General Partner sought and accepted his advice. The parties' inability to point to legal precedent addressing a potential conflict situation like this in the limited partnership context also makes me reluctant to resolve this issue without the benefit of live trial testimony by Kailer and his client defendants.

### 2. The Affirmative Defenses Raised By The Non-HGI Directors

The Non-HGI Directors argue that their actions must be viewed in a very different light than those of the HGI Defendants. Unlike the HGI Defendants, the Non-HGI Directors had no personal pecuniary interest in favoring HGI's interests over the interests of the other unitholders other than that they were elected to the General Partner's board with the votes of HGI

Undoubtedly, the Non-HGI Directors were forced to balance the interests of constituencies whose interests were in conflict. By virtue of long-established principles of Delaware corporation law, the Non-HGI Directors owed fiduciary duties to the General Partner and its sole owner, HGI. Under the less venerable but largely unquestioned precedent in *USACafes*, [FN54] the non-HGI director-defendants also owed fiduciary duties to the Partnership and its unitholders.

FN54. Del. Ch., 600 A.2d 43 (1991).

But the Non-HGI Directors contend that this sort of structural conflict does not preclude a grant of summary judgment to them under § 7.06 of the Partnership Agreement, which exculpates them for any breach of duty that does not involve a breach of the duty of loyalty [FN55] or the receipt of an improper personal benefit

FN55. I include within this traditional concept the contract's list of bad faith acts, intentional misconduct, and knowing violations of law; a list which was obviously inspired by 8 Del. C. § 102(b)(7).

*20 Gotham retorts by analogy to corporation law principles. Posit a scenario in which Director Jones serves on the board of Corporation A, which is the majority stockholder of Corporation B. Assume that Director Jones also serves as a director of Corporation B. Further assume that Corporation A buys a major asset from Corporation B. In that context, Gotham claims, plain principles of Delaware corporation law would treat Director Jones who was on both boards as having her loyalty (whether framed in terms of independence or interest) compromised. [FN56] If there were a triable question about the fairness of the underlying transaction, Director Jones would have a difficult time escaping a trial because her conflicted loyalties would raise a question of scienter difficult to resolve before trial. Gotham argues that the same approach must be taken in this situation involving a challenge to conduct by directors of a corporate general partner.

FN56. Cf 8 Del. C. § 144

For the following reasons, I conclude that the analogy to corporation law Gotham seeks to make is inapt and would produce unproductive results in contexts like the ones presented here

To understand why I reach this conclusion, it is necessary to reflect on this court's decision in *USACafes*. In that decision, Chancellor Allen concluded that the directors of a corporate general partner owed certain fiduciary duties to the limited partners of the limited partnership the general partner controlled. [FN57] He did so, for among other reasons, because the directors of the general partner play a key role

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

Westlaw.

Not Reported in A 2d
Not Reported in A 2d, 2000 WL 1476663 (Del Ch ), 27 Del J Corp L 247
(Cite as: 2000 WL 1476663 (Del.Ch.))

Page 20

in controlling the assets of the limited partnership for the benefit of the limited partners, a traditional indicator of a fiduciary relationship [FN58]

FN57. 600 A.2d at 48-49.

FN58. *Id* The facts in *USACafes* involved serious accusations of actual *personal* self-dealing by the individual directors of a corporate general partner Even then Chancellor Allen was careful to indicate that the scope of duty owed by the general partner's directors "may well not be so broad as the duty of the director of a corporate trustee." *Id* at 49 "But [those duties] surely entail the duty not to use control over the partnership's property to advantage the corporate partner at the expense of the partnership." *Id*

This decision was in some senses unorthodox When limited partners contract to join a limited partnership run by a corporate general partner, a rote traditional approach would impose fiduciary duties solely upon the corporate general partner as an entity After all, it is the entity that the limited partners agreed would manage their assets [FN59]

FN59. The earlier decision in this case holding that the derivative demand excusal test must focus on the General Partner's ability as an entity to consider a demand reflects the more traditional approach *See Gotham I*, mem op at 15-16 (finding that a contrary rule "would undermine this state's established policy of respecting the legal fiction of the business entity" and that any other approach "would ignore the reality that it is the general partner who owes the limited partners fiduciary duties, not the management of the general partner even though they make the decisions for the business entity ").

Under this more strictly traditional approach, the limited partners would therefore be able to look to only the corporate general partner in the first instance to seek redress for any breach of duty Only if there had been abuse of the corporate form by the owners of the corporate general partner that would justify veil piercing would the limited

partners be able to look beyond the corporate partner to others for redress

As the leading treatise on Delaware limited partnerships puts it:

The directors of a corporate general partner of a Delaware limited partnership owe fiduciary duties to the stockholders of the corporate general partner A corporate general partner itself owes a fiduciary duty to limited partners of the limited partnership of which it is a general partner Prior to *USACafes, L P* the authors did not believe that the fiduciary duty of directors of a corporate general partner to the limited partners of the limited partnership of which it is a general partner would, in and of themselves, justify a court's holding that the directors of the corporate general partner owed a fiduciary duty to the limited partners of the limited partnership of which the corporation (and not the directors) was the general partner If the directors were to have managed the corporate general partner in such a way that the corporate general partner damaged a limited partnership, many practitioners believed that the stockholders of the corporate general partner might have had a cause of action against the directors of the corporate general partner for mismanagement or breach of fiduciary duty to the extent of any loss, suffered by the corporation either directly or as a result of a limited partner action against the corporate general partner resulting in a recovery by the limited partners, but that the limited partners would not have had a claim directly against the directors The limited partners' claim would have been against the corporate general partner itself Under such an approach, the corporate general partner is viewed as an entity with duties flowing from its relationship with the limited partnership of which it is the general partner It was felt that such an approach would avoid putting directors in the situation of having potentially conflicting and irreconcilable fiduciary duties to stockholders of the corporation and to limited partners of the limited partnership [FN60]

FN60. LUBAROFF & ALTMAN § 11 2 11, at 11-32-11-32 1

*21 The question presented here is whether § 7 06 of the

© 2005 Thomson/West. No Claim to Orig. U S Govt Works.

Agreement can be read as including the structural conflict faced by the Non-HGI Directors within its concept of a loyalty breach That is, if the Non-HGI Directors unintentionally struck a contractually improper balance between HGI's interests and the Partnership's interests that was unfair to the Partnership, would the structural conflict elevate such a breach to the level of disloyalty?

To conclude so would be to rewrite the understanding that exists between the parties to the Partnership Agreement. Regardless of the decision in *USACafes*, the parties here agreed that the General Partner as an entity was the general partner. While the directors of the General Partner were not named as general partner, the Agreement does recognize that the directors of the General Partner would play a role in the decisionmaking process of the General Partner But that recognition does not aid Gotham because the Agreement contemplates that the Non-HGI Directors would be responsible for reviewing and approving certain transactions between General Partner affiliates and the Partnerships Put simply, the Agreement contemplates that the Non-HGI Directors will operate in situations involving structural conflicts as a protective mechanism for the unitholders unaffiliated with the General Partner.

As such, it is inconceivable that § 7 06 of the Agreement can be read as precluding exculpation of the Non-HGI Directors when they play the role specifically envisioned for them by the Agreement. Absent some indication that they conducted themselves in a structural conflict situation in a bad faith manner, for their own personal self-interest, or to intentionally injure the other unitholders for the benefit of the General Partner's affiliate, § 7 06 bars a recovery against them

In an important sense, this conclusion can be said to rest on an analogy to decisional law under the Delaware General Corporation Law. On several occasions, our courts have held that directors did not lack independence simply because they were required to balance the interests of different stockholder classes whose interests were at odds as to a particular transaction [FN61] For example, this court recently stated:

FN61. *Gilbert v. El Paso Co.*, Del.Supr., 575 A.2d 1131, 1147-48 (1990); *In re General Motors Class H Stockholders Litig.*, Del. Ch., 734 A.2d 611, 618-619 (1999); *Solomon v. Armstrong*, Del. Ch., 747 A.2d 1098, 1118 & n. 63 (1999); *Freedman v. Restaurant Assocs. Indus.*, Del. Ch., C.A. No. 9212, 1987 WL 14323 at *10, mem op at 27-28, Allen, C (Oct 16, 1987)

At essence, therefore, the plaintiffs' duty of loyalty claim hinges on the following In structuring the Hughes Transactions, the GM Board had the duty to balance fairly the interests of two groups of stockholders to whom they owed fiduciary duties Since the two stockholders groups had potentially divergent interests, plaintiffs believe that they state a duty of loyalty claim merely by alleging that the Board treated one group unfairly--even if it was for reasons unrelated to director self-interest In my view, that is not the law. Rather, the plaintiffs must plead facts from which one could infer disloyalty or bad faith on the part of GM's directors, in the sense that the directors acted for reasons inimical to their fiduciary responsibilities An allegation that properly motivated directors, for no improper personal reason, advantaged one class of stockholders over the other in apportioning transactional consideration does not state a claim for breach of the duty of loyalty [FN62]

FN62. *In re General Motors Class H Stockholders Litig.*, 734 A.2d at 618-619.

*22 This strand of our corporate decisional law logically extends to the limited partnership context, wherein it will usually be (as in this case) inferable that the limited partners explicitly recognized that the directors of the general partner would be the ones entrusted with balancing the interests of the corporate general partner and its affiliates against the interests of the other unitholders In analogous circumstances, this court's decisions have precluded limited partners from complaining about a general partner's conflict of interest that was clearly disclosed to the limited partners in the partnership agreement [FN63]

FN63. *Seaford Funding L.P. v. M & M Associates II, L.P.*, Del. Ch., 672 A.2d 66, 72 (1995) (stating that if limited partners had accepted an investment

© 2005 Thomson/West No Claim to Orig U.S Govt Works

Westlaw.

Not Reported in A 2d
Not Reported in A.2d, 2000 WL 1476663 (Del Ch ), 27 Del J Corp L 247
(Cite as: 2000 WL 1476663 (Del.Ch.))

Page 22

knowing of a conflict of interest on the part of the general partner in making certain decisions, they will be precluded from asserting a breach based on the general partner's later engagement in that contemplated conduct); *Boxer v. Husky Oil Co.,* Del. Ch., C.A. No. 6261, 1983 WL 17937, at * 6, Hartnett, V C (June 28, 1983) (where partnership agreement and prospectus specifically contemplated that a general partner with a disclosed conflict would play a role in selecting an appraiser, the plaintiffs could not base a cause of action on the mere fact that the general partner in fact played the very role contemplated for it when it came time to select an appraiser), *aff'd.* Del.Supr., 483 A.2d 633 (1984) (ORDER)

As a final factor, I must also confess concern that adopting Gotham's argument would create a disincentive for qualified persons to serve as directors of corporate general partners While anyone who serves in such a capacity must expect to deal with the possibility of litigation, it is quite another thing for such a person to accept service that potentially exposes her to a triable claim for breach of the duty of loyalty whenever she makes a good-faith decision about a transaction between the partnership and an affiliate of the general partner.

For all these reasons, summary judgment will be entered for the Non-HGI Directors Because I resolve the issue under § 7 06, I do not reach the defenses under § 17-1101(d)(1) of DRULPA and § 7 08 of the Agreement, other than to note that there is no record evidence that suggests that the Non-HGI Directors acted other than in a good faith belief that the Transactions complied with the Agreement

### V. Conclusion
In accordance with the reasons set forth in this opinion, this motion is disposed of as follows The HGI Defendants' motion for summary judgment is DENIED as to Gotham's Contract Claim, is GRANTED as to Gotham's Fiduciary Duty against the General Partner only, and is GRANTED as to Gotham's Fraud Claims against all the HGI Defendants. The Non-HGI Directors' motion for summary judgment on all the claims against them is GRANTED All claims on which the defendants have obtained summary judgment are

dismissed with prejudice IT IS SO ORDERED

Not Reported in A 2d, 2000 WL 1476663 (Del Ch ), 27 Del J Corp L 247

END OF DOCUMENT

# EXHIBIT B



Only the Westlaw citation is currently available

UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

Court of Appeals of Virginia
Stephen Wilson PAULETTE,
v
Rugene Seaton PAULETTE
No. 0577-99-2.

Feb 22, 2000

From the Circuit Court of Henrico County Buford M
Parsons, Jr , Judge.

Lawrence H. Framme. III; Susan H. Call; Framme Law
Firm, P L C , on briefs, for appellant

Terrence R. Batzli; M. Alicia Finley; Barnes & Batzli, P C.,
on brief, for appellee

Present Judge BRAY, Senior Judges COLE and
OVERTON

MEMORANDUM OPINION [FN*]

FN* Pursuant to Code § 17.1-413, recodifying
Code § 17-116 010, this opinion is not designated
for publication

BRAY

*1 Dr Stephen Wilson Paulette (husband) appeals an order
of the trial court finding him "in breach of [the Separation
and Property Settlement] Agreement" (agreement) with his
former wife, Rugene Seaton Paulette (wife), and assessing
attendant damages, fees, and costs. Husband argues that the
court erroneously relied upon certain evidence provided by
wife's accountant/witness in determining such issues. We
agree and reverse the order

The parties are fully conversant with the record, and this
memorandum opinion recites only those facts necessary to a
disposition of the appeal

I

Husband and wife executed the subject agreement, dated

November 27, 1985, incidental to their separation and
divorce. The agreement obligated husband, in pertinent part,
to "pay to wife 20% of his net income for spousal support"
and was incorporated into the final decree, entered
December 23, 1986. On May 29, 1997, wife moved the trial
court to "reinstate this matter on the active docket," and
"review the amount of spousal support and maintenance
[husband] is currently paying." Thereafter, by further
motion, wife alleged that husband had failed to pay spousal
support in accordance with the agreement and prayed the
court, inter alia, to ascertain the "arrearage" and enter an
appropriate judgment, "with interest  , attorney's fees and
costs "

In proof of her claim, wife presented the evidence of
William K. Stephens, III, an accountant retained by her to
conduct an "analysis  to determine if the net income
reported by [husband] to [wife], for purposes of determining
the amount due to her according to [the] agreement, is a fair
and accurate representation of his share of the income of the
[professional] practice" conducted by husband, an oral
surgeon, and his current wife, Dr Kathryn A Biery Paulette
(Dr. Biery), a dentist/anesthesiologist. In performing his
task, Stephens reviewed "all of the pertinent data" with
respect to "two major areas of concern . that have a
material impact on the outcome:" (1) "the overall net
income available for distribution between the two doctors,"
and (2) "how that ._ net income was distributed to the two "
Recognizing that "[b]oth components represent
opportunities for . . manipulation, which  directly affects
payments" to wife, Stephens compared the "activity [of
husband and Dr Biery] to reliable industry statistics" for
professional "peer groups" to "determine the reasonableness
of the ... allocation of income between the two doctors"
during the targeted time period, January 1, 1993 to
December 31, 1997

Stephens' efforts culminated in a lengthy report, introduced
into evidence, together with detailed schedules, appendices
and related testimony Guided by "information in his head"
and "different sources that are recognized sources for
percentages of profit,  of overhead, productivity norms,"
[FN1] Stephens' analysis evinced a convoluted
methodology. Without needlessly detailing his formulations,

© 2005 Thomson/West  No Claim to Orig. U S. Govt Works

Westlaw.

Not Reported in S.E.2d                                                                          Page 2
Not Reported in S.E.2d, 2000 WL 196788 (Va.App.)
(Cite as: 2000 WL 196788 (Va.App.))

several factors were critical to the validity of the evaluation, including the "normal profit percentage[s] for general dentistry ... and oral surgery," 34.1% and 46.8%, respectively, and husband's contribution to the "gross receipts" of the practice. Applying such "industry averages" to receipts attributable to husband and Dr. Biery for the years under scrutiny, Stephens determined a "fair allocation and distribution of collections and overhead" to ascertain an appropriate net income for each. He then compared such standardized net income to the actual salaries of husband and Dr. Biery for the subject years to conclude that husband was grossly underpaid, while Dr. Biery enjoyed a substantial "overage" in compensation.

> FN1. Stephens specifically identified two "industry sources" which provided "industry averages," "industry data," "norms," benchmarks indispensable to his analysis.

*2 Aided by further evidence pertaining to husband's transfer of certain assets to Dr. Biery, including his interests in the professional corporation which operated the practice and in a partnership which owned the condominium it occupied, at an "inflated rent[.]," Stephens resolved that husband had breached the agreement, colluding with Dr. Biery in a "plan," a "strategy," "over a period of years," to reduce his "net income" chargeable with wife's spousal support. Stephens then determined the resulting arrearage by recalculating and otherwise adjusting husband's "net income" to that amount "the industry feels that [husband] should be able to pay himself" for the years, 1993-1997, offset by that support already paid to wife based upon "underreported net income."

II

"In Virginia property settlement [and separation] agreements are contracts and subject to the same rules of formation, validity and interpretation as other contracts." *Smith v. Smith*, 3 Va.App. 510, 513, 351 S.E.2d 593, 595 (1986). "The essential elements of a cause of action for breach of contract are: (1) 'a legal obligation of a defendant to the plaintiff,' (2) 'a violation or breach of that right or duty,' and (3) 'a consequential injury or damage to the plaintiff.' " *Westminster Investing Corp. v. Lamps Unlimited*, 237 Va. 543, 546, 379 S.E.2d 316, 317 (1989)

(quoting *Caudill v. Wise Rambler*, 210 Va. 11, 13, 168 S.E.2d 257, 259 (1969))

"While it is true upon the breach of a valid and binding contract the law infers nominal damages, it does not infer or presume substantial or compensatory damages. The latter must be proven by competent evidence." *Orebaugh v. Antonious*, 190 Va. 829, 834, 58 S.E.2d 873, 875 (1950). The party alleging a breach has an "obligation to establish his damages with reasonable certainty by the best evidence which is available." *White Sewing Mach. Co. v. Gilmore Furniture Co.*, 128 Va. 630, 650, 105 S.E. 134, 140 (1920). "Proof with mathematical precision is not required, but there must be at least sufficient evidence to permit an intelligent and probable estimate of the amount of damage." *Hailes v. Gonzales*, 207 Va. 612, 614, 151 S.E.2d 388, 390 (1966)

In adjudicating a contractual dispute, evidence provided by an expert is "admissible ... if it will assist the fact finder in understanding the evidence [,]" *Tittsworth v. Robinson*, 252 Va. 151, 154, 475 S.E.2d 261, 263 (1996), but it must "be based on an adequate foundation." *Kessee v. Donigan*, ___ Va. ___, ___, ___ S.E.2d ___, ___ (2000). "[E]xpert testimony is [not relevant and probative] if it is founded on assumptions that have an insufficient factual basis." *Id.* at ___, ___ S.E.2d at ___

Here, the trial court expressly "accepted [Stephens'] evaluation" and opinions, both with respect to the alleged breach and related arrearages, and fashioned the disputed order accordingly. However, much of Stephens' methodology was problematic, oftentimes remote from and without appropriate consideration of circumstances specific to the instant cause. Of particular concern, Stephens' analysis relied upon an attribution to husband of a fixed percentage of the total gross receipts of husband and Dr. Biery for *each* of the *five* years in issue, derived from actual data for only seven successive months in 1997 and 1998, a year otherwise excluded from his calculations. Thus, several months during the final year of the five under examination provided a pivotal component in Stephens' computations, thereby clearly infecting his analysis and attendant opinions with temporal bias. Similarly, Stephens' strict adherence to "industry averages," without consideration of regional variables and the specific expenses, operational and other

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

Westlaw.

Not Reported in S E 2d
Not Reported in S E 2d, 2000 WL 196788 (Va App )
(Cite as: 2000 WL 196788 (Va.App.))

factors peculiar to husband's practice, provided an inadequate foundation for relevant conclusions

*3 Accordingly, we reverse the disputed order and remand these proceedings for further consideration of that evidence properly before the court and attendant redetermination of the issues

*Reversed and remanded*

Not Reported in S E 2d, 2000 WL 196788 (Va App )

END OF DOCUMENT

© 2005 Thomson/West No Claim to Orig U.S Govt Works

# EXHIBIT C

Westlaw.

Not Reported in S E 2d                                                          Page 1
Not Reported in S E 2d, 2005 WL 832236 (Va. Cir Ct )
(Cite as: 2005 WL 832236 (Va. Cir. Ct.))

Only the Westlaw citation is currently available

Circuit Court of Virginia, Fairfax County
WEATHERNEWS AMERICAS, INC
v.
INTER NET U S , LTD
No. 218617.

April 5, 2005

Dear Counsel:

MCWEENY, J

*1 This matter came before the Court on Plaintiff's Motion for Summary Judgment pursuant to a claim of assumpsit from a breach of contract

The Court now has considered the briefs submitted as well as the Order of March 11, 2005 wherein the parties stipulated that no facts remain in dispute as to the pleadings As only questions of law remain and for the reasons set forth below, the Court finds that Defendant is in breach of the contract and owes the balance of the contract thereof. Therefore, the Court grants Plaintiff's Motion for Summary Judgment and awards the Plaintiff $33,000 00 and attorney's fees

FACTS

This is a claim of assumpsit arising out of a breach of contract. Defendant Inter net contracted with Plaintiff Weathernews to receive certain information services in exchange for $3,000 00 per month The term of the contract was 14 months, to begin in December 2001. On February 13, 2001, Inter net's Director of Finance, Carmen Romero, faxed a letter to Plaintiff asking to terminate the agreement Plaintiff notified Inter net that the balance owed on the contract was $32,400 00. On May 29, 2001, Defendant paid Plaintiff $3,000 00, which Plaintiff attributed to Defendant's February payment The balance of the contract is still outstanding

The Plaintiff asks this Court to grant its Motion for Summary Judgment because Plaintiff is entitled to full recovery under the contract as a matter of law

ANALYSIS

The Court grants Summary Judgment for Plaintiff because the pleadings aver that Defendant breached the contract As no dispute of material fact exists between the parties, this Court holds that Plaintiff is entitled to the benefit of the bargain as to the amount of damages for the breach The Court also awards attorneys fees to Plaintiff, as stipulated under the breached contract.

The Virginia Supreme Court has labeled Summary Judgment as a drastic remedy "Either party may make a motion for summary judgment at any time after the parties are at issue If it appears from the pleadings, the orders, if any, made at a pretrial conference, the admissions, if any, in the proceedings, or, upon sustaining a motion to strike the evidence that the moving party is entitled to judgment, the court shall enter judgment in his favor " VA Sup Ct R Pt 3, 3:18 (2004). However, "summary judgment is a drastic remedy which is available only where there is no material fact genuinely in dispute " *Shevel's Inc. v. Southeastern Assoc.*, 228 Va. 175, 181, 320 S.E.2d 339, 342 (1984). Summary judgment should apply "only to cases in which no trial is necessary because no evidence could affect the result." *Id* The court, in considering a motion for summary judgment, must adopt those inferences from the facts that are most favorable to the nonmoving party, unless such inferences are strained, forced, or contrary to reason. *United Leasing Corp. v. Thrift Ins. Corp.*, 247 Va. 299, 301-302, 440 S.E.2d 902, 903-904 (1994)

*2 On March 11, 2005, this Court entered a consent order wherein the parties stipulated that no facts remain in dispute as to the pleadings The parties also stipulated that each party would rely upon their briefs submitted to argue the amount owed in damages In this judgment, the Court adopts all inferences of fact most favorable to the nonmoving party, the Defendant, and considers the facts stated in the pleading as not in dispute

To state a cause of action for breach of contract, the pleadings must allege: (1) a legal obligation of a defendant to the plaintiff, (2) a violation or breach of that right or duty, and (3) a consequential injury or damage to the plaintiff. *Brown v. Harms*, 251 Va. 301, 306, 467 S.E.2d 805, 807

© 2005 Thomson/West No Claim to Orig U S Govt Works

Westlaw.

Not Reported in S E 2d
Not Reported in S E 2d, 2005 WL 832236 (Va. Cir Ct.)
(Cite as: 2005 WL 832236 (Va. Cir. Ct.))

Page 2

(1996) "Where one enters into a contract to perform certain acts and receives from the party with whom he contracts a valuable consideration he must abide by the contract" *Manassas Park Dev. Co. v. Offutt,* 203 Va. 382, 124 S.E.2d 29 (1962)

In this case, Plaintiff's Motion for Judgment alleges a written agreement between Plaintiff and Defendant where Plaintiff agreed to supply certain information on a monthly basis for fourteen months, and Defendant agreed to pay $3,000 per month in return The Motion for Judgment also alleges that Defendant did not pay the monthly fee after three months into the agreement, even though Plaintiff made certain information available for Defendant's use The facts state a claim for a breach of contract The memorandums submitted in this current Motion do not dispute that Defendant sought to terminate the contract before the contract's term ended Therefore, the question before this Court is whether Defendant possesses some justification that precludes this Court from granting Plaintiff the full benefit of the bargain under the contract

Defendant first pleads the defense of impossibility because Defendant was not able to use the services provided by Plaintiff in the website Defendant sought to design The facts do not allege a defense of impossibility because Defendant could still pay the monthly charge for use of the information, even if the website could not be developed Defendant also argues that it did not receive the thing bargained for, but received something worthless that could not be used Again, Defendant does not state the defense of impossibility because the services and information provided by Plaintiff were not worthless things in themselves, but simply things that Defendant could not use

Second, Defendant argues that as a matter of law, damages due to the breach of contract have not been established with reasonable certainty, showing that damages are the direct and proximate cause of the breach and finally, that damages were reasonably foreseeable by the parties at the time of the execution of the contract Surveying this facts, Plaintiff has proven this requisite standard because Plaintiff expected monthly payments from Defendant on a monthly basis due to the contract

*3 Third, Defendant contends that it had the right to terminate the contract at any time during the 14 month period and therefore, does not have to pay any damages It is the law of this Commonwealth that either party is able to terminate a contract after reasonable notice when the intended duration cannot be determined *Stonega Coke & Coal Co. v. Louisville & N.R. Co.,* 106 Va. 223, 55 S.E. 551 (1906) This case is different. The contract was set for a term of months Defendant offers no authority in Virginia that says otherwise Certainly, either party can renounce a contract and refuse to perform; however, on that point, Virginia law allows the other party to sue for breach *Rowland Lumber Co., v. Ross,* 100 Va. 275, 40 S.E. 922 (1902) Under contract law principles, the wronged party is entitled to the benefit or value of the bargain as damages for a breach See *McDaniel v. Daves,* 139 Va. 178, 123 S.E. 663 (1924) In this case, the benefit extended to the life of the contract: 14 months

CONCLUSION

For the reasons state above, this Court grants Plaintiff's Motion for Summary Judgment and awards the Plaintiff $33,000 00 and attorney's fees Mr Aldridge is requested to prepare an order consistent with this ruling This matter will be placed on my docket for Friday, April 22, 2005 at 10:00 a.m for entry of the Order

Not Reported in S E 2d, 2005 WL 832236 (Va. Cir Ct.)

END OF DOCUMENT

© 2005 Thomson/West No Claim to Orig U S Govt Works

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of November, 2005, a copy of the within

document was served upon the following parties in the following manner:

Via E-file

Kenneth J. Nachbar, Esquire
Morris Nichols Arsht & Tunnell
1201 North Market Street
Wilmington, DE  19801

David C. McBride, Esquire
Young Conaway Stargatt & Taylor LLP
1000 West Street, 17th Floor
Wilmington, DE  19899

By Hand

America West Airlines, Inc.
c/o The Corporation Trust Company
1209 Orange Street
Wilmington, DE  19801

Brian C. Ralston (I.D. No. 3770)