# EXHIBIT 15 – PART 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 04-13819 |
|  | ) | Jointly Administered |
| US AIRWAYS, INC., et al., | ) | Chapter 11 |
|  | ) | Hon. Stephen S. Mitchell |
| Debtors-in-Possession. | ) |  |
|  | ) |  |

### SECOND AMENDED DISCLOSURE STATEMENT WITH RESPECT TO JOINT PLAN OF REORGANIZATION OF US AIRWAYS, INC. AND ITS AFFILIATED DEBTORS AND DEBTORS-IN-POSSESSION

Brian P. Leitch, Esq.
Daniel M. Lewis, Esq.
Michael J. Canning, Esq.
Neil M. Goodman, Esq.
ARNOLD & PORTER LLP
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-1000

- and -

555 Twelfth Street, NW
Washington, DC 20004-1206
(202) 942-5000

- and –

399 Park Avenue
New York, New York 10022
(212) 715-1000

Thomas Wardell, Esq.
McKENNA LONG & ALDRIDGE LLP
303 Peachtree Street, NE
Atlanta, Georgia 30308
(404) 527-4000

Lawrence E. Rifken, Esq. (VSB No. 29037)
Douglas M. Foley, Esq. (VSB No. 34364)
David I. Swan, Esq.
McGUIREWOODS LLP
1750 Tysons Boulevard, Suite 1800
McLean, Virginia 22102-4215
(703) 712-5000

Attorneys for Debtors and Debtors-in-Possession
Dated:   August 7, 2005

---

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT HAS APPROVED THIS DISCLOSURE STATEMENT.**

---

DC_1430080_11 DOC

## DISCLAIMER

THE INFORMATION CONTAINED IN THIS SECOND AMENDED DISCLOSURE STATEMENT AND THE APPENDICES HERETO RELATES TO THE DEBTORS' JOINT PLAN OF REORGANIZATION. THE INFORMATION IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, AND OTHER EXHIBITS ANNEXED OR REFERRED TO IN THE PLAN AND THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER LAWS GOVERNING DISCLOSURE OUTSIDE THE CONTEXT OF CHAPTER 11. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT AND APPENDICES HERETO WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER. THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NONBANKRUPTCY PROCEEDING NOR WILL IT BE CONSTRUED TO BE LEGAL ADVICE ON THE TAX, SECURITIES OR OTHER EFFECTS OF THE REORGANIZATION AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, US AIRWAYS GROUP, INC. OR ITS AFFILIATES.

## SUMMARY OF PLAN

The following introduction and summary is a general overview only, which is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information and financial statements and notes thereto appearing elsewhere in this Disclosure Statement and the Joint Plan of Reorganization of US Airways, Inc. and Its Affiliated Debtors and Debtors-in-Possession (the "Plan"). All capitalized terms not defined in this Disclosure Statement have the meanings ascribed to such terms in the Plan, a copy of which is annexed hereto as Appendix A.

### A.    The Plan

The Plan provides for a reorganization of each of the five Debtors. In accordance with the Plan, the Debtors will effectuate a merger transaction with America West Holdings Corporation ("America West"), the holding company for America West Airlines, Inc., pursuant to which a new subsidiary of Group will merge with and into America West, and America West will become a wholly-owned subsidiary of Group and the existing shareholders of America West will receive approximately 37% of the New Common Stock of Reorganized Group. In addition, the Plan contemplates that certain new equity investors (the "Plan Investors") will invest not less than $565 million in New Common Stock of Reorganized Group representing, in the aggregate, approximately 52% of Reorganized Group. New Common Stock representing approximately 12% of Reorganized Group will be distributed to unsecured creditors of the Debtors. In each case, these percentages reflect the assumed stock ownership outstanding immediately following the effective date of the Plan and Merger and are subject to dilution as a result of any additional equity issuances, including as a result of the proposed stock offering discussed below, and are subject to certain assumptions concerning the likely exchange of certain convertible debt for New Common Stock shortly after the Merger. For more detail, see the table on page 27 detailing the pro forma security ownership of Reorganized Group upon the Effective Date of the Plan.

In connection with the transactions contemplated by the Plan, Reorganized Group may conduct a stock offering of up to $150 million in shares of New Common Stock, a portion of which may be made available to certain creditors of the Debtors and to existing common stockholders of America West (the "Stock Offering"). In the event that the Stock Offering were to be consummated, the percentage ownership of Reorganized Group by the stakeholders described above would be diluted. Completion of the Merger and effectiveness of the Plan are not conditioned on completion of the Stock Offering.

The Plan permits the Debtors to continue their businesses as a going concern, under a new hybrid point-to-point/hub-and-spoke low cost carrier business model. The Debtors believe that through the Plan and Merger they will be able to compete more effectively in the current competitive environment, thereby maximizing the going concern value of their assets for the benefit of their stakeholders.

General Unsecured Claimholder recoveries under the Plan will depend on resolution of Disputed Claims, as well as the value of shares of New Common Stock in the marketplace. The Debtors project, however, that Class 9 General Unsecured Claimholder recoveries are likely to range between 3.1% and 17.4% of the amount of their Allowed General Unsecured Claims.[1]

### B.    Competitive Strengths of Reorganized Group Resulting from the Merger

America West and Group will have a number of competitive strengths as a combined company, including:

---

[1] The estimated percentage recovery is based on the valuation of the shares issued under the Plan, as reflected in the valuation analysis attached as Appendix D. If the weighted average price paid for such shares by the Plan Investors were used rather than that valuation, the estimated percentage recovery would be approximately 2.7% to 8.2%.

*Largest U.S. Low-Cost Carrier with Nationwide Route Network.* Reorganized Group will be the first national full-service low-cost carrier and the largest low-cost carrier by revenue passenger miles ("RPMs") (including international service), the fifth largest airline operating in the United States as measured by domestic RPMs and by available seat miles ("ASMs"), with a national hub-and-spoke route network that will provide customers with nationwide reach. Reorganized Group is expected to capture approximately 10% of all domestic RPMs. Reorganized Group plans to continue as a member of the Star Alliance, the world's largest airline alliance group.

With a simplified pricing structure and international scope, Reorganized Group will offer competitive fare service to approximately 229 cities in the United States, Canada, the Caribbean, Latin America and Europe, making it the only low-cost carrier with a significant international route presence. Starting in 2006, Reorganized Group expects to expand its route network to include Hawaii, and will be the only low-cost carrier with an established East Coast route network, including the US Airways Shuttle service, with substantial presence at capacity-constrained airports such as New York's LaGuardia International Airport and Washington, D.C.'s Ronald Reagan Washington National Airport.

*Offer Services Not Typical of Low-Cost Carriers.* By delivering high-quality service, with greater frequency of flight departures and offering customers premium amenities not available on other low-cost carriers, Reorganized Group will provide the best value in its markets and create increased demand for its air travel services. Reorganized Group is expected to be the only national low-cost carrier offering a global frequent flyer program, assigned seating, a First Class cabin, the US Airways Shuttle, same-carrier service to approximately 44 international destinations, convenient access to over 700 global destinations through its membership in the Star Alliance, and the convenience of airport clubs. These amenities will differentiate Reorganized Group's service from other low-cost carriers and will allow it to strengthen customer loyalty and attract new air travelers.

*Competitive Low-Cost Structure.* The cost saving initiatives of America West and the Debtors discussed in Section III.F.1, coupled with the significant cost synergies from the Merger, will allow Reorganized Group to have one of the most competitive cost structures in the airline industry. On a pro forma basis, once the anticipated Merger synergies are realized, the unit costs of Reorganized Group will be approximately the same as those of America West today.

*Improved Balance Sheet with Substantial New Liquidity.* Reorganized Group is expected to be one of the industry's most financially stable airlines. Reorganized Group is expected to realize approximately $10 billion in annual revenues and have as of the completion of the Merger a strong balance sheet. The combined balance sheets will benefit from new liquidity of approximately $1.5 billion, which will include equity investments aggregating $565 million, the proceeds raised through the proposed Stock Offering of approximately $150 million, cash infusions from commercial partners and other initiatives.

*Experienced Management Team.* Reorganized Group will benefit from an experienced, highly motivated combined management team. Reorganized Group's team will be led by W. Douglas Parker, who has been the chief executive officer of America West since 2001 and prior to that, served as America West's chief operating officer from 2000 to 2001 and chief financial officer from 1995 to 2000. As chief executive officer, Mr. Parker led America West's transformation into a low-cost carrier.

FOR A DESCRIPTION OF THE PLAN AND VARIOUS RISK AND OTHER FACTORS PERTAINING TO THE PLAN AS IT RELATES TO HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS, PLEASE SEE ARTICLE VIII – SUMMARY OF THE REORGANIZATION PLAN AND ARTICLE IX – CERTAIN RISK FACTORS TO BE CONSIDERED.

C.    Treatment of Claims and Interests Under the Plan

The following chart contains a brief, general summary of the treatment of each Class of Claims and Interests under the Plan other than Allowed Administrative Claims, the holders of which, except with respect to the Eastshore Administrative Claim, shall receive Cash equal to the unpaid portion of such Allowed Administrative Claim or such other treatment as to which the Debtors (or the Reorganized

Debtors) and such Claimholder shall have agreed upon in writing. It is not a complete statement of the treatment of any Class of Claims or Interests. The Plan constitutes a plan of reorganization for each of the five Debtors. Unless otherwise indicated, this Chart summarizes the treatment of Classes of Claims and Interests against each of the Debtors. For a more detailed discussion of the treatment of Claims and Interests against each of the Debtors, see Section VIII.B below and Article V of the Plan.

| Class Description | Treatment Under Plan |
|---|---|
| Class-1 (Miscellaneous Secured Claims) | At the Debtors' option, each holder of an Allowed Miscellaneous Secured Claim will receive one of the following: (i) Reinstatement of Claimholder's rights; (ii) Cash equal to the value of the Miscellaneous Secured Claimholder's interest in the property of the Estate that secures such Allowed Miscellaneous Secured Claim; (iii) the property of the Estate that constitutes collateral for such Allowed Miscellaneous Secured Claim; (iv) a note secured by such Claimholder's collateral (or, if approved by the Bankruptcy Court, a portion of such collateral and/or substitute collateral), which note shall satisfy the requirements set forth in Section 1129(b)(2)(A)(i) of the Bankruptcy Code; (v) such other treatment determined by the Debtors and held by the Bankruptcy Court as constituting the indubitable equivalent of the Claim, in accordance with Section 1129(b)(2)(A)(iii) of the Bankruptcy Code; or (vi) such other treatment as may be agreed to in writing by the Debtors and Claimholder.<br><br>**Estimated Percentage Recovery: 100%** |
| Class-2A (GECC Claims) | GECC shall receive such treatment as described in the GE Master MOU discussed in greater detail in Section VII.D.6 below. |
| Class-2B (GEAE Claims) | GEAE shall receive such treatment as described in the GE Master MOU discussed in greater detail in Section VII.D.6 below. |
| Class-3 (ATSB Loan Claims) | ATSB Lenders shall receive such treatment as described in the ATSB Term Sheet discussed in greater detail in Section V.C.1. below.<br><br>**Estimated Amount of Claims:**[2] **$708,000,000**<br>**Estimated Percentage Recovery: 100%** |
| Class-4 (Airbus Claim) | Airbus shall receive the treatment described in <u>Exhibit A</u> to the Plan. |

---

[2] The "Estimated Amount of Claims" includes the aggregate amount of all Claims in each Class against all of the Debtors.

| Class Description | Treatment Under Plan |
|---|---|
| Class-5 (Other Priority Claims)[3] | Each holder of an Allowed Class-5 Other Priority Claim shall receive: (i) Cash equal to the amount of such Allowed Class-5 Other Priority Claim; or (ii) such other treatment as to which the Debtors (or Reorganized Debtors) and such Claimholder shall have agreed to in writing.<br><br>**Estimated Amount of Claims: $500,000 - $1,500,000**<br>**Estimated Percentage Recovery: 100%** |
| Class-6 (Aircraft Secured Claims) | For each Allowed Class-6 Aircraft Secured Claim, either: (i) the Allowed Class-6 Aircraft Secured Claim shall be Reinstated; or (ii) the Claimholder shall receive such other treatment as may be agreed to in writing by the Debtors and the Claimholder.<br><br>**Estimated Amount of Claims: $1,750,000,000 - $2,000,000,000**<br>**Estimated Percentage Recovery: 100%** |
| Class-7 (PBGC Claims) | PBGC shall receive: (i) Cash in the amount of $13,500,000; (ii) an unsecured promissory note in the principal amount of $10,000,000 issued by Reorganized USAI and guaranteed by Reorganized Group, bearing interest at a rate of 6.00% per annum payable annually in arrears, such promissory note to payable in a single installment on the seventh anniversary of the Effective Date; and (iii) seventy percent (70%) of the Unsecured Creditors Stock, or such other treatment as may be agreed to by the parties or ordered by the Bankruptcy Court. |
| Class-8 (General Unsecured Convenience Claims)[4] | Each holder of an Allowed General Unsecured Convenience Claim shall receive Cash equal to: (i) ten percent (10 %) of the amount of such Allowed Claim if the amount of such Allowed Claim is less than or equal to $50,000; or (ii) $5,000 if the amount of such Allowed Claim is greater than $50,000.<br><br>Any Claimholder receiving General Unsecured Convenience Class treatment in any Debtor's Chapter 11 Case waives any right such Claimholder might otherwise have to receive a distribution on account of any other General Unsecured Claim or General Unsecured Convenience Claim.<br><br>**Estimated Amount of Claims:  $22,250,000 - $61,500,000**<br>**Estimated Percentage Recovery: 10% - 6.8%** |

---

[3] "Other Priority Claims" refers to priority claims other than Priority Tax Claims under Bankruptcy Code §502(a)(8). Priority Tax Claims are not classified, but pursuant to Section 2.2 of the Plan the holders of such Claims will receive payment over six years from the date of assessment or other treatment as may be agreed by the Debtors and the Claimholder.

[4] Estimated claims amounts represent the sum of docketed claims and scheduled liabilities.  The estimated claim range is based on individual claims and scheduled liabilities below $50,000 at a 10% recovery and "opt-ins" up to $300,000. The low claims estimate assumes there are no "opt-ins" and the high estimate assumes 100% "opt-ins."

| Class Description | Treatment Under Plan |
|---|---|
| Class-9 (General Unsecured Claims) | Each holder of an Allowed General Unsecured Claim shall receive such Claimholder's Pro Rata share of thirty percent (30%) of the Unsecured Creditors Stock. If more than one of the Debtors is obligated for a General Unsecured Claim, the holder of such Claim shall be deemed to have a single Claim against all of the Debtors.<br><br>**Estimated Amount of Claims:** $408,500,000 – $1,241,500,000<br>**Estimated Percentage Recovery[5]:** 17.4% - 3.1% |
| Class-10 (Interests in the Debtors) | Holders of Interests in Group shall receive no distribution and their Interests shall be cancelled as of the Effective Date. Interests in the Debtors other than Group shall be Reinstated, in exchange for consideration provided by Group.<br><br>**Estimated Percentage Recovery:** 0% |

## D.    Claims Estimates

On September 15, 2004, the Bankruptcy Court entered the Bar Date Order (Docket No. 128) approving the form and manner of the bar date notice, which was attached as Exhibit 1 to the Bar Date Order (the "Bar Date Notice"). Pursuant to the Bar Date Order and the Bar Date Notice, the general Bar Date for filing proofs of claim in these bankruptcy cases was February 3, 2005 and the Bar Date for governmental units was March 11, 2005. In addition to serving copies of the Bar Date Notice on all scheduled creditors, employees and other potential creditors, the Debtors published the Bar Date Notice in The New York Times (Docket No. 1188), The Wall Street Journal (Global) (Docket Nos. 1189) and USA Today (Domestic and International editions) (Docket No. 1190).

The Debtors' Claims Agent received approximately 5,000 timely filed proofs of claim as of the Bar Date totaling approximately $39.4 billion. The Debtors believe that many of these proofs of claim are invalid, duplicative or otherwise substantially overstated in amount. The Debtors are in the process of evaluating the proofs of claim and anticipate that they will file objections to many of them. Pursuant to the Bar Date Notice and the Bar Date Order, and consistent with Section 502(b)(9) of the Bankruptcy Code, any proofs of claim filed after the Bar Date are disallowed as untimely unless and until such proofs of claim are deemed timely filed by the Bankruptcy Court after notice and hearing.

The Debtors currently estimate that at the conclusion of the claims resolution process the aggregate amount of estimated and allowed General Unsecured Claims (inclusive of General Unsecured Convenience Claims) against the Debtors will be between $430,750,000 and $1,303,000,000. This is in addition to the PBGC Claims, Secured Claims, such as the ATSB Loan Claims, Aircraft Secured Claims, and Miscellaneous Secured Claims. The Debtors believe that certain claims that have been asserted are without merit and intend to object to such claims. There can be no assurance, however, that the Debtors will be successful in contesting any such claims, or that total Allowed General Unsecured Claims will be within this range.

There can be no assurance that these estimates are accurate. Moreover, Claims may be filed or identified during the Claims resolution process that may materially affect the foregoing Claims estimates.

---

[5] The estimated percentage recovery is based on the valuation of the shares issued under the Plan, as reflected in the valuation analysis attached as Appendix D. If the weighted average price paid for such shares by the Plan Investors were used rather than that valuation, the estimated percentage recovery would be approximately 2.7% to 8.2%.

E.    Recommendation

The Debtors believe that the Plan, including the Merger, provides the best recoveries possible for the Debtors' Claimholders and strongly recommend that, if you are entitled to vote, you vote to accept the Plan. The Debtors believe any alternative to confirmation of the Plan, such as liquidation, partial sale of assets, or attempts by another party-in-interest to file a plan, would result in lower recoveries for stakeholders, as well as significant delays, litigation and costs, and the loss of jobs by employees.

THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR THE HOLDERS OF CLAIMS AGAINST EACH OF THE DEBTORS AND THUS RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.

## TABLE OF CONTENTS

PAGE

I.      INTRODUCTION...............................................................................................1

II.     THE BANKRUPTCY PLAN VOTING INSTRUCTIONS AND PROCEDURES ..........1
        A.    Definitions...........................................................................................1
        B.    Notice to Holders of Claims ................................................................2
        C.    Solicitation Package..............................................................................2
        D.    General Voting Procedures, Ballots, and Voting Deadline..................3
        E.    Confirmation Hearing and Deadline for Objections to Confirmation....4

III.    THE US AIRWAYS – AMERICA WEST MERGER .............................................6
        A.    Overview of the Merger Agreement......................................................6
        B.    America West and Its Business.............................................................6
        C.    Structure and Terms of the Merger Agreement....................................8
        D.    Equity Investments from the Plan Investors ......................................20
        E.    The Proposed Stock Offering...............................................................28
        F.    Combined Company Following the Merger ........................................29

IV.     DESCRIPTION OF THE DEBTORS....................................................................31
        A.    Overview of Business Operations........................................................31
        B.    Airline Industry and the Debtors' Position in the Marketplace...........33
        C.    Marketing Agreements with Other Airlines.........................................34
        D.    Industry Regulation and Airport Access .............................................34
        E.    Employees.............................................................................................36
        F.    Aviation Fuel .......................................................................................37
        G.    Airline Ticket Distribution..................................................................37
        H.    Frequent Traveler Program .................................................................38
        I.    Insurance...............................................................................................38
        J.    Properties.............................................................................................39
        K.    Financial Statements and Recent Financial Results............................41

V.      PREPETITION CAPITAL STRUCTURE OF THE DEBTORS ................................41
        A.    Group's Stock .....................................................................................42
        B.    Group's Warrants.................................................................................42
        C.    Debt.....................................................................................................43

VI.     CORPORATE STRUCTURE OF THE DEBTORS .................................................45
        A.    Current Corporate Structure................................................................45
        B.    Management of the Debtors..................................................................46
        C.    Current Debtors Other Than Group and USAI ...................................47

VII.    THE CHAPTER 11 CASES ...............................................................................48
        A.    Events Leading Up to the Chapter 11 Cases.......................................48
        B.    Failure of Reorganization after Prior Bankruptcy..............................49
        C.    Efforts to Implement the Transformation Plan ...................................50
        D.    Significant Events During the Bankruptcy Cases ...............................51

VIII.   SUMMARY OF THE REORGANIZATION PLAN..................................................68
        A.    Overall Structure of the Plan...............................................................68
        B.    Classification and Treatment of Claims and Interests.........................69
        C.    Means of Plan Implementation ........................................................... 83
        D.    Distributions.........................................................................................90

E.    Executory Contracts...................................................................................94
F.    Miscellaneous Matters...............................................................................103

IX.    CERTAIN RISK FACTORS TO BE CONSIDERED..........................................107

X.    RESALE OF SECURITIES RECEIVED UNDER THE PLAN..............................116
A.    Issuance of New Equity.............................................................................116
B.    Subsequent Transfers of New Equity........................................................117

XI.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE
PLAN    118
A.    United States Federal Income Tax Consequences to the Debtors................118
B.    United States Federal Income Tax Consequences to Claimholders of the Debtors
and Interestholders of Group.....................................................................120
C.    Importance of Obtaining Professional Tax Assistance................................125

XII.    FEASIBILITY OF THE PLAN, ACCEPTANCE OF THE PLAN AND THE BEST
INTERESTS TEST..............................................................................................125
A.    Feasibility of the Plan...............................................................................125
B.    Acceptance of the Plan..............................................................................126
C.    Best Interests Test.....................................................................................126
D.    Estimated Valuation of the Reorganized Debtors......................................127
E.    Application of the Best Interests Test to the Liquidation Analysis and the
Valuation of the Reorganized Debtors.......................................................127
F.    Confirmation Without Acceptance of All Impaired Classes:  The 'Cramdown'
Alternative................................................................................................128
G.    Conditions to Confirmation and/or Consummation of the Plan..................128
H.    Waiver of Conditions to Confirmation and/or Consummation of the Plan...129
I.    Retention of Jurisdiction...........................................................................129

XIII.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN...........131
A.    Continuation of the Bankruptcy Case........................................................131
B.    Alternative Plans of Reorganization..........................................................131
C.    Liquidation Under Chapter 7 or Chapter 11..............................................132

XIV.    VOTING REQUIREMENTS................................................................................132
A.    Parties in Interest Entitled to Vote............................................................133
B.    Classes Impaired Under the Plan...............................................................133

XV.    CONCLUSION...................................................................................................134
A.    Hearing on and Objections to Confirmation..............................................134
B.    Recommendation.......................................................................................134
APPENDICES

Appendix A    Joint Plan of Reorganization of US Airways, Inc. and Its Affiliated Debtors and Debtors-
in-Possession
Appendix B    Liquidation Analysis
Appendix C    Reorganized Group Financial Projections
Appendix D    Reorganization Valuation Analysis
Appendix E    Group's Form 10-K for the fiscal year ended December 31, 2004
Appendix F    Group's Form 10-Q for the quarterly period ended June 30, 2005
Appendix G    America West's Form 10-K for the fiscal year ended June 30, 2005
Appendix H    America West's Form 10-Q for the quarterly period ended June 30, 2005
Appendix I    Merger Proxy Statement
Appendix J    Unaudited Pro Forma Condensed Combined Financial Statements of Reorganized Group

DISCLOSURE STATEMENT WITH RESPECT TO
JOINT PLAN OF REORGANIZATION OF
US AIRWAYS, INC. AND ITS AFFILIATED
DEBTORS AND DEBTORS-IN-POSSESSION

## I.  INTRODUCTION

US Airways, Inc., US Airways Group, Inc., PSA Airlines, Inc., Piedmont Airlines, Inc., and Material Services Company, Inc. submit this disclosure statement (the "Disclosure Statement") pursuant to Section 1125 of the United States Bankruptcy Code (the "Bankruptcy Code"), for use in the solicitation of votes on the Joint Plan of Reorganization of US Airways, Inc. and Its Affiliated Debtors and Debtors-in-Possession (the "Plan") dated August __, 2005, which was filed with the United States Bankruptcy Court for the Eastern District of Virginia (Alexandria Division) (the "Court" and/or the "Bankruptcy Court"), a copy of which is attached as Appendix A hereto.

This Disclosure Statement sets forth certain information regarding the Debtors' prepetition history, significant events that have occurred during the Chapter 11 Cases and the anticipated organization, operations and financing of the Reorganized Debtors upon emergence of the Debtors from the Chapter 11 Cases. This Disclosure Statement also includes a description of America West's business, the Merger, and the synergies that the Debtors believe will result from the Merger. This Disclosure Statement also describes the terms and provisions of the Plan, including certain alternatives to the Plan, certain effects of confirmation of the Plan, certain risk factors associated with the results and operations of the Debtors following emergence from bankruptcy and with the securities to be issued under the Plan and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of Claims must follow for their votes to be counted.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN DOCUMENTS RELATED TO THE PLAN, CERTAIN EVENTS IN THE CHAPTER 11 CASES AND CERTAIN FINANCIAL INFORMATION. ALTHOUGH THE DEBTORS BELIEVE THAT SUCH SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT WARRANT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY INACCURACY OR OMISSION.

THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF THE STRUCTURE OF, CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS IN, AND IMPLEMENTATION OF THE PLAN. IT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT AND TO THE EXHIBITS ATTACHED THERETO OR REFERRED TO THEREIN.

## II.  THE BANKRUPTCY PLAN VOTING INSTRUCTIONS AND PROCEDURES

A.    Definitions

Except as otherwise provided herein, capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to them in the Plan. In addition, all references in this Disclosure Statement to monetary figures refer to United States currency, unless otherwise expressly provided.

**B.    Notice to Holders of Claims**

This Disclosure Statement is being transmitted to certain Claimholders for the purpose of soliciting votes on the Plan and to others for informational purposes. The purpose of this Disclosure Statement is to provide adequate information to enable the holder of a Claim against the Debtors to make a reasonably informed decision with respect to the Plan prior to exercising the right to vote to accept or reject the Plan.

By order entered on _____, 2005, the Bankruptcy Court approved this Disclosure Statement as containing information of a kind and in sufficient and adequate detail to enable Claimholders that are entitled to vote on the Plan to make an informed judgment with respect to acceptance or rejection of the Plan. THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE EITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.

ALL CLAIMHOLDERS ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS APPENDICES CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR TO REJECT THE PLAN. This Disclosure Statement contains important information about the Plan, considerations pertinent to acceptance or rejection of the Plan, and developments concerning the Chapter 11 Cases.

THIS DISCLOSURE STATEMENT AND THE OTHER MATERIALS INCLUDED IN THE SOLICITATION PACKAGE ARE THE ONLY DOCUMENTS AUTHORIZED BY THE COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN. No solicitation of votes may be made except after distribution of this Disclosure Statement, and no person has been authorized to distribute any information concerning the Debtors or the Plan other than the information contained herein.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD-LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL, FUTURE RESULTS. This Disclosure Statement contains projections of future performance as set forth in Appendix C attached hereto (the "Projections"). Other events may occur subsequent to the date hereof that may have a material impact on the information contained in this Disclosure Statement. Neither the Debtors nor the Reorganized Debtors intend to update the Projections for the purposes hereof. Thus, the Projections will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Projections. Further, the Debtors do not anticipate that any amendments or supplements to this Disclosure Statement will be distributed to reflect such occurrences. Accordingly, the delivery of this Disclosure Statement does not imply that the information herein is correct or complete as of any time subsequent to the date hereof.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

**C.    Solicitation Package**

Accompanying this Disclosure Statement are, among other things, copies of (1) the Plan (Appendix A hereto); (2) the notice of, among other things, the time for submitting Ballots to accept or reject the Plan, the date, time and place of the hearing to consider the confirmation of the Plan and related matters, and the time for filing objections to the confirmation of the Plan (the "Confirmation Hearing Notice"); and (3) if you are entitled to vote, one or more Ballots (and return envelopes) to be used by you in voting to accept or to reject the Plan.

D.    General Voting Procedures, Ballots, and Voting Deadline

On _____, 2005, the Bankruptcy Court issued an order (the "Solicitation Procedures Order"), among other things, approving this Disclosure Statement, setting voting procedures and scheduling the hearing on confirmation of the Plan. A copy of the Confirmation Hearing Notice is enclosed with this Disclosure Statement. The Confirmation Hearing Notice sets forth in detail, among other things, the voting deadlines and objection deadlines with respect to the Plan. The Confirmation Hearing Notice and the instructions attached to the Ballot should be read in connection with this Section of this Disclosure Statement.

If you are entitled to vote, after carefully reviewing the Plan, this Disclosure Statement, and the detailed instructions accompanying your Ballot(s), please indicate your acceptance or rejection of the Plan by checking the appropriate box on the enclosed Ballot(s). Please complete and sign your original Ballot(s) (copies will not be accepted) and return it in the envelope provided. You must provide all of the information requested by the appropriate Ballot(s). Failure to do so may result in the disqualification of your vote on such Ballot(s).

Each Ballot has been coded to reflect the Class of Claims it represents. Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot or Ballots sent to you with this Disclosure Statement.

If you have any questions about (i) the procedure for voting your Claim or with respect to the packet of materials that you have received, (ii) the amount of your Claim, or (iii) if you wish to obtain, at your own expense, unless otherwise specifically required by Federal Rule of Bankruptcy Procedure 3017(d), an additional copy of the Plan, this Disclosure Statement or any appendices or exhibits to such documents, please contact:

Donlin, Recano & Company, Inc.
(Attn.: Voting and Distributions Dept.)
419 Park Avenue South, Suite 1206
New York, New York 10016
(212) 481-1411

IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND ACTUALLY RECEIVED NO LATER THAN ____, 2005 AT ____ P.M. (PREVAILING EASTERN TIME) (THE "VOTING DEADLINE") BY DONLIN, RECANO & COMPANY, INC. (US AIRWAYS BALLOT DEPARTMENT), AS FOLLOWS:

If by regular mail:

Donlin, Recano & Company, Inc.
Re: US Airways, Inc., _et al_.
P.O. Box 2034, Murray Hill Station
New York, NY 10156-0701
Attn.: Voting Department

If by hand delivery or overnight courier:

Donlin, Recano & Company, Inc.
Re: US Airways, Inc., *et al.*
419 Park Avenue South, Suite 1206
New York, NY 10016
Attn.: Voting Department

BALLOTS RECEIVED AFTER SUCH TIME WILL NOT BE COUNTED. BALLOTS SHOULD NOT BE DELIVERED DIRECTLY TO THE DEBTORS, THE COURT, THE CREDITORS' COMMITTEE OR COUNSEL TO THE DEBTORS OR THE CREDITORS' COMMITTEE.

FOR INFORMATION ABOUT WHICH CLASSES OF CLAIMHOLDERS AND INTERESTHOLDERS ARE IMPAIRED AND UNIMPAIRED UNDER THE PLAN, AND WHICH CLASSES ARE ENTITLED TO VOTE ON THE PLAN, PLEASE SEE SECTION XIV OF THIS DISCLOSURE STATEMENT.

E.      Confirmation Hearing and Deadline for Objections to Confirmation

Pursuant to Section 1128 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 3017(c), the Court has scheduled the Confirmation Hearing for _____, 2005, at ____ a.m. (prevailing Eastern time) before the Honorable Stephen S. Mitchell, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Eastern District of Virginia (Alexandria Division), 200 South Washington Street, Courtroom I, Alexandria, Virginia 22314. The hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the hearing or at any subsequently adjourned hearing. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed with the Clerk of the Bankruptcy Court and served so that they are RECEIVED on or before _____, 2005, at _:__ p.m. (prevailing Eastern time) by:

*Counsel for the Debtors*

Brian P. Leitch, Esq.
Daniel M. Lewis, Esq.
Michael J. Canning, Esq.
Neil M. Goodman, Esq.
Arnold & Porter LLP
555 Twelfth Street, NW
Washington, DC 20004

and

Lawrence E. Rifken, Esq.
Douglas M. Foley, Esq.
David I. Swan, Esq.
McGuireWoods LLP
1750 Tysons Boulevard
Suite 1800
McLean, Virginia 22102-4215

4

*United States Trustee*

> Dennis J. Early, Esq.
> The Office of the United States Trustee
> 115 South Union Street
> Alexandria, Virginia 22314

*Counsel for the Creditors' Committee*

> Scott L. Hazan, Esq.
> Brett H. Miller, Esq.
> Otterbourg, Steindler, Houston & Rosen, P.C.
> 230 Park Avenue
> New York, New York 10169

> and

> Malcolm M. Mitchell Jr., Esq.
> Melissa M. Nichols, Esq.
> Vorys, Sater, Seymour and Pease LLP
> 277 South Washington Street, Suite 310
> Alexandria, Virginia 22314-3674

*Counsel for America West*

> Timothy R. Pohl, Esq.
> Chris L. Dickerson, Esq.
> Skadden, Arps, Slate, Meagher & Flom LLP
> 333 West Wacker Drive
> Suite 2100
> Chicago, Illinois 60606

*Counsel for the ATSB*

> Brendan Collins, Esq.
> Andrea Horowitz Handel, Esq.
> U.S. Department of Justice
> Commercial Litigation Branch
> Civil Division
> P.O. Box 875
> Ben Franklin Station
> Washington, D.C. 20044

> – and –

> Steven J. Reisman, Esq.
> Andrew M. Thau, Esq.
> Curtis, Mallet-Prevost, Colt & Mosle LLP
> 101 Park Avenue
> New York, NY 10178-0061.

### III.  THE US AIRWAYS – AMERICA WEST MERGER

A.    Overview of the Merger Agreement.

On May 19, 2005, Group entered into an Agreement and Plan of Merger with America West, as amended, which is attached as Exhibit M to the Plan. The Merger Agreement provides, subject to Plan approval, for a merger transaction pursuant to which America West will merge with Barbell Acquisition Corp. ("Barbell"), a wholly-owned subsidiary of Group, and New Common Stock will be distributed to America West's shareholders, with the result of the Merger being that America West will become a wholly-owned subsidiary of Reorganized Group.

The management of both the Debtors and America West believe that the Merger is in the best interests of both companies' stakeholders, including creditors of the Debtors' bankruptcy estates. The Merger would result in the creation of the first nationwide low-cost carrier. The Debtors and America West would operate under a single brand name, "US Airways," and offer consumers a nationwide route network, with full labor and operational integration between the Debtors and America West anticipated to occur over a period of 24 months.

The Debtors believe that the Merger will create a number of synergies with resulting annual revenue increases and cost savings to Reorganized Group in the aggregate amount of over $600 million. The Debtors anticipate that cost savings will result from shrinking unprofitable routes, redistributing excess capacity from the western United States to the East Coast, streamlining aircraft fleets (the companies contemplate a net reduction of 58 aircraft between the Debtors and America West), downgrading mainline aircraft to regional jets on certain routes, and better utilization of aircraft. The Debtors expect that further cost savings will result from reductions in management overhead; elimination of overlap in airport facilities, airport labor, office space and real estate; and utilization of America West's in-house information technology department. Finally, the Debtors and America West have similar labor costs, and there is a significant commonality in the companies' aircraft fleets.

The Merger will result in the fifth largest airline operating in the United States, with primary hubs in Charlotte, Philadelphia and Phoenix, and secondary hubs/focus cities in Pittsburgh, Las Vegas, New York-LaGuardia, Washington-Reagan National and Boston. America West and the Debtors believe that this combined presence in more cities will lead to increased revenue through the addition of new routes, including service to Hawaii, and through a broader network offering passengers improved connectivity between cities. In addition to cost savings, the Merger is anticipated to increase liquidity by combining the balance sheets of the Debtors and America West and from the cash infusions provided by the equity investments of the Plan Investors, thereby improving the ability of the merged company to obtain credit providing the combined entity with access to currently restricted cash.

The Debtors believe that the Merger Agreement, coupled with the new investments from the Plan Investors, present the best business opportunity for the Debtors' reorganization and emergence from the Chapter 11 Cases.

B.    America West and Its Business.

America West, a Delaware corporation formed in 1996, is a holding company that owns all of the stock of America West Airlines, Inc. ("AWA"), a Delaware corporation formed in 1981. AWA accounted for most of America West's revenues and expenses in 2004. Based on 2004 operating revenues and ASMs, AWA is the eighth largest passenger airline and the second largest low-cost carrier in the United States. AWA is the largest low-cost carrier that operates a hub-and-spoke network, with large hubs in both Phoenix and Las Vegas. Since 2003, AWA has also offered limited point-to-point service in certain major transcontinental markets. As of June 30, 2005, AWA operated a fleet of 143 aircraft with an average age of 10.9 years and served 63 destinations in North America, including eight in Mexico, three in Canada and one in Costa Rica. Through regional alliance and code share arrangements with other airlines, AWA served an additional 52 destinations in North America. In 2004, AWA had approximately 21.1 million passengers boarding its planes and generated revenues of approximately $2.3 billion.

The following table sets forth selected financial data for America West for each of the five fiscal years ended December 31, 2004, 2003, 2002, 2001 and 2000 and for the six month periods ended June 30, 2005 and 2004, respectively. The selected consolidated financial data presented below is derived from America West's consolidated financial statements contained in America West's annual reports on Form 10-K for the years ended December 31, 2004, 2003, 2002, 2001 and 2000 and America West's unaudited consolidated financial statements contained in America West's quarterly report on Form 10-Q for the quarter ended June 30, 2005. The selected consolidated financial data should be read in conjunction with the consolidated financial statements for the respective periods, the related notes and the related reports of America West's independent registered public accounting firms. A copy of America West's annual report on Form 10-K for the fiscal year ended December 31, 2004 is attached hereto as <u>Appendix G</u> hereto, and a copy of America West's quarterly report on Form 10-Q for the period ended June 30, 2005 is attached hereto as <u>Appendix H</u> hereto.

| | Six months ended June 30, | | Year ended December 31, | | | | |
|---|---|---|---|---|---|---|---|
| | 2005 | 2004 | 2004 | 2003 | 2002 | 2001 | 2000 |
| | | | (in thousands except per share amounts) | | | | |
| **Consolidated statements of operations data:** | | | | | | | |
| Operating revenues [a] | $1,556,009 | $1,343,485 | $2,338.957 | $2,254,497 | $2,047,116 | $2,065,913 | $2,344,354 |
| Operating expenses [a][b] | 1,475,653 | 1,302,581 | 2,382,728 | 2,232,362 | 2,206,540 | 2,476,594 | 2,356,991 |
| Operating income (loss) | 80,356 | 40,904 | (43,771) | 22,135 | (159,424) | (410,681) | (12,637) |
| Income (loss) before income taxes (benefit) and cumulative effect of change in accounting principle [c] | 47,485 | 9,098 | (88,993) | 57,534 | (214,757) | (324,387) | 24,743 |
| Income taxes (benefit) | — | — | 30 | 114 | (35,071) | (74,536) | 17,064 |
| Income (loss) before cumulative effect of change in accounting principle | 47,485 | 9,098 | (89,023) | 57,420 | (179,686) | (249,851) | 7,679 |
| Net income (loss) | 47,485 | 9,098 | (89,023) | 57,420 | (387,909) | (249,851) | 7,679 |
| **Earnings (loss) per share before cumulative effect of change in accounting principle:** | | | | | | | |
| Basic | 1.32 | 0.25 | (2.47) | 1.66 | (5.33) | (7.42) | 0.22 |
| Diluted | 0.92 | 0.17 | (2.47) | 1.26 | (5.33) | (7.42) | 0.22 |
| **Net income (loss) per share:** | | | | | | | |
| Basic | 1.32 | 0.25 | (2.47) | 1.66 | (11.50) | (7.42) | 0.22 |
| Diluted [d] | 0.92 | 0.17 | (2.47) | 1.26 | (11.50) | (7.42) | 0.22 |
| **Shares used for computation:** | | | | | | | |
| Basic | 36,015 | 35,928 | 36,026 | 34,551 | 33,723 | 33,723 | 35,139 |
| Diluted [d] | 62,551 | 52,070 | 36,026 | 56,113 | 33,723 | 33,670 | 35.688 |
| **Consolidated balance sheet data (at end of period):** | | | | | | | |
| Total assets | $1,604,817 | $1,645,017 | $1,475,264 | $1,614,385 | $1,438,953 | $1,469,218 | $1,568,515 |
| Long-term debt, less current maturities | 588,060 | 647,670 | 635,129 | 688,965 | 700,983 | 224,551 | 145,578 |
| Total stockholders' equity | 84,138 | 147,040 | 36,447 | 125,989 | 68,178 | 420,363 | 667,073 |

Source: America West Holdings Corporation

(a) Effective with the first quarter of 2005, America West changed the presentation of its regional alliance agreement with Mesa Airlines to the gross basis of presentation. Previously, America West used the net basis of presentation. The amounts below depict total operating revenues and total operating expenses under the gross basis of presentation:

| | Year ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2004 | 2003 | 2002 | 2001 | 2000 |
| | | | (in thousands) | | |
| Operating revenues | $2,711,530 | $2,541,471 | $2,309,162 | $2,273,339 | $2,522,553 |
| Operating expenses | 2,755,301 | 2,519,336 | 2,468,586 | 2,684,020 | 2,535,190 |

(b) The 2004 results include a $16.3 million net credit associated with the termination of the rate per engine hour agreement with

General Electric Engine Services for overhaul maintenance services on V2500-A1 engines, a $0.6 million credit related to the revision of the estimated costs associated with the sale and leaseback of certain aircraft recorded in the first quarter of 2002 and a $0.4 million credit related to the revision of estimated charges associated with the Columbus, Ohio hub closure originally recorded in the second quarter of 2003. These credits were partially offset by $1.9 million of net charges related to the return of certain Boeing 737-200 aircraft which includes termination payments of $2.1 million, the write-down of leasehold improvements and deferred rent of $2.8 million, offset by the net reversal of maintenance reserves of $3.0 million. The 2003 period includes $16.0 million of charges resulting from the elimination of AWA's hub operations in Columbus, Ohio ($11.1 million), the reduction-in-force of certain management, professional and administrative employees ($2.3 million), and the impairment of certain owned Boeing 737-200 aircraft that have been grounded ($2.6 million) offset by a $1.1 million reduction of charges due to a revision of the estimated costs related to the early termination of certain aircraft leases and a $0.5 million reduction related to the revision of estimated costs associated with the sale and leaseback of certain aircraft. The 2002 period includes $19.0 million of charges primarily related to the restructuring completed on January 18, 2002, resulting from the events of September 11, 2001. The 2001 period includes $141.6 million of special charges related to the impairment of reorganization value in excess of amounts allocable to identifiable assets and owned aircraft and engines, as well as the earlier-than-planned return of seven leased aircraft and severance expenses following a reduction-in-force in 2001. America West reclassified amounts related to settled fuel hedge transactions and mark-to-market adjustments on open hedge instruments from fuel expense to gain (loss) on derivative instruments, net. The amounts for the years ended December 31, 2004 and 2003 were an addition to fuel expense of $30.5 million and $10.7 million, respectively For the years ended December 31, 2002 and 2001. the amounts reduced fuel expense by $0.7 million and $7.2 million, respectively.

(c) Nonoperating income (expense) in the 2004 period includes a $30.5 million net gain on derivative instruments, which included mark-to-market changes and settled transactions, and $1.3 million for the write-off of debt issue costs in connection with the refinancing of a term loan issued by General Electric Capital Corporation with an aggregate amount of $110.6 million. The 2003 period includes federal government assistance of $81.3 million recognized as nonoperating income under the Emergency Wartime Supplemental Appropriations Act and $8.5 million and $108.2 million recognized in 2002 and 2001, respectively, as nonoperating income under the Air Transportation Safety and System Stabilization Act. The 2003, 2002 and 2001 periods include a $10.7 million net gain, $0.7 million net loss and $7.2 million net loss on derivative instruments, respectively, including mark-to-market changes and settled transactions.

(d) America West diluted earnings per share for the year ended December 31, 2003 includes the impact related to the 7.25% notes under the "if-converted" methodology The impact reduced diluted earnings per share by $0.03 from $1.29 to $1.26.

America West files annual, quarterly and current reports, proxy statements and other information with the SEC, which provide additional and more detailed information about America West, its management, stockholders and operations, and the historical trading prices of its common stock, than are contained in this Disclosure Statement. You can read and copy these reports, statements or other information at the SEC's Public Reference Room at Room 1580, 100 F Street, NE, Washington, D.C. 20549. America West's SEC filings are also available to the public from commercial document retrieval services and at the website maintained by the SEC at www.sec.gov. You can also find the SEC filings of America West on its website at www.americawest.com. Any such information is not considered to be part of, or incorporated by reference into, this Disclosure Statement.

C.      Structure and Terms of the Merger Agreement.

    *1.      Closing and Effective Time of the Merger.*

The closing of the Merger will occur on the fifth business day after the satisfaction or waiver of all of the closing conditions provided in the Merger Agreement, except for those conditions that, by their terms, are to be satisfied at the closing (but subject to the satisfaction or waiver of those conditions), or on such other date as America West and Group may agree in writing. As soon as practicable following the closing, America West and Group will deliver an executed and acknowledged certificate of merger to the Secretary of State of the State of Delaware. At that time, or at such later time as may be agreed by the parties in writing and specified in the certificate of merger, the Merger will become effective.

    *2      Officers and Directors of Reorganized Group*

After the Merger, the following individuals will be recommended to the board of directors of Reorganized Group for positions on the executive team:

W. Douglas Parker, Age 43. Chairman of the Board, President and Chief Executive Officer of America West and AWA and has served as a director of America West since 1999. Mr. Parker has served as Chairman of the Board, President and Chief Executive Officer of the America West and as Chairman of

the Board and Chief Executive Officer of AWA since September 2001. Mr. Parker joined America West as Senior Vice President and Chief Financial Officer in June 1995. He was elected Executive Vice President of America West and Executive Vice President — Corporate Group of AWA in April 1999. He was elected President of AWA in May 2000 and Chief Operating Officer of AWA in December 2000. Mr. Parker will be recommended to the board of directors of Reorganized Group to serve as Chairman and Chief Executive Officer.

**Bruce R. Lakefield, Age 61.** President and Chief Executive Officer and a director of Group and USAI. Mr. Lakefield served as Chairman and Chief Executive Officer of Lehman Brothers International from 1995 until 1999. He has served as a Senior Advisor to the Investment Policy Committee of HGK Asset Management since 2000. Mr. Lakefield serves as a Non-Executive Director of Constellation Corporation PLC and a member of the Board of Directors of Magic Media, Inc. He is a member of the Strategy and Finance Committee of Group's Board of Directors. Mr. Lakefield will be recommended to the board of directors of Reorganized Group to serve as Vice Chairman.

**Alan W. Crellin, Age 58.** Mr. Crellin joined Group in 1988 as a result of the acquisition of Pacific Southwest Airlines. He was promoted to serve as Vice President — Ground Services of Group in 1995. Mr. Crellin served as Senior Vice President — Customer Service of Group from 2000 until his election as Executive Vice President — Operations in January 2002. Prior to joining Group, Mr. Crellin held a variety of management positions with Pacific Southwest Airlines from 1971 to 1988, including Vice President — Customer Service. Mr. Crellin will be recommended to the board of directors of Reorganized Group to be responsible for operations, including safety, flight operations, maintenance, airports and inflight services at Reorganized Group, and will retain his current title.

**J. Scott Kirby, Age 37.** Currently Executive Vice President — Sales and Marketing of AWA. Mr. Kirby joined AWA as Senior Director — Schedules and Planning in October 1995. In October 1997, Mr. Kirby was elected to the position of Vice President — Planning and in May 1998, he was elected to the position of Vice President — Revenue Management. In January 2000, he was elected to the positions of Senior Vice President — E-Business and Technology of AWA. He was elected to his current position in September 2001. He will be recommended to the board of directors of Reorganized Group to be responsible for revenue management, information technologies, scheduling/planning, marketing, sales, alliances, distribution and reservations at Reorganized Group, and will retain his current title.

**Jeffrey D. McClelland, Age 45.** Executive Vice President and Chief Operating Officer of AWA. Mr. McClelland joined AWA as Senior Vice President — Operations in September 1999. He was elected Executive Vice President — Operations in September 2001 and was elected Chief Operating Officer in November 2002. From 1991 until 1999, Mr. McClelland worked at Northwest Airlines, most recently as Senior Vice President — Finance and Controller. He will be recommended to the board of directors of Reorganized Group to become Executive Vice President and Chief Administrative Officer at Reorganized Group.

**Derek J. Kerr, Age 40.** Senior Vice President and Chief Financial Officer of AWA and America West. Mr. Kerr joined AWA as Senior Director — Financial Planning in April 1996. He was elected to the position of Vice President — Financial Planning and Analysis in May 1998. In February 2002, Mr. Kerr was elected Senior Vice President — Financial Planning and Analysis. He was elected to his current position in September 2002. He will be recommended to the board of directors of Reorganized Group to retain his title and to report to Jeffrey McClelland.

**James E. Walsh III, Age 57.** Senior Vice President and General Counsel of AWA. Mr. Walsh joined AWA as Senior Vice President and General Counsel in August 2004. Prior to joining AWA, Mr. Walsh was Senior Vice President & General Counsel of Fairchild Dornier Corporation. Prior to joining Fairchild in 1991, Mr. Walsh spent 12 years at American Airlines in various positions including Vice President of Purchasing & Inventory Control and later Vice President of Law. He will be recommended to the board of directors of Reorganized Group to retain his title and to report to Jeffrey McClelland.

**C.A. Howlett**, Age 61. Senior Vice President — Public Affairs of AWA and America West. Mr. Howlett joined AWA as Vice President — Public Affairs in January 1995. On January 1, 1997, he was elected Vice President — Public Affairs of Holdings. He was elected to his current positions in February 1999. He will be recommended to the board of directors of Reorganized Group to retain his title and to report to Doug Parker.

**Elise R. Eberwein**, Age 39. Vice President — Corporate Communications of AWA. Ms. Eberwein joined AWA in September 2003. Prior to joining AWA Ms. Eberwein held various communication positions for three other airlines, including Denver based Frontier Airlines where she served as Vice President, Communications from 2000 until she joined AWA. She will be recommended to the board of directors of Reorganized Group to retain her title and to report to Doug Parker.

3.     *The Merger Consideration.*

At the effective time of the Merger, each share of America West Class A common stock issued and outstanding immediately prior to the effective time (other than any shares of America West Class A common stock owned by Group, America West or any of their respective subsidiaries, which shares are not beneficially owned by third parties) will be converted into the right to receive 0.5362 of a share of New Common Stock, together with the right, if any, to receive cash in lieu of fractional shares of New Common Stock. At the effective time of the Merger, each share of America West Class B common stock issued and outstanding immediately prior to the effective time (other than any shares of America West Class B common stock owned by Group, America West or any of their respective subsidiaries, which shares are not beneficially owned by third parties) will be converted into the right to receive 0.4125 of a share of New Common Stock, together with the right, if any, to receive cash in lieu of fractional shares of New Common Stock. In connection with the Merger, Group has filed a registration statement on Form S-4 under the Securities Act to register the shares of New Common Stock to be issued to holders of America West Class A common stock and America West Class B common stock in the Merger (the "S-4 Registration Statement"). A copy of the prospectus/proxy statement comprising a part of the S-4 Registration Statement is attached to the Disclosure Statement as <u>Appendix I</u>.

Shares of America West common stock owned by Group, America West or any of their respective subsidiaries, except for shares that are beneficially owned by third parties, will be canceled and retired without payment of any consideration therefor and will cease to exist.

4.     *Effect of the Merger on America West's Labor and Benefits.*

Group has agreed that it will cause America West after the Merger to honor all America West compensation and benefit plans, other than collective bargaining agreements, in accordance with their terms as in effect immediately before the effective time of the Merger, subject to any amendment or termination of those plans that may be permitted by the terms of those plans and applicable law.

Subject to the terms of any applicable collective bargaining agreement, Reorganized Group will cause any Reorganized Group compensation and benefit plans that cover the employees of America West and its subsidiaries who are employed by Reorganized Group or any of its subsidiaries at or after the effective time of the Merger, which are referred to as continuing employees, to treat the employment and service of the continuing employees with America West and its subsidiaries and any predecessor employers through the date the Merger closes as employment and service with Reorganized Group and its subsidiaries for eligibility and vesting purposes, but not benefit accrual purposes under any defined benefit pension plan, under the Reorganized Group compensation and benefit plans. Subject to the terms of any applicable collective bargaining agreement, the continuing employees and their dependents and beneficiaries will not be required for the calendar year that includes the closing date of the Merger to satisfy any deductible, co-payment, out-of-pocket maximum or similar requirements under any Reorganized Group compensation and benefit plan that provides medical, dental and other welfare benefits to the continuing employees and their beneficiaries to the extent of amounts previously credited for those purposes under the medical, dental and other welfare benefit plans of America West and its subsidiaries that covered the continuing employees prior to the closing date of the Merger, and any waiting periods, pre-existing condition exclusions and

10

requirements to show evidence of good health contained in that Reorganized Group compensation and benefit plan will not apply with respect to the continuing employees and their dependents and beneficiaries, except to the extent such waiting periods, exclusions or requirements were applicable under the America West compensation and benefit plans at the effective time of the Merger.

     5.       *Approvals Arising in Connection with the Merger.*

          (a)       *United States Antitrust*

The Merger is subject to review by the Antitrust Division of the U.S. Department of Justice (the "Antitrust Division"), under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, (the "HSR Act"). Under the HSR Act, America West and Group are required to make pre-merger notification filings at the expiration or early termination of the statutory waiting period prior to completing the Merger. On May 23, 2005, America West and Group each filed a Premerger Notification and Report Form with the Antitrust Division and the U.S. Federal Trade Commission (the "FTC"). The initial waiting period expired on June 23, 2005, without America West or Group having received notice of a second request.

There can be no assurance that other government agencies, including state attorneys general, or a private party, could not also initiate action to challenge the Merger before or after it is completed. Any such challenge to the Merger could result in restrictions or conditions that would have a material adverse effect on the combined company if the Merger is completed. These restrictions and conditions could include operating restrictions, or the divestiture, spin-off or the holding separate of assets or businesses. Under the terms of the Merger Agreement, America West and Group, if requested by America West, are required to commit to any divestitures, licenses or hold separate or similar arrangements with respect to its assets or conduct of business arrangements if that divestiture, license, holding separate or arrangement is a condition to obtain any approval from any governmental entity in order to complete the merger and would not have a material adverse effect on the combined company. Group may condition any divestiture, license or hold separate or similar arrangement upon the completion of the Merger. No additional stockholder approval is expected to be required or sought for any decision by America West or Group, after the America West special meeting, to agree to any terms and conditions necessary to resolve any regulatory objections to the Merger.

Certain of the Plan Investors are also required to file notifications under the HSR Act and obtain regulatory approvals. The waiting periods applicable to those Plan Investors expired on or before June 27, 2005.

          (b)       *Other Regulatory Approvals*

America West and Group are regulated by various federal, state and foreign regulatory authorities that exercise broad powers, generally governing activities such as operations, safety, financial reporting, security and certain mergers, consolidations and acquisitions. The airline industry is subject to possible regulatory and legislative changes that may affect the economics of the industry by requiring changes in operating practices or by affecting the cost of providing services.

In addition to the required filings under the HSR Act, completion of the Merger is conditioned on America West and Group supplying or obtaining certain notices, reports, filings, consents, registrations, approvals, permits or authorizations with, from or to the U.S. Department of Transportation ("DOT"), the Federal Aviation Administration ("FAA"), the Federal Communications Commission ("FCC"), the Department of Homeland Security and the Air Transportation Stabilization Board (the "ATSB").

America West and Group must also either notify or obtain consent from certain foreign regulatory agencies. Pursuant to the terms of the Merger Agreement, Group and America West are required to file a notification with, and obtain approval from, the German Federal Cartel Office or Bundeskartellamt. Such approval was granted in June 2005.

(c)    *Approvals of the Air Transportation Stabilization Board*

Pursuant to a loan agreement partially guaranteed by the ATSB (the "AWA ATSB Loan"), America West will require the consent of the ATSB to complete the Merger. On January 18, 2002, AWA closed the AWA ATSB Loan, a $429 million loan supported by a $380 million guarantee provided by the ATSB. America West fully and unconditionally guaranteed the payment of all principal, premium, interest and other obligations outstanding under the AWA ATSB Loan, and has pledged the stock of AWA to secure its obligations under such guarantee. The loan balance is currently $300.3 million. Principal amounts under the AWA ATSB Loan are due in ten installments of $42.9 million on each March 31 and September 30, commencing on March 31, 2004 and ending on September 30, 2008. Principal amounts outstanding under the AWA ATSB Loan bear interest at a rate per annum equal to LIBOR plus 40 basis points, and the portion of the AWA ATSB Loan guaranteed by the ATSB is subject to a guarantee fee of 8% per year.

The AWA ATSB Loan requires that AWA maintain a minimum unrestricted cash balance of $100 million. In addition, the loan contains customary affirmative covenants and the following negative covenants: restrictions on liens, investments, restricted payments, fundamental changes, asset sales and acquisitions, the creation of new subsidiaries, sale and leasebacks, transactions with affiliates, the conduct of business, mergers or consolidations, issuances and dispositions of capital stock of subsidiaries, and amendments to other indebtedness. The AWA ATSB Loan contains customary events of default, including payment defaults, cross-defaults, breach of covenants, bankruptcy and insolvency defaults and judgment defaults.

Subject to certain exceptions, America West is required to prepay the AWA ATSB Loan upon a change in control and may be required to prepay portions of the loan if America West's employee compensation costs exceed a certain threshold.

As part of its reorganization under the prior bankruptcy, USAI also received a $900 million loan guarantee under the Air Transportation Safety and System Stabilization Act from the ATSB in connection with a $1 billion term loan financing that was funded on March 31, 2003. Group required this loan and related guarantee in order to provide the additional liquidity necessary to carry out its 2003 plan of reorganization. USAI is the primary obligor under the ATSB Loan, which is guaranteed by Group and each of its other domestic subsidiaries. The ATSB Loan is secured by substantially all of the present and future assets of the Debtors not otherwise encumbered (including certain cash and investment accounts, previously unencumbered aircraft, aircraft engines, spare parts, flight simulators, real property, takeoff and landing slots, ground equipment and accounts receivable), other than certain specified assets, including assets which are subject to other financing agreements. See Section V.C.1 of this Disclosure Statement for more information about the ATSB Loan.

On July 22, 2005, the Debtors, America West and the ATSB reached an agreement in principle regarding modifications to the ATSB Loan and to the AWA ATSB Loan. Upon the consummation of such modifications on the Effective Date, which will also constitute the treatment for the ATSB's Claims against the Debtors in the Chapter 11 Cases, the ATSB will waive its right to require the prepayment in full of the the AWA ATSB Loan in connection with the Merger. Further detail regarding the terms of the agreement in principle among the Debtors, America West and the ATSB is included below at Section V.C.1.

6.    *Major Conditions to Consummation of the Merger.*

(a)    *Conditions to Each Party's Obligations to Effect the Merger*

The respective obligations of each of Group, Barbell and America West to complete the Merger are conditioned upon the satisfaction or waiver prior to the effective time of the Merger of each of the following conditions:

- the Merger Agreement must have been duly adopted by holders of a majority of the outstanding shares of America West common stock entitled to vote on the matter in

accordance with applicable law and America West's certificate of incorporation and bylaws;

- all approvals and authorizations required to be obtained from the ATSB, DOT and FAA for the completion of the Merger must have been obtained;

- all other governmental consents required to be obtained from any governmental entities for the completion of the Merger must have been obtained (subject to certain exceptions);

- all other governmental consents the failure of which to make or obtain would, individually or in the aggregate, provide a reasonable basis to conclude that America West or its directors or officers would be subject to the risk of criminal liability, must have been made or obtained;

- no governmental entity of competent jurisdiction must have enacted, issued, promulgated, enforced or entered any order or law that is in effect and restrains, enjoins, makes illegal or otherwise prohibits completion of the Merger or the other transactions contemplated by the Merger Agreement, except for orders of governmental entities outside the United States as would not, individually or in the aggregate, reasonably be expected to have a specified material adverse effect and which do not provide a reasonable basis to conclude that America West, Group or their respective directors or officers would be subject to the risk of criminal liability;

- the registration statement relating to the shares of New Common Stock to be issued pursuant to the Merger Agreement must have been declared effective by the SEC under the Securities Act and no stop order suspending its effectiveness will have been issued by the SEC and no proceedings for that purpose will have been initiated or threatened by the SEC;

- the Plan, in form and substance reasonably acceptable to each of Group and America West, must have been confirmed by the Court pursuant to a confirmation order in form and substance reasonably acceptable to each of Group and America West, and such confirmation order must have become a final order;

- in connection with the emergence of Group from bankruptcy and the completion of the Plan, Group must have received from the Plan Investors on or before the effective time of the Merger, cash equity investments of not less than $375 million, such equity investments to be made substantially on the basis set forth in the Investment Agreements; and

- all agreements and Court orders entered into, modified or otherwise effected pursuant to or in connection with the Merger Agreement or the Plan must be in form and substance reasonably acceptable to each of Group and America West.

(b)    *Conditions to Obligations of Group*

The obligations of Group to effect the Merger are subject to the satisfaction or waiver by Group at or prior to the effective time of the Merger of certain conditions, including the following:

- each of the representations and warranties made by America West in the Merger Agreement must be true and correct in all respects as of the date of the Merger Agreement and as of the closing date as though made on and as of the closing date (except to the extent any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date) except where the failure of that representation and warranty to be true and correct would not, individually or in the aggregate, reasonably be expected to have a

13

specified material adverse effect on America West, and Group must have received a certificate as to the foregoing from the chief executive officer or chief financial officer of America West;

- America West must have performed in all material respects all obligations required to be performed by it under the Merger Agreement at or prior to the closing date, and Group must have received a certificate as to the foregoing from the chief executive officer or chief financial officer of America West;

- no governmental entity of competent jurisdiction must have instituted (or if instituted, must not have withdrawn) any suit, action or proceeding seeking any order which would, in the reasonable judgment of Group, individually or in the aggregate, be reasonably likely to result in the failure of the condition described in the fifth bullet point under Section III.C.6(a) above;

- America West must have obtained the consent or approval of each person whose consent or approval will be required under any material contract to which America West or any of its subsidiaries is a party in connection with the transactions contemplated by the Merger Agreement, except where the failure to obtain such consent or approval, individually or in the aggregate, would not reasonably be expected to result in a specified material adverse effect on America West; and

- Group must have received the opinion of Arnold & Porter LLP, counsel to Group, in form and substance reasonably satisfactory to Group, dated the closing date, substantially to the effect that the Merger will be treated for federal income tax purposes as a reorganization within the meaning of Section 368(a) of the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code").

    *(c)    Conditions to Obligations of America West*

The obligations of America West to effect the Merger are subject to the satisfaction or waiver by America West at or prior to the effective time of the Merger of certain conditions, including the following:

- each of the representations and warranties made by Group in the Merger Agreement must be true and correct in all respects as of the date of the Merger Agreement and as of the closing date as though made on and as of the closing date (except to the extent any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date) except where the failure of such representations and warranties to be true and correct would not, individually or in the aggregate, reasonably be expected to have a specified material adverse effect on Group, and America West must have received a certificate as to the foregoing from the chief executive officer or chief financial officer of Group;

- each of Group and Barbell must have performed in all material respects all obligations required to be performed by it under the Merger Agreement at or prior to the closing date, and America West must have received a certificate as to the foregoing from the chief executive officer or chief financial officer of Group and Barbell;

- no governmental entity of competent jurisdiction must have instituted (or if instituted, must not have withdrawn) any suit, action or proceeding seeking any order which would, in the reasonable judgment of America West, individually or in the aggregate, be reasonably likely to result in the failure of the condition described in the fifth bullet point under Section III.C.6(a) above;

- Group must have obtained the consent or approval of each person whose consent or approval will be required under any material contract to which Group or any of its subsidiaries is a party in connection with the transactions contemplated by the Merger

14

Agreement, except where the failure to obtain such consent or approval, individually or in the aggregate, would not reasonably be expected to result in a specified material adverse effect on Group;

- America West must have received the opinion of Skadden, Arps, Slate, Meagher & Flom LLP, counsel to America West, in form and substance reasonably satisfactory to America West, dated the closing date, substantially to the effect that the Merger will be treated for federal income tax purposes as a reorganization within the meaning of Section 368(a) of the Internal Revenue Code; and

- immediately prior to the effective time of the Merger, there must not exist more than $10 million of Administrative Claims, including contingent liabilities, arising out of or related to any Group compensation and benefit plan that is subject to Section 302 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") or Section 412 of the Internal Revenue Code, other than any claims relating to amounts incurred in the ordinary course of Group's business.

7.    *Representations, Warranties, Covenants and Agreements.*

The Merger Agreement contains customary and substantially reciprocal representations and warranties by each of Group and America West. Parties-in-interest are referred to the Merger Agreement, a copy of which is attached as an exhibit to the Plan, for a complete statement of the parties' representations and warranties. The assertions embodied in those representations and warranties are qualified by information in confidential disclosure letters that Group and America West exchanged in connection with the signing of the Merger Agreement. While Group and America West do not believe that the disclosure letters contain information that the securities laws require Group and America West to publicly disclose other than information that has already been so disclosed, the disclosure letters may contain information that modifies, qualifies and creates exceptions to the representations and warranties in the Merger Agreement. Accordingly, holders of Claims and Interests should not rely on any of those representations and warranties as characterizations of the actual state of facts because they may be modified in important responses by the underlying disclosure letters. Moreover, information concerning the subject matter of the representations and warranties may have changed since the date of the Merger Agreement.

The Merger Agreement contains covenants and agreements by the parties to conduct their businesses and the businesses of their respective subsidiaries in the ordinary and usual course pending consummation of the Merger, and to maintain existing relations and goodwill with governmental entities, customers, suppliers, distributors, creditors, lessors, employees and business associates and keep available the services of present employees and agents of the parties and their respective subsidiaries. The Merger Agreement also contains certain negative covenants, including but not limited to an agreement by the parties not to knowingly take or permit any of their respective subsidiaries to take any action or refrain from taking any action that would be reasonably and foreseeably likely to prevent the closing conditions in the Merger Agreement not to be satisfied. Parties-in-interest are referred to the Merger Agreement for a complete description of the parties' covenants and agreements.

8.    *Termination of the Merger Agreement.*

(a)    *Termination by Mutual Consent*

The Merger Agreement may be terminated and the Merger may be abandoned at any time prior to the effective time of the Merger by action taken by the board of directors of the terminating party or parties by mutual written consent of America West and Group, whether before or after the adoption of the Merger Agreement by America West stockholders or the entry of the order confirming the Plan.

(b)    *Termination by either America West or Group*

Either America West or Group may terminate the merger under the following circumstances:

15