# EXHIBIT 15 – PART 5

or other property from the Distribution Reserve that would have been distributed on the dates distributions were previously made to Claimholders had such Allowed Claim been an Allowed Claim on such dates. After a Final Order has been entered, or other final resolution has been reached with respect to all Disputed Claims, any remaining Cash, New Common Stock or other property held in the Distribution Reserve will be distributed Pro Rata to Allowed General Unsecured Claimholders in accordance with the other provisions of the Plan. Subject to Section 9.2 of the Plan, all distributions made under Section 9.8.c of the Plan on account of an Allowed Claim will be made together with any dividends, payments, or other distributions made on account of, as well as any obligations arising from, the distributed property as if such Allowed Claim had been an Allowed Claim on the dates distributions were previously made to Allowed Claimholders included in the applicable class.

The Disbursing Agent shall be deemed to have voted any New Common Stock held in the Distribution Reserve in the same proportion as all shares of New Common Stock that are not held in the Distribution Reserve. The Servicers shall be deemed to have voted any New Common Stock held by such Servicer in the same proportion as shares previously disbursed by such Servicer or, if not shares have been previously disbursed by such Servicer, then in the same proportion as all shares of New Common Stock that are not held in the Distribution Reserve.

(e)    *De Minimis Distributions*

Neither the Distribution Agent nor any Servicer shall have any obligation to make a distribution on account of an Allowed Claim from any Distribution Reserve or otherwise if (i) the aggregate amount of all distributions authorized to be made from such Distribution Reserve or otherwise on the Periodic Distribution Date in question is or has a value less than $250,000.00, or (ii) if the amount to be distributed to the specific holder of the Allowed Claim on the particular Periodic Distribution Date does not constitute a final distribution to such holder and is or has a value less than $100.00.

9.    *Fractional Securities; Fractional Dollars*

Any other provision of the Plan notwithstanding, payments of fractions of shares of New Common Stock will not be made and shall be rounded (up or down) to the nearest whole number, with fractions equal to or less than one-half (½) being rounded down. Any other provision of the Plan notwithstanding, neither the Reorganized Debtors nor the Disbursing Agent or Servicer shall be required to make distributions or payments of fractions of dollars. Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

10.    *Allowance and Payment of Certain Administrative Claims.*

(a)    *Professional Claims*

Under the Plan, all final requests for payment of Professional Claims must be filed no later than sixty (60) days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court, the allowed amounts of such Professional Claims shall be determined by the Bankruptcy Court. All Ordinary Course Professionals shall file final requests for payment, which shall be served and reviewed in accordance with paragraphs 5 and 6 of the Ordinary Course Professional Order, provided, however, that in the event that there is an objection that cannot be resolved, such Ordinary Course Professional shall have thirty (30) days from receipt of such objection to file a request for payment of the disputed portion of its Ordinary Course Professional Claim.

Subject to the Holdback Amount, on the Effective Date, the Debtors or Reorganized Debtors shall pay all amounts owing to Professionals and Ordinary Course Professionals for all outstanding amounts payable relating to prior periods through the Effective Date. In order to receive payment on the Effective Date for unbilled fees and expenses incurred through such date, the Professionals and Ordinary Course Professionals shall estimate fees and expenses due for periods that have not been billed as of the Effective

Date and shall deliver such estimate to the Debtors, counsel for the Debtors, and the Creditors' Committee. Within forty-five (45) days after the Effective Date, a Professional or Ordinary Course Professional receiving payment for the estimated period shall submit a detailed invoice covering such period in the manner and providing the detail as set forth in the Professional Fee Order or the Ordinary Course Professional Order, as applicable. Should the estimated payment received by any Professional or Ordinary Course Professional exceed the actual fees and expenses for such period, this excess amount will be credited against the Holdback Amount for Professionals, or if the award of the Holdback Amount is insufficient and for Ordinary Course Professionals, the excess amount shall be disgorged by such Professional or Ordinary Course Professional.

Upon the Effective Date, any requirement that Professionals or Ordinary Course Professionals comply with Sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate, and the Reorganized Debtors will employ and pay Professionals and Ordinary Course Professionals in the ordinary course of business.

(b)    *Substantial Contribution Compensation and Expenses Bar Date*

Any Person who requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to Sections 503(b)(3), (4), and (5) of the Bankruptcy Code must file an application with the clerk of the Bankruptcy Court, on or before the forty-fifth (45th) day after the Effective Date (the "503 Deadline"), and serve such application on counsel for the Reorganized Debtors and the Post-Effective Date Committee, and as may otherwise be required by the Bankruptcy Court or the Bankruptcy Code or the Bankruptcy Rules on or before the 503 Deadline, or be forever barred from seeking such compensation or expense reimbursement.

(c)    *Other Administrative Claims*

All other requests for payment of an Administrative Claim (other than as set forth in Sections 10.1 and 10.2 of the Plan and subject to the final sentence of Section 10.3 of the Plan) must be filed, in substantially the form of the Administrative Claim Request Form attached to the Plan as Exhibit V, with the Claims Agent and, except as set forth in any order of the Bankruptcy Court, served on counsel for the Reorganized Debtors and the Post-Effective Date Committee, and as may otherwise be required by the Bankruptcy Court or the Bankruptcy Code or the Bankruptcy Rules, by the Administrative Claims Bar Date applicable to such Administrative Claim. Any request for payment of an Administrative Claim pursuant to Section 10.3 of the Plan that is not timely filed and served shall be disallowed automatically without the need for any objection from the Debtors or the Reorganized Debtors. The Reorganized Debtors may settle an Administrative Claim without further Bankruptcy Court approval. Unless the Debtors or the Reorganized Debtors object to an Administrative Claim by the date set forth by the Bankruptcy Court in its order establishing the Administrative Claims Bar Date applicable to such Administrative Claim as the deadline for any such objections, such Administrative Claim shall be deemed allowed in the amount requested. In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the Bankruptcy Court shall determine the allowed amount of such Administrative Claim. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim which (i) is for goods or services (including wages, salaries, commissions, and trade payables) paid or payable by the Debtors in the ordinary course of business, (ii) previously has been Allowed by Final Order of the Bankruptcy Court, (iii) are for break-up fees or expense reimbursements approved as provided for in the Procedures Order, or (iv) the Debtors have agreed that no request is required.

E.    **Executory Contracts**

1    *Interline Agreements*

Each Interline Agreement to which any of the Debtors are a party shall be deemed automatically assumed in accordance with the provisions and requirements of Sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless such Interline Agreement (i) shall have been previously rejected by

the Debtors by order of the Bankruptcy Court, (ii) is the subject of a motion to reject pending on or before the Effective Date, (iii) is listed on the schedule of rejected Interline Agreements annexed to the Plan as Exhibit U-l, or (iv) is otherwise rejected pursuant to the terms of the Plan. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions and rejections pursuant to Sections 365 and 1123 of the Bankruptcy Code. Each Interline Agreement assumed pursuant to Section 8.1.a of the Plan shall vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing or providing for its assumption or applicable federal law. The Debtors reserve the right to file a motion on or before the Confirmation Date to assume or reject any Interline Agreement.

      *2.*     *Employee-Related Agreements.*

      Each Employee-Related Agreement as to which any of the Debtors is a party shall be deemed automatically assumed in accordance with the provisions and requirements of Sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless such Employee-Related Agreement: (i) shall have been previously rejected by the Debtors by order of the Bankruptcy Court; (ii) is the subject of a motion to reject pending on or before the Effective Date; (iii) is listed on the schedule of rejected Employee-Related Agreements annexed to the Plan as Exhibit U-2; or (iv) is otherwise rejected pursuant to the terms of the Plan. Without limiting the foregoing, the employment contracts of the officers identified on Exhibit U-6 to the Plan shall be assumed in accordance with Section 8.2.b of the Plan, as modified, as further described in Section VIII.E.6 of this Disclosure Statement. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions and rejections contemplated hereby pursuant to Sections 365 and 1123 of the Bankruptcy Code. Notwithstanding the foregoing, (x) the collective bargaining agreements that existed as of the Petition Date between USAI and IAMAW and between USAI and AFA have been rejected pursuant to Section 1113 of the Bankruptcy Code and new CBAs have been entered into between these parties, and (y) the Assumed Modified CBAs and the Assumed Other CBAs shall be deemed assumed in accordance with the provisions and requirements of Section 1123 of the Bankruptcy Code as of the Effective Date. After the Effective Date, the Assumed Modified CBAs and Assumed Other CBAs, and the Postpetition CBAs shall remain in effect according to their terms. Each Employee-Related Agreement assumed pursuant to Section 8.1 b of the Plan and each of the Postpetition CBAs shall vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing or providing for its assumption or applicable federal law. The Debtors reserve the right to file a motion on or before the Confirmation Date to assume or reject any Employee-Related Agreement, provided, however, that such right shall not apply to any of the Assumed Modified CBAs, Assumed Other CBAs and the Postpetition CBAs,. These provisions are without prejudice to the assertion of any claim arising under the prepetition CBAs, the Assumed Modified CBAs, the Assumed Other CBAs and the Postpetition CBAs (collectively, the "CBAs") or any defense to such claim, or with respect to the classification or treatment of such claim as a prepetition claim or otherwise.

      *The respective positions of ALPA, AFA, IAM, CWA, and the Debtors on whether this provision is consistent with the Debtors' collective bargaining agreements and the Bankruptcy Code are reviewed in Section VIII E 3.*

      *3.*     *Labor Union Positions Relating to Treatment of Collective Bargaining Agreements.*

      Objections to the Debtors' Disclosure Statement were filed by a number of the Debtors' labor unions that serve as the collective bargaining representatives of employees of the Debtors, including IAM, ALPA, AFA, and CWA. These labor unions contend, with regard to certain issues, that the Plan is inconsistent with the requirements of their respective present collective bargaining agreements (" CBAs"), violates Sections 1113 and 365 of the Bankruptcy Code, and cannot be confirmed under the Bankruptcy Code because the Plan will fail to meet the requirements of Sections 1129(a) and 1123 (b) of the Bankruptcy Code. The Debtors contend that the Plan does not violate the CBAs in question, Sections 1129 and 1123 of the Bankruptcy Code, and the Plan is confirmable.

The labor unions requested that the Disclosure Statement contain a summary of their positions with respect to these confirmation issues. To accommodate their requests and resolve or partially resolve their objections to the Disclosure Statement, a summary of their positions with respect to the confirmability of the Plan is set forth herein. This accommodation with respect to the disclosure of the labor unions' positions does not in any way imply that the Debtors believe the objections to confirmation are valid. The Debtors believe that each of these objections is without merit and can be denied by the Bankruptcy Court at the Confirmation Hearing.

Certain of the labor unions stated certain of their objections in slightly different ways. This summary does not purport to contain all of the subtleties of position among such labor unions, but rather, it broadly summarizes the positions that have been asserted. Because the CBAs with these labor unions are substantially similar in certain respects, and substantially different in other respects, each labor union does not have the identical legal or factual position, but they are broadly similar. To the extent that one labor union has filed Disclosure Statement objections that another labor union has not filed, but the terms of the agreements are substantially similar, the Debtors believe that it is reasonable to assume that both labor unions would end up asserting such objections, in connection of the Confirmation Hearing, if the disputes between such labor union and the Debtors were not resolved before such time. The Debtors are working closely with each of the labor unions to attempt to resolve open disputes, and permit confirmation of the Plan on a consensual basis. If the Debtors are not successful in this effort, however, the labor unions may choose to assert their rights and attempt to prevent confirmation of the Plan. Although the Debtors believe that the Plan is confirmable over these objections, the determination of that issue would ultimately be made in the Bankruptcy Court.

    (a)    *Positions of the Labor Unions on Board of Directors, Profit-Sharing, and Equity.*

        (i)    *Board of Directors*

A number of the Debtors' labor unions assert that, under the terms of their CBAs, they have the right to designate a member of Group's Board of Directors (the "Labor Board Designation Rights"). ALPA asserts that its right is not in any way limited to a "best efforts" undertaking by the Debtors. The Debtors disagree that their labor unions have these rights. The Plan does not provide for any Labor Board Designation Rights. Certain of the labor unions assert that the Debtors did not engage in negotiations before determining not to include a Labor Board Designation Right in the Plan. Certain labor unions further assert that the Debtors did not communicate with them regarding any contractual basis for excluding a Labor Board Designation Right in the Plan. Certain labor unions assert that any contractual dispute over any difference in interpretation of a Labor Board Designation Right is subject to resolution through the grievance and System Board of Adjustment arbitration provisions of the CBA. The Debtors disagree that these disputes are properly subject to arbitration.

The labor unions assert that in the absence of a consensual resolution of this issue, which the parties are continuing to attempt to achieve, the Debtors may not modify their contractual rights absent compliance with the requirements of Section 1113 of the Bankruptcy Code. The outcome of any such litigation is uncertain, and certain of the labor unions assert that even if the Debtors are successful in any such litigation, the labor unions may invoke remedies including damages and a right to self help.

The Debtors contend the labor union assertions of Labor Board Designation Rights are incorrect and that they have no such rights and that the objections to confirmation raised by the labor unions are subject to the jurisdiction of the Bankruptcy Court.

        (ii)    *Profit Sharing Plan*

Certain labor unions assert that their CBA with the Debtors provide them with the right to participate in a specified profit sharing plan to be filed with a plan of reorganization (the "CBA Profit Sharing Plan"). These labor unions assert that the limitations on a profit sharing plan included in the Debtors' various Investment Agreements conflict with the provision of the CBA Profit Sharing Plan

included in the Debtors' agreement with them. The Debtors disagree. Certain labor unions assert that the Debtors did not engage in a negotiation with them before determining not to include the terms of the CBA Profit Sharing Plan in the Plan, and the Debtors have not communicated with them concerning any contractual basis to exclude the CBA Profit Sharing Plan from the Plan. The Debtors assert that the CBA Profit Sharing Plan was contingent on their being able to propose a feasible, confirmable plan. The labor unions assert that in the absence of a consensual resolution of this issue, which the parties are continuing to attempt to achieve, the Debtors may not modify their contractual rights absent compliance with the requirements of Section 1113 of the Bankruptcy Code. The Debtors disagree that they are modifying any contractual rights. Certain labor unions assert that the outcome of litigation is uncertain and that in the event they are successful, they may seek to invoke remedies including damages and a right to self-help. The Debtors contend that they have no such rights.

(iii)    <em>Equity</em>

Certain of the labor unions assert that they are entitled to choose to take shares of New Common Stock in the Debtors' reorganization, in lieu of profit sharing. The Debtors dispute this contention, except that they agree that ALPA was entitled to choose under a formula that provided for ALPA to take profit sharing in lieu of a portion of shares of New Common Stock that would be available to it if it chose to decline profit sharing. ALPA elected to take profit sharing, but asserted that it preserved all its rights in doing so. ALPA asserts that the allocation of common stock to it is not consistent with the ALPA CBA, and that ALPA is entitled to a larger number of shares. ALPA also asserts that under its agreement with the Debtors it is entitled, as one alternative, to choose at least the same amount of equity as is issued to management, whether in stock or stock options and whether provided or reserved in or at the time of a plan of reorganization. The Debtors disagree and assert that they are in compliance with the requirements of the CBA regarding equity. If ALPA is granted more equity, the distribution of equity to unsecured creditors may be diluted, but if ALPA is granted less the distribution of equity to unsecured creditors will be increased. It is the Debtors' position that the Plan provides the proper allocation of shares to ALPA, but it also provides that ALPA has the right to challenge that number and to litigate the issue before the Bankruptcy Court, and the Plan provides that the Reorganized Debtors will allocate the number of shares to ALPA as determined by the Court. This the contractual obligations under the ALPA CBA are, in the Debtors' view, being wholly fulfilled.

The Debtors believe that none of the terms of the CBAs relating to Board seats, equity, or profit sharing have been violated, and that these issues should not be impediments to confirmation of the Plan.

(b)    <em>Labor Union Objections Related to Grievances, Rejection Damages and Claims</em>

The labor unions , in their Disclosure Statement objections, have objected to some aspects of the Plan's treatment of grievances and claims arising under their respective CBAs. For example, AFA objects, as a violation of its CBA, to the elimination of grievances and claims arising under the CBA, and of grievances or claims that arise from termination of employment.

Similarly, CWA protested the provision of the Plan that purport to eliminate grievances and to deem as withdrawn all proofs of claim arising under the CWA CBA.

In its Disclosure Statement objections, ALPA objected that the provisions for the treatment of collective bargaining agreements are inconsistent with the legal requirements under the Bankruptcy Code, and that all claims under assumed executory contracts like collective bargaining agreements must be paid "in full" including but not limited to all grievance claims, litigation claims, and indemnification claims. ALPA further asserted that the Debtors were not authorized to obtain rejection of a collective bargaining agreement after confirmation of the Plan. Furthermore, ALPA asserted that, in the event a CBA is rejected, the affected union is authorized to assert a claim for rejection damages and that such a claim cannot be nullified by the Plan.

In response to these Disclosure Statement objections, the Debtors made amendments to the Plan as follows: (1) the option of the Debtors to reject, under the Plan, any of its collective bargaining agreements

97

is eliminated, and the Debtor hereby commits that it does not intend to exercise its right to reject any CBA if the Plan becomes effective; (2) the special text in the Plan with respect to CBA claims is omitted, so that all claims arising from prepetition events, including grievances, CBA violations, indemnities, and similar claims under the assumed CBAs, will be treated as determined by applicable law; (3) the Plan will remain silent with respect to particularized treatment of claims allegedly arising after the Petition Date, including claims arising from the rejection, modification, or amendment or substitution of new collective bargaining agreements and claims allegedly arising under Sections 1113(c) and 1113(e) of the Bankruptcy Code, and all such claims will be therefore dealt with, along with other claims of a similar nature, under the Plan's claims resolution procedures, with respect to their allowance, disallowance, the bar date for filing proofs of claim, and whether they are appropriately treated as administrative expense claims, or prepetition general unsecured claims. It is the intent of the Debtors, in so amending the Plan, to preserve all arguments for both the Debtors and the labor unions with respect to these claims, all defenses to these claims, and whether these claims will be adjudicated in the bankruptcy court or pursuant to the grievance and system board of adjustment provisions of the respective CBAs.

The Debtors therefore believe that these objections to the Plan at confirmation, and to the disclosure with respect to them, are now moot and that the bankruptcy court has jurisdiction to decide these issues. The labor unions disagree. They assert that as a matter of law and binding precedent of the Fourth Circuit Court of Appeals in *Adventure Resources, Inc. v. Holland*, 137 F.3d 786 (4th Cir. 1998) all claims under an assumed collective bargaining agreement must be paid in full, including, but not limited to, all grievance claims, litigation claims, and indemnification claims, that the Plan and Disclosure Statement should so provide, and that any dispute concerning a claim arising under a CBA (as opposed to the bankruptcy priority of any such claim) must be adjudicated under the grievance and system board of adjustment procedures of the respective collective bargaining agreements.

> (c)    *Other Labor Objections*

AFA, IAM, and ALPA in their Disclosure Statement objections, seek additional information with respect to management compensation. This information was included in the amendments to the Plan and the Disclosure Statement filed with the Court on August 7, 2005.

In its objections to the Disclosure Statement, ALPA takes the position that its CBA with USAI had several limitations on how flying can be conducted by Group and these limitations would be implicated by the Merger and the Plan. It is the position of ALPA that, in the absence of consensual resolution of this issue, the Debtors may not modify ALPA's contractual rights absent compliance with the requirements of Section 1113 of the Bankruptcy Code. According to ALPA, the outcome of any such litigation is uncertain. And ALPA states that even in the event that such a litigation is successful, ALPA may seek to invoke remedies including damages and the right to self help. ALPA states there are also issues raised by the Joint Plan under the ALPA CBAs with Piedmont and PSA. It is the position of the Debtors that there is no such violation of the ALPA CBA contained in the Merger or Plan of Reorganization.

> 4.    *Other Executory Contracts and Unexpired Leases.*

No later than 15 days prior to the Voting Deadline, the Debtors shall file with the Bankruptcy Court (i) a list of Other Executory Contracts and Unexpired Leases to be assumed in the form of Exhibit U-3 to the Plan (the "Contracts Assumption Schedule") and (ii) a list of Other Executory Contracts and Unexpired Leases for Post-Effective Date Determination, (the "Post-Effective Date Determination Schedule") in the form of Exhibit U-5 to the Plan. Subject to the terms and provisions provided for in the Plan, Other Executory Contracts and Unexpired Leases that are identified on the Post-Effective Date Determination Schedule may be assumed or rejected by the Debtors at any time during the six months following the Effective Date, and if not assumed by the end of such period, shall be deemed rejected. Any assumption or rejection of an Other Executory Contract or Unexpired Lease on the Post-Effective Date Determination Schedule shall give rise to the same rights and obligations to all parties thereto as if the Other Executory Contract or Unexpired Lease had been assumed or rejected during the Chapter 11 Cases. Any Person that is a party to an Other Executory Contract or Unexpired Lease contained on the Post-Effective Date Determination Schedule shall have the right to seek an amount to be allowed for temporary

voting purposes by mutual agreement with the Debtors by contacting the Debtors within five (5) days of the filing by the Debtors of the Post Effective Date Determination Schedule, by electronic mail at usairwaysservice@mcguirewoods.com or by telephone at 703-712-5460, and the Debtors shall propose temporary allowance of such Claims for voting purposes within __ days of notification. The Debtors shall not unreasonably object to the temporary allowance of such Claims for voting purposes. If such amount is agreed between the Debtors and such Person, the Debtors and such Person shall file a stipulation in the Chapter 11 Cases and such Person shall receive a Ballot to enable it to exercise its rights; provided, however, that such procedures shall be without prejudice to the rights of the Debtors or such Person under Section 8.4 or Section 9.8.a of the Plan; and provided further, that any such Allowed Amount shall be of no consequence or effect in the determination of the amounts of any Claim for purposes of making or receiving distributions under the Plan.

In the event that any Person objects to its inclusion on the Post-Effective Date Determination Schedule, such Person must provide written notice to the Debtors not later than 72 hours before the scheduled commencement of the Confirmation Hearing (such date and time, the "Contract Assumption Objection Time"), and, unless the Debtors shall have filed a motion with the Bankruptcy Court prior to the commencement of the Confirmation Hearing to assume such Other Executory Contract or Unexpired Lease, such Other Executory Contract or Unexpired Lease shall be deemed rejected as of the earlier of (i) the Closing of either of the Eastshore or Wellington Investment Agreements (as such term is defined in such Investment Agreements) or (ii) 60 days after entry of the Confirmation Order (such date, the "Rejection Effective Date"), unless otherwise agreed by the parties to such Other Executory Contract or Unexpired Lease. Each Other Executory Contract and Unexpired Lease as to which any of the Debtors is a party not included on the Contracts Assumption Schedule or the Post-Effective Date Determination Schedule shall be deemed automatically rejected in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code as of the Rejection Effective Date, unless such Other Executory Contract or Unexpired Lease: (i) shall have been previously assumed by the Debtors by order of the Bankruptcy Court; (ii) is the subject of a motion to assume filed no later than the Contract Assumption Objection Time; or (iii) is otherwise assumed pursuant to the terms of the Plan, including, without limitation, those Other Executory Contracts and Unexpired Leases described in the GE Master MOU that are not rejected in accordance with or as contemplated by the terms and provisions of the GE Master MOU. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions and rejections described herein pursuant to sections 365 and 1123 of the Bankruptcy Code. Each Other Executory Contract or Unexpired Lease assumed pursuant to Section 8.1.c of the Plan shall vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing or providing for its assumption or applicable federal law.

The Debtors reserve the right to file a motion no later than the Confirmation Assumption Objection Time to assume or reject any Other Executory Contract or Unexpired Lease. To the extent that any Other Executory Contract or Unexpired Lease originally included on the Contracts Assumption Schedule or otherwise subject to a motion to assume is subsequently removed from the Contracts Assumption Schedule or subject to a motion to reject, in each case prior to the Contract Assumption Objection Time, the affected counterparty thereto shall have the right to file a proof of claim with respect to the rejection of such Other Executory Contract or Unexpired Lease and, regardless of whether the Voting Deadline has passed, may at any time prior to the completion of the Confirmation Hearing change their vote for or against the Plan and file an objection to the confirmation of the Plan, and in connection therewith the Debtors shall not unreasonably object to the temporary allowance of such Claims for voting purposes. In the event that the Debtors modify the Contracts Assumption Schedule or otherwise file a motion to reject any Other Executory Contract or Unexpired Lease originally included on the Contracts Assumption Schedule, in each case in accordance with the terms and provisions contained in Section 8.1.c of the Plan, the Debtors shall use best efforts to notify the applicable counterparty promptly of such rejection via facsimile, email and telephone at such addresses included for such purposes in the relevant Other Executory Contract or Unexpired Lease. Except as set forth in the Post-Effective Determination Schedule or as may otherwise be agreed between the Debtors and applicable counterparty, the effective date of rejection for Other Executory Contracts or Unexpired Leases shall not be later than the Rejection Effective Date.

Notwithstanding anything to the contrary contained in <u>Section 8.1.c</u> of the Plan, the IP Agreements, the IP Contracts (each as defined in the General Notes to <u>Exhibit U-3</u> to the Plan) and the insurance policies (as described in the General Notes to <u>Exhibit U-3</u> to the Plan) to which the Debtors are a party shall be deemed automatically assumed in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date unless such an agreement (i) shall have been previously rejected by the Debtors by order of the Bankruptcy Court, (ii) is the subject of a motion to reject filed no later than the Contract Assumption Objection Time, (iii) is otherwise rejected pursuant to the terms of the Plan, or (iv) is listed by the Debtors on the Post-Effective Date Determination Schedule; <u>provided, however,</u> that neither the exclusion nor inclusion of a contract or lease by the Debtors on the Contracts Assumption Schedule, nor anything contained herein, shall constitute an admission by the Debtors that any such lease or contract is an unexpired lease or executory contract or that any Debtor, or its respective Affiliates, has any liability thereunder.

5.    *Intercompany Executory Contracts and Unexpired Leases.*

Except as otherwise provided in Section 8.1.d of the Plan, each Intercompany Executory Contract and Intercompany Unexpired Lease to which the Debtors are a party shall be deemed automatically assumed in accordance with the provisions and requirements of Sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless such Intercompany Executory Contract or Intercompany Unexpired Lease: (i) shall have been previously rejected by the Debtors by order of the Bankruptcy Court, (ii) is the subject of a motion to reject pending on or before the Effective Date, (iii) is listed on the schedule of rejected Intercompany Executory Contracts and Intercompany Unexpired Leases annexed to the Plan as <u>Exhibit U-4</u>, or (iv) is otherwise rejected pursuant to the terms of the Plan. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions and rejections pursuant to Sections 365 and 1123 of the Bankruptcy Code. Each Intercompany Executory Contract and Intercompany Unexpired Lease assumed pursuant to Section 8.1.d of the Plan shall vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing or providing for its assumption or applicable federal law. The Debtors reserve the right to file a motion on or before the Confirmation Date to assume or reject any Intercompany Executory Contract or Intercompany Unexpired Lease.

6.    *Officer Employment Contracts*

The Plan provides for the assumption of 24 employment contracts with the Debtor's senior executives. On May 9, 2005, the Debtors filed a Motion Pursuant to Sections 105(a), 363(b) (1) and 365(a) of the Bankruptcy Code for an Order Approving and Authorizing a Transaction Retention Program Consisting of (1) Officer Employment Contracts and (2) Severance and Retention Policies for Salaried Employees (the "TRP Motion") (Docket No. 2125). The forms of contract were attached to the TRP Motion as Exhibits 4 and 5, and were amended pursuant to representations made on the record at the hearing on May 31, 2005. The terms of the contracts were summarized in Exhibit 6 to the TRP Motion. The executives receiving these contracts are identified in Exhibit U-6 to the Plan. In addition to the compensation provided under these employment contracts, these officers will retain the benefits provided under the benefit plans that are assumed pursuant to Section 7.5 of the Plan as identified on <u>Exhibit Y</u> thereto. The total payments under the contract and benefit plans for severance and change of control benefits, for the senior officers who are not anticipated to be retained by the Reorganized Debtors on a long term basis, but whose services are required to effect the Merger and its implementation, is estimated to be approximately $10.3 million (excluding the Debtor's Chief Executive Officer). In addition, the Debtor's Chief Executive Officer will receive severance and change of control payments of $1.7 million. These modified contracts provide materially lower compensation and severance benefits than (1) the executives' current unassumed prepetition employment contracts (with the exception of certain officers who were promoted during the pendency of the Chapter 11 Cases), and (2) contracts for officers holding similar positions at the Debtor's merger partner, America West. Information regarding the compensation for America West officers is set forth in Appendix I to this Disclosure Statement.

7.    *Real Property Agreements*

Each executory contract and unexpired lease, whether such executory contract or unexpired lease is an Interline Agreement, Employee-Related Agreement, Intercompany Executory Contract, Intercompany Unexpired Lease, or Other Executory Contract or Unexpired Lease that is assumed and relates to the use, ability to acquire, or occupancy of real property shall include (a) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease, and (b) all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements, and any other interests in real estate or rights in rem related to such premises, unless any of the foregoing agreements has been rejected pursuant to a Final Order of the Bankruptcy Court or is otherwise rejected as a part of the Plan.

8.    *Jet Service Agreement.*

After the Effective Date, Reorganized USAI shall continue to honor, perform under and be bound by the Air Wisconsin Jet Service Agreement dated February 18, 2005, as amended, by and between USAI and Air Wisconsin Airlines Corporation.

9.    *Rejected Contracts and Leases.*

Except with respect to executory contracts and unexpired leases that have previously been rejected or are the subject of a motion to reject filed, or a notice of rejection served, pursuant to order of the Bankruptcy Court, on or before the Confirmation Date, all Interline Agreements set forth on Exhibit U-1 to the Plan, and all Intercompany Executory Contracts and Intercompany Unexpired Leases set forth on Exhibit U-4 to the Plan shall be deemed automatically rejected as of the Effective Date or such earlier date as the Debtors may have unequivocally terminated their performance under such lease or contract; provided, however, that neither the exclusion nor inclusion of a contract or lease by the Debtors on any Exhibit to the Plan, nor anything contained herein, shall constitute an admission by the Debtors that any such lease or contract is an unexpired lease or executory contract or that any Debtor, or its respective Affiliates, has any liability thereunder. The Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions and rejections contemplated herein, pursuant to Sections 365 and 1123 of the Bankruptcy Code. Without limiting anything to the contrary in Section 8.1.c of the Plan, the Debtors, with the consent of America West, reserve the right to (a) file a motion on or before the Confirmation Date: (i) to reject any Interline Agreement not listed on Exhibit U-1 to the Plan, to add or delete any Interline Agreement on Exhibit U-1 to the Plan, or to modify or supplement Exhibit U-1 to the Plan; (ii) to assume any Employee-Related Agreement listed on Exhibit U-2 to the Plan, to add or delete any Employee-Related Agreement on Exhibit U-2 to the Plan, or to modify or supplement Exhibit U-2 to the Plan, provided, however, that no such additions, modifications or supplements shall be made with respect to any of the Assumed Modified CBAs, Assumed Other CBAs or Postpetition CBAs; and (iii) to reject any Intercompany Executory Contract or Intercompany Unexpired Lease not listed on Exhibit U-4 to the Plan, to add or delete any Intercompany Executory Contract or Intercompany Unexpired Lease on Exhibit U-4 to the Plan, or to modify or supplement Exhibit U-4 to the Plan, or (b) file a motion on or before the Contract Assumption Objection Time to reject any Other Executory Contract or Unexpired Lease listed on the Contracts Assumption Schedule, to assume any Other Executory Contract of Unexpired Lease listed on the Post-Effective Date Determination Schedule, to add or delete any Other Executory Contract or Unexpired Lease on the Contracts Assumption Schedule or the Post-Effective Date Determination Schedule, or to modify of supplement the Contracts Assumption Schedule or Post-Effective Date Determination Schedule.

In the event that the Debtors reject any Other Executory Contract or Unexpired Lease pursuant to which a Debtor has the right to use any Aircraft Equipment within the meanings of Section 1110(a)(3)(A)(i) and Section 1110(a)(3)(B) of the Bankruptcy Code pursuant to the Plan, the Debtors shall: (i) pay to the relevant counterparty an amount equal to the average daily basic rent and supplemental rent (subject to the Debtors' right to dispute the alleged amount of such supplemental rent) payable by the Debtors with respect to such Aircraft Equipment as provided in the applicable Other

Executory Contracts or Unexpired Lease for the period beginning on the effective date of rejection and ending on the date of return of such Aircraft Equipment [including, but not limited to, all books, records, technical records, and/or other documents required by the FAA relating to the Aircraft Equipment]; (ii) continue existing insurance coverage for such Aircraft Equipment for twenty (20) days after the effective date of such rejection; (iii) during such twenty (20) day period, maintain such Aircraft Equipment pursuant to the short-term requirements of the Debtor's Federal Aviation Administration-approved maintenance program; and (iv) upon the written request of the counterparty to such rejected Other Executory Contract or Unexpired Lease, provide such counterparty with a termination document to file with the Federal Aviation Administration in connection with such Aircraft Equipment; _provided, however,_ that such counterparty shall be solely responsible for all costs associated with such termination document, including, but not limited to the costs for preparation, filing and recordation.

        10.     _Payments Related to Assumption of Executory Contracts and Unexpired Leases._

        The provisions (if any) of each Interline Agreement, Employee-Related Agreement, or Other Executory Contract or Unexpired Lease to be assumed under the Plan which are or may be in default shall be satisfied solely by such cure, if any, as may be required by Section 365(b) of the Bankruptcy Code, no later than 20 days after the Effective Date, or on such other terms agreed to by the parties or as ordered by the Bankruptcy Court. In the event of a dispute regarding (a) the nature or the amount of any cure, (b) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of Section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (c) any other matter pertaining to assumption, any required cure shall occur on the terms agreed by the parties or ordered by the Bankruptcy Court, following the entry of a Final Order resolving the dispute and approving the assumption and, as the case may be, assignment. The provisions (if any) of each Intercompany Executory Contract and Intercompany Unexpired Lease to be assumed under the Plan which are or may be in default shall be satisfied in a manner to be agreed to by the relevant Debtors and/or Airways Assurance.

        In the event that an Other Executory Contract or Other Unexpired Lease involving the lease of Aircraft Equipment has been assumed or is assumed pursuant to Section 8.1.c of the Plan: (i) the determination of cure amounts shall be made pursuant to Section 365(b) and if applicable Section 1110 of the Bankruptcy Code, and shall not be otherwise limited by any provision in the Plan, including without limitation Section 7.13 of the Plan; (ii) the provisions of Sections 7.13 and 9.4 of the Plan shall not apply to any note, bond or other security to which such assumed Other Executory Contract or Other Unexpired Lease relates, or to any pass through trust agreement, pass through trust certificate, participation agreement or other instrument relating thereto to which the Debtors are a party (all of the above being collectively referred to as "Associated Instruments"); and (iii) all Associated Instruments relating to such assumed Other Executory Contract or Other Unexpired Lease shall also be deemed assumed pursuant to the Plan.

        11.     _Rejection Damages Bar Date._

        If the rejection by the Debtors (pursuant to the Plan or otherwise) of an Interline Agreement, Employee-Related Agreement, Other Executory Contract or Unexpired Lease, Intercompany Executory Contract or Intercompany Unexpired Lease results in a Claim, then such Claim shall be forever barred and shall not be enforceable against either the Debtors or the Reorganized Debtors or their properties unless a proof of claim is filed with the Claims Agent and served upon counsel to the Reorganized Debtors and the Creditors' Committee or the Post-Effective Date Committee, as applicable, within thirty (30) days after service of the earlier of (a) notice of the Confirmation Order, or (b) other notice that the executory contract or unexpired lease has been rejected; _provided, however,_ that the foregoing requirement to file a proof of claim shall not be applicable to any such Claim that was previously allowed by Final Order of the Bankruptcy Court. The Plan provides that under no circumstances shall any rejection damage Claim be asserted against America West or any Plan Investor or any of their respective assets or properties.

Chapter 11 Cases. The Released Parties include, collectively, (i) all officers of each of the Debtors, all members of the boards of directors of each of the Debtors, and all employees of each of the Debtors, in each case, as of the date of the commencement of the hearing on approval of this Disclosure Statement; (ii) the Creditors' Committee and all members of the Creditors' Committee in such capacity; (iii) the Retiree Committee and all members of the Retiree Committee in such capacity; (iv) the Plan Investors; (v) America West; (vi) the Debtors; (vii) the ATSB Lenders, solely in such capacities; (viii) GECC and GEAE; and (ix) with respect to each of the foregoing Persons, such Person's affiliates, principals, employees, agents, officers, directors, financial advisors, attorneys and other professionals, in their capacities as such. Notwithstanding the foregoing, nothing in the Plan releases or shall be deemed to release any of the Debtors, America West, or the Plan Investors or any of their respective Affiliates from any of their obligations under the Investment Agreement, the Merger Agreement, or any other agreement, document or instrument entered into, executed or delivered pursuant thereto or in connection therewith.

No provision of the Plan or of the Confirmation Order, including, without limitation, any release or exculpation provision, shall modify, release or otherwise limit the liability of any Person not specifically released under the Plan, including, without limitation, any Person that is a co-obligor or joint tortfeasor of a Released Party or that otherwise is liable under theories of vicarious or other derivative liability.

The Reorganized Debtors and any newly-formed entities that will be continuing the Debtors' businesses after the Effective Date shall be bound, to the same extent the Debtors are bound, by all of the releases set forth above.

5.    *Release by Holders of Claims and Interests.*

On the Effective Date each Person that votes to accept the Plan, to the fullest extent permissible under applicable law, as such law may be extended subsequent to the Effective Date, in consideration for the obligations of the Debtors and the Reorganized Debtors under the Plan and the Cash, New Common Stock and other contracts, instruments, releases, agreements or documents to be delivered in connection with the Plan (each such Person, a "Release Obligor"), shall have conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged each Released Party from any Cause of Action existing as of the Effective Date arising from, based on or relating to, in whole or in part, the subject matter of, or the transaction or event giving rise to, the Claim or Interest of such Release Obligor, and any act, omission, occurrence or event in any manner related to such subject matter, transaction or obligation; provided, however, that (i) Section 11.5 shall not release any Released Party from (A) any obligations with respect to or in connection with the treatment of Claims as provided under the Plan, or (B) any Cause of Action existing as of the Effective Date based on the Internal Revenue Code or other domestic state, city or municipal tax code, the environmental laws of the United States or any domestic state, city or municipality, or any criminal laws of the United States or any domestic state, city or municipality, and (ii) nothing set forth in the Plan or Confirmation Order shall be construed to preclude the United States from pursuing any cause of action against any Released Party based upon any civil law of the United States. Notwithstanding the foregoing, nothing in Section 11.5 of the Plan is intended to release any Claims against any Released Party arising under 29 U.S.C. §§ 1104-1109 and 1342(d), as amended, unless either (a) the Claim is based on an alleged failure to make, or timely to make, or the amount of, a required funding contribution to a plan or (b) the Released Party can demonstrate that it, he or she acted (or failed to act, in the case of a Claim based on failure to act) in good faith or in reasonable reliance. Furthermore, nothing in Section 11.5 of the Plan is intended to permit the United States to assert any claim against any of the Debtors for the payment of money for acts or omissions occurring prior to the Confirmation Date.

6.    *Setoffs.*

The Debtors may, but shall not be required to, set off against any Claim, and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtors may have against such Claimholder; but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claim that the Debtors or the Reorganized Debtors may have against such Claimholder.

7.    *Satisfaction of Subordination Rights.*

All Claims against the Debtors and all rights and claims between or among Claimholders relating in any manner whatsoever to distributions on account of Claims against the Debtors, based upon any subordination rights, whether asserted or unasserted, legal or equitable, shall be deemed satisfied by the distributions under the Plan to Claimholders having such subordination rights, and such subordination rights shall be deemed waived, released, discharged and terminated as of the Effective Date. Distributions to the various Classes of Claims under the Plan shall not be subject to levy, garnishment, attachment, or like legal process by any Claimholder by reason of any subordination rights or otherwise, so that each Claimholder shall have and receive the benefit of the distributions in the manner set forth in the Plan.

8.    *Exculpation and Limitation of Liability.*

Except as otherwise specifically provided in the Plan, including Section 11.5, the Debtors, the Reorganized Debtors, the Creditors' Committee, the members of the Creditors' Committee in their capacities as such, the Retiree Committee, the members of the Retiree Committee in their capacities as such, America West, the Plan Investors, the ATSB Lenders (solely in such capacities), GECC and GEAE, any of such parties' respective present or former affiliates, members, officers, directors, employees, advisors, attorneys, representatives, financial advisors, investment bankers or agents and any of such parties' successors and assigns, shall not have or incur, and are hereby released from, any claim, obligation, Cause of Action, or liability to one another or to any Claimholder or Interestholder, or any other party-in-interest, or any of their respective agents, employees, representatives, financial advisors, attorneys or Affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of the Debtors' Chapter 11 Cases, negotiation and filing of the Plan, filing the Chapter 11 Cases, the pursuit of confirmation of the Plan, the consummation of the Plan, the administration of the Plan or the property to be distributed under the Plan, except for their willful misconduct, recklessness or gross negligence and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan Notwithstanding the foregoing, nothing in the Plan releases or shall be deemed to release the Debtors, the Reorganized Debtors, America West, the Plan Investors or their respective Affiliates from any of their obligations under the ATSB Loan, the AWA ATSB Loan (in each case as amended and modified in accordance with the ATSB Term Sheet), the Investment Agreement, the Merger Agreement, or any other instrument, document, or agreement entered into, executed or delivered pursuant thereto or in connection therewith.

9.    *Indemnification Obligations.*

Except as specifically provided in the Plan, (a) all Indemnification Rights, including, without limitation, (i) those based upon any act or omission arising out of or relating to any Indemnitee's service with, for, or on behalf of the Debtors on or after the Petition Date, (ii) those held by Persons who served during the Chapter 11 Cases as the Debtors' respective officers, directors, or employees and/or serve in such capacities (or similar capacities) after the Effective Date and (iii) indemnification obligations assumed pursuant to an order of the Bankruptcy Court or Section 8.1.b of the Plan shall remain in full force and effect on and after the Effective Date and shall not be modified, reduced, discharged, or otherwise affected in any way by the Chapter 11 Cases; (b) the Debtors or the Reorganized Debtors, as the case may be, covenant to purchase and maintain director and officer insurance providing coverage for those Indemnitees currently covered by such policies for a period of six years after the Effective Date insuring such parties in respect of any claims, demands, suits, Causes of Action, or proceedings against such Persons based upon any act or omission related to such Person's service with, for, or on behalf of the Debtors in at least the scope and amount as currently maintained by the Debtors and in accordance with any further requirements of the Investment Agreements (the "Insurance Coverage"); (c) the insurers are authorized to pay any professional fees and expenses incurred in connection with any action relating to any continuing Indemnification Rights; and (d) the Debtors or the Reorganized Debtors, as the case may be, hereby indemnify Indemnitees and agree to pay for any deductible or retention amount that may be payable in connection with any claim covered under either the foregoing Insurance Coverage or any prior similar policy.

10.    *Injunction*

The satisfaction, release, and discharge pursuant to Article XI of the Plan shall act as an injunction against any Person commencing or continuing any action, employment of process, or act to collect, offset, or recover any Claim or Cause of Action satisfied, released, or discharged under the Plan to the fullest extent authorized or provided by the Bankruptcy Code, including, without limitation, to the extent provided for or authorized by Sections 524 and 1141 thereof. Further, except as otherwise provided in the Plan or the Confirmation Order, as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Persons who have held, hold or may hold Claims against or Interests in any of the Debtors or the Estates shall be, with respect to any such Claims or Interests, permanently enjoined from and after the Confirmation Date from: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Estates or the Reorganized Debtors or any of their property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons, or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, of any judgment, award, decree or order against the Debtors, the Estates or the Reorganized Debtors or any of their property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons, or any property of any such transferee or successor; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Estates or the Reorganized Debtors or any of their property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons; (iv) exercising any right of setoff, subrogation, or recoupment of any kind, directly or indirectly, against any obligation due the Debtors, the Estates or the Reorganized Debtors, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan to the full extent permitted by applicable law. Notwithstanding the foregoing, nothing in the Plan shall enjoin or otherwise impair the United States' rights of setoff and/or recoupment unless otherwise agreed to in writing by the United States and the Debtors or Reorganized Debtors, as the case may be, or be construed to preclude the United States from pursuing any regulatory or police action against any Debtor, Reorganized Debtor, or any other party to the extent not prohibited by the automatic stay of Section 362 of the Bankruptcy Code or discharged or enjoined pursuant to Sections 524 or 1141(d) of the Bankruptcy Code or other applicable law.

11    *Avoidance Claims*

On the Effective Date, each of the Debtors shall be deemed to waive and release all Avoidance Claims.

12    *Committees*

Dissolution of Committees. Effective on the Effective Date, the Creditors' Committee and any other committee appointed in the Chapter 11 Cases, including the Retiree Committee, shall dissolve automatically, whereupon its members, professionals, and agents shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except with respect to applications for Professional Claims or reimbursement of expenses incurred as a member of the Creditors' Committee or the Retiree Committee and any motions or other actions seeking enforcement or implementation of the provisions of the Plan or the Confirmation Order or pending appeals of Orders entered in the Chapter 11 Cases.

Post-Effective Date Committee. On the Effective Date, there shall be formed a Post-Effective Date Committee (the "Post-Effective Date Committee") with its duties limited to: (a) overseeing the general unsecured claims reconciliation and settlement process conducted by or on behalf of the Reorganized Debtors; (b) formulating with the Reorganized Debtors appropriate procedures for the settlement of claims; (c) overseeing (i) the establishment (including the determination of the amount of

New Common Stock to be withheld) and (ii) the maintenance of, the Distribution Reserve; (d) overseeing the distributions to the holders of General Unsecured Claims under the Plan; (e) appearing before and being heard by the Bankruptcy Court and other Courts of competent jurisdiction in connection with the above limited duties; and (f) such other matters as may be agreed upon between the Reorganized Debtors and the Post-Effective Date Committee or specified in the Plan. The Post-Effective Date Committee shall consist of not less than three nor more than five members to be appointed by the Creditors' Committee and may adopt by-laws governing its conduct. For so long as the claims reconciliation process shall continue, the Reorganized Debtors shall make regular reports to the Post-Effective Date Committee as and when the Reorganized Debtors and the Post-Effective Date Committee may reasonably agree upon. The Post-Effective Date Committee may employ, without further order of the Court, professionals to assist it in carrying out its duties as limited above, including any professionals retained in these Reorganization Cases, and the Reorganized Debtors shall pay the reasonable costs and expenses of the Post-Effective Date Committee, including reasonable professional fees, in the ordinary course without further order of the Court.

## IX.    CERTAIN RISK FACTORS TO BE CONSIDERED

*In addition to the other information included in this Disclosure Statement, the holders of Claims against the Debtors should carefully consider the following risks before deciding whether to vote to accept or reject the Plan.*

### Certain Bankruptcy Considerations.

There is a risk that the Plan will not be confirmed. If the Plan is not confirmed and consummated, there can be no assurance that the Chapter 11 Cases will continue rather than be converted to a liquidation, or that any alternative plan of reorganization would be on terms as favorable to the Claimholders and Interestholders as the terms of the Plan. If a liquidation or protracted reorganization were to occur, there is a risk that there would be little, if any, value available for distribution to the holders of Claims and Interests. See Appendix B attached to this Disclosure Statement for a hypothetical liquidation analysis of each individual Debtor.

There can be no assurance that the estimated Claim amounts set forth herein are correct, and the actual allowed amounts of Claims may differ from the estimates. The estimated amounts are subject to certain risks, uncertainties and assumptions. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual allowed amounts of Claims may vary from those estimated herein.

### General Considerations; Purpose of the Plan.

The formulation of a reorganization plan is the principal purpose of a Chapter 11 case. The Plan sets forth the means for satisfying the holders of Claims against and Interests in the Debtors. Certain Claims may receive partial distributions pursuant to the Plan, and in some instances, no distributions at all. See Section VIII.B, "Classification and Treatment of Claims and Interests," above. The recapitalization of the Debtors realizes the going concern value of the Debtors for their Claimholders. Moreover, reorganization of the Debtors' business and operations under the proposed Plan also avoids the potentially adverse impact of a liquidation on the Debtors' employees, and many of its customers, trade vendors, suppliers of goods and services and lessors.

### The Merger and the Plan are subject to the approval of the United States Bankruptcy Court.

On September 12, 2004, the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the Court. From the date of the filing of the petition, the Debtors have operated their business and managed their assets as debtors-in-possession, subject to the supervision of the Bankruptcy Court. The Merger is an integral part of the Plan. In order for the Merger to be completed, (i) the Plan must be confirmed by the Bankruptcy Court, and (ii) the other conditions specified in the Plan must be

satisfied or waived. There can be no assurance that the Bankruptcy Court will approve the Merger or the Plan as submitted.

*The Debtors' business is dependent on the price and availability of aircraft fuel. Continued periods of historically high fuel costs, significant disruptions in the supply of aircraft fuel or significant further increases in fuel costs could have a significant negative impact on the Debtors' operating results.*

The Debtors' operating results are significantly impacted by changes in the availability or price of aircraft fuel. Fuel prices increased substantially in 2004 compared with 2003 and have continued to increase in 2005. On a combined basis, the Debtors' average fuel price per gallon rose 30% to approximately $1.17 as compared to an average price of $0.90 in 2003. Due to the competitive nature of the airline industry, the Debtors generally have not been able to increase fares when fuel prices have risen in the past and the Debtors may not be able to do so in the future. Although the Debtors are currently able to obtain adequate supplies of aircraft fuel, it is impossible to predict the future availability or price of aircraft fuel. In addition, from time to time the Debtors enter into hedging arrangements to protect against rising fuel costs. The Debtors' ability to hedge in the future, however, may be limited.

*Reorganized Group may not perform as well financially as expected following the Merger.*

In deciding to enter into the Merger Agreement, Group and America West considered the benefits of operating as a combined company, including, among others, an enhanced ability to compete in the airline industry and the fact that the proprietary brands of the combined company would permit Reorganized Group to further differentiate itself from other airline companies. The success of the Merger will depend, in part, on the Debtors' ability to realize the anticipated revenue opportunities and cost savings from combining the businesses of the Debtors and America West. The Debtors have estimated that the combined companies expect to realize approximately $600 million in incremental operating cost and revenue synergies. The Debtors cannot assure you, however, that these synergies will be realized.

To realize the anticipated benefits from the Merger, the the businesses of the Debtors and America West must be successfully combined in a manner that permits those costs savings and other synergies to be realized in a timely fashion. In addition, these savings must be achieved without adversely affecting revenues or suffering a business interruption. If these objectives are not successfully achieved, the anticipated benefits of the Merger may not be realized fully or at all or may take longer to realize than expected. We cannot assure you that the Merger, even if achieved in an efficient, effective and timely manner, will result in combined results of operations and financial condition consistent with the pro forma condensed, combined financial data or superior to what America West and the Debtors could have achieved independently.

The Projections attached as <u>Appendix C</u> to this Disclosure Statement cover the Reorganized Debtors' operations on a consolidated basis through fiscal year 2007, after giving effect to the Merger. These Projections are based on numerous assumptions including the timing, confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Reorganized Debtors, projected synergies resulting from the Merger, industry performance, general business and economic conditions and other matters, many of which are beyond the control of the Reorganized Debtors and some or all of which may not materialize. In addition, unanticipated events and circumstances occurring subsequent to the date that this Disclosure Statement was approved by the Bankruptcy Court may affect the actual financial results of the Reorganized Debtors' operations. These variations may be material and may adversely affect the ability of the Reorganized Debtors to make payments with respect to post-Effective Date indebtedness. Because the actual results achieved throughout the periods covered by the Projections may vary from the projected results and may affect the market prices of the New Common Stock, the Projections should not be relied upon as a guaranty, representation or other assurance of the actual results that will occur.

Except with respect to the Projections and except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur subsequent to the date hereof and that may have a material impact on the information contained in this Disclosure Statement. Neither the Debtors nor the Reorganized Debtors intend to update the Projections; thus, the Projections will not reflect

the impact of any subsequent events not already accounted for in the assumptions underlying the Projections.

### *The integration of the Debtors and America West following the Merger will present significant challenges.*

The Debtors and America West have operated and, until the completion of the Merger, will continue to operate, independently. The Debtors and America West will face significant challenges in consolidating functions, integrating their organizations, procedures and operations in a timely and efficient manner and retaining key Debtor and America West personnel. The integration of the Debtors and America West will be costly, complex and time consuming, and the management of Reorganized Debtors and America West will have to devote substantial effort to such integration that could otherwise be spent on operational matters or other strategic opportunities.

The Debtors expect that the Merger will result in certain synergies, business opportunities and growth prospects. Reorganized Group, however, may never realize these expected synergies, business opportunities and growth prospects. Reorganized Group may experience increased competition that limits its ability to expand its business. The Debtors may not be able to capitalize on expected business opportunities, including retaining current customers. In addition, assumptions underlying estimates of expected cost savings and expected revenue synergies may be inaccurate, or general industry and business conditions may deteriorate. Furthermore, integrating operations will require significant efforts and expenses. Personnel may leave or may be terminated because of the Merger. Reorganized Group management may have its attention diverted from ongoing operations while trying to integrate.

### *If the Debtors do not receive all of the new liquidity contemplated, the Plan may not be confirmed, or even if the Plan is confirmed, Reorganized Group's liquidity position may be reduced.*

The Debtors anticipate receiving cash infusions of $1.5 billion in connection with the Merger, the Investment Agreements and their emergence from bankruptcy. In addition to amounts to be received from the Plan Investors and pursuant to the proposed Stock Offering, the Debtors expect to receive a loan of $250 million from Airbus in connection with the transactions agreed with Airbus as part of the treatment of its claims in bankruptcy, $455 million in advances from its affinity credit card providers, and lesser amounts from specified sales of assets, net of prepayment of amounts due to the ATSB, and other transactions. Pursuant to the terms of its agreement with the ATSB, Reorganized Group must have $1.25 billion in unrestricted cash upon emergence. While the Debtors have commitments, including from Airbus and the affinity credit card providers, to provide such funds subject to agreed documentation and other conditions, there can be no assurance that such transactions will be consummated. The failure of the Debtors to consummate these liquidity transactions could result in the Plan not being confirmed and the Merger and related transactions not occurring. In addition, the credit arrangements of the Debtors with the ATSB and other creditors contain covenants requiring maintenance of specified levels of unrestricted cash, which could limit the availability of the unrestricted cash for operating requirements. Even if the ATSB or other creditors were to waive these covenants, the Debtors' failure to maintain the levels of liquidity required by these covenants could have an adverse affect on its business and prospects and would make the Debtors more vulnerable to adverse economic and business conditions post-emergence.

### *The Debtors continue to experience significant operating losses.*

Despite significant labor cost reductions and other cost savings achieved in the Prior Bankruptcy, the Debtors have continued to experience significant operating losses. Since early 2001, the U.S. airline industry's revenue performance has fallen short of what would have been expected based on historical growth trends. This shortfall has been caused by a number of factors, including rising fuel costs, as discussed above, and the factors discussed below.

The rapid growth of low-cost carriers has had a profound impact on industry revenues. Using the advantage of low unit costs, these carriers offer lower fares, particularly those targeted at business passengers, in order to shift demand from larger, more-established airlines. As a result of growth, these low-cost carriers now transport nearly 30% of all domestic U.S. passengers compared to less than 10% a

decade ago. They now compete for, and thus influence industry pricing on, approximately 81% of all domestic U.S. passenger ticket sales compared to less than 20% a decade ago. As a result of their better financial performance they have access to capital to fund fleet growth. Low-cost carriers are expected to continue to increase their market share through pricing and growth.

The advent of Internet travel websites has lowered the cost to airlines of selling tickets. However, it has also had a large negative impact on airline revenues because travel consumers now have access to nearly perfect pricing information, and, as a result, have become more efficient at finding lower fare alternatives.

*Union disputes, employee strikes and other labor-related disruptions may adversely affect the Debtors' operations.*

The business plan of Reorganized Group includes assumptions about labor costs going forward. Currently, the labor costs of both America West and the Debtors are very competitive and very similar; however, the Debtors cannot assure you that labor costs going forward will remain competitive, either because Reorganized Group's CBAs may become amendable or because competitors may significantly reduce their labor costs.

Approximately 80% of the employees within the Debtors and approximately 81% of the employees within America West are represented for collective bargaining purposes by labor unions. In the United States, these employees are organized into nine labor groups represented by five different unions at USAI, seven labor groups represented by four different unions at AWA; four labor groups represented by four different unions at Piedmont, and four labor groups represented by four different unions at PSA. There are additional unionized groups of USAI employees abroad.

Relations between air carriers and labor unions in the United States are governed by the Railway Labor Act (the "RLA"). Under the RLA, collective bargaining agreements generally contain "amendable dates" rather than expiration dates, and the RLA requires that a carrier maintain the existing terms and conditions of employment following the amendable date through a multi-stage and usually lengthy series of bargaining processes overseen by the National Mediation Board. This process continues until either the parties have reached agreement on a new collective bargaining agreement, or the parties have been released to "self-help" by the National Mediation Board. Although in most circumstances the RLA prohibits strikes, after release by the National Mediation Board carriers and unions are free to engage in self-help measures such as strikes and lock-outs. None of the USAI labor agreements become amendable until December 31, 2009. Of the America West labor agreements, three are currently amendable, a fourth becomes amendable soon and negotiations are proceeding with a fifth group for an initial collective bargaining agreement.

There is the potential for litigation to arise in the context of airline mergers. Unions may seek to delay or halt a transaction, may seek monetary damages, either in court or in grievance arbitration, may seek to compel airlines to engage in the bargaining processes where the airline believes it has no such obligation or may seek to assert rights to participate in corporate governance, including through board representation. There is a risk that one or more unions may pursue such judicial or arbitral avenues in the context of the Merger, and if successful, could delay or block the Merger or create additional costs that the Debtors did not anticipate.

*The respective positions of ALPA, AFA, IAM, CWA, and the Debtors on whether certain provisions of the Joint Plan in this case are consistent with the Debtors' collective bargaining agreements and the Bankruptcy Code, and the potential remedies available to these labor unions, are reviewed in Section VIII E 3.*

There is also a risk that disgruntled employees, either with or without union involvement, could engage in illegal slow-downs, work stoppages, partial work stoppages, sick-outs or other action short of a full strike that could individually or collectively harm the operation of the airline and impair its financial performance.

*America West and the Debtors may be required to comply with material restrictions or conditions in order to obtain the regulatory approvals to complete the Merger and any delays in obtaining regulatory approvals will delay and may possibly prevent the Merger.*

The completion of the Merger is conditioned upon receiving approval from various federal, state and local regulatory authorities, including DOT, FAA, FCC and Department of Homeland Security and certain foreign regulatory authorities. America West and Group have not yet obtained all of the regulatory approvals required to complete the Merger.

While America West and Group have received clearance from the Department of Justice and expect to obtain the required regulatory approvals, America West and Group cannot be certain that all of the required air transportation and non-U.S. antitrust approvals may be obtained, nor can they be certain that the approvals will be obtained within the time contemplated by the Merger Agreement. A delay in obtaining the required approvals may delay and may possibly prevent the completion of the Merger.

*Fluctuations in interest rates could adversely affect the Debtors' liquidity, operating expenses and results.*

A substantial portion of the Debtors' indebtedness bears interest at fluctuating interest rates. These are primarily based on the London interbank offered rate for deposits of U.S. dollars, or LIBOR. LIBOR tends to fluctuate based on general economic conditions, general interest rates, federal reserve rates and the supply of and demand for credit in the London interbank market. The Debtors have not hedged their interest rate exposure and, accordingly, the Debtors' interest expense for any particular period may fluctuate based on LIBOR or other variable interest rates. To the extent these interest rates increase, the Debtors' interest expense will increase, in which event, they may have difficulties making interest payments and funding the Debtors' other fixed costs and the Debtors' available cash flow for general corporate requirements may be adversely affected.

*The Debtors rely heavily on automated systems to operate their business and any failure of these systems, or the failure to successfully integrate them following the Merger, could harm the Debtors' business.*

The Debtors depend on automated systems to operate their business, including computerized airline reservation systems, flight operations systems, telecommunication systems and websites. The Debtors' website and reservation systems must be able to accommodate a high volume of traffic and deliver important flight information. Substantial or repeated website, reservations systems or telecommunication systems failures could reduce the attractiveness of the Debtors' services and could cause the Debtors' customers to purchase tickets from another airline. Furthermore, following the Merger, the automated systems of America West and the Debtors must be integrated. Any disruption in these systems could result in the loss of important data, increase expenses and generally harm the Debtors' business.

*If the Debtors incur problems with any of their third party service providers, their operations could be adversely affected by a resulting decline in revenue or negative public perception about their services.*

The Debtors' reliance upon others to provide essential services on behalf of their operations may result in the relative inability to control the efficiency and timeliness of contract services. The Debtors have entered into agreements with contractors to provide various facilities and services required for their operations, including aircraft maintenance, ground facilities and baggage handling. It is likely that similar agreements will be entered into in any new markets the Debtors decide to serve. All of these agreements are subject to termination after notice. Any material problems with the efficiency and timeliness of contract services could have a material adverse effect on the Debtors' business, financial condition and results of operations.

*The travel industry, materially adversely affected by the September 11, 2001 terrorist attacks, continues to face on-going security concerns and cost burdens associated with security.*

The attacks of September 11, 2001 materially impacted and continue to impact air travel. In November 2001, the President signed into law the Aviation and Transportation Security Act, (the "Aviation

Security Act"). This law federalized substantially all aspects of civil aviation security, creating a new Transportation Security Administration. Under the Aviation Security Act, substantially all security screeners at airports are now federal employees and significant other elements of airline and airport security are now overseen and performed by federal employees, including federal security managers, federal law enforcement officers, federal air marshals and federal security screeners. Among other matters, the law mandates improved flight deck security, deployment of federal air marshals onboard flights, improved airport perimeter access security, airline crew security training, enhanced security screening of passengers, baggage, cargo, mail, employees and vendors, enhanced training and qualifications of security screening personnel, additional provision of passenger data to U.S. Customs and enhanced background checks. These increased security procedures introduced at airports since the attacks have increased costs to airlines. The Debtors would also be materially impacted in the event of further terrorist attacks or perceived terrorist threats.

*Increases in insurance costs or reductions in insurance coverage may adversely impact the Debtors' operations and financial results.*

The terrorist attacks of September 11, 2001 led to a significant increase in insurance premiums and a decrease in the insurance coverage available to commercial airline carriers. Accordingly, the Debtors' insurance costs increased significantly and the Debtors' ability to continue to obtain insurance even at current prices remains uncertain. Group has obtained this insurance through a special program administered by the FAA resulting in lower premiums than if it had obtained this insurance in the commercial insurance market. If the federal insurance program terminates, the Debtors would likely face a material increase in the cost of war risk insurance. Because of competitive pressures in the Debtors' industry, the Debtors' ability to pass additional insurance costs to passengers is limited. As a result, further increases in insurance costs or reductions in available insurance coverage could harm the Debtors' earnings.

*Changes in government regulation could increase the Debtors' operating costs and limit the Debtors' ability to conduct the Debtors' business.*

Airlines are subject to extensive regulatory requirements. In the last several years, Congress has passed laws and the FAA has issued a number of maintenance directives and other regulations. These requirements impose substantial costs on airlines.

Additional laws, regulations, taxes and airport rates and charges have been proposed from time to time that could significantly increase the cost of airline operations or reduce revenues. The ability of U.S. carriers to operate international routes is subject to change because the applicable arrangements between the U.S. and foreign governments may be amended from time to time, or because appropriate slots or facilities may not be available. The Debtors cannot assure you that laws or regulations enacted in the future will not adversely affect their operating costs.

*A small number of shareholders will beneficially own a substantial amount of New Common Stock.*

Immediately following the effectiveness of the Merger and the Plan, a significant portion of the New Common Stock will be beneficially owned by a relatively small number of Plan Investors. As a result, until these stockholders sell a substantial portion of their shares, they will have a greater percentage vote in matters that may be presented for a vote to stockholders than most other stockholders. This may make it more difficult for other stockholders to influence the votes on matters that may come before the stockholders of Reorganized Group.

*There is no public market for the New Common Stock and the market price of the New Common Stock may be volatile.*

There is currently no market for the New Common Stock. The New Common Stock will be a new issue of securities, which has been accepted for listing on the New York Stock Exchange subject to the issuance on the Effective Date. However, an active public market for the New Common Stock may not develop or be sustained after the Effective Date, and the Debtors cannot assure you that there will be any liquidity in any such market. If a market for the New Common Stock develops, the price at which a holder

of New Common Stock could sell its shares may be higher or lower than the per share valuation for the New Common Stock provided in this Disclosure Statement. The market price of the New Common Stock may fluctuate significantly in response to a number of factors (some of which are beyond the Debtors' control), including:

- variations in operating results

- changes in financial estimates by securities analysts

- changes in market values of airline companies

- announcements by the Debtors or their competitors of significant acquisitions, strategic partnerships, changes in routes or capital commitments

- the Debtors' success or failure to implement the Merger, including the integration of the separate operations of Group and America West

- increases or decreases in reported holdings by insiders or other significant stockholders

- additions or departures of key personnel

- future sales of New Common Stock

- stock market price and volume fluctuations

*The Merger is subject to certain closing conditions that, if not satisfied or waived, will result in the Merger not being completed, which may adversely affect Reorganized Group's financial results and operations and the market price of the New Common Stock.*

Although America West and Group have agreed to use their reasonable best efforts to complete the merger, the Debtors cannot assure you that the Merger will be completed. The Merger is subject to various conditions to closing, including, but not limited to, (a) receipt of the required approval of the stockholders of America West, (b) receipt by Group of new equity investments of not less than $375 million and (c) approval by the Bankruptcy Court of the Plan in form reasonably acceptable to America West and Group. If any condition to the Merger is not satisfied or, if permissible, waived, the Merger will not be completed.

America West and the Debtors have incurred and will continue to incur substantial costs in connection with the proposed Merger. These costs are primarily associated with the fees of attorneys, accountants and financial advisors. In addition, America West and the Debtors have diverted significant management resources in an effort to complete the Merger and each is subject to restrictions contained in the Merger Agreement on the conduct of its business. If the Merger is not completed, the Debtors and America West will have incurred significant costs, including the diversion of management resources, for which they will have received little or no benefit. Also, if the Merger is not completed under certain circumstances specified in the Merger Agreement, Group may be required to pay America West a termination fee of $15 million or, alternatively, America West may be required to pay Group a termination fee of $15 million.

*There is a risk that all Creditor Classes will not vote to accept the Plan, and the Debtors' ability to confirm the Plan will depend on meeting the "cram-down" standard of Section 1129(b) of the Bankruptcy Code.*

The Plan provides treatment for each class as described above. Each Creditor Class must vote on the Plan. In the event that a particular class does not agree to the treatment provided in the Plan, the Debtors will seek to confirm the Plan over their objection pursuant to Section 1129(b) of the Bankruptcy Code. The Bankruptcy Court will determine whether or not the Debtors meet the requirements of Section 1129(b) of the Bankruptcy Code for purposes of confirmation of the Plan.

*The use of America West's and Group's respective pre-merger NOLs and certain other tax attributes may be limited following the Merger.*

Although Reorganized Group is the same legal entity as Group and will continue as the publicly traded parent entity, each of America West and Group will undergo an "ownership change," as defined in Internal Revenue Code Section 382, in connection with the Merger. When such an ownership change occurs, Section 382 limits the companies' future ability to utilize any net operating losses, or NOLs, generated before the ownership change and certain subsequently recognized "built-in" losses and deductions, if any, existing as of the date of the ownership change. The companies' ability to utilize new NOLs arising after the ownership change would not be affected. An ownership change generally occurs if certain persons or groups increase their aggregate ownership percentage in a corporation's stock by more than 50 percentage points in the shorter of any three-year period or the period since the last ownership change.

### The airline industry is intensely competitive.

The Debtors' competitors include other major domestic airlines as well as foreign, regional and new entrant airlines, some of which have more financial resources or lower cost structures than the Debtors', and other forms of transportation, including rail and private automobiles. In most of their markets the Debtors compete with at least one low-cost air carrier. The Debtors' revenues are sensitive to numerous factors, and the actions of other carriers in the areas of pricing, scheduling and promotions can have a substantial adverse impact on overall industry revenues. These factors may become even more significant in periods when the industry experiences large losses, as airlines under financial stress, or in bankruptcy, may institute pricing structures intended to achieve near-term survival rather than long-term viability.

### Certain liabilities will not be fully extinguished as a result of confirmation of the plan of reorganization.

While a significant amount of Group's current liabilities will be subject to discharge as a result of these Chapter 11 Cases, a large number of Group obligations may remain in effect following the Merger. Various agreements and liabilities will remain in place, including secured financings such as the ATSB Loan in connection with its treatment as set forth in the ATSB Term Sheet, aircraft agreements, certain environmental liabilities, leases and other contracts that, even if modified during the Chapter 11 Cases, will still subject Reorganized Group to substantial obligations and liabilities.

### The Debtors' high level of fixed obligations limits the Debtors' ability to fund general corporate requirements and obtain additional financing, limits the Debtors' flexibility in responding to competitive developments and increases the Debtors' vulnerability to adverse economic and industry conditions.

The Debtors have a significant amount of fixed obligations, including debt, aircraft leases and financings, aircraft purchase commitments, leases of airport and other facilities and other cash obligations. As a result of the substantial fixed costs associated with these obligations:

- A decrease in revenues would result in a disproportionately greater percentage decrease in earnings.

- The Debtors may not have sufficient liquidity to fund all of these fixed costs if their revenues decline or costs increase.

- The Debtors may have to use their working capital to fund these fixed costs instead of funding general corporate requirements, including capital expenditures.

- The Debtors may not have sufficient liquidity to respond to competitive developments and adverse economic conditions.

The Debtors' obligations also impair their ability to obtain additional financing, if needed, and their flexibility in the conduct of their business. The Debtors' existing indebtedness is secured by substantially all of their assets, leaving the Debtors with limited collateral for additional financing.

The Debtors' ability to pay the fixed costs associated with their contractual obligations depends on the Debtors' operating performance and cash flow, which in turn depend on general economic and political

conditions. A failure to pay the Debtors' fixed costs or a breach of their contractual obligations could result in a variety of adverse consequences, including the acceleration of indebtedness, the withholding of credit card proceeds by the credit card servicers and the exercise of remedies by creditors and lessors. In such a situation, it is unlikely that the Debtors would be able to fulfill their obligations under or repay the accelerated indebtedness, make required lease payments or otherwise cover fixed costs.

*Interruptions or disruptions in service at one of the Debtors' hub airports could have a material adverse impact on the Debtors' operations.*

The Debtors expect that Reorganized Group will operate primarily through primary hubs in Charlotte, Philadelphia, Phoenix and Las Vegas. A majority of the Debtors' flights will either originate or fly into one of these hubs. A significant interruption or disruption in service at one of the Debtors' hubs could result in the cancellation or delay of a significant portion of the Debtors' flights and, as a result, could have a severe impact on their business, operations and financial performance.

*The Debtors are at risk of losses and adverse publicity stemming from any accident involving any of their aircraft.*

If one of the Debtors' aircraft were to be involved in an accident, they could be exposed to significant tort liability. The insurance the Debtors carry to cover damages arising from any future accidents may be inadequate. In the event that Reorganized Group's insurance is not adequate, the Debtors may be forced to bear substantial losses from an accident. In addition, any accident involving an aircraft that Reorganized Group operates could create a public perception that its aircraft are not safe or reliable, which could harm its reputation, result in air travelers being reluctant to fly on Reorganized Group's aircraft and adversely impact its financial condition and operations.

*The Debtors' business is subject to weather factors and seasonal variations in airline travel, which cause results to fluctuate.*

The Debtors' operations are vulnerable to severe weather conditions in parts of their network that could disrupt service, create air traffic control problems, decrease revenue, and increase costs, such as during hurricane season in the Caribbean and Southeast United States, and snow and severe winters in the Northeast United States. In addition, the air travel business historically fluctuates on a seasonal basis. Due to the greater demand for air and leisure travel during the summer months, revenues in the airline industry in the second and third quarters of the year tend to be greater than revenues in the first and fourth quarters of the year. The results of operations of the combined company will likely reflect weather factors and seasonality, and therefore quarterly results are not necessarily indicative of those for an entire year and the prior results of America West and the Debtors are not necessarily indicative of the combined company's future results.

*Employee benefit plans represent significant continuing costs to the sponsoring employers.*

America West and the subsidiaries of Group sponsor employee benefit plans and arrangements that provide retirement, medical, disability, and other benefits to their employees and participating retirees. Many of the benefits provided under these plans are mandated under various collective bargaining agreements, while others are provided on a voluntary basis as a means to recruit and retain valuable employees.

While Group recently terminated certain defined benefit pension plans and related retiree benefits, the benefit obligations associated with the remaining employee benefit plans and related costs represent a substantial continuing cost to the sponsors. In addition, many of these employee benefit plans are subject to federal laws such as the Employee Retirement Income Security Act of 1974 and the Internal Revenue Code, and must be maintained accordingly. Continued compliance with these employee benefit plans' rules is necessary, as even unintentional failures to comply can result in significant fines and penalties. Employee benefit plans in general also are increasingly the subject of protracted litigation, especially following significant plan design changes. Certain of the plans sponsored by the subsidiaries of Group have undergone several changes in connection with the Chapter 11 Cases.

*Certain provisions of the second amended and restated certificate of incorporation and second amended and restated bylaws of Reorganized Group will make it difficult for stockholders to change the composition of the board of directors and may discourage takeover attempts that some stockholders may consider beneficial.*

Certain provisions of the second amended and restated certificate of incorporation and second amended and restated bylaws of Reorganized Group may have the effect of delaying or preventing changes in control if the board of directors determines that such changes in control are not in the best interests of Reorganized Group and its stockholders. These provisions include, among other things, the following:

- a classified board of directors with three-year staggered terms;

- advance notice procedures for stockholder proposals to be considered at stockholders' meetings;

- the ability of Reorganized Group's board of directors to fill vacancies on the board;

- a prohibition against stockholders taking action by written consent;

- a prohibition against stockholders calling special meetings of stockholders;

- requiring the approval of holders of at least 80% of the voting power of the shares entitled to vote in the election of directors and for the stockholders to amend the second amended and restated bylaws; and

- super majority voting requirements to modify or amend specified provisions of Reorganized Group's second amended and restated certificate of incorporation.

These provisions are not intended to prevent a takeover, but are intended to protect and maximize the value of Reorganized Group's stockholders' interests. While these provisions have the effect of encouraging persons seeking to acquire control of the Debtors' company to negotiate with the board of directors, they could enable the board of directors to prevent a transaction that some, or a majority, of stockholders might believe to be in their best interests and, in that case, may prevent or discourage attempts to remove and replace incumbent directors. In addition, Reorganized Group will be subject to the provisions of Section 203 of the Delaware General Corporation Law, which prohibits business combinations with interested stockholders. Interested stockholders do not include stockholders whose acquisition of Reorganized Group's securities is pre-approved by the board of directors under Section 203.

## X.     RESALE OF SECURITIES RECEIVED UNDER THE PLAN

### A.     Issuance of New Equity

Except for persons or entities, such as the Plan Investors, who could be Affiliates of Reorganized Group following consummation of the Plan, Reorganized Group does not believe that registration under the Securities Act or comparable state laws is required with respect to the New Common Stock to be distributed to holders of Claims. Reorganized Group does, however, intend to list the New Common Stock on a national securities exchange or for quotation on a United States automated inter-dealer quotation system.

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state laws if three principal requirements are satisfied: (i) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in joint plan with the debtor, or of a successor to the debtor under the plan; (ii) the recipients of the securities must hold claims against or interests in the debtor; and (iii) the securities must be issued in exchange (or principally in exchange) for the recipient's claim against or interest in the debtor. The Debtors believe that the issuance of the New Common Stock

under the Plan to Claimholders, including the New Common Stock to be issued to ALPA, satisfies the requirements of Section 1145(a)(1) of the Bankruptcy Code and is, therefore, exempt from registration under the Securities Act and state securities laws. The Debtors further believe that (a) the offer and sale of New Common Stock to the Plan Investors are exempt from registration requirements pursuant to Section 4(2) of the Securities Act and, to the extent that such New Common Stock is issued in exchange for the Eastshore Financing Agreement Claim, pursuant to Section 1145(a)(1) of the Bankruptcy Code, (b) the issuance of the New Convertible Note to GECC, and the shares of New Common Stock issuable upon conversion thereof, is exempt from registration requirements pursuant to Section 1145(a)(1) of the Bankruptcy Code, and (c) the New Common Stock to be issued pursuant to the Management Compensation Plan will be the subject of registration pursuant to Form S-8 or exempt from, or not subject to, the registration requirements of the Securities Act.

**B.    Subsequent Transfers of New Equity**

        To the extent that the New Common Stock is issued under the Plan and is covered by Section 1145(a)(1) and (2) of the Bankruptcy Code, it may be resold by the holders thereof without registration unless, as more fully described below, the holder is an "underwriter" with respect to such securities. Generally, Section 1145(b)(l) of the Bankruptcy Code defines an "underwriter" as any person who:

                (i)      purchases a claim against, an interest in, or a claim for an administrative expense against the debtor, if such purchase is with a view to distributing any security received in exchange for such a claim or interest;

                (ii)     offers to sell securities offered under a plan for the holders of such securities;

                (iii)    offers to buy such securities from the holders of such securities, if the offer to buy is:

                        (A)     with a view to distributing such securities; and

                        (B)     under an agreement made in connection with the plan, the consummation of the plan, or with the offer or sale of securities under the plan; or

                (iv)     is an "issuer" with respect to the securities, as the term "issuer" is defined in Section 2(11) of the Securities Act.

        Under Section 2(11) of the Securities Act, an "issuer" includes any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control of the issuer.

        To the extent that Persons who receive New Common Stock pursuant to the Plan are deemed to be "underwriters" as defined in Section 1145(b) of the Bankruptcy Code, resales by such Persons would not be exempted by Section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Such Persons would, however, be permitted to sell such New Common Stock or other securities without registration if they are able to comply with the provisions of Rule 144 under the Securities Act. These rules permit the public sale of securities received by such Person if current information regarding the issuer is publicly available and if volume limitations and certain other conditions are met.

        Whether or not any particular person would be deemed to be an "underwriter" with respect to the New Common Stock or other security to be issued pursuant to the Plan would depend upon various facts and circumstances applicable to that person. Accordingly, the Debtors express no view as to whether any particular Person receiving New Common Stock or other securities under the Plan would be an "underwriter" with respect to such New Common Stock or other securities.

        Given the complex and subjective nature of the question of whether a particular holder may be an underwriter, the Debtors make no representation concerning the right of any Person to trade in the New Common Stock or other securities. The Debtors recommend that potential recipients of the New Common

Stock or other securities consult their own counsel concerning whether they may freely trade New Common Stock or other securities without compliance with the Securities Act, the Exchange Act or similar state and federal laws.

## XI.     CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

A summary description of certain material United States federal income tax consequences of the Plan is provided below. This description is for informational purposes only and, due to a lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various tax consequences of the Plan as discussed herein. Only the principal United States federal income tax consequences of the Plan to the Debtors and to holders of Claims who are entitled to vote or to accept or reject the Plan are described below. No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan. No rulings or determinations of the Internal Revenue Service (the "IRS") or any other tax authorities have been sought or obtained with respect to any tax consequences of the Plan, and the discussion below is not binding upon the IRS or such other authorities. No representations are being made regarding the particular tax consequences of the confirmation and consummation of the Plan to the Debtors or any holder of a Claim. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein.

The discussion of United States federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations, judicial authorities, published positions of the IRS and other applicable authorities, all as in effect on the date of this document and all of which are subject to change or differing interpretations (possibly with retroactive effect).

The following discussion does not address foreign, state or local tax consequences of the Plan, nor does it purport to address the United States federal income tax consequences of the Plan to special classes of taxpayers (e.g., banks and certain other financial institutions, insurance companies, tax-exempt organizations, governmental entities, persons that are, or hold their Claims through, pass-through entities, persons whose functional currency is not the United States dollar, foreign persons, dealers in securities or foreign currency, employees, persons who received their Claims pursuant to the exercise of an employee stock option or otherwise as compensation and persons holding Claims that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale or conversion transaction). Furthermore, the following discussion does not address United States federal taxes other than income taxes.

EACH HOLDER IS STRONGLY URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE UNITED STATES FEDERAL, STATE, AND LOCAL AND ANY FOREIGN TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN.

IRS 230 NOTICE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, WE INFORM YOU THAT, UNLESS EXPRESSLY STATED OTHERWISE, ANY U.S. FEDERAL TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF (I) AVOIDING PENALTIES UNDER THE INTERNAL REVENUE CODE OR (II) PROMOTING, MARKETING OR RECOMMENDING TO ANOTHER PARTY ANY TRANSACTION OR MATTER ADDRESSED HEREIN.

### A.     United States Federal Income Tax Consequences to the Debtors

#### 1.     *Cancellation of Indebtedness Income*

Upon implementation of the Plan, the amount of the Debtors' aggregate outstanding indebtedness will be reduced substantially. In general, the discharge of a debt obligation in exchange for an amount of cash and other property having a fair market value (or, in the case of a new debt instrument, an "issue price") less than the "adjusted issue price" of the debt gives rise to cancellation of indebtedness ("COD") income to the debtor, unless the payment of the debt obligation would have given rise to a deduction for