# EXHIBIT 15 – PART 6

federal income tax purposes. However, COD income is not taxable to the debtor if the debt discharge occurs in a Title 11 bankruptcy case. Rather, under the Tax Code, such COD income instead will reduce certain of the Debtors' tax attributes, generally in the following order: (a) net operating losses ("NOLs") and NOL carryforwards; (b) general business credit carryforwards; (c) minimum tax credit carryforwards; (d) capital loss carryforwards; (e) the tax basis of the Debtors' depreciable and nondepreciable assets (but not below the amount of its liabilities immediately after the discharge); and (f) foreign tax credit carryforwards. The reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined (i.e., such attributes may be available to offset taxable income that accrues between the date of discharge and the end of the Debtors' tax year). Any excess COD income over the amount of available tax attributes is not subject to United States federal income tax and has no other United States federal income tax impact.

Because some of the Debtors' outstanding indebtedness will be satisfied in exchange for New Common Stock under the Plan, the amount of COD income, and accordingly the amount of tax attributes required to be reduced, will depend in part on the fair market value of the New Common Stock. These values cannot be known with certainty until after the Effective Date. Thus, although it is expected that the Debtors may be required to reduce their tax attributes, the exact amount of such reduction cannot be predicted.

2.    *Disposition of Aircraft.*

The Debtors are in negotiations with certain aircraft lessors and/or mortgagees with respect to the disposition or use of such aircraft. The Debtors anticipate that, on the disposition of certain aircraft, they will recognize gain that is taxable as ordinary income for United States federal income tax purposes. The Debtors expect to offset any such taxable income with pre-Effective Date NOLs prior to any reduction of such NOLs by COD income that is realized.

3.    *Net Operating Losses—Section 382.*

The Debtors anticipate that they will experience an "ownership change" (within the meaning of Tax Code Section 382) on the Effective Date as a result of the cancellation of current equity holders' interests in Group and the issuance of equity to certain Claimholders and others pursuant to the Plan. As a result, the Debtors' ability to use any pre-Effective Date NOLs and capital loss carryovers to offset their income in any post-Effective Date taxable year (and in the portion of the taxable year of the ownership change following the Effective Date) to which such a carryover is made generally (subject to various exceptions and adjustments, some of which are described below) will be limited to the sum of (a) a regular annual limitation (prorated for the portion of the taxable year of the ownership change following the Effective Date), (b) the amount of the "recognized built-in gain" for the year which does not exceed the excess of their "net unrealized built-in gain" over previously recognized built-in gains (as the quoted terms are defined in Tax Code Section 382(h)), and (c) any carryforward of unused amounts described in (a) and (b) from prior years. Tax Code Section 382 may also limit the Debtors' ability to use "net unrealized built-in losses," if any, to offset future taxable income. It is uncertain whether the Debtors will have any such "net unrealized built-in losses." Moreover, the Debtors' loss carryovers will be subject to further limitations if the Debtors experience additional future ownership changes or if they do not continue their business enterprise for at least two years following the Effective Date. The Debtors do not expect to have any meaningful pre-Effective Date NOLs or capital loss carryovers following the Effective Date.

The operation and effect of Tax Code Section 382 will be materially different from that just described if the Debtors are subject to the special rules for corporations in bankruptcy provided in Tax Code Section 382(l)(5). In that case, the Debtors' ability to utilize their pre-Effective Date NOLs would not be limited as described in the preceding paragraph. However, several other limitations would apply to the Debtors under Tax Code Section 382(l)(5), including (a) the Debtors' NOLs would be calculated without taking into account deductions for interest paid or accrued in the portion of the current tax year ending on the Effective Date and all other tax years ending during the three-year period prior to the current tax year with respect to the Claims that are exchanged for New Common Stock pursuant to the Plan, and

(b) if the Debtors undergo another ownership change within two years after the Effective Date, the Debtors' Tax Code Section 382 limitation with respect to that ownership change will be zero.

It is uncertain whether the provisions of Tax Code Section 382(l)(5) would apply to the ownership change that is expected to occur as a result of the confirmation of the Plan. However, under Tax Code Section 382(l)(5)(H), the Debtors may elect not to have the special rules of Tax Code Section 382(l)(5) apply (in which case the Tax Code Section 382 rules, described above, generally will apply). The Debtors have not yet determined whether they would elect to have the Tax Code Section 382(l)(5) rules apply to the ownership change arising from the consummation of the Plan (assuming Tax Code Section 382(l)(5) would otherwise apply).

Because the Plan Investors will hold significant equity positions in Reorganized Group following the consummation of the Plan, if one or more Plan Investors dispose of all or a significant amount of such positions after the Effective Date, it could cause Reorganized Group to undergo an ownership change. This would generally limit (or possibly eliminate) Reorganized Group's ability to use NOLs and other tax attributes.

**B.      United States Federal Income Tax Consequences to Claimholders of the Debtors and Interestholders of Group**

The following discusses certain United States federal income tax consequences of the transactions contemplated by the Plan to Claimholders that are "United States holders," as defined below. The United States federal income tax consequences to Claimholders (including the character, timing and amount of income, gain or loss recognized) will depend upon, among other things, (1) whether the Claim and the consideration received in respect thereof are "securities" for United States federal income tax purposes; (2) the manner in which a holder acquired a Claim; (3) the length of time the Claim has been held; (4) whether the Claim was acquired at a discount; (5) whether the holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (6) whether the holder has previously included in its taxable income accrued but unpaid interest with respect to the Claim; (7) the holder's method of tax accounting; and (8) whether the Claim is an installment obligation for United States federal income tax purposes. Therefore, Claimholders should consult their own tax advisors for information that may be relevant to their particular situations and circumstances and the particular tax consequences to them of the transactions contemplated by the Plan. This discussion assumes that the Claimholder has not taken a bad debt deduction with respect to a Claim (or any portion thereof) in the current or any prior year and such Claim did not become completely or partially worthless in a prior taxable year. Moreover, the Debtors intend to claim deductions to the extent they are permitted to deduct any amounts they pay in Cash, stock, or other property pursuant to the Plan.

For purposes of the following discussion, a "United States holder" is a Claimholder that is (1) a citizen or individual resident of the United States, (2) a partnership or corporation created or organized in the United States or under the laws of the United States or any political subdivision thereof, (3) an estate the income of which is subject to United States federal income taxation regardless of its source, or (4) a trust if (a) a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States fiduciaries have the authority to control all substantial decisions of the trust or (b) the trust was in existence on August 20, 1996 and properly elected to be treated as a United States person.

*1.      Holders of Other Priority Claims*

A holder of an Other Priority Claim that receives Cash or other property in discharge of its Claim pursuant to the Plan will recognize income, gain or loss for United States federal income tax purposes in an amount equal to the difference between (1) Cash and the fair market value on the Effective Date of any property received by such holder in respect of its Claim, and (2) the holder's adjusted tax basis in the Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, the nature of the Claim in such holder's hands, whether the Claim constitutes a capital asset in the hands of the holder, whether the Claim

was purchased at a discount, and whether and to what extent the holder has previously claimed a bad debt deduction with respect to its Claim. A holder's adjusted tax basis in property received in exchange for its Claim will generally be equal to the fair market value of such property on the Effective Date. The holding period for any such property will begin on the day after the Effective Date.

### (a)    Accrued Interest

Under the Plan, some property may be distributed or deemed distributed to certain Claimholders with respect to their Claims for accrued interest. Holders of Claims for accrued interest that previously have not included such accrued interest in taxable income will be required to recognize ordinary income equal to the fair market value of the property received with respect to such Claims for accrued interest. Holders of Claims for accrued interest that have included such accrued interest in taxable income generally may take an ordinary deduction to the extent that such Claim is not fully satisfied under the Plan (after allocating the distribution between principal and accrued interest), even if the underlying Claim is held as a capital asset. The adjusted tax basis of the property received in exchange for Claims for accrued interest will equal the fair market value of such property on the Effective Date, and the holding period for the property received in exchange for such Claims will begin on the day after the Effective Date. The extent to which consideration distributable under the Plan is allocable to interest is not clear. Claimholders are advised to consult their own tax advisors to determine the amount, if any, of consideration received under the Plan that is allocable to interest.

### (b)    Market Discount

The market discount provisions of the Tax Code may apply to holders of certain Claims. In general, a debt obligation other than a debt obligation with a fixed maturity of one year or less that is acquired by a holder in the secondary market (or, in certain circumstances, upon original issuance) is a "market discount bond" as to that holder if its stated redemption price at maturity (or, in the case of a debt obligation having original issue discount, the revised issue price) exceeds the adjusted tax basis of the bond in the holder's hands immediately after its acquisition. However, a debt obligation will not be a "market discount bond" if such excess is less than a statutory de minimis amount. Gain recognized by a creditor with respect to a "market discount bond" will generally be treated as ordinary interest income to the extent of the market discount accrued on such bond during the creditor's period of ownership, unless the creditor elected to include accrued market discount in taxable income currently. A holder of a market discount bond may be required under the market discount rules of the Tax Code to defer deduction of all or a portion of the interest on indebtedness incurred or maintained to acquire or carry the bond. In such circumstances, such holder may be allowed to deduct such interest, in whole or in part, on the disposition of such bond.

### 2.    Holders of Miscellaneous Secured Claims.

A holder whose Miscellaneous Secured Claim is Reinstated pursuant to the Plan will not realize gain or loss unless either (i) such holder is treated as having received interest, damages or other income in connection with the Reinstatement, or (ii) such Reinstatement is considered a "significant modification" of the Claim. A holder who receives Cash or other property in exchange for its Miscellaneous Secured Claim pursuant to the Plan will generally recognize income, gain or loss for United States federal income tax purposes in an amount equal to the difference between (1) the amount of Cash or fair market value of the other property received in exchange for its Claim, and (2) the Claimholder's adjusted tax basis in its Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, the nature of the Claim in such holder's hands, whether the Claim constitutes a capital asset in the hands of the holder, whether the Claim was purchased at a discount, and whether and to what extent the holder has previously claimed a bad debt deduction with respect to its Claim. The United States federal income tax consequences of the receipt of Cash or other property allocable to accrued interest may be relevant and are summarized above in Section XI.B.1.a. In addition, the market discount provisions summarized above in Section XI.B.1.b may also apply.

3.    *Holders of Aircraft Secured Claims*

The holders of Aircraft Secured Claims may recognize income, gain or loss for United States federal income tax purposes with respect to the discharge of their Claims, depending on whether their Claims are Reinstated or, if not Reinstated, on the outcome of their negotiations with the Debtors. A holder whose Aircraft Secured Claim is Reinstated pursuant to the Plan will not realize income, gain or loss unless either (i) such holder is treated as having received interest, damages or other income in connection with the Reinstatement, or (ii) such Reinstatement is considered a "significant modification" of the Claim. A holder who receives Cash or other property in exchange for its Aircraft Secured Claim pursuant to the Plan will generally recognize income, gain or loss for United States federal income tax purposes in an amount equal to the difference between (1) the amount of Cash or fair market value of the other property received in exchange for its Claim, and (2) the Claimholder's adjusted tax basis in its Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, the nature of the Claim in such holder's hands, whether the Claim constitutes a capital asset in the hands of the holder, whether the Claim was purchased at a discount, and whether and to what extent the holder has previously claimed a bad debt deduction with respect to its Claim. The United States federal income tax consequences of the receipt of Cash or other property allocable to accrued interest may be relevant and are summarized above in Section XI.B.1.a. In addition, the market discount provisions summarized above in Section XI.B.1.b may also apply.

4.    *Holders of General Unsecured Convenience Claims*

A holder of General Unsecured Convenience Claims that receives Cash in discharge of its Claim pursuant to the Plan will generally recognize income, gain or loss for United States federal income tax purposes in an amount equal to the difference between (1) the amount of Cash received in exchange for its Claim, and (2) the Claimholder's adjusted tax basis in its Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, the nature of the Claim in such holder's hands, whether the Claim constitutes a capital asset in the hands of the holder, whether the Claim was purchased at a discount, and whether and to what extent the holder has previously claimed a bad debt deduction with respect to its Claim. The United States federal income tax consequences of the receipt of Cash or other property allocable to accrued interest may be relevant and are summarized above in Section XI.B.1.a. In addition, the market discount provisions summarized above in Section XI.B.1.b may also apply.

5.    *Holders of General Unsecured Claims*

(a)    *Holders of General Unsecured Claims of Group*

Pursuant to the Plan, Group will issue Unsecured Creditors Stock and to the holders of General Unsecured Claims of Group to discharge such Claims. The United States federal income tax consequences arising from the Plan to holders of General Unsecured Claims will vary depending upon, among other things, whether such Claims constitute "securities" for United States federal income tax purposes. The determination of whether a debt instrument constitutes a "security" depends upon an evaluation of the nature of the debt instrument. Generally, corporate debt instruments with maturities when issued of less than five years are not considered securities, and corporate debt instruments with maturities when issued of ten years or more are considered securities. Each holder is urged to consult its tax advisor regarding the status of its Claim.

If such Claims of Group constitute "securities" for United States federal income tax purposes, the exchange of such Claims for Unsecured Creditors Stock should constitute a "recapitalization" for United States federal income tax purposes. As a result, except as discussed below with respect to Claims for accrued interest and accrued market discount, a holder of such Claims of Group should recognize gain, but not loss, with respect to each Claim surrendered in an amount equal to the lesser of (1) the amount of gain realized (i.e., the excess of the fair market value of any property received by such holder in respect of its Claim over the adjusted tax basis of such Claim), excluding any such property received in respect of a Claim for accrued interest that had not been included in income, and (2) the "boot" (as defined below)

_ 122

received by such holder in respect of its Claim (other than with respect to any Claim for such accrued interest). A holder should be treated as receiving "boot" to the extent of the fair market value of any property other than shares of Unsecured Creditors Stock received by the holder. Any such gain recognized will generally be treated as capital gain if the Claim of Group is a capital asset in the hands of the Claimholder. In addition, a holder's aggregate adjusted tax basis in the Unsecured Creditors Stock (other than the Unsecured Creditors Stock received for accrued interest) should be equal to the aggregate adjusted tax basis in the Claims exchanged therefor (exclusive of any basis in such Claim attributable to accrued interest), decreased by the amount of the boot received, and increased by any gain recognized, and such holder's holding period for the Unsecured Creditors Stock (other than Unsecured Creditors Stock received for accrued interest) will include the holding period of the Claims of Group exchanged therefor, provided that such Claims are held as capital assets on the Effective Date. A holder's adjusted tax basis in boot received, if any, will equal the fair market value of such boot on the Effective Date, and the holder's holding period in such boot will begin on the day after the Effective Date.

In addition, as is discussed in Section XI.B.1.a. above, holders of General Unsecured Claims of Group will recognize ordinary income to the extent that the consideration they receive in discharge of their Claims is treated as received in satisfaction of accrued and unpaid interest with respect to such Claims. Moreover, under the market discount rules discussed in Section XI.B.1.b. above, any accrued but unrecognized market discount with respect to Claims generally will be treated as ordinary income to the extent of the gain recognized in connection with the recapitalization described above. Any remaining accrued but unrecognized market discount generally will be treated as ordinary income to the extent of the gain recognized upon the subsequent disposition of Unsecured Creditors Stock received in exchange for the Claim. The treatment of accrued market discount in a nonrecognition transaction is, however, subject to the issuance of Treasury regulations that have not yet been promulgated. In the absence of such regulations, the application of the market discount rules in the present transaction is uncertain. If a holder of a Claim was required under the market discount rules of the Tax Code to defer its deduction of all or a portion of the interest on indebtedness, if any, incurred or maintained to acquire or carry the Claim, continued deferral of the deduction for interest on such indebtedness may be required. Any such deferred interest expense would be attributed to the Unsecured Creditors Stock received in exchange for the Claim, and would be treated as interest paid or accrued in the year in which the shares of Unsecured Creditors Stock are disposed.

If such General Unsecured Claims of Group do not constitute "securities" for United States federal income tax purposes, the exchange of such Claims for Unsecured Creditors Stock should constitute a taxable exchange for United States federal income tax purposes. As a result, a United States Claimholder would generally recognize income, gain or loss for United States federal income tax purposes in an amount equal to the difference between (1) the fair market value on the Effective Date of the Unsecured Creditors Stock received in exchange for its Claim, and (2) the Claimholder's adjusted tax basis in its Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, the nature of the Claim in such holder's hands, whether the Claim constitutes a capital asset in the hands of the holder, whether the Claim was purchased at a discount, and whether and to what extent the holder has previously claimed a bad debt deduction with respect to its Claim. Any such gain recognized would generally be treated as ordinary income to the extent that the Unsecured Creditors Stock are received in respect of accrued but unpaid interest or accrued market discount that, in either case, have not been previously taken into account under the Claimholder's method of accounting. See Sections XI.B.1.a and XI.B.1.b above. A Claimholder recognizing a loss as a result of the Plan may be entitled to a bad debt deduction, either in the taxable year of the Effective Date or a prior taxable year. A Claimholder's aggregate tax basis in the Unsecured Creditors Stock received in exchange for its Claims would generally be equal to the aggregate fair market value of such stock on the Effective Date. Any gain or loss would be long-term gain or loss if the Claimholder's holding period for its Claims was more than one year on the Effective Date. The holding period for Unsecured Creditors Stock received pursuant to the Plan would begin on the day after the Effective Date.

(b)    *Holders of General Unsecured Claims of USAI, PSA, Piedmont and Material Services*

Pursuant to the Plan, Group will issue Unsecured Creditors Stock to the holders of General Unsecured Claims of USAI, PSA, Piedmont, and Material Services to discharge such General Unsecured Claims. For United States federal income tax purposes, the exchange of such Claims for Unsecured Creditors Stock should constitute a taxable exchange for United States federal income tax purposes. As a result, a United States Claimholder would generally recognize income, gain or loss for United States federal income tax purposes in an amount equal to the difference between (1) the fair market value on the Effective Date of the Unsecured Creditors Stock received in exchange for its Claim, and (2) the Claimholder's adjusted tax basis in its Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, the nature of the Claim in such holder's hands, whether the Claim constitutes a capital asset in the hands of the holder, whether the Claim was purchased at a discount, and whether and to what extent the holder has previously claimed a bad debt deduction with respect to its Claim. Any such gain recognized would generally be treated as ordinary income to the extent that the Unsecured Creditors Stock are received in respect of accrued but unpaid interest or accrued market discount that, in either case, have not been previously taken into account under the Claimholder's method of accounting. See Sections XI.B.1.a and XI.B.1.b above. A Claimholder recognizing a loss as a result of the Plan may be entitled to a bad debt deduction, either in the taxable year of the Effective Date or a prior taxable year. A Claimholder's aggregate tax basis in the Unsecured Creditors Stock received in exchange for its Claims would generally be equal to the aggregate fair market value of such stock on the Effective Date. Any gain or loss would be long-term gain or loss if the Claimholder's holding period for its Claims was more than one year on the Effective Date. The holding period for Unsecured Creditors Stock received pursuant to the Plan would begin on the day after the Effective Date.

6.    *GECC Claims, GEAE Claims, ATSB Loan Claims, Airbus Claim and PBGC Claims*

The tax consequences of the Plan to the holders of the claims referenced above are not discussed herein, and such holders should consult their own tax advisor regarding the tax consequences to them of the receipt of cash or property in exchange for their claims.

7.    *Holders of Subordinated Securities Claims*

A holder who holds Subordinated Securities Claims of Group will generally recognize a loss for United States federal income tax purposes in an amount equal to the holder's adjusted tax basis in its Subordinated Securities Claims cancelled under the Plan. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, the nature of the Claim in such holder's hands, whether the Claim constitutes a capital asset in the hands of the holder, whether the Claim was purchased at a discount, and whether and to what extent the holder has previously claimed a bad debt deduction with respect to its Claim.

8.    *Existing Interestholders*

An existing Interestholder who holds existing common stock of Group will generally recognize a loss for United States federal income tax purposes in an amount equal to the stockholder's adjusted tax basis in its existing common stock of Group cancelled under the Plan. The character of such loss as capital loss or as ordinary loss will be determined by a number of factors, including the tax status of the holder and whether the Interestholder holds its common stock of Group as a capital asset.

9.    *Other Claimholders*

To the extent certain holders of Claims reach an agreement with the Debtors to have their Claims satisfied, settled, released, exchanged or otherwise discharged in a manner other than as discussed above,

such holders should consult with their own tax advisors regarding the tax consequences to them of such treatment.

      *10*     *Information Reporting and Backup Withholding.*

      Certain payments, including payments in respect of accrued interest or market discount, are generally subject to information reporting by the payor to the IRS. Moreover, such reportable payments are subject to backup withholding under certain circumstances. Under the Tax Code's backup withholding rules, a United States holder may be subject to backup withholding at the applicable rate with respect to certain distributions or payments pursuant to the Plan, unless the holder (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact, or (b) provides a correct United States taxpayer identification number and certifies under penalty of perjury that the holder is a U.S. person, the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income.

      Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's United States federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS.

## C.    Importance of Obtaining Professional Tax Assistance

      THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIMHOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, CLAIMHOLDERS ARE STRONGLY URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE, AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN, INCLUDING WITH RESPECT TO TAX REPORTING AND RECORD KEEPING REQUIREMENTS.

## XII.    FEASIBILITY OF THE PLAN, ACCEPTANCE OF THE PLAN AND THE BEST INTERESTS TEST

## A.    Feasibility of the Plan

      To confirm the Plan, the Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors. This requirement is imposed by Section 1129(a)(11) of the Bankruptcy Code and is referred to as the "feasibility" requirement. The Debtors believe that they will be able to timely perform all obligations described in the Plan and, therefore, that the Plan is feasible.

      To demonstrate the feasibility of the Plan, the Debtors have prepared financial Projections for fiscal years 2005 through 2007, as set forth in Appendix C attached to this Disclosure Statement. These Projections take into account the Merger. The Projections show that the Reorganized Debtors should have sufficient cash flow to pay and service their debt obligations, and to handle their operations. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of Section 1129(a)(11) of the Bankruptcy Code. As noted in the Projections, however, the Debtors caution that no representations can be made as to the accuracy of the Projections or as to the Reorganized Debtors' ability to achieve the projected results. Many of the assumptions upon which the Projections are based are subject to uncertainties outside the control of the Reorganized Debtors. Some assumptions inevitably will not materialize, and events and circumstances occurring after the date on which the Projections were prepared may be different from those assumed or may be unanticipated, and may adversely affect the Reorganized Debtors' financial results.

Therefore, the actual results may vary from the projected results and the variations may be material and adverse. See Section IX, "Certain Risk Factors to Be Considered," for a discussion of certain risk factors that may affect financial feasibility of the Plan.

THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS, THE PRACTICES RECOGNIZED TO BE IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES, OR THE RULES AND REGULATIONS OF THE SECURITIES AND EXCHANGE COMMISSION REGARDING PROJECTIONS. FURTHERMORE, THE PROJECTIONS HAVE NOT BEEN AUDITED BY THE DEBTORS' INDEPENDENT ACCOUNTANTS. ALTHOUGH PRESENTED WITH NUMERICAL SPECIFICITY, THE PROJECTIONS ARE BASED UPON A VARIETY OF ASSUMPTIONS, SOME OF WHICH IN THE PAST HAVE NOT BEEN ACHIEVED AND WHICH MAY NOT BE REALIZED IN THE FUTURE, AND ARE SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS. CONSEQUENTLY, THE PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTORS, OR ANY OTHER PERSON, THAT THE PROJECTIONS WILL BE REALIZED. ACTUAL RESULTS MAY VARY MATERIALLY FROM THOSE PRESENTED IN THE PROJECTIONS.

**B.    Acceptance of the Plan**

As a condition to confirmation, the Bankruptcy Code requires that each Class of Impaired Claims and Interests vote to accept the Plan, except under certain circumstances.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the Plan. Thus, a Class of Claims will have voted to accept the Plan if two-thirds in amount actually voting and a majority in number actually voting cast their Ballots in favor of acceptance. Under Section 1126(d) of the Bankruptcy Code, a Class of Interests has accepted the Plan if holders of such Interests holding at least two-thirds in amount actually voting have voted to accept the Plan. Holders of claims or interests who fail to vote are not counted as either accepting or rejecting a plan.

**C.    Best Interests Test**

Even if a plan is accepted by each class of holders of claims and interests, the Bankruptcy Code requires a bankruptcy court to determine that the plan is in the "best interests" of all holders of claims and interests that are impaired by the plan and that have not accepted the plan. The "best interests" test, as set forth in Section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court to find either that (i) all members of an impaired class of claims or interests have accepted the plan, or (ii) the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under Chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to members of each impaired class of holders of claims and interests if the debtor were liquidated under Chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its Chapter 11 case were converted to a Chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a Chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by the costs of liquidation under Chapter 7 of the Bankruptcy Code, including the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, additional administrative claims and other wind-down expenses. The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full

from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity interests. The liquidation also would prompt the rejection of a large number of executory contracts and thereby create a significantly higher number of unsecured claims.

Once the court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under a debtor's plan, then such plan is not in the best interests of creditors and equity security holders.

D.     Estimated Valuation of the Reorganized Debtors

A copy of the reorganization valuation analysis is attached to this Disclosure Statement as Appendix D.

E.     Application of the Best Interests Test to the Liquidation Analysis and the Valuation of the Reorganized Debtors

A liquidation analysis prepared with respect to each of the Debtors is attached as Appendix B to this Disclosure Statement. The Debtors believe that any liquidation analysis is uncertain. For example, the liquidation analysis necessarily contains an estimate of the amount of Claims which will ultimately become Allowed Claims. In preparing the liquidation analysis, the Debtors have projected an amount of Allowed Claims based upon a review of their scheduled claims. Additions were made to the scheduled claims to adjust for estimated claims related to postpetition obligations, pension liabilities and other employee-related obligations, post-retirement obligations and certain lease damage claims. No order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the liquidation analysis. The estimate of the amount of Allowed Claims set forth in the liquidation analysis should not be relied on for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims and Interests under the Plan. In addition, as noted above, the valuation analysis of the Reorganized Debtors also contains numerous estimates and assumptions. For example, the value of the New Common Stock cannot be determined with precision due to the absence of a public market for the New Common Stock.

Notwithstanding the difficulties in quantifying recoveries to creditors with precision, the Debtors believe that, taking into account the liquidation analysis and the valuation analysis of the Reorganized Debtors, the Plan meets the "best interests" test of Section 1129(a)(7) of the Bankruptcy Code. The Debtors believe that the members of each impaired class will receive at least as much under the Plan as they would in a liquidation in a hypothetical Chapter 7 case. Creditors will receive a better recovery through the distributions contemplated by the Plan because the continued operation of the Debtors as going concerns rather than a forced liquidation will allow the realization of more value for the Debtors' assets. Moreover, many of the Debtors' employees, who in large number, will retain their jobs and most likely make few if any other claims against the Estates. Lastly, in the event of liquidation, the aggregate amount of unsecured claims would likely increase significantly, and such claims would be subordinated to priority claims that will be created. Also, a Chapter 7 liquidation would give rise to additional administrative claims. For example, employees would file claims for wages, pensions and other benefits, some of which would be entitled to priority. Landlords, aircraft lessors and mortgage holders would likely file large claims for both unsecured and administrative amounts. The resulting increase in both general unsecured and priority claims would decrease percentage recoveries to unsecured creditors of each of the Debtors. Furthermore, while under a liquidation scenario unsecured creditors will not receive a distribution, as the valuation analysis indicates, the New Common Stock will have a value. All of these factors lead to the conclusion that recoveries under the Plan would be at least as much, and in many cases significantly greater, than the recoveries available in a Chapter 7 liquidation.

F.     Confirmation Without Acceptance of All Impaired Classes:  The 'Cramdown' Alternative

Section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if it has not been accepted by all impaired classes, as long as at least one impaired class of Claims has accepted it.  The Court may confirm the Plan at the request of the Debtors notwithstanding the Plan's rejection (or deemed rejection) by impaired Classes as long as the Plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired Class that has not accepted it.  A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

A plan is fair and equitable as to a class of secured claims that rejects such plan if the plan provides (1)(a) that the holders of claims included in the rejecting class retain the liens securing those claims whether the property subject to those liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and (b) that each holder of a claim of such class receives on account of that claim deferred cash payments totaling at least the allowed amount of that claim, of a value, as of the effective date of the plan, of at least the value of the holder's interest in the estate's interest in such property; (2) for the sale, subject to Section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of the liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on proceeds under clause (1) or (2) of this paragraph; or (3) for the realization by such holders of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims which rejects a plan if the plan provides (1) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim, or (2) that the holder of any claim or interest that is junior to the claims of such rejecting class will not receive or retain on account of such junior claim or interest any property.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (1) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest, or (2) that the holder of any interest that is junior to the interest of such rejecting class will not receive or retain under the plan on account of such junior interest any property.

Because holders of Class Group-10 Interests, which includes all capital stock and warrants in Group, and Class Group-11 Claims, which include all subordinated securities claims against Group, are receiving no distribution on account of such Interests and Claims under the Plan, their votes are not being solicited and they are deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Accordingly, the Debtors are seeking confirmation of the Plan pursuant to Section 1129(b) of the Bankruptcy Code with respect to such Classes and may seek confirmation pursuant thereto as to other Classes if such Classes vote to reject the Plan.

G.     Conditions to Confirmation and/or Consummation of the Plan

1.     Conditions to Confirmation.

The following are conditions precedent to confirmation of the Plan:

(a)     the Bankruptcy Court shall have approved a Disclosure Statement with respect to the Plan in form and substance acceptable to the Debtors and America West, in their sole and absolute discretion, and reasonably acceptable to GECC and the ATSB; and

(b)     each of the Plan and the Confirmation Order shall be in form and substance acceptable to the Debtors and America West, in their sole and absolute discretion, and reasonably acceptable to GECC and the ATSB in its capacity as a lender under the ATSB Loan

2.  *Conditions to Consummation for All Debtors.*

  The Effective Date shall occur on or prior to December 31, 2005, unless such date is extended by the Debtors. The following are conditions precedent to the occurrence of the Effective Date, each of which may be satisfied or waived in accordance with Section 12.3 of the Plan:

    (a)  the Bankruptcy Court shall have entered one or more orders (which may include the Confirmation Order) authorizing the assumption of unexpired leases and executory contracts by the Debtors as contemplated by Section 8.1 of the Plan;

    (b)  the Plan Investors shall have invested or committed to invest an aggregate of at least $375 million and such investments shall have been made;

    (c)  all conditions precedent to the funding under the Investment Agreement shall have been satisfied or waived in accordance with the terms thereof;

    (d)  all conditions precedent to consummation of the Merger, pursuant to the Merger Agreement, shall have occurred;

    (e)  all conditions precedent to the closing of the amendments to the ATSB Loan and the AWA ATSB Loan in accordance with the ATSB Term Sheet shall have been satisfied or waived in accordance with the terms thereof;

    (f)  the Confirmation Order shall have been entered by the Bankruptcy Court and shall remain unstayed;

    (g)  there shall not exist more than $10,000,000 of Administrative Claims (including contingent liabilities) arising out of or related to any compensation and benefit plan of the Debtors that is subject to Section 302 of ERISA or Section 412 of the Internal Revenue Code other than any claims relating to Amounts incurred in the ordinary course of business; and

    (h)  the Confirmation Date shall have occurred.

**H.  Waiver of Conditions to Confirmation and/or Consummation of the Plan**

  The conditions set forth in Section 12.2 of the Plan may be waived by the Debtors, such waiver to be acceptable to America West and the ATSB, without any notice to parties-in-interest or the Bankruptcy Court and without a hearing; provided, however, that no such waiver shall be binding on any party to any Investment Agreement or any agreement entered into in connection therewith, except in each case as permitted thereunder. The failure to satisfy or waive any condition to the Confirmation Order or the Effective Date may be asserted by the Debtors in their sole discretion regardless of the circumstances giving rise to the failure of such condition to be satisfied (including any action or inaction by the Debtors in their sole discretion). The failure of the Debtors in their sole discretion to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

**I.  Retention of Jurisdiction**

  Pursuant to Sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and the Plan, including, among others, the following matters:

    (i)  to hear and determine pending motions for (A) the assumption or rejection or (B) the assumption and assignment of executory contracts or unexpired leases to which the Debtors are a party or with respect to which the Debtors may be liable, and to hear and determine the allowance of Claims resulting therefrom including the amount of Cure, if any, required to be paid;

    (ii)  to adjudicate any and all adversary proceedings, applications, and contested matters that may be commenced or maintained pursuant to the Chapter 11 Cases or the Plan,

proceedings to adjudicate the allowance of Disputed Claims and Disputed Interests, and all controversies and issues arising from or relating to any of the foregoing;

(iii)    to adjudicate any and all disputes arising from or relating to the distribution or retention of the New Common Stock or other consideration under or pursuant to the Plan or Merger Agreement;

(iv)    to ensure that distributions to Allowed Claimholders and Allowed Interestholders are accomplished as provided herein;

(v)    to hear and determine any and all objections to the allowance of Claims and Interests and the estimation of Claims, both before and after the Confirmation Date, including any objections to the classification of any Claim or Interest, and to allow or disallow any Claim or Interest, in whole or in part;

(vi)    to enter and implement such orders as may be appropriate if the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(vii)    to issue orders in aid of execution, implementation, or consummation of the Plan;

(viii)    to consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(ix)    to hear and determine all applications for compensation and reimbursement of Professional Claims and Ordinary Course Professional Claims under the Plan or under Sections 330, 331, 503(b), 1103 and 1129(a)(4) of the Bankruptcy Code;

(x)    to determine requests for the payment of Claims entitled to priority under Section 507(a)(1) of the Bankruptcy Code, including compensation of and reimbursement of expenses of parties entitled thereto;

(xi)    to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan and/or the Confirmation Order, including, except as expressly set forth therein, disputes arising under agreements, documents, or instruments executed in connection with the Plan;

(xii)    to hear and determine all suits or adversary proceedings to recover assets of the Debtors and property of their Estates, wherever located;

(xiii)    to hear and determine any dispute arising under or in connection with the Investment Agreements, the Merger Agreement, or, except as expressly set forth therein, any instruments, documents or agreements executed or delivered pursuant thereto or in connection therewith or any dispute otherwise related to the transactions contemplated thereby;

(xiv)    to hear and determine any disputes arising under or relating to the Bidding Procedures Motion or the Bidding Procedures Order;

(xv)    to determine whether Debtors are in grave and imminent danger such that they will be forced to suspend, discontinue, or materially reduce their mainline flight operations, as compared to the operations as of the effective date of their Section 1114 agreements with the IAMAW and the Retiree Committee, such that they may seek relief pursuant Section 1114 in accordance with the Consent Order Approving Agreement to Modify Certain Retiree Benefits, entered on January 11, 2005 and the January 11, 2005 Consent Order Approving Agreement With the International Association of Machinists and Aerospace Workers to Modify Certain Retiree Health Benefits;

(xvi)    to hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505 and 1146 of the Bankruptcy Code;

(xvii)    to hear any other matter not inconsistent with the Bankruptcy Code;

(xviii)    to hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination

of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

        (xix)    to enter a final decree closing the Chapter 11 Cases; and

        (xx)    to enforce all orders previously entered by the Bankruptcy Court.

Unless otherwise specifically provided herein or in a prior order of the Bankruptcy Court, the Bankruptcy Court shall have exclusive jurisdiction to hear and determine disputes concerning Claims, Interests and Retained Actions. Notwithstanding the foregoing, the Debtors and any party may agree in writing that (i) the jurisdiction of the Bankruptcy Court, as delineated in Article XIII of the Plan, shall not be exclusive, but concurrent with other courts of competent jurisdiction or (ii) such other court of competent jurisdiction shall have sole jurisdiction with respect to any dispute relating to any agreements to be entered into in connection with the Plan.

## XIII.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors believe that the Plan, including the Merger, affords holders of Claims the potential for the greatest realization on the Debtors' assets and, therefore, is in the best interests of such holders.

If the Plan is not confirmed, however, the theoretical alternatives include: (a) continuation of the pending Chapter 11 Cases; (b) an alternative plan or plans of reorganization; or (c) liquidation of the Debtors under Chapter 7 or Chapter 11 of the Bankruptcy Code.[8]

### A.    Continuation of the Bankruptcy Case

If the Debtors remain in Chapter 11, they could continue to operate their businesses and manage their properties as debtors-in-possession, but they would remain subject to the restrictions imposed by the Bankruptcy Code. It is not clear whether the Debtors could survive as going concerns in protracted Chapter 11 Cases. The Debtors could have difficulty sustaining the high costs and the erosion of market confidence which may be caused if the Debtors remain Chapter 11 debtors-in-possession. In addition, the Debtors are currently operating through the continued use of cash collateral pursuant to the ATSB Cash Collateral Order. The ATSB Cash Collateral Order will expire no earlier than August 19, 2005 and, if the Debtors were not pursuing the Merger Agreement, it is unclear whether the Debtors would be able to obtain authorization from the Court to continue using cash collateral thereafter, and the period of any such extension, if obtained.

### B.    Alternative Plans of Reorganization

If the Plan is not confirmed, the Debtors, or, after the expiration of the Debtors' exclusive period in which to propose and solicit a reorganization plan, any other party in interest in the Chapter 11 Cases, could propose a different plan or plans. Such plans might involve either a reorganization and continuation of the Debtors' businesses, an alternative transaction to the Merger, or an orderly liquidation of its assets, or a combination of such alternatives. The Debtors worked to develop an alternative "stand alone" plan of reorganization pursuant to the Transformation Plan described in Section VII.C of this Disclosure Statement. As of the date of this Disclosure Statement, under the current revenue and fuel cost environment, there is no feasible alternative plan of reorganization that has been developed by the Debtors.

---

[8] As provided in Section 14.5 of the Plan, the Debtors, with the consent of America West, reserve the right to revoke or withdraw the Plan, at any time prior to the Effective Date, either entirely or with respect to one or more of the Debtors. If the Plan is revoked or withdrawn with respect to fewer than all of the Debtors, such revocation or withdrawal shall not affect the enforceability of the Plan as it relates to the Debtors for which the Plan is not revoked.

C.    Liquidation Under Chapter 7 or Chapter 11

If no plan is confirmed, the Debtors' Chapter 11 Cases may be converted to a case under Chapter 7 of the Bankruptcy Code. In a Chapter 7 case, a trustee or trustees would be appointed to liquidate the assets of the Debtors. It is impossible to predict precisely how the proceeds of the liquidation, if any, would be distributed to the respective holders of Claims against the Debtors.  ,

However, the Debtors believe that creditors would lose the substantially higher going concern value if the Debtors were forced to liquidate. In addition, the Debtors believe that in liquidation under Chapter 7, before creditors received any distribution, additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants and other professionals to assist such trustees would cause a substantial diminution in the value of the Estates. The assets available for distribution to creditors would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, which would arise by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of operations and the failure to realize the greater going concern value of the Debtors' assets.

The Debtors may also be liquidated pursuant to a Chapter 11 plan. In a liquidation under Chapter 11, the Debtors' assets could be sold in an orderly fashion, a process that may be conducted over a more extended period of time than in a liquidation under Chapter 7. Thus, a Chapter 11 liquidation might result in larger recoveries than a Chapter 7 liquidation, but the potential delay in distributions could result in lower present values received and higher administrative costs. Because a trustee is not required in a Chapter 11 case, expenses for professional fees could be lower than in a Chapter 7 case, in which a trustee must be appointed. Any distribution to the Claimholders and Interestholders under a Chapter 11 liquidation plan potentially may be delayed substantially.

The Debtors' liquidation analysis, prepared with its accountants and financial advisors, is premised upon a hypothetical liquidation in a Chapter 7 case and is attached as Appendix B to this Disclosure Statement. In the analysis, the Debtors have taken into account the nature, status, and underlying value of their assets, the ultimate realizable value of their assets, and the extent to which such assets are subject to liens and security interests.

The likely form of any liquidation would be the sale of individual assets. Based on this analysis, it is likely that a Chapter 7 liquidation of the Debtors' assets would produce less value for distribution to creditors than that recoverable in each instance under the Plan. In the opinion of the Debtors, the recoveries projected to be available in a Chapter 7 liquidation are not likely to afford holders of Claims and holders of Interests as great a realization potential as does the Plan.

XIV.  VOTING REQUIREMENTS

The Bankruptcy Court may confirm the Plan only if it determines that the Plan complies with the technical requirements of Chapter 11 of the Bankruptcy Code and that the disclosures by the Debtors concerning the Plan have been adequate and have included information concerning all payments made or promised by the Debtors in connection with the Plan and the Chapter 11 Cases. In addition, the Bankruptcy Court must determine that the Plan has been proposed in good faith and not by any means forbidden by law, and under Federal Rule of Bankruptcy Procedure 3020(b)(2), it may do so without receiving evidence if no objection is timely filed.

In particular, the Bankruptcy Code requires the Bankruptcy Court to find, among other things, that (a) the Plan has been accepted by the requisite votes of all Classes of impaired Claims and Interests unless approval will be sought under Section 1129(b) of the Bankruptcy Code in spite of the nonacceptance by one or more such Classes, (b) the Plan is "feasible," which means that there is a reasonable probability that the Debtors will be able to perform their obligations under the Plan and continue to operate their businesses without further financial reorganization or liquidation, and (c) the Plan is in the "best interests" of all Claimholders and Interestholders, which means that such holders will receive at least as much under the Plan as they would receive in a liquidation under Chapter 7 of the Bankruptcy Code. The Bankruptcy

Court must find that all conditions mentioned above are met before it can confirm the Plan. Thus, even if all the Classes of impaired Claims against the Debtors accept the Plan by the requisite votes, the Bankruptcy Court must still make an independent finding that the Plan satisfies these requirements of the Bankruptcy Code, that the Plan is feasible, and that the Plan is in the best interests of the holders of Claims against and Interests in the Debtors.

A.      Parties in Interest Entitled to Vote

Under Section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (a) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, a holder of a claim or interest may vote to accept or to reject a plan if (1) no party in interest has objected to such claim or interest, and (2) the claim or interest is impaired by the Plan. If the holder of an impaired claim or impaired interest will not receive any distribution under the plan in respect of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan and the plan proponent need not solicit such holder's vote. If the claim or interest is not impaired, the Bankruptcy Code deems that the holder of such claim or interest has accepted the plan and the plan proponent need not solicit such holder's vote.

Except for holders of Claims or Interests in Classes Group 10 and Group-11 (who are presumed to have rejected the Plan), the holder of a Claim that is or may be Impaired under the Plan is entitled to vote to accept or reject the Plan if (1) the Plan provides a distribution in respect of such Claim, and (2) (a) the Claim has been scheduled by the respective Debtor (and such Claim is not scheduled as disputed, contingent, or unliquidated), (b) such Claimholder has timely filed a Proof of Claim as to which no objection has been filed, or (c) such Claimholder has timely filed a motion pursuant to Federal Rule of Bankruptcy Procedure 3018(a) seeking temporary allowance of such Claim for voting purposes only and the Bankruptcy Court has ordered that such Claimholder may vote.

A vote may be disregarded if the Court determines, pursuant to Section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code. The Solicitation Procedures Order also sets forth assumptions and procedures for tabulating Ballots, including Ballots that are not completed fully or correctly.

B.      Classes Impaired Under the Plan

        1.      *Non- Voting Impaired Classes of Claims and Interests.*

Class Group-10 and Class Group-11 are not entitled to receive or retain any property under the Plan. Under Section 1126(g) of the Bankruptcy Code, Claimholders and Interestholders in such Classes are deemed to reject the Plan, and the votes of such Claimholders and Interestholders will not be solicited.

        2.      *Unimpaired Classes of Claims and Interests.*

The Classes listed below are Unimpaired by the Plan.

| USAI -1 | Group -1 | PSA-1 | Piedmont-1 | Material Services-1 |
| USAI -5 | Group-5 | PSA-5 | Piedmont-5 | Material Services-5 |
| USAI -6 | Group-6 | PSA-6 | Piedmont-6 | Material Services-6 |

      *3.*     *Presumed Acceptances by Certain Classes of Interests.*

Pursuant to the agreement of the Interestholders, holders of Interests in Classes USAI-10, Piedmont-10, PSA-10, and Material Services-10 are conclusively presumed to have accepted the Plan as such Interestholders are proponents of the Plan, and the votes of such Interestholders will not be solicited.

      *4.*     *Voting Impaired Classes of Claims and Interests.*

All other Classes are Impaired under, and entitled to vote to accept or reject, the Plan.

## XV.   CONCLUSION

### A.   Hearing on and Objections to Confirmation

      *1.*     *Confirmation Hearing.*

The hearing on confirmation of the Plan has been scheduled for _____, 2005 at ____ a.m. (prevailing Eastern time). Such hearing may be adjourned from time to time by announcing such adjournment in open court, all without further notice to parties in interest, and the Plan may be modified by the Debtors pursuant to Section 1127 of the Bankruptcy Code prior to, during, or as a result of that hearing, without further notice to parties in interest.

      *2.*     *Date Set for Filing Objections to Confirmation of the Plan.*

The time by which all objections to confirmation of the Plan must be filed with the Court and received by the parties listed in the Confirmation Hearing Notice has been set for _____, 2005, at _____ p.m. (prevailing Eastern time). A copy of the Confirmation Hearing Notice is enclosed with this Disclosure Statement.

### B.   Recommendation

The Plan provides for an equitable and early distribution to creditors of the Debtors, preserves the value of the business as a going concern, and preserves the jobs of employees. The Debtors believe that any alternative to confirmation of the Plan, such as liquidation or attempts by another party in interest to file a plan, could result in significant delays, litigation, and costs, as well as the loss of jobs by the employees. Moreover, the Debtors believe that their creditors will receive greater and earlier recoveries under the Plan than those that would be achieved in liquidation or under an alternative plan. FOR THESE REASONS, THE DEBTORS URGE YOU TO RETURN YOUR BALLOT ACCEPTING THE PLAN.

Dated:   August 7, 2005

US Airways, Inc.
US Airways Group, Inc.
PSA Airlines, Inc.
Piedmont Airlines, Inc.
Material Services Company, Inc.

*Debtors and Debtors-in-Possession*

By:  ___/s/ Bruce R. Lakefield___
Bruce R. Lakefield
President and Chief Executive Officer
USAI, Inc. and USAI Group, Inc.
and authorized signatory for each of the
other Debtors