# EXHIBIT 17 – PART 1

```
<DOCUMENT>
<TYPE>EX-2
<SEQUENCE>2
<FILENAME>mergeragmt.txt
<DESCRIPTION>EXHIBIT 2.1 - AGREEMENT AND PLAN OF MERGER
<TEXT>
```

EXHIBIT 2.1

AGREEMENT AND PLAN OF MERGER

among

US AIRWAYS GROUP, INC.,

AMERICA WEST HOLDINGS CORPORATION

and

BARBELL ACQUISITION CORP.

Dated as of May 19, 2005

```
<PAGE>
```

TABLE OF CONTENTS

```
<TABLE>
<CAPTION>


<S>
```

ARTICLE I THE MERGER; CLOSING; EFFECTIVE TIME....................................................

1.1       The Merger.........................................................................................
1.2       Closing............................................................................................
1.3       Effective Time.....................................................................................
1.4       Plan of Reorganization.............................................................................
1.5       Effects of the Merger..............................................................................
1.6       Certificates of Incorporation......................................................................
1.7       By-Laws............................................................................................
1.8       Directors..........................................................................................
1.9       Officers...........................................................................................
1.10      Headquarters.......................................................................................

ARTICLE II EFFECT OF THE MERGER ON CAPITAL STOCK; EXCHANGE OF CERTIFICATES...........

2.1       Effect on Capital Stock............................................................................
          (a)       Merger Consideration...................................................................
          (b)       Cancellation of Shares.................................................................
          (c)       Merger Sub.............................................................................
2.2       Exchange of Certificates for Shares................................................................
          (a)       Exchange Agent.........................................................................
          (b)       Exchange Procedures....................................................................
          (c)       Distributions with Respect to Unexchanged Shares; Voting...........

|       |     |                                                              |
|-------|-----|--------------------------------------------------------------|
|       | (d) | Transfers ................................................... |
|       | (e) | No Fractional Shares ........................................ |
|       | (f) | Termination of Exchange Fund ................................ |
|       | (g) | Lost, Stolen or Destroyed Certificates ...................... |
|       | (h) | Uncertificated Shares ....................................... |
| 2.3   |     | Adjustments to Prevent Dilution ............................. |
| 2.4   |     | Withholding Rights .......................................... |
| 2.5   |     | West Stock Based Plans ...................................... |
| 2.6   |     | No Dissenters' Rights ....................................... |

ARTICLE III REPRESENTATIONS AND WARRANTIES ................................

| 3.1   |     | Representations and Warranties of West ...................... |
|-------|-----|--------------------------------------------------------------|
|       | (a) | Organization, Good Standing and Qualification ............... |
|       | (b) | Capital Structure ........................................... |
|       | (c) | Corporate Authority; Approval and Fairness .................. |
|       | (d) | Governmental Filings; No Violations; Certain Contracts ...... |
|       | (e) | West Reports; Financial Statements .......................... |
|       | (f) | Absence of Certain Changes .................................. |

</TABLE>

- i -

<PAGE>

<TABLE>
<S>

|       |     |                                                              |
|-------|-----|--------------------------------------------------------------|
|       | (g) | Litigation and Liabilities .................................. |
|       | (h) | Employee Benefits ........................................... |
|       | (i) | Compliance with Laws; Licenses .............................. |
|       | (j) | Material Contracts .......................................... |
|       | (k) | Real Property ............................................... |
|       | (l) | Takeover Statutes ........................................... |
|       | (m) | Environmental Matters ....................................... |
|       | (n) | Taxes ....................................................... |
|       | (o) | Labor Matters ............................................... |
|       | (p) | Intellectual Property and IT Assets ......................... |
|       | (q) | Foreign Corrupt Practices Act ............................... |
|       | (r) | Aircraft .................................................... |
|       | (s) | Slots ....................................................... |
|       | (t) | Equipment ................................................... |
|       | (u) | U.S. Citizen; Air Carrier ................................... |
|       | (v) | Insurance ................................................... |
|       | (w) | Brokers and Finders ......................................... |
| 3.2   |     | Representations and Warranties of East and Merger Sub ....... |
|       | (a) | Organization, Good Standing and Qualification ............... |
|       | (b) | Capital Structure of East ................................... |
|       | (c) | Capitalization of Merger Sub ................................ |
|       | (d) | Corporate Authority; Approval and Fairness .................. |
|       | (e) | Governmental Filings; No Violations; Certain Contracts ...... |
|       | (f) | East Reports; Financial Statements .......................... |
|       | (g) | Absence of Changes .......................................... |
|       | (h) | Litigation and Liabilities .................................. |
|       | (i) | Employee Benefits ........................................... |
|       | (j) | Compliance with Laws; Licenses .............................. |
|       | (k) | Material Contracts .......................................... |
|       | (l) | Real Property ............................................... |
|       | (m) | Takeover Statutes ........................................... |
|       | (n) | Environmental Matters ....................................... |
|       | (o) | Taxes ....................................................... |
|       | (p) | Labor Matters ............................................... |

| | | |
|---|---|---|
| (q) | Intellectual Property and IT Assets | ........ |
| (r) | Foreign Corrupt Practices Act | ........ |
| (s) | Aircraft | ........ |
| (t) | Slots | ........ |
| (u) | Equipment | ........ |
| (v) | U.S. Citizen; Air Carrier | ........ |
| (w) | Insurance | ........ |
| (x) | Brokers and Finders | ........ |
| (y) | Merger Sub Constituent Documents | ........ |

ARTICLE IV COVENANTS ........

| | | |
|---|---|---|
| 4.1 | Interim Operations | ........ |
</TABLE>

- ii -

<PAGE>

<TABLE>
<S>

| | | |
|---|---|---|
| 4.2 | Bankruptcy Filings, Covenants and Agreements | ........ |
| 4.3 | West Acquisition Proposals | ........ |
| 4.4 | East Acquisition Proposals | ........ |
| 4.5 | Information Supplied | ........ |
| 4.6 | Shareholders Meeting | ........ |
| 4.7 | Filings; Other Actions; Notification | ........ |
| 4.8 | Access and Reports | ........ |
| 4.9 | Publicity | ........ |
| 4.10 | Employee Benefits | ........ |
| 4.11 | Expenses | ........ |
| 4.12 | Indemnification; Directors' and Officers' Insurance | ........ |
| 4.13 | Takeover Statutes | ........ |
| 4.14 | Transfer Taxes | ........ |
| 4.15 | Taxation | ........ |
| 4.16 | Stock Exchange Listing and De-listing | ........ |
| 4.17 | Affiliates | ........ |
| 4.18 | Section 16(b) | ........ |
| 4.19 | Compliance with Indenture and Warrant | ........ |
| 4.20 | Adjustment for Increase in Pre-Investment Valuation of East | ........ |

ARTICLE V CONDITIONS ........

| | | |
|---|---|---|
| 5.1 | Conditions to Each Party's Obligation to Effect the Merger | ........ |
| | (a) Shareholder Approval | ........ |
| | (b) Regulatory Consents | ........ |
| | (c) Orders | ........ |
| | (d) Bankruptcy | ........ |
| | (e) S-4 Registration Statement | ........ |
| | (f) Listing | ........ |
| | (g) Additional East Equity | ........ |
| | (h) Further Agreements | ........ |
| 5.2 | Conditions to Obligations of East and Merger Sub | ........ |
| | (a) Representations and Warranties | ........ |
| | (b) Performance of Obligations of West | ........ |
| | (c) Certain Litigation | ........ |
| | (d) Consents Under Agreements | ........ |
| | (e) Tax Opinion | ........ |
| 5.3 | Conditions to Obligation of West | ........ |
| | (a) Representations and Warranties | ........ |
| | (b) Performance of Obligations of East and Merger Sub | ........ |

(c)     Certain Litigation...............................................
(d)     Consents Under Agreements.......................................
(e)     Tax Opinion.....................................................

ARTICLE VI  TERMINATION................................................

6.1     Termination by Mutual Consent...................................
</TABLE>

                                - iii -

<PAGE>

<TABLE>
<S>
6.2     Termination by Either East or West..............................
6.3     Termination by West.............................................
6.4     Termination by East.............................................
6.5     Effect of Termination and Abandonment...........................

ARTICLE VII  MISCELLANEOUS AND GENERAL.................................

7.1     Survival........................................................
7.2     Modification or Amendment.......................................
7.3     Waiver of Conditions............................................
7.4     Counterparts....................................................
7.5     Governing Law And Venue; Waiver Of Jury Trial...................
7.6     Notices.........................................................
7.7     Entire Agreement................................................
7.8     Third Party Beneficiaries.......................................
7.9     Obligations of East and of West.................................
7.10    Definitions.....................................................
7.11    Severability....................................................
7.12    Interpretation; Construction....................................
7.13    Assignment......................................................

Annex A             Defined Terms.......................................

</TABLE>

Exhibit A           Financing Commitments
Exhibit B           Voting Agreement
Exhibit C           Form of Parent Charter
Exhibit D           Form of Parent Amended By-Laws
Exhibit E           Order Approving Bidding Procedures
Exhibit F           Affiliate Agreement

                                - iv -

<PAGE>

                        AGREEMENT AND PLAN OF MERGER

            AGREEMENT AND PLAN OF MERGER (this "Agreement"), dated as of
May 19, 2005, among US Airways Group, Inc., a Delaware corporation, and its
successors (including, as the context may require, on or after the effective
date of the Plan, as reorganized pursuant to the Bankruptcy Code) ("East"),
America West Holdings Corporation, a Delaware corporation ("West"), and Barbell
Acquisition Corp., a Delaware corporation and a wholly owned subsidiary of East
("Merger Sub").

RECITALS

WHEREAS, the respective Boards of Directors of each of East, West and Merger Sub have, by resolutions duly adopted, declared that, the merger of Merger Sub with and into West (the "Merger"), upon the terms and subject to the conditions set forth in this Agreement and the other transactions contemplated by this Agreement are advisable, and approved and adopted this Agreement;

WHEREAS, on September 12, 2004, East and certain of its Subsidiaries (each a "Debtor" and collectively, the "Debtors") filed a voluntary petition (the "Cases") for reorganization pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. Sections 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Virginia, Alexandria Division (the "Bankruptcy Court");

WHEREAS, the Debtors intend to seek the entry of an order of the Bankruptcy Court (the "Confirmation Order") to approve the restructuring of the Debtors pursuant to a plan of reorganization (the "Plan"), including the approval of this Agreement, the investment in additional East equity by certain new equity investors (the "Equity Investors") pursuant to financing commitments substantially in the form attached hereto as Exhibit A (the "Financing Commitments") and the authorization of East to consummate the transactions contemplated hereby and thereby;

WHEREAS, it is intended that, for federal income tax purposes, the Merger shall qualify as a reorganization under the provisions of Section 368(a) of the Internal Revenue Code of 1986, as amended (the "Code");

WHEREAS, certain stockholders of West are concurrently herewith entering into a voting agreement in connection with the Merger in the form attached hereto as Exhibit B (the "Voting Agreement"); and

WHEREAS, East, the other Debtors, West and Merger Sub desire to make certain representations, warranties, covenants and agreements in connection with this Agreement.

NOW, THEREFORE, in consideration of the premises, and of the representations, warranties, covenants and agreements contained herein, the parties hereto agree as follows:

<PAGE>

ARTICLE I

The Merger; Closing; Effective Time

1.1     The Merger. Upon the terms and subject to the conditions set forth in this Agreement, and in accordance with the Delaware General Corporation Law (the "DGCL"), at the Effective Time (as defined in Section 1.3) Merger Sub shall be merged with and into West and the separate corporate existence of Merger Sub shall thereupon cease. West shall be the surviving corporation in the Merger (sometimes hereinafter referred to as the "Surviving Corporation"), and the separate corporate existence of West, with all its rights, privileges, immunities, powers and franchises, shall continue unaffected by the Merger in accordance with the DGCL.

1.2     Closing. Subject to Section 1.4, the closing of the Merger (the "Closing") shall take place (i) at the offices of Arnold & Porter

LLP, 555 12th St., NW, Washington, DC at 9:00 a.m., Washington DC time, on the fifth business day following the day on which the last to be satisfied or waived of the conditions set forth in Article V (other than those conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions) shall be satisfied or waived in accordance with this Agreement or (ii) at such other place and time or on such other date as West and East may agree (the "Closing Date").

      1.3     Effective Time. As soon as practicable following the Closing, West and East will cause a Certificate of Merger (the "Certificate of Merger") to be executed, acknowledged and delivered to the Secretary of State of the State of Delaware in accordance with the relevant provisions of the DGCL and shall make all other filings or recordings required under the DGCL. The Merger shall become effective on the date on which the Certificate of Merger shall have been filed with the Secretary of State of the State of Delaware or at such later time as may be agreed by the parties in writing and specified in the Certificate of Merger (the "Effective Time").

      1.4     Plan of Reorganization. The Merger shall be effected as a principal component of the Plan. The Closing Date and the Effective Time hereunder shall occur on or as soon as practicable after the date the Confirmation Order is entered by the Bankruptcy Court.

      1.5     Effects of the Merger. The Merger shall have the effects set forth in Section 259 of the DGCL.

      1.6     Certificates of Incorporation.

      (a)     East. At the Effective Time, pursuant to the Plan, the certificate of incorporation of East shall be amended and restated in its entirety to read substantially as set forth on Exhibit C hereto, until thereafter duly amended as provided therein or by applicable Laws (as defined in Section 3.1(i)) (the "Parent Charter").

      (b)     Surviving Corporation. The certificate of incorporation of Merger Sub in effect at the Effective Time shall be the certificate of incorporation of the

-2-

<PAGE>

Surviving Corporation (the "Surviving Corporation Charter"), until thereafter amended as provided therein or by applicable Laws; provided, however, that the Surviving Corporation Charter shall be amended immediately following the Effective Time to change the name of Merger Sub to America West Holdings Corporation.

      1.7     By-Laws.

      (a)     East. At the Effective Time, the by-laws of East shall be amended and restated in their entirety to read substantially as set forth on Exhibit D hereto until duly amended as provided therein or by applicable Laws (the "Parent Amended By-Laws").

      (b)     Surviving Corporation. The by-laws of Merger Sub in effect at the Effective Time shall be the by-laws of the Surviving Corporation (the "Surviving Corporation By-Laws"), until thereafter amended as provided therein or by applicable Laws; provided, however, that the Surviving Corporation By-Laws shall be amended immediately following the Effective Time to change the name of Merger Sub to America West Holdings Corporation.

1.8      Directors.

(a)      East. Except as hereinafter provided, the number of directors comprising the full board of directors of East as of the Effective Time shall be no more than 13 directors. Initially, assuming East has received from the Equity Investors on or before the Effective Date cash equity investments totaling $375,000,000, (i) 2 of such directors shall be designated by East to an initial one-year term, all of whom shall be Independent Directors, (ii) 2 of such directors shall be designated by West to an initial one-year term, all of whom shall be Independent Directors, (iii) 1 of such directors shall be designated by East to an initial two-year term, which director shall be an Independent Director, (iv) 3 of such directors shall be designated by West to an initial two-year term, all of whom shall be Independent Directors, (v) 1 of such directors shall be W. Douglas Parker, Chief Executive Officer of West, who shall also serve as Chairman of the Board, appointed to an initial three-year term, (vi) 1 of such directors shall be Bruce Lakefield, Chief Executive Officer of East, who shall also serve as Vice Chairman of the Board, appointed to an initial three-year term and (vii) 3 of such directors shall be nominated by the Equity Investors to an initial three-year term pursuant to the terms of the Financing Commitments; provided, however, that in the event that East has received from the Equity Investors on or before the Effective Time cash equity investments totaling at least $500,000,000, then (i) 2 of such directors shall be designated by East to an initial one-year term, all of whom shall be Independent Directors, (ii) 2 of such directors shall be designated by West to an initial one-year term, all of whom shall be Independent Directors, (iii) 1 of such directors shall be Bruce Lakefield, Chief Executive Officer of East, who shall also serve as Vice Chairman of the Board, appointed to an initial two-year term, (iv) 3 of such directors shall be designated by West to an initial two-year term, all of whom shall be Independent Directors, (v) one of such directors shall be W. Douglas Parker, Chief Executive Officer of West, who shall also serve as Chairman of the Board, appointed to an initial three-year term and (vi) 4 of such directors shall be nominated by

-3-

<PAGE>

the Equity Investors to an initial three-year term pursuant to the terms of the Financing Commitments. Each of East and West shall select their designees prior to the effectiveness of the S-4 Registration Statement (as defined in Section 4.5) from the current Independent Directors of their respective boards of directors with respect to all directors that are required to be Independent Directors, and each such designee shall be reasonably satisfactory to each of East and West. If any persons designated as directors pursuant to the two preceding sentences are unable to serve as directors for any reason prior to closing, the party who nominated such person shall designate a qualified replacement as soon as reasonably practicable. An "Independent Director" means a person who satisfies the requirements for independence under the rules of the New York Stock Exchange ("NYSE") as then in effect.

(b)      Surviving Corporation. The members of the Board of Directors of the Surviving Corporation at the Effective Time shall be the Chief Executive Officer of East immediately prior to the Effective Time and the Chief Executive Officer of West immediately prior to the Effective Time. On or prior to the Effective Time, the Board of Directors of each of East and the Surviving Corporation shall take such actions as are necessary to cause such persons to be elected to the Board of Directors of the Surviving Corporation.

1.9      Officers.

     (a)     East. W. Douglas Parker, the Chief Executive Officer of West, shall serve as the Chief·Executive Officer of East from and after the Effective Time.

     (b)     Surviving Corporation. The officers of West at the Effective Time shall, from and after the Effective Time, be the officers of the Surviving Corporation until their successors shall have been duly elected or appointed and qualified or until their earlier death, resignation or removal in accordance with the Surviving Corporation Charter and the Surviving Corporation By-Laws.

     1.10     Headquarters. East, Merger Sub and West agree that immediately following the Effective Time the headquarters of East and the Surviving Corporation shall be located at 111 W. Rio Salado Pkwy., Tempe, Arizona.

ARTICLE II

Effect of the Merger on Capital Stock;
Exchange of Certificates

     2.1     Effect on Capital Stock. At the Effective Time, as a result of the Merger and without any action on the part of the holder of any capital stock of West:

     (a)     Merger Consideration.

     (i)     Each share of Class A common stock, par value $0.01 per share, of West (each, a "Class A Share"), issued and outstanding immediately prior to the Effective Time (other than (i) Class A Shares owned by East or any direct or indirect

-4-

<PAGE>

Subsidiary (as defined in Section 3.1(a)) of East and (ii) any Class A Shares owned by West or any direct or indirect Subsidiary of West, except, in the case of clauses (i) and (ii), for any such Class A Shares held on behalf of third parties (each, an "Excluded Class A Share")) (each such Class A Share not constituting an Excluded Class A Share, an "Outstanding Class A Share") shall be converted into, and become exchangeable for, 0.5306 (the "Class A Merger Exchange Ratio") common shares (the "Per Class A Share Merger Consideration"), par value $0.01 per share, of East ("East Common Stock").

     (ii)     Each share of Class B Common Stock, par value $0.01 per share, of West (each, a "Class B Share" and, together with the Class A Shares, the "Shares"), issued and outstanding immediately prior to the Effective Time (other than (i) Class B Shares owned by East or any direct or indirect Subsidiary of East and (ii) any Class B Shares owned by West or any direct or indirect Subsidiary of West except, in the case of clauses (i) and (ii), for any such Class B Shares held on behalf of third parties (each, an "Excluded Class B Share" and collectively with all Excluded Class A Shares, "Excluded Shares")) (each such Class B Share not constituting an Excluded Class B Share, an "Outstanding Class B Share" and, collectively with all Outstanding Class A Shares, the "Outstanding Shares") shall be converted into, and become exchangeable for, 0.4082 (the "Class B Merger Exchange Ratio") shares (the "Per Class B Share Merger Consideration") of East Common Stock.

     (iii)     At the Effective Time, all of the Shares shall cease to be outstanding, shall be cancelled and retired and shall cease to exist, and

each certificate (a "Certificate") formerly representing any of the Shares (other than Excluded Shares) shall thereafter represent only the right to receive either the Per Class A Share Merger Consideration or the Per Class B Share Merger Consideration, as applicable (the "Applicable Per Share Merger Consideration"), and the right, if any, to receive pursuant to Section 2.2(e) cash in lieu of fractional shares into which such Shares have been converted pursuant to this Section 2.1(a) and any dividend or distribution with respect to shares of East Common Stock pursuant to Section 2.2(c).

(b)    Cancellation of Shares. Each Excluded Share shall, by virtue of the Merger, and without any action on the part of the holder thereof, cease to be outstanding, shall be cancelled and retired without payment of any consideration therefor and shall cease to exist.

(c)    Merger Sub. At the Effective Time, by virtue of the Merger and without any action on the part of the holder thereof, each share of common stock, par value $0.01 per share, of Merger Sub issued and outstanding immediately prior to the Effective Time shall be converted into one fully paid and nonassessable share of common stock, par value $0.01 per share, of the Surviving Corporation.

2.2    Exchange of Certificates for Shares.

(a)    Exchange Agent. As of the Effective Time, East shall deposit, or shall cause to be deposited, with an exchange agent selected by East with West's prior approval, which shall not be unreasonably withheld or delayed (the "Exchange Agent"),

-5-

<PAGE>

in trust for the benefit of the holders of Outstanding Shares, certificates representing the shares of East Common Stock to be exchanged for Outstanding Shares in respect of the Applicable Per Share Merger Consideration to be paid in the Merger and, after the Effective Time, if applicable, any cash and dividends or other distributions with respect to the East Common Stock to be paid or to be issued pursuant to Section 2.2(e) or 2.2(c) in exchange for Outstanding Shares (such certificates for shares of East Common Stock, together with the amount of any cash payable pursuant to Section 2.2(e) in lieu of fractional shares and dividends or other distributions payable with respect thereto pursuant to Section 2.2(c), being hereinafter referred to as the "Exchange Fund").

(b)    Exchange Procedures. Appropriate transmittal materials, to be reasonably agreed upon by East and West, shall be provided as soon as practicable after the Effective Time by the Exchange Agent to holders of record of Outstanding Shares converted in the Merger, advising such holders of the effectiveness of the Merger and the procedure for surrendering the Certificates to the Exchange Agent. Such transmittal materials shall specify that delivery shall be effected and risk of loss and title to the Certificates held by any holder representing Shares, shall pass only upon proper delivery of the Certificates to the Exchange Agent. Upon the surrender of a Certificate (or affidavit of loss in lieu thereof) to the Exchange Agent in accordance with the terms of such transmittal materials, the holder of such Certificate shall be entitled to receive in exchange therefor (after giving effect to any required tax withholdings) (i) one or more shares of East Common Stock which shall be in uncertificated book-entry form unless a physical certificate is requested and which shall represent, in the aggregate, a certificate representing that number of whole shares of East Common Stock that such holder is entitled to receive pursuant to this Article II, (ii) a check in the amount of (A) any cash payable pursuant to Section 2.2(e) in lieu of fractional shares plus (B) any unpaid

non-stock dividends and any other dividends or other distributions that such holder has the right to receive pursuant to Section 2.2(c), and, in each case, the Certificate so surrendered shall forthwith be cancelled. No interest will be paid or accrued on any amount payable upon due surrender of the Certificates. In the event of a transfer of ownership of Shares that is not registered in the transfer records of West, a certificate representing the proper number of shares of East Common Stock, together with a check for any cash to be paid upon due surrender of the Certificate and any other dividends or distributions in respect thereof, may be issued and/or paid to such a transferee if the Certificate formerly representing such Shares is presented to the Exchange Agent, accompanied by all documents required to evidence and effect such transfer and to evidence that any applicable stock transfer taxes have been paid or are not applicable. If any certificate for shares of East Common Stock is to be issued in a name other than that in which the Certificate surrendered in exchange therefor is registered, it shall be a condition of such exchange that the Person (as defined below) requesting such exchange shall pay any transfer or other taxes required by reason of the issuance of certificates for shares of East Common Stock in a name other than that of the registered holder of the Certificate surrendered, or shall establish to the satisfaction of East or the Exchange Agent that such taxes have been paid or are not applicable.

For the purposes of this Agreement, the term "Person" shall mean any individual, corporation (including not-for-profit), general or limited partnership, limited

-6-

<PAGE>

liability company, joint venture, estate, trust, association, organization, Governmental Entity (as defined in Section 3.1(d)(i)) or other entity of any kind or nature.

(c)     Distributions with Respect to Unexchanged Shares; Voting.

(i)     All shares of East Common Stock to be issued pursuant to the Merger shall be deemed issued and outstanding as of the Effective Time and whenever a dividend or other distribution is declared by East in respect of the East Common Stock, the record date for which is after the Effective Time, that declaration shall include dividends or other distributions in respect of all shares issuable pursuant to this Agreement. No dividends or other distributions in respect of the East Common Stock shall be paid to any holder of any unsurrendered Certificate until such Certificate is surrendered for exchange in accordance with this Article II. Subject to the effect of applicable Laws, following surrender of any such Certificate, there shall be issued and/or paid to the holder of the certificates representing whole shares of East Common Stock issued in exchange therefor, without interest, (A) at the time of such surrender, the dividends or other distributions with a record date after the Effective Time theretofore payable with respect to such whole shares of East Common Stock and not paid and (B) at the appropriate payment date, the dividends or other distributions payable with respect to such whole shares of East Common Stock with a record date after the Effective Time but with a payment date subsequent to surrender.

(ii)     Holders of unsurrendered Certificates shall be entitled to vote after the Effective Time at any meeting of East stockholders the number of whole shares of East Common Stock represented by such Certificates, regardless of whether such holders have exchanged their Certificates.

(d)     Transfers. After the Effective Time, there shall be no transfers on the stock transfer books of West of the Outstanding Shares. If, after the Effective Time, Outstanding Shares are presented for transfer to the Exchange Agent, they will be cancelled and exchanged for the Applicable Per Share Merger Consideration, as the case may be, as provided in this Article II.

(e)     No Fractional Shares. Notwithstanding any other provision of this Agreement, each holder of Common Shares exchanged pursuant to the Merger who would otherwise have been entitled to receive a fractional share of East Common Stock (after taking into account all Certificates delivered by such holder) shall receive, in lieu thereof, cash (without interest) in an amount equal to the product of (i) such fractional part of a share of East Common Stock multiplied by (ii) the average of the closing price for a share of East Common Stock on the NASDAQ Stock Market or NYSE Composite Transactions Tape, as applicable, for the three (3) trading days following the day on which the Effective Time occurs.

(f)     Termination of Exchange Fund. Any portion of the Exchange Fund (including the proceeds of any investments thereof and any shares of East Common Stock) that remains unclaimed by the shareholders of West for 180 days after the Effective Time shall be delivered to East. Any shareholders of West who have not

-7-

<PAGE>

theretofore complied with this Article II shall thereafter look only to East for delivery of any cash or any shares of East Common Stock and payment of any cash, dividends and other distributions in respect thereof payable or deliverable pursuant to Section 2.1, Section 2.2(c) and Section 2.2(e) upon due surrender of their Certificates (or affidavits of loss in lieu thereof), in each case, without any interest thereon. Any such portion of the Exchange Fund remaining unclaimed by holders of Common Shares five (5) years after the Effective Time (or such earlier date immediately prior to such time as such amounts would otherwise escheat to or become property of any Governmental Entity) shall, to the extent permitted by applicable Law, become the property of East free and clear of any claims or interest of any Person previously entitled thereto. Notwithstanding the foregoing, none of East, the Surviving Corporation, the Exchange Agent or any other Person shall be liable to any former holder of Shares for any amount properly delivered to a public official pursuant to applicable abandoned property, escheat or similar Laws.

(g)     Lost, Stolen or Destroyed Certificates. In the event any Certificate shall have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the Person claiming such Certificate to be lost, stolen or destroyed and, if required by East, the posting by such Person of a bond in customary amount and upon such terms as may be required by East as indemnity against any claim that may be made against it or the Surviving Corporation with respect to such Certificate, the Exchange Agent will issue in exchange for such lost, stolen or destroyed Certificate the cash or the shares of East Common Stock and any cash, unpaid dividends or other distributions in respect thereof that would be payable or deliverable pursuant to this Agreement had such lost, stolen or destroyed Certificate been surrendered.

(h)     Uncertificated Shares. In the case of any Shares that are not represented by certificates, the Exchange Agent shall issue at the Effective Time East Common Stock to the holders of such shares without any action by such holders, and the parties shall make appropriate adjustments to this Section 2.2 to assure the equivalent treatment thereof.

2.3    Adjustments to Prevent Dilution. In the event that, as a result of a reclassification, stock split (including a reverse stock split), stock dividend or distribution, recapitalization, combination or exchange of shares, or other similar transaction, West changes the number of Shares or securities convertible or exchangeable into or exercisable for Shares issued and outstanding prior to the Effective Time, or East changes the number of shares of East Common Stock or securities convertible or exchangeable into or exercisable for shares of East Common Stock, issued and outstanding subsequent to the effective date of the Plan and prior to the Effective Time, the Class A Merger Exchange Ratio and Class B Merger Exchange Ratio shall be equitably adjusted.

2.4    Withholding Rights. East, the Surviving Corporation or the Exchange Agent shall be entitled to deduct and withhold from amounts otherwise payable under this Article II any amounts that it is required to deduct and withhold with respect to such payments under the Code, Treasury Regulations promulgated under the Code, or any provision of state, local or foreign tax law. Any amounts so deducted and withheld will

-8-

<PAGE>

be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.

2.5    West Stock Based Plans.

(a)    At the Effective Time, each outstanding option to purchase Class B Shares (a "West Option") under West's stock-based benefit plans and under individual employment agreements to which West is a party (the "West Stock Plans"), whether vested or unvested, shall be converted into an option to acquire a number of shares of East Common Stock equal to the product (rounded up to the nearest whole number) of (x) the number of Class B Shares subject to the West Option immediately prior to the Effective Time and (y) the Class B Merger Exchange Ratio, at an exercise price per share (rounded down to the nearest whole cent) equal to (A) the exercise price per Share of such West Option immediately prior to the Effective Time divided by (B) the Class B Merger Exchange Ratio; provided, however, that the exercise price and the number of shares of East Common Stock purchasable pursuant to the West Options shall be determined in a manner consistent with the requirements of Section 409A of the Code; provided, further, that in the case of any West Option to which Section 422 of the Code applies, the exercise price and the number of shares of East Common Stock purchasable pursuant to such option shall be determined in accordance with the foregoing, subject to such adjustments as are necessary in order to satisfy the requirements of Section 424(a) of the Code. Except as specifically provided above and to the extent the terms, conditions and restrictions may be altered in accordance with their terms as a result of the transactions contemplated hereby, following the Effective Time, each West Option shall continue to be governed by the same terms and conditions as were applicable under such West Option immediately prior to the Effective Time, including its vesting schedule and expiration date. At or prior to the Effective Time, West shall adopt appropriate amendments to the West Stock Plans, if applicable, and the Board of Directors of West shall adopt appropriate resolutions, if applicable, to effectuate the provisions of this Section 2.5(a). East shall take all actions as are necessary for the assumption of the West Stock Plans pursuant to this Section 2.5, including the reservation, issuance (subject to Section 2.5(c)) and listing of East Common Stock as necessary to effect the transactions contemplated by this Section 2.5.

(b)    At the Effective Time, each right of any kind,

contingent or accrued, to acquire or receive Class B Shares or benefits measured by the value of Class B Shares, and each award of any kind consisting of Class B Shares that may be held, awarded, outstanding, payable or reserved for issuance under the West Stock Plans and any other Compensation and Benefits Plans (as defined in Section 3.1(h)(i)), other than West Options (the "West Awards"), shall be deemed to be converted into the right to acquire or receive stock of East or benefits (as the case may be) measured by the value of the number of shares of East Common Stock equal to the product of (x) the number of Class B Shares subject to such West Award immediately prior to the Effective Time and (y) the Class B Merger Exchange Ratio, and each such right shall otherwise be subject to the terms and conditions applicable to such right under the relevant West Stock Plan or other West Compensation and Benefit Plan. At or prior to the Effective Time, West shall adopt appropriate amendments to the West Stock Plans and such Compensation and Benefits

-9-

<PAGE>

Plans, if applicable, and the Board of Directors of West shall adopt appropriate resolutions, if applicable, to effectuate the provisions of this Section 2.5(b).

(c)     Promptly following the Effective Time, East shall file with the Securities and Exchange Commission (the "SEC") a registration statement on Form S-3 or Form S-8, as the case may be (or any successor form), or another appropriate form with respect to such interests or East Common Stock, and shall use its reasonable best efforts to have such registration statement declared effective by the SEC as of the Effective Time and to maintain the effectiveness of such registration statement (and maintain the current status of the prospectus or prospectuses contained therein and comply with any applicable state securities or "blue sky" laws) for so long as the relevant West Stock Plans or other West Compensation and Benefit Plans, as applicable, remain in effect and such registration of interests therein or the shares of East Common Stock issuable thereunder (and compliance with any such state laws) continues to be required. As soon as practicable after the registration of such interests or shares, as applicable, East shall deliver to the holders of West Options and West Awards appropriate notices setting forth such holders' rights pursuant to the respective West Stock Plans and agreements evidencing the grants of such West Options and West Awards, and stating that such West Options and West Awards and agreements have been assumed by East and shall continue in effect on the same terms and conditions (subject to the adjustments required by this Section 2.5 after giving effect to the Merger and the terms of the West Stock Plans).

(d)     Without limiting the applicability of the preceding paragraph, West and East shall take all necessary action to ensure that the Surviving Corporation will not be required to deliver Shares or other capital stock of West to any Person pursuant to or in settlement of West Options or West Awards after the Effective Time. At or prior to the Effective Time, West shall adopt appropriate amendments to all West Stock Plans conferring any rights to Shares or other capital stock of West, if applicable, and the Board of Directors of West shall adopt appropriate resolutions, if applicable, to effectuate the provisions of this Section 2.5(d).

2.6     No Dissenters' Rights. In accordance with Section 262 of the DGCL, no appraisal rights shall be available to holders of Class B Shares in connection with the Merger.

ARTICLE III

Representations and Warranties

3.1          Representations and Warranties of West. Except as set forth in the disclosure letter (subject to Section 7.12(c) of this Agreement) delivered to East by West prior to entering into this Agreement (the "West Disclosure Letter") or, to the extent the qualifying nature of such disclosure with respect to a specific representation and warranty is readily apparent therefrom, as set forth in the West Reports (as defined in Section 3.1(e)) filed on or after January 1, 2005 and prior to the date hereof (excluding any disclosures included in any such West Report that are predictive or forward-looking in nature), West hereby represents and warrants to East and Merger Sub that:

-10-

<PAGE>

(a)          Organization, Good Standing and Qualification. Each of West and its Subsidiaries is a legal entity duly organized, validly existing and in good standing under the Laws of its respective jurisdiction of organization and has all requisite corporate or similar power and authority to own, lease and operate its properties and assets and to carry on its business as presently conducted and is qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership, leasing or operation of its assets or properties or conduct of its business requires such qualification, except where the failure to be so organized, validly existing, qualified or in good standing, or to have such power or authority, would not, individually or in the aggregate, reasonably be expected to result in a West Material Adverse Effect (as defined below). West has made available to East complete and correct copies of West's certificate of incorporation and by-laws, each as amended to date. As used in this Agreement, the term (i) "Subsidiary" means, with respect to any Person, any other Person of which at least a majority of the securities or ownership interests having by their terms ordinary voting power to elect a majority of the board of directors or other persons performing similar functions is directly or indirectly owned or controlled by such Person or by one or more of its respective Subsidiaries or by such Person and any one or more of its respective Subsidiaries, and (ii) "West Material Adverse Effect" means (x) a material adverse effect on the financial condition, assets, liabilities, business or results of operations of West and its Subsidiaries taken as a whole, excluding any such effect resulting from (I) changes or conditions generally affecting the U.S. economy or financial markets, (II) changes or conditions generally affecting any of the segments of the airline industry in which West or any of its Subsidiaries operates, to the extent such conditions or changes do not disproportionately impact West or its subsidiaries, (III) changes or conditions resulting from divestiture required in order to satisfy Section 5.1(b) hereof or (IV) the announcement or consummation of this Agreement, or (y) an effect that would prevent, materially delay or materially impair the ability of West to consummate the Merger and the other transactions contemplated by this Agreement.

(b)          Capital Structure. The authorized capital stock of West consists of (x) 1,200,000 Class A Shares, of which 859,117 Class A Shares were outstanding as of the close of business on April 8, 2005, (y) 200,000,000 Class B Shares, of which 51,600,766 Class B Shares were outstanding as of the close of business on April 8, 2005, including 16,437,575 Class B Shares held by West as treasury shares, and (z) 48,800,000 shares of preferred stock, par value $0.01 per share, of West (the "West Preferred Shares"), of which no shares were outstanding as of the close of business on April 8, 2005. The Subsidiaries of West hold no shares of capital stock of West, or securities or obligations convertible or exchangeable into or exercisable for such capital stock. All of the outstanding Shares have been duly authorized and validly issued and are fully paid and nonassessable. West has no Shares or West Preferred Shares reserved for issuance, except that, as of April 8, 2005, there were an aggregate

of 11,640,501 Shares reserved for issuance pursuant to the West Stock Plans, 19,692,000 Shares reserved for issuance pursuant to the Warrants dated as of January 18, 2002 (the "West Warrants"), 9,358,276 Shares reserved for issuance pursuant to West's 7.5% Convertible Senior Notes Due 2009 (the "2009 Notes") and 8,095,842 Shares reserved for issuance pursuant to America West Airlines, Inc.'s 7.25% Senior Exchangeable Notes due 2023 (the "2023 Notes" and, together with the 2009 Notes, the "West Convertible Debt"). From April 8, 2005 through

-11-

<PAGE>

the date hereof West has not issued any shares of Common Stock except (i) pursuant to the exercise of West Options, (ii) the settlement of West Awards outstanding on March 31, 2005 in accordance with their terms, (iii) the West Warrants, (iv) the West Convertible Debt and (v) after the date hereof, as permitted by Section 4.1 hereof. Except pursuant to the West Stock Plans or as permitted by Section 4.1 hereof, from and after April 8, 2005, neither West nor its Subsidiaries has granted or issued any West Options or West Awards. Each of the outstanding shares of capital stock or other securities of each of West's Subsidiaries has been duly authorized and validly issued and is fully paid and nonassessable and, to the extent owned by West or by a direct or indirect wholly-owned Subsidiary of West, is owned free and clear of any lien, charge, pledge, security interest, claim or other encumbrance (each, a "Lien"). Except as set forth above, as of the date of this Agreement, there are no preemptive or other outstanding rights, options, warrants, conversion rights, stock appreciation rights, redemption rights, repurchase rights, agreements, arrangements, calls, commitments or rights of any kind that obligate West or any of its Subsidiaries to issue or sell any shares of capital stock or other securities of West or any of its Subsidiaries or any securities or obligations convertible or exchangeable into or exercisable for, or giving any Person a right to subscribe for or acquire, any securities of West or any of its Subsidiaries, and no securities or obligations evidencing such rights are authorized, issued or outstanding. Upon any issuance of any Shares in accordance with the terms of the West Stock Plans, such Shares will be duly authorized, validly issued, fully paid and nonassessable and free and clear of any Lien. Other than the West Convertible Debt, West does not have outstanding any bonds, debentures, notes or other obligations the holders of which have the right to vote (or which obligations are convertible into or exercisable for securities having the right to vote) with the shareholders of West on any matter.

            (c)      Corporate Authority; Approval and Fairness.

            (i)      West has all requisite corporate power and authority and has taken all corporate action necessary in order to execute, deliver and perform its obligations under this Agreement and to consummate the Merger, subject only to the adoption of this Agreement by the holders of a majority of the outstanding Shares entitled to vote on such matter at a shareholders' meeting duly called and held for the purpose (the "West Requisite Vote"). This Agreement is a valid and binding agreement of West enforceable against West in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles (the "Bankruptcy and Equity Exception").

            (ii)      The Board of Directors of West has (A) declared that the Merger and the other transactions contemplated hereby are advisable and has adopted this Agreement; (B) received an opinion of its financial advisors, Greenhill & Co., LLC, to the effect that the Per Class B Share Merger Consideration is fair from a financial point of view to the holders of Shares (other than Excluded Shares), which opinion has not been amended or rescinded as

of the date of this Agreement; (C) resolved to recommend adoption of this
Agreement to the holders of Shares (such recommendations being the

-12-

<PAGE>

"Directors' Recommendation"); and (D) directed that this Agreement be submitted
to the holders of Shares for their adoption.

              (d)        Governmental Filings; No Violations; Certain
Contracts.

              (i)        Other than the notices, reports, filings, consents,
registrations, approvals, permits or authorizations (A) pursuant to Section 1.3;
(B) required under the Hart Scott Rodino Antitrust Improvements Act of 1976, as
amended (the "HSR Act"), the Securities Act of 1933, as amended (the "Securities
Act") and the Securities Exchange Act of 1934 (the "Exchange Act") and the rules
and regulations promulgated thereunder; (C) with, from or to the Federal
Aviation Administration (the "FAA"); (D) with, from or to the United States
Department of Transportation (the "DOT"); (E) with, from or to the Federal
Communications Commission (the "FCC"); (F) with, from or to the Department of
Homeland Security (the "DHS"); (G) with, from or to the Air Transportation
Stabilization Board (the "ATSB") and (H) with, from or to those foreign
Governmental Entities regulating competition and the airline industry set forth
in Section 3.1(d)(i)(H) of the West Disclosure Letter, no notices, reports or
other filings are required to be made by West with, nor are any consents,
registrations, approvals, permits or authorizations required to be obtained by
West or any of its Subsidiaries from, any domestic or foreign governmental or
regulatory authority, agency, commission, body, court or other legislative,
executive or judicial governmental entity (each a "Governmental Entity"), in
connection with the execution, delivery and performance of this Agreement by
West and the consummation by West of the Merger and the other transactic ~
contemplated hereby, except those that the failure to make or obtain woulu 1ot,
individually or in the aggregate, reasonably be expected to result in a West
Material Adverse Effect.

              (ii)       Except as set forth on Section 3.1(d)(ii) of the West
Disclosure Letter, the execution, delivery and performance of this Agreement by
West do not, and the consummation by West of the Merger and the other
transactions contemplated hereby will not, constitute or result in (A) a breach
or violation of, or a default under, the certificate of incorporation or by-laws
of West or the comparable governing documents of any of its Subsidiaries; (B)
with or without notice, lapse of time or both, a breach or violation of, a
termination (or right of termination) or default under, the creation or
acceleration of any obligations under or the creation of a Lien on any of the
assets of West or any of its Subsidiaries pursuant to any agreement, lease,
license, contract, note, mortgage, indenture or other legally binding obligation
(a "Contract") binding upon West or any of its Subsidiaries or, assuming (solely
with respect to performance of this Agreement and consummation by West of the
Merger and the other transactions contemplated hereby) compliance with the
matters referred to in Section 3.1(d)(i), any Law or governmental or
non-governmental permit or license to which West or any of its Subsidiaries is
subject; or (C) a default under any agreement or loan agreement or any other
indebtedness agreement or instrument of indebtedness that is binding upon West
or any of its Subsidiaries or assets; except, in the case of clause (B) or (C)
above, for any such breach, violation, termination, default, creation,
acceleration or change that would not, individually or in the aggregate,
reasonably be expected to result in a West Material Adverse Effect.

-13-

<PAGE>

       (e)      West Reports; Financial Statements.

       (i)      West has made available to East each registration statement, report, proxy statement or information statement prepared by it or any Subsidiary since December 31, 2004 (the "Audit Date") and filed with the SEC, including West's Annual Report on Form 10-K for the year ended December 31, 2004, each in the form (including exhibits, annexes and any amendments thereto) filed with the SEC. West and each Subsidiary has filed or furnished all forms, statements, schedules, reports and documents required to be filed or furnished by it with the SEC pursuant to applicable securities statutes, regulations, policies and rules since the Audit Date (the forms, statements, schedules, reports and documents filed or furnished with the SEC since the Audit Date and those filed or furnished with the SEC subsequent to the date of this Agreement, if any, including any amendments thereto, the "West Reports"). Each of the West Reports, at the time of its filing, complied in all material respects with the applicable requirements of the Exchange Act and the rules and regulations thereunder and complied in all material respects with the then applicable accounting standards. As of their respective dates (or, if amended, as of the date of such amendment), the West Reports did not, and any West Reports filed with the SEC subsequent to the date hereof will not, contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances in which they were made, not misleading. The West Reports included or will include all certificates required to be included therein pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002, as amended (the "SOX Act"), and the internal control report and attestation of West's outside auditors required by Section 404 of the SOX Act.

       (ii)      Each of the consolidated balance sheets included in or incorporated by reference into the West Reports (including the related notes and schedules) fairly presents, or, in the case of West Reports filed after the date hereof, will fairly present, in all material respects, the consolidated financial position of West and any other entity included therein and their respective Subsidiaries as of its date, and each of the consolidated statements of income, changes in shareholders' equity and cash flows included in or incorporated by reference into the West Reports (including any related notes and schedules) fairly presents, or in the case of West Reports filed after the date hereof, will fairly present, in all material respects, the net income, total shareholders' equity and net increase (decrease) in cash and cash equivalents, as the case may be, of West and any other entity included therein and their respective Subsidiaries for the periods set forth therein (subject, in the case of unaudited statements, to notes and normal year-end adjustments that are not expected to be material in amount or effect), in each case in accordance with U.S. generally accepted accounting principles ("GAAP") consistently applied during the periods involved, except as may be noted therein and subject, in the case of any unaudited interim financial statements, to the absence of notes and normal year-end adjustments.

       (iii)      The management of West has (x) established and maintained disclosure controls and procedures (as defined in Rule 13a-15(e) of the Exchange Act) designed to ensure that material information relating to West, including its consolidated Subsidiaries, is made known to the management of West by others within those entities,

-14-

<PAGE>

and (y) has disclosed, based on its most recent evaluation, to West's outside

auditors and the audit committee of the Board of Directors of West (A) all
significant deficiencies and material weaknesses in the design or operation of
internal controls over financial reporting (as defined in Rule 13a-15(f) of the
Exchange Act) which are reasonably likely to adversely affect West's ability to
record, process, summarize and report financial data and (B) any fraud, whether
or not material, that involves management or other employees who have a
significant role in West's internal controls over financial reporting. Since the
Audit Date, any material change in internal control over financial reporting
required to be disclosed in any West Report has been so disclosed.

            (iv)      Since the Audit Date, neither West nor any of its
Subsidiaries nor, to West's Knowledge (as defined below), any director, officer,
employee, auditor, accountant or representative of West or any of its
Subsidiaries has received or otherwise had or obtained knowledge of any material
complaint, allegation, assertion or claim, whether written or oral, regarding
the accounting or auditing practices, procedures, methodologies or methods of
West or any of its Subsidiaries or their respective internal accounting controls
relating to periods after the Audit Date, including any material complaint,
allegation, assertion or claim that West or any of its Subsidiaries has engaged
in questionable accounting or auditing practices (except for any of the
foregoing after the date hereof which have no reasonable basis). "West's
Knowledge" shall mean the knowledge of the Chief Executive Officer, Chief
Operating Officer and each Executive Vice President and Senior Vice President of
West, after reasonable inquiry.

            (f)      Absence of Certain Changes. Since the Audit Date,
West and its Subsidiaries have conducted their respective businesses only in,
and have not engaged in any material transaction other than in accordance with,
the ordinary course of such businesses. Since the Audit Date, there has not been
any West Material Adverse Effect or any event, occurrence, discovery or
development which would, individually or in the aggregate, reasonably be
expected to result in a West Material Adverse Effect.

            (g)      Litigation and Liabilities.

            (i)      Except as otherwise disclosed on West's Annual Report
on Form 10-K for the year ended December 31, 2004 or as set forth on Section
3.1(g)(i) of the West Disclosure Letter, there are no (A) civil, criminal or
administrative actions, suits, claims, hearings, arbitrations, investigations or
proceedings pending or, to West's Knowledge, threatened against West or any of
its Subsidiaries or (B) litigations, arbitrations, investigations or other
proceedings, or injunctions or final judgments relating thereto, pending or, to
West's Knowledge, threatened against West or any of its Subsidiaries before any
Governmental Entity, including, without limitation, the FAA, except in the case
of either clause (A) or (B), for those that would not, individually or in the
aggregate, reasonably be expected to result in a West Material Adverse Effect.
None of West or any of its Subsidiaries is a party to or subject to the
provisions of any judgment, order, writ, injunction, decree or award of any
Governmental Entity which would, individually or in the aggregate, reasonably be
expected to result in a West Material Adverse Effect.

                                    -15-

<PAGE>

            (ii)      There are no liabilities or obligations of West or
any Subsidiary of West, whether or not accrued, contingent or otherwise and
whether or not required to be disclosed, or any other facts or circumstances
that would reasonably be expected to result in any obligations or liabilities
of, West or any of its Subsidiaries, other than:

(A)      liabilities or obligations to the extent (I) reflected on the consolidated balance sheet of West or (II) disclosed in the notes thereto, in accordance with GAAP, in each case included in West's quarterly report on Form 10-Q for the period ended March 31, 2005 or in West's annual report on Form 10-K for the period ended December 31, 2004;

(B)      liabilities or obligations incurred in the ordinary course of business since December 31, 2004;

(C)      performance obligations under contracts required in accordance with their terms, or performance obligations, to the extent required under applicable Law, in each case to the extent arising after the date hereof; or

(D)      liabilities or obligations that would not, individually or in the aggregate, reasonably be expected to result in a West Material Adverse Effect.

(h)      Employee Benefits.

(i)      Section 3.1(h)(i) of the West Disclosure Letter contains a true and complete list of each material West Compensation and Benefit Plan. "West Compensation and Benefit Plan" means each bonus, deferred compensation, incentive compensation, stock purchase, stock option, severance pay, medical, life or other insurance, profit-sharing, or pension plan, program, agreement or arrangement, and each other employee benefit or compensation plan, program, agreement or arrangement, sponsored, maintained or contributed to or required to be contributed to by West or any of its Subsidiaries or by any trade or business, whether or not incorporated, that together with West or any of its Subsidiaries would be deemed a "single employer" under Section 414 of the Code (a "West ERISA Affiliate") or to which West or any West ERISA Affiliate is a party, for the benefit of, with or relating to any current or former employee, officer or director of West or any West ERISA Affiliate. Except as would not result in a material liability, neither West nor any of its Subsidiaries has any formal plan or commitment, whether legally binding or not, to create any additional plan or modify or change any existing West Compensation and Benefit Plan (excluding any severance or retention bonus plan) that would affect any employee or director or former employee or former director of West or any of its Subsidiaries.

(ii)      With respect to each of the material West Compensation and Benefit Plans, West has heretofore delivered or made available to East true and complete copies of each of the following documents: (A) the West Compensation and Benefit Plan and related trust agreements and insurance contracts (including all amendments thereto), if any; (B) the most recent annual report, actuarial report, and financial statement, if any; (C) the most recent Summary Plan Description, together with each Summary of Material

-16-

<PAGE>

Modifications, required under the Employee Retirement Income Security Act of 1974, as amended ("ERISA") with respect to such West Compensation and Benefit Plan, if any; and (D) the most recent determination letter received from the Internal Revenue Service (the "IRS") with respect to each West Compensation and Benefit Plan that is intended to be qualified under Section 401(a) of the Code.

(iii)      No liability under Title IV of ERISA, Section 302 of ERISA or Section 412 of the Code has been incurred by West or any of its

Subsidiaries or any West ERISA Affiliate since the effective date of ERISA that has not been satisfied in full, and no condition exists that presents a risk to West or any of its Subsidiaries or any West ERISA Affiliate of incurring a liability under such Title or such Sections, in each case, which would, individually or in the aggregate, reasonably be expected to have a West Material Adverse Effect.

(iv)     Neither West, nor any of its Subsidiaries, nor any West ERISA Affiliate, nor any of the West Compensation and Benefit Plans, nor any trust created thereunder, nor, to West's Knowledge, any trustee or administrator thereof, has engaged in a prohibited transaction (within the meaning of Section 406 of ERISA and Section 4975 of the Code) in connection with which West, any of its Subsidiaries, or any of the West Compensation and Benefit Plans would, individually or in the aggregate, reasonably be expected to have a West Material Adverse Effect.

(v)     Except as would not, individually or in the aggregate, have a West Material Adverse Effect, (A) all contributions required to have been made under the terms of any West Compensation and Benefit Plan have been timely made, and (B) all obligations in respect of each West Compensation and Benefit Plan have been properly accrued and reflected on the most recent consolidated statement of operations and consolidated balance sheet filed or incorporated by reference in the West Reports to the extent required by GAAP.

(vi)     Except as set forth on Section 3.1(h)(vi) of the West Disclosure Letter, no West Compensation and Benefit Plan (other than any that is a "multiemployer plan" as such term is defined in Section 3(37) of ERISA) is subject to Section 412 of the Code or Section 302 of ERISA or Title IV of ERISA.

(vii)     None of the West Compensation and Benefit Plans is a "multiple employer welfare arrangement," as such term is defined in Section 3(40) of ERISA, or single employer plan that has two or more contributing sponsors, at least two of whom are not under common control, within the meaning of Section 4063(a) of ERISA. With respect to any West Compensation and Benefit Plan that is a "multiemployer plan" as such term is defined in Section 3(37) of ERISA (each of which is identified in Section 3.1(h)(vii) of the West Disclosure Letter), (A) neither West, any of its Subsidiaries nor any West ERISA Affiliate has made or suffered a "complete withdrawal" or a "partial withdrawal," as such terms are respectively defined in Section 4203 and 4205 of ERISA, (B) no event has occurred that presents a material risk of a partial withdrawal, (C) neither West, any of its Subsidiaries nor any West ERISA Affiliate has any contingent liability under Section 4204 of ERISA, and no circumstances exist that present a material risk that

-17-

<PAGE>

any such plan will go into reorganization, and (D) neither West, any of its Subsidiaries nor any West ERISA Affiliates would have any material withdrawal liability if a complete withdrawal by West, its Subsidiaries and the West ERISA Affiliates occurred under each such plan on the date hereof.

(viii)     Except as set forth on Section 3.1(h)(viii) of the West Disclosure Letter, the IRS has issued a favorable determination letter in respect of each of the West Compensation and Benefit Plans that is intended to be "qualified" within the meaning of Section 401(a) of the Code and neither West nor any of its Subsidiaries is aware of any circumstances that could reasonably be expected to result in the revocation of such letter. Each of the West Compensation and Benefit Plans that is intended to satisfy the requirements of Section 125 or 501(c)(9) of the Code satisfies such requirements in all material

respects, except as would not, either individually or in the aggregate,
reasonably be expected to have a West Material Adverse Effect. Each of the West
Compensation and Benefit Plans has been operated and administered in all
material respects in accordance with its terms and applicable laws, including
but not limited to ERISA and the Code, except as would not, either individually
or in the aggregate, reasonably be expected to have a West Material Adverse
Effect.

      (ix)    Except as set forth on Section 3.1(h)(ix) of the West
Disclosure Letter, there are no claims pending, or, to West's Knowledge,
threatened or anticipated (other than routine claims for benefits) against any
West Compensation and Benefit Plan, the assets of any West Compensation and
Benefit Plan or against West, any of its Subsidiaries or any West ERISA
Affiliate with respect to any West Compensation and Benefit Plan. There is no
judgment, decree, injunction, rule or order of any court, governmental body,
commission, agency or arbitrator outstanding against or in favor of any West
Compensation and Benefit Plan or any fiduciary thereof (other than rules of
general applicability). There are no pending or, to West's Knowledge, threatened
audits or investigations by any governmental body, commission or agency
involving any West Compensation and Benefit Plan, that would, individually or in
the aggregate, reasonably be expected to have a West Material Adverse Effect.

      (x)    Except as set forth on Section 3.1(h)(x) of the West
Disclosure Letter, no West Compensation and Benefit Plan provides benefits,
including without limitation death or medical benefits (whether or not insured),
with respect to current or former employees or directors of West or any of its
Subsidiaries after retirement or other termination of service (other than (A)
coverage mandated by applicable law, (B) death benefit or retirement benefits
under any "employee pension benefit plan," as that term is defined in Section
3(2) of ERISA, (C) deferred compensation benefits accrued as liabilities on the
books of West, or (D) benefits, the full cost of which is borne by the current
or former employee or director (or his beneficiary)), which would, individually
or in the aggregate, reasonably be expected to result in a West Material Adverse
Effect.

      (xi)    West and its Subsidiaries have no unfunded
liabilities with respect to any West Compensation and Benefit Plan that is a
"pension plan" (within the meaning of Section 3(2) of ERISA) that covers current
or former non-U.S. employees of West or

-18-

<PAGE>

any of its Subsidiaries which, if funded, would, individually or in the
aggregate, reasonably be expected to have a West Material Adverse Effect.

      (i)    Compliance with Laws; Licenses.

      (i)    The businesses of each of West and its Subsidiaries
have not been conducted in violation of any material federal, state, local or
foreign law, statute or ordinance, common law, or any rule, regulation,
standard, judgment, order, writ, injunction, decree, arbitration award, agency
requirement, license or permit, of any Governmental Entity (collectively,
"Laws") or any applicable operating certificates, common carrier obligations,
airworthiness directives ("ADs"), Federal Aviation Regulations ("FARs") or any
other rules, regulations, directives or policies of the FAA, DOT, FCC, DHS or
any other Governmental Entity, except for such violations that would not,
individually or in the aggregate, reasonably be expected to result in a West
Material Adverse Effect. Except as set forth on Section 3.1(i)(i) of the West
Disclosure Letter, no investigation or review by any Governmental Entity with

respect to West or any of its Subsidiaries is pending or, to West's Knowledge, threatened, nor has any Governmental Entity indicated an intention to conduct the same, except for any such investigations or reviews that would not, individually or in the aggregate, reasonably be expected to result in a West Material Adverse Effect. Each of West and its Subsidiaries has obtained and is in substantial compliance with all permits, licenses, certifications, approvals, registrations, consents, authorizations, franchises, variances, exemptions and orders required, issued or granted by the FAA, DOT or any other Governmental Entity applicable to it ("Licenses") necessary to conduct its business as presently conducted, except for any failures to have or to be in compliance with such Licenses which would not, individually or in the aggregate, reasonably be expected to result in a West Material Adverse Effect. The representations and warranties contained in this Section 3.1(i) shall not apply to the following applicable Laws to the extent applicable to West and its Subsidiaries (or Licenses required under such applicable Laws): (i) ERISA and other applicable Laws regarding employee benefit matters, which are exclusively governed by Section 3.1(h), (ii) applicable Laws regarding Taxes, which are exclusively governed by Section 3.1(n), (iii) Environmental Laws, which are exclusively governed by Section 3.1(m), and (iv) applicable Laws regarding labor matters, which are exclusively governed by Section 3.1(o).

        (ii)    Each of West and its Subsidiaries is in compliance with (A) its obligations under each of the Licenses and (B) the rules and regulations of the Governmental Entity issuing such Licenses, except in each instance for any failures to be in compliance which would not, individually or in the aggregate, reasonably be expected to result in a West Material Adverse Effect. There is not pending or, to West's Knowledge, threatened before the FAA, DOT or any other Governmental Entity any material proceeding, notice of violation, order of forfeiture or complaint or investigation against West or any of its Subsidiaries relating to any of the Licenses, except for any of the foregoing that would not, individually or in the aggregate, reasonably be expected to result in a West Material Adverse Effect. The actions of the applicable Governmental Entities granting all Licenses have not been reversed, stayed, enjoined, annulled or suspended, and there is not pending or, to West's Knowledge, threatened, any material

                                -19-

<PAGE>

application, petition, objection or other pleading with the FAA, DOT or any other Governmental Entity which challenges or questions the validity of or any rights of the holder under any License, except, for any of the foregoing that would not, individually or in the aggregate, reasonably be expected to result in a West Material Adverse Effect.

        (j)    Material Contracts.

        (i)    As of the date of this Agreement, neither West nor any of its Subsidiaries is a party to or bound by any Contract required pursuant to Item 601 of Regulation S-K under the Securities Act to be filed as an exhibit to West's Annual Report on Form 10-K for the year ended December 31, 2004, or on any Quarterly Report on Form 10-Q or Current Report on Form 8-K filed by West since December 31, 2004, which has not been so filed.

        (ii)    As of the date of this Agreement, neither West nor any of its Subsidiaries is a party to or is bound by any non-competition Contract or other Contract (other than the West CBAs, as defined below, and the Loan Agreement, dated January 18, 2002 with the ATSB) that (I) purports to limit in any material respect either the type of business in which West or its Subsidiaries may engage or the manner or locations in which any of them may so

engage in any business, or (II) could require the disposition of any material
assets or line of business of West or any of its Subsidiaries.

(iii)    All Contracts that have been filed as an exhibit to
West's Annual Report on Form 10-K for the year ended December 31, 2004, or on
any Quarterly Report on Form 10-Q or Current Report on Form 8-K filed by West
since December 31, 2004, and all Contracts listed on Section 3.1(j)(ii) of the
West Disclosure Letter, together with all exhibits and schedules to such
Contracts, shall constitute the "West Material Contracts".

(iv)    A true and complete copy of each West Material
Contract has previously been delivered or made available to East (subject to
applicable confidentiality restrictions) and each such Contract is a valid and
binding agreement of West or one of its Subsidiaries, as the case may be, and is
in full force and effect, except to the extent they have previously expired in
accordance with their terms or if the failure to be in full force and effect,
individually or in the aggregate, would not, individually or in the aggregate,
reasonably be expected to have a West Material Adverse Effect. Neither West nor
any of its Subsidiaries is in default or breach under the terms of any such West
Material Contract which, individually or in the aggregate, would, individually
or in the aggregate, reasonably be expected to result in a West Material Adverse
Effect.

(k)    Real Property.

(i)    Except in any such case as would not, individually or
in the aggregate, reasonably be expected to result in a West Material Adverse
Effect, with respect to the real property, including the land and any and all
buildings, structures and other improvements located thereon, owned by West or
its Subsidiaries or as set forth in Section 3.1(k)(i) of the West Disclosure
Letter (the "West Owned Real Property"),

-20-

<PAGE>

(A) West or one of its Subsidiaries, as applicable, has good and marketable
title to the West Owned Real Property, free and clear of any Encumbrance, and
(B) there are no outstanding options or rights of first refusal to purchase the
West Owned Real Property, or any portion thereof or interest therein.

(ii)    Section 3.1(k)(ii) of the West Disclosure Letter sets
forth a true, correct and complete list of all the airport gates leased,
occupied or otherwise used by West or any of its Subsidiaries (the "West
Gates"), including, where applicable, the gate number and the airport and
terminal or concourse location of each such West Gate.

(iii)    With respect to the real property leased or subleased
to West or its Subsidiaries as lessee (the "West Leased Real Property" and,
together with the West Gates and West Owned Real Property, the "West Real
Property"), (A) the lease or sublease for such property is valid, legally
binding, enforceable in accordance with its terms and in full force and effect,
and none of West or any of its Subsidiaries is in breach of or default under
such lease or sublease, and no event has occurred which, with notice, lapse of
time or both, would constitute a breach or default by any of West or its
Subsidiaries or permit termination, modification or acceleration by any third
party thereunder, and (B) no third party lessor has repudiated or has the right
to terminate or repudiate such lease or sublease (except for the normal exercise
of remedies in connection with a default thereunder or any termination rights
set forth in the lease or sublease) or any provision thereof, except in each
case, for such invalidity, failures to be binding, unenforceability,

ineffectiveness, breaches, defaults, terminations, modifications, accelerations, repudiations and rights to terminate or repudiate that would not, individually or in the aggregate, reasonably be expected to result in a West Material Adverse Effect.

(iv)    Section 3.1(k)(iv) of the West Disclosure Letter contains a true, correct and complete list of all material West Real Property, including the name of the owner of record thereof, a brief description of the use of such West Real Property, a list of any leases, subleases or other agreements, pursuant to which West or its Subsidiaries lease the West Real Property as lessor, in each case including identification of the lease expiration date, and a description of the lease, sublease or other agreement, for all West Leased Real Property. Except as would not, individually or in the aggregate, reasonably be expected to have a West Material Adverse Effect or as set forth in Section 3.1(k)(iv) of the West Disclosure Letter, as of the date hereof, no third party occupies or uses or has the right to occupy or use all or any part of any West Real Property.

(v)    Except as would not, individually or in the aggregate, reasonably be expected to result in a West Material Adverse Effect, all water, gas, electrical, steam, compressed air, telecommunication, sanitary and storm sewage lines and systems and other similar systems currently serving the West Real Property are installed and operating and are sufficient to enable the West Real Property to continue to be used and operated in the manner currently being used and operated, and to West's Knowledge there is no factor or condition that could result in the termination or material impairment of the furnishing thereof.

-21-

<PAGE>

(vi)    All Licenses required to have been issued to West to enable any West Real Property to be lawfully occupied and used for all of the purposes for which they are currently occupied and used have been lawfully issued and are in full force and effect, except as would not, individually or in the aggregate, reasonably be expected to result in a West Material Adverse Effect.

(vii)    West has not received any notice, nor to West's Knowledge is there any pending, threatened or contemplated condemnation or eminent domain proceeding affecting any West Real Property or any part thereof, or any proposed termination or impairment of any parking at any such West Real Property or denial of access to any such West Real Property from any current point of public access, or of any sale or other disposition of any such West Real Property or any part thereof in lieu of condemnation, except as would not, individually or in the aggregate, reasonably be expected to result in a West Material Adverse Effect.

(viii)    Except as set forth on Section 3.1(k)(viii) of the West Disclosure Letter, no portion of any West Real Property has suffered any damage by fire or other casualty loss which has not heretofore been completely repaired and restored to its original condition (ordinary wear and tear excepted), except as would not, individually or in the aggregate, reasonably be expected to result in a West Material Adverse Effect.

(ix)    For purposes of this Section 3.1(k) only, "Encumbrance" means any mortgage, lien, pledge, charge, security interest, easement, covenant, or other restriction or title matter or encumbrance of any kind in respect of such asset except for (A) specified encumbrances described in Section 3.1(k)(i) of the West Disclosure Letter; (B) leases or subleases by West

or its Subsidiaries as lessor as described in Section 3.1(k)(iv) of the West Disclosure Letter; (C) encumbrances for current Taxes (as defined in Section 3.1(n)) or other governmental charges not yet due and payable; (D) mechanics', carriers', workmen's, repairmen's or other like encumbrances arising or incurred in the ordinary course of business consistent with past practice relating to obligations as to which there is no default on the part of West, or the validity or amount of which is being contested in good faith by appropriate proceedings; and (E) other encumbrances that do not, individually or in the aggregate, materially impair the continued use, operation, value or marketability of the specific parcel of West Owned Real Property or West Leased Real Property to which they relate or the conduct of the business of West and its Subsidiaries as presently conducted.

(l)     Takeover Statutes. The Board of Directors of West has approved this Agreement and the transactions contemplated hereby as required to render inapplicable to such agreements and transactions DGCL Section 203, to the extent applicable. No other state takeover or similar statute or regulation (each a "Takeover Statute") is applicable to West, the Shares, the Merger or the other transactions contemplated by this Agreement.

-22-

<PAGE>

(m)     Environmental Matters.

(i)     (a) West and its Subsidiaries have complied at all times with all applicable Environmental Laws (as defined below) except for such matters as would not, individually or in the aggregate, reasonably be expected to result in a West Material Adverse Effect; (b) no property currently owned, leased or operated by West or any of its Subsidiaries (including soils, groundwater, surface water, buildings or other structures) is contaminated with any Hazardous Substance (as defined below) in a manner that is or could reasonably be expected to be required to be Remediated or Removed (as such terms are defined below), that is in violation of any Environmental Law, or that is reasonably likely to give rise to any Environmental Liability (as defined below) except for any Environmental Liability that would not, individually or in the aggregate, reasonably be expected to result in a West Material Adverse Effect; (c) West and its Subsidiaries have no information that any property formerly owned, leased or operated by West or any of its Subsidiaries was contaminated with any Hazardous Substance during or prior to such period of ownership, leasehold, or operation; (d) neither West nor any of its Subsidiaries nor any prior owner or operator has incurred in the past or is now subject to any Environmental Liabilities except for such matters as would not, individually or in the aggregate, reasonably be expected to result in a West Material Adverse Effect; (e) except as set forth on Section 3.1(m)(i)(e) of the West Disclosure Letter, and except for such matters as would not, individually or in the aggregate, reasonably be expected to result in a West Material Adverse Effect, in the past five (5) years neither West nor any of its Subsidiaries has received any notice, demand, letter, claim or request for information alleging that West or any of its Subsidiaries may be in violation of or subject to liability under any Environmental Law; (f) neither West nor any of its Subsidiaries is subject to any order, decree, injunction or agreement with any Governmental Entity, or any indemnity or other agreement with any third party, concerning liability or obligations relating to any Environmental Law or otherwise relating to any Hazardous Substance or any environmental matter; (g) there is no Removal, Remedial or Response Action being undertaken on any property currently owned, leased or operated by West or any of its Subsidiaries; and (h) there are no other circumstances or conditions involving West or any of its Subsidiaries that could reasonably be expected to result in any Environmental Liability except for such matters as would not, individually or in the aggregate, reasonably be