# EXHIBIT 17 – PART 2

expected to result in a West Material Adverse Effect.

(ii)    As used herein, the term "Environmental Laws" means all Laws relating to: (A) the protection, investigation or restoration of the environment, health, safety, or natural resources, (B) the handling, use, presence, disposal, Release or threatened release of any Hazardous Substance or (C) noise, odor, indoor air, employee exposure, electromagnetic fields, wetlands, pollution, contamination or any injury or threat of injury to persons or property relating to any Hazardous Substance.

(iii)    As used herein, the term "Environmental Liability" means any obligations or liabilities (including any notices, claims, complaints, suits or other assertions of obligations or liabilities) that are: (A) related to environment, health or safety issues (including on-site or off-site contamination by Hazardous Substances of surface or subsurface soil or water, and occupational safety and health); and (B) based

-23-

<PAGE>

upon (I) any provision of Environmental Laws or (II) any order, consent, decree, writ, injunction or judgment issued or otherwise imposed by any Governmental Entity. The term "Environmental Liabilities" includes, without limitation: (A) fines, penalties, judgments, awards, settlements, losses, damages (including consequential damages), costs, fees (including attorneys' and consultants' fees), expenses and disbursements relating to environmental, health or safety matters; (B) defense and other responses to any administrative or judicial action (including notices, claims, complaints, suits and other assertions of liability) relating to environmental, health or safety matters; and (C) financial responsibility for (x) cleanup costs and injunctive relief, including any Removal, Remedial or Response Actions, and natural resource damages, and (y) other Environmental Laws compliance or remedial measures.

(iv)    As used herein, the term "Hazardous Substance" means any "hazardous substance" and any "pollutant or contaminant" as those terms are defined in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"); any "hazardous waste" as that term is defined in the Resource Conservation and Recovery Act ("RCRA"); and any "hazardous material" as that term is defined in the Hazardous Materials Transportation Act (49 U.S.C. Section 1801 et seq.), as amended (including as those terms are further defined, construed, or otherwise used in rules, regulations, standards, orders, guidelines, directives, and publications issued pursuant to, or otherwise in implementation of, said Laws); and including, without limitation, any petroleum product or byproduct, solvent, flammable or explosive material, radioactive material, asbestos, lead paint, polychlorinated biphenyls (or PCBs), dioxins, dibenzofurans, heavy metals, radon gas, mold, mold spores, and mycotoxins.

(v)    As used herein, the term "Release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, placing, discarding, abandonment, or disposing into the environment (including the placing, discarding or abandonment of any barrel, container or other receptacle containing any Hazardous Substance or other material).

(vi)    As used herein, the term "Removal, Remedial or Response Actions" means all actions required to: (1) cleanup, remove, treat or remediate Hazardous Materials in the indoor or outdoor environment; (2) prevent the Release of Hazardous Materials so that they do not migrate, endanger or threaten to endanger public health or welfare or the indoor or outdoor

environment; (3) perform pre-remedial studies and investigations and post-remedial monitoring and care; or (4) respond to any government requests for information or documents in any way relating to cleanup, removal, treatment or remediation or potential cleanup, removal, treatment or remediation of Hazardous Materials in the indoor or outdoor environment.

(n)     Taxes. Except as would not, individually or in the aggregate, reasonably be expected to result in a West Material Adverse Effect: West and each of its Subsidiaries (i) have prepared in good faith and duly and timely filed (taking into account any extension of time within which to file) all Tax Returns (as defined below) required to be filed by any of them and all such filed Tax Returns are complete and accurate in all material respects; and (ii) have paid all Taxes (as defined below) that are required to be

-24-

<PAGE>

paid or that West or any of its Subsidiaries are obligated to withhold from amounts owing to any employee, creditor or third party, except with respect to matters contested in good faith or for which adequate reserves have been established on the most recent consolidated balance sheet included in or incorporated into the West Reports. As of the date hereof, except as would not, individually or in the aggregate, reasonably be expected to result in an increase in Taxes that is material to West, there are no audits, examinations, investigations or other proceedings, in each case, pending or threatened in writing, in respect of Taxes or Tax matters. West has made available to East true and correct copies of the United States federal income Tax Returns filed by West and its Subsidiaries for each of the fiscal years ended December 31, 2003 and 2002. None of West or its Subsidiaries has been a "distributing corporation" or "controlled corporation" in any distribution occurring during the last 30 months that was purported or intended to be governed by Section 355 of the Code (or any similar provision of state, local or foreign law). Neither West nor any of its Subsidiaries has taken any action or knows of any fact, agreement, plan or other circumstance that is reasonably likely to prevent the Merger from qualifying as a reorganization with the meaning of Section 368(a) of the Code. There are no Liens for Taxes on any asset of West or any of its Subsidiaries, except for Liens for Taxes not yet due and payable and Liens for Taxes that would not, individually or in the aggregate, reasonably be expected to result in a West Material Adverse Effect.

As used in this Agreement, (i) the term "Tax" (including, with correlative meaning, the terms "Taxes") includes all federal, state, local and foreign income, profits, franchise, gross receipts, environmental, customs duty, capital stock, severances, stamp, payroll, sales, employment, unemployment, disability, use, property, withholding, excise, escheat, production, value added, occupancy and other taxes, duties or assessments of any nature whatsoever, together with all interest, penalties and additions imposed with respect to such amounts and any interest in respect of such penalties and additions, and (ii) the term "Tax Return" includes all returns and reports (including elections, declarations, disclosures, schedules, estimates and information returns) required or permitted to be supplied to a Tax authority relating to Taxes.

(o)     Labor Matters.

(i)     West has made available to East true and complete copies of all collective bargaining agreements and other labor union contracts (including all amendments thereto) applicable to any employees of West or any of its Subsidiaries (the "West CBAs").

(ii)    No labor union, labor organization or group of employees of West or any of its Subsidiaries has made a pending demand for recognition or certification, and there are no representation or certification proceedings or petitions seeking a representation proceeding presently pending or threatened in writing to be brought or filed with any labor relations tribunal or authority. To West's Knowledge, there are no labor union organizing activities pending or threatened with respect to any employees of West or any of its Subsidiaries.

-25-

<PAGE>

(iii)    There is no labor dispute, strike, slowdown, work stoppage or lockout, or to West's Knowledge, threat thereof by or with respect to any employee of West or any of its Subsidiaries.

(iv)    There are no arbitrations, written grievances or written complaints outstanding or, to West's Knowledge, threatened against West or any of its Subsidiaries under any West CBAs, except for such matters as would not, individually or in the aggregate, reasonably be expected to result in a West Material Adverse Effect. Neither West nor any of its Subsidiaries is in receipt of written notice of any material statutory disputes or unfair labor practice charges.

(p)    Intellectual Property and IT Assets. Except for such matters as would not, individually or in the aggregate, reasonably be expected to result in a West Material Adverse Effect:

(i)    All patents, patent applications, trademark and copyright registrations and applications for registration, and Internet domain name registrations claimed to be owned by West or its Subsidiaries are owned exclusively by West or such Subsidiaries and are subsisting and, to West's Knowledge, valid and enforceable.

(ii)    Except as set forth on Section 3.1(p)(ii) of the West Disclosure Letter, West and/or each of its Subsidiaries owns, or is licensed or otherwise possesses legally enforceable rights to use, all Intellectual Property (as defined below) necessary to conduct the business of West and its Subsidiaries as currently conducted, all of which rights shall in all material respects survive unchanged the execution and delivery of this Agreement and the consummation of the Merger and the other transactions contemplated hereunder.

(iii)    The conduct of the business as currently conducted by West and its Subsidiaries does not infringe, misappropriate or otherwise violate the Intellectual Property rights of any third Person and in the three (3) year period immediately preceding the date of this Agreement, there has been no such claim, action or proceeding asserted, or to West's Knowledge threatened against West or its Subsidiaries or any indemnitee thereof. There is no claim, action or proceeding asserted, or to West's Knowledge threatened, against West or its Subsidiaries or any indemnitees thereof concerning the ownership, validity, registerability, enforceability, infringement, use or licensed right to use any Intellectual Property claimed to be owned or held by West or its Subsidiaries or used or alleged to be used in the business of West or its Subsidiaries.

(iv)    To West's Knowledge, no third Person has, in the three (3) year period immediately preceding the date of this Agreement, infringed, misappropriated or otherwise violated the Intellectual Property rights of West or its Subsidiaries. There are no claims, actions or proceedings asserted or threatened by West, or decided by West to be asserted or threatened, that (A) a third Person infringes, misappropriates or otherwise violates, or in

the three (3) year period immediately preceding the date of this Agreement, infringed, misappropriated or otherwise violated, the Intellectual Property rights of West or its Subsidiaries; or (B) a third Person's owned or claimed Intellectual Property

-26-

<PAGE>

interferes with, infringes, dilutes or otherwise harms the Intellectual Property rights of West or its Subsidiaries.

(v)     West and its Subsidiaries have taken reasonable measures to protect the confidentiality of all material Trade Secrets (as defined below) that are owned, used or held by West and its Subsidiaries and, to West's Knowledge, such material Trade Secrets have not been used, disclosed to or discovered by any Person except pursuant to valid and appropriate non-disclosure and/or license agreements which have not been breached.

(vi)     The IT Assets (as defined below) of West and its Subsidiaries operate and perform in all material respects in accordance with their documentation and functional specifications and otherwise as required by West and its Subsidiaries for the operation of their respective businesses, and have not malfunctioned or failed within the three (3) year period immediately preceding the date of this Agreement. To West's Knowledge, no Person has gained unauthorized access to such IT Assets. West and its Subsidiaries have implemented and maintained for the three (3) year period immediately preceding the date of this Agreement reasonable and sufficient backup and disaster recovery technology consistent with industry practices.

As used in this Agreement,

(1)     "Computer Software" means all computer software and databases (including, without limitation, source code, object code, and all related documentation).

(2)     "Intellectual Property" means, collectively, all United States and foreign (i) trademarks, service marks, brand names, certification marks, collective marks, d/b/a's, Internet domain names, logos, symbols, trade dress, assumed names, fictitious names, trade names, and other indicia of origin, all applications and registrations for the foregoing, and all goodwill associated therewith and symbolized thereby, including all renewals of same (collectively, "Trademarks"); (ii) inventions and discoveries, whether patentable or not, and all patents, registrations, invention disclosures and applications therefor, including divisions, continuations, continuations-in-part and renewal applications, and including renewals, extensions and reissues (collectively, "Patents"); (iii) trade secrets and confidential information and know-how, including confidential processes, schematics, business methods, formulae, drawings, prototypes, models, designs, customer lists and supplier lists (collectively, "Trade Secrets"); (iv) all rights in published and unpublished works of authorship, whether copyrightable or not (including without limitation Computer Software and other compilations of information), copyrights therein and thereto, and registrations and applications therefor, and all renewals, extensions, restorations and reversions thereof (collectively, "Copyrights"); (v) moral rights, rights of publicity and rights of privacy; and (vi) all other intellectual property or proprietary rights.

(3)     "IT Assets" means computers, Computer Software, firmware, middleware, servers, workstations, routers, hubs, switches, data communications lines,

-27-

<PAGE>

and all other information technology equipment and elements, and all associated documentation.

　　　　(q)　　　Foreign Corrupt Practices Act. Except for such matters as would not, individually or in the aggregate, reasonably be expected to result in a material adverse impact on the ability of West and its Subsidiaries to conduct their operations in the ordinary course of business:

　　　　(i)　　　West and its Subsidiaries have developed and implemented a compliance program which includes corporate policies and procedures to ensure compliance with the Foreign Corrupt Practices Act, as amended (the "Foreign Corrupt Practices Act").

　　　　(ii)　　　In connection with its compliance with the Foreign Corrupt Practices Act, there are no adverse or negative past performance evaluations or ratings by the U.S. Government, or any voluntary disclosures under the Foreign Corrupt Practices Act, any enforcement actions or threats of enforcement actions, or any facts that, in each case, could result in any adverse or negative performance evaluation related to the Foreign Corrupt Practices Act.

　　　　(iii)　　　Neither the U.S. Government nor any other Person has notified West or any of its Subsidiaries in writing of any actual or alleged violation or breach of the Foreign Corrupt Practices Act.

　　　　(iv)　　　None of West or its Subsidiaries has undergone and is undergoing any audit, review, inspection, investigation, survey or examination of records relating to West's or any of its Subsidiaries' compliance with the Foreign Corrupt Practice Act, and, to West's Knowledge, there is no basis for any such audit, review, inspection, investigation, survey or examination of records.

　　　　(v)　　　West and its Subsidiaries have not been and are not now under any administrative, civil or criminal investigation, charge or indictment involving alleged false statements, false claims or other improprieties relating to West's or any of its Subsidiaries' compliance with the Foreign Corrupt Practices Act, nor, to West's Knowledge, is there any basis for any such investigation or indictment.

　　　　(vi)　　　None of West or its Subsidiaries has been and is not now a party to any administrative or civil litigation involving alleged false statements, false claims or other improprieties relating to West's or any of its Subsidiaries' compliance with the Foreign Corrupt Practices Act, nor, to West's Knowledge, is there any basis for any such proceeding.

　　　　(r)　　　Aircraft.

　　　　(i)　　　Section 3.1(r)(i) of the West Disclosure Letter sets forth a true and complete list of all aircraft owned or leased by West or any of its Subsidiaries as of March 31, 2005 (the "West Aircraft"), including a description of the type and aircraft number of each such West Aircraft and the date West placed such West Aircraft in

-28-

<PAGE>

service or proposes to place such West Aircraft in service. All West Aircraft

owned or leased by West or any of its Subsidiaries are in airworthy condition and are being maintained according to applicable FAA regulatory standards and the FAA-approved maintenance program of West and its Subsidiaries. West and its Subsidiaries have implemented maintenance schedules with respect to their respective West Aircraft and engines that, if complied with, would result in the satisfaction of all requirements under all applicable ADs and FARs required to be complied with in accordance with the FAA-approved maintenance program of West and its Subsidiaries, and West and its Subsidiaries are in compliance with such maintenance schedules in all material respects and currently have no reason to believe that they will not satisfy any component of such maintenance schedules on or prior to the dates specified in such maintenance schedules.

                    (ii)      Section 3.1(r)(ii) of the West Disclosure Letter sets forth a true and complete list, as of the date hereof, containing all Contracts (other than existing aircraft leases) pursuant to which West or any of its Subsidiaries may purchase or lease aircraft, including the manufacturer and model of all aircraft subject to each Contract. West has delivered or made available to East true and complete copies of all Contracts listed on Section 3.1(r)(ii) of the West Disclosure Letter, including all amendments thereto.

                    (iii)     Each West Aircraft has a validly issued, current individual aircraft FAA Certificate of Airworthiness with respect to such West Aircraft which satisfies all requirements for the effectiveness of such FAA Certificate of Airworthiness.

                    (iv)      Each West Aircraft's structure, systems and components are functioning in accordance with its intended use as set forth in FAA-approved documentation, including any applicable manuals, technical standard orders or parts manufacturing approval certificates.

                    (v)       All deferred maintenance items and temporary repairs with respect to each such West Aircraft have been or will be made materially in accordance with FAA, manufacturer's and West's maintenance programs.

                    (vi)      Each West Aircraft is properly registered on the FAA aircraft registry.

                    (vii)     West is not a party to any interchange or pooling agreements with respect to its West Aircraft.

                    (viii)    No West Aircraft is subleased to or otherwise in the possession of another air carrier or other Person other than West or any of its Subsidiaries, to operate such West Aircraft in air transportation or otherwise.

                    (s)       Slots. Section 3.1(s) of the West Disclosure Letter sets forth a true, correct and complete list of all takeoff and landing slots and other similar takeoff and landing rights ("West Slots") used by West or any of its Subsidiaries on the date hereof at any domestic or international airport, including a true, correct and complete list of all West Slot lease agreements. West and its Subsidiaries will have complied in all material respects with the requirements of the regulations issued under the Federal

                                        -29-

<PAGE>

Aviation Act and any other Laws with respect to the West Slots. Neither West nor any of its Subsidiaries has received any notice of any proposed withdrawal of the West Slots by the FAA, the DOT or any other Governmental Entity. The West Slots have not been designated for the provision of essential air services in accordance with the regulations issued under the Federal Aviation Act, were not

acquired pursuant to 14 C.F.R. Section 93.219 and have not been designated for international operations, as more fully detailed in 14 C.F.R. Section 93.217. To the extent covered by 14 C.F.R. Section 93.227, West and its Subsidiaries have used each West Slot either at least 80% of the maximum amount that each West Slot could have been used during each full and partial reporting period (as described in 14 C.F.R. Section 93.227(i)) or such greater or lesser amount of minimum usage as may have been required to protect such West Slot's authorization from termination or withdrawal under regulations established by any Governmental Entity or airport authority. All reports required by the FAA or any Governmental Entity relating to the West Slots have been filed in a timely manner. Neither West nor any of its Subsidiaries has agreed to any West Slot slide, West Slot trade, West Slot purchase, West Slot sale or other transfer of any of the West Slots.

(t)    Equipment. Section 3.1(t) of the West Disclosure Letter sets forth a true, correct and complete list of all passenger loading bridges owned by West or any of its subsidiaries.

(u)    U.S. Citizen; Air Carrier. West's primary subsidiary, America West Airlines, Inc., is a "citizen of the United States" as defined in the Federal Aviation Act and is an "air carrier" within the meaning of such Act operating under certificates issued pursuant to such Act (49 U.S.C. Sections 41101-41112).

(v)    Insurance. Section 3.1(v) of the West Disclosure Letter lists and briefly describes (including name of insurer, agent or broker, coverage and expiration date) each insurance policy maintained by, at the expense of or for the benefit of West or any of the Subsidiaries with respect to its properties and assets. All such insurance policies are in full force and effect and neither West nor any Subsidiary is in default with respect to its obligations under any such insurance policy. The insurance coverage of West and the Subsidiaries is customary for corporations of similar size engaged in similar lines of businesses. West has not received any notice or other communication regarding any actual or possible (a) cancellation or invalidation of any insurance policy, (b) refusal of any coverage or rejection of any material claim under any insurance policy or (c) material adjustment in the amount of premiums payable with respect to any insurance policy.

(w)    Brokers and Finders. Neither West nor any of its officers, directors or employees has employed any broker or finder or incurred any liability for any brokerage fees, commissions or finders, fees in connection with the Merger or the other transactions contemplated in this Agreement, except that West has employed, and is solely responsible for the fees and expenses of, Greenhill & Co., LLC and TPG Partners, L.P., or one of its affiliates, as its financial advisors that may be payable to them in connection with any of the transactions contemplated by this Agreement, and a copy of

-30-

<PAGE>

the engagement letter with each such financial advisor has been provided to East prior to the date hereof.

3.2    Representations and Warranties of East and Merger Sub. Except as set forth in the disclosure letter (subject to Section 7.12(c) of this Agreement) delivered to West by East prior to entering into this Agreement (the "East Disclosure Letter") or, to the extent the qualifying nature of such disclosure with respect to a specific representation and warranty is readily apparent therefrom, as set forth in the East Reports (as defined in Section 3.2(f)) filed on or after January 1, 2005 and prior to the date hereof

(excluding any disclosures included in any such East Report that are predictive or forward-looking in nature), East and Merger Sub each hereby represent and warrant to West that:

(a)    Organization, Good Standing and Qualification. Each of East and Merger Sub is a legal entity duly organized, validly existing and in good standing under the Laws of its respective jurisdiction of organization and, pursuant to Sections 1107 and 1108 of the Bankruptcy Code and the orders of the Bankruptcy Court, has all requisite corporate or similar power and authority to own and operate its properties and assets and to carry on its business as presently conducted and is qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of its assets or properties or conduct of its business requires such qualification, except where the failure to be so organized, validly existing, qualified or in good standing, or to have such power or authority, would not, individually or in the aggregate, reasonably be expected (x) to result in a material adverse effect on the financial condition, assets, liabilities, business or results of operations of East and its Subsidiaries taken as a whole, excluding any such effect resulting from (I) changes or conditions generally affecting the U.S. economy or financial markets, (II) changes or conditions generally affecting any of the segments of the airline industry in which East or any of its Subsidiaries operates, to the extent such conditions or changes do not disproportionately impact East or its Subsidiaries, (III) changes or conditions resulting from divestiture required in order to satisfy Section 5.1(b) hereof or (IV) the announcement or consummation of this Agreement, or (y) to prevent, materially delay or materially impair the ability of East and Merger Sub to consummate the Merger and the other transactions contemplated by this Agreement (a "East Material Adverse Effect").

(b)    Capital Structure of East. Upon the Closing and after giving effect to the Confirmation Order and the Plan, the authorized common stock of East shall consist of 200,000,000 shares of East Common Stock, of which 47,475,729 shares will be outstanding, subject to the assumptions set forth on Section 3.2(b)(i) of the East Disclosure Letter. At the Effective Time, the East Common Stock to be issued and delivered pursuant to the terms hereof, shall have been duly authorized and validly issued, fully paid, nonassessable and not subject to preemptive or similar rights of third parties or reserved for issuance in accordance with the terms of the Plan and Confirmation Order. The rights, preferences and privileges of the capital stock of East shall be as set forth in the Parent Charter, as amended pursuant to the Plan and in effect at the Effective Time. Other than pursuant to the transactions contemplated by this Agreement, and except as set forth on Section 3.2(b)(ii) of the East Disclosure Letter,

-31-

<PAGE>

upon the Closing and after giving effect to the Confirmation Order and the Plan, there will be no preemptive or other outstanding rights, options, warrants, conversion rights, stock appreciation rights, redemption rights, repurchase rights, agreements, arrangements, calls, commitments or rights of any kind that obligate East or any of its Subsidiaries to issue or sell any shares of capital stock or other securities of East or any of its Subsidiaries or any securities or obligations convertible or exchangeable into or exercisable for, or giving any Person a right to subscribe for or acquire, any securities of East or any of its Subsidiaries, and no securities or obligations evidencing such rights are authorized, issued or outstanding.

(c)    Capitalization of Merger Sub. The authorized capital stock of Merger Sub consists solely of 1,000 shares of Common Stock, par value

$0.01 per share, all of which are validly issued and outstanding. All of the issued and outstanding capital stock of Merger Sub is, and at the Effective Time will be, directly owned by East. Merger Sub has not conducted any business prior to the date hereof and has no, and prior to the Effective Time will have no, assets, liabilities or obligations of any nature other than those incident to its formation and pursuant to this Agreement and the Merger and the other transactions contemplated by this Agreement.

       (d)      Corporate Authority; Approval and Fairness.

       (i)      Subject to entry by the Bankruptcy Court of the Confirmation Order, (x) each of East and Merger Sub has all requisite corporate power and authority and has taken all corporate action necessary in order to execute, deliver and perform its obligations under this Agreement and to consummate the Merger, and (y) this Agreement is a valid and binding agreement of East and Merger Sub, enforceable against each of East and Merger Sub in accordance with its terms.

       (ii)      The Board of Directors of each of East and Merger Sub has declared that the Merger and the other transactions contemplated hereby are advisable, the Board of Directors of East has approved this Agreement and the Board of Directors and the sole shareholder of Merger Sub have adopted this Agreement.

       (e)      Governmental Filings; No Violations; Certain Contracts.

       (i)      Other than the reports, filings, registrations, consents, approvals, permits, authorizations and/or notices (A) pursuant to Section 1.3; (B) under the HSR Act, the Securities Act and the Exchange Act and the rules and regulations promulgated thereunder; (C) with, from or to the FAA; (D) with, from or to the DOT; (E) with, from or to the FCC; (F) with, from or to the DHS; (G) with, from or to the ATSB and (H) with, from or to those foreign Governmental Entities regulating competition and the airline industry set forth in Section 3.2(e)(i)(H) of the East Disclosure Letter, no notices, reports or other filings are required to be made by East with, nor are any consents, registrations, approvals, permits or authorizations required to be obtained by East or any of its Subsidiaries from any Governmental Entity (subject and after giving effect to any required approvals of the Bankruptcy Court (including, without limitation, to the extent applicable, the Confirmation Order) and the Plan) in connection with the execution,

-32-

<PAGE>

delivery and performance of this Agreement by East and the consummation by East and Merger Sub of the Merger and the other transactions contemplated hereby, except those that the failure to make or obtain would not, individually or in the aggregate, reasonably be expected to result in an East Material Adverse Effect.

       (ii)      The execution, delivery and performance of this Agreement by East and Merger Sub do not, and the consummation by East and Merger Sub of the Merger and the other transactions contemplated hereby will not, constitute or result in (A) a breach or violation of, or a default under, the certificate of incorporation or by-laws of East or Merger Sub; (B) with or without notice, lapse of time or both, a breach or violation of, a termination (or right of termination) or a default under, the creation or acceleration of any obligations under or the creation of a Lien on any of the assets of East or any of its Subsidiaries pursuant to any Contract binding upon East or any of its

Subsidiaries or, assuming (solely with respect to performance of this Agreement and consummation by East and Merger Sub of the Merger and the other transactions contemplated hereby) compliance with the matters referred to in Section 3.2(e)(i), any Law or governmental or non-governmental permit or license to which East or any of its Subsidiaries is subject; or (C) a default under any agreement or loan agreement or any other indebtedness agreement or instrument of indebtedness that first occurred after the commencement of the Cases that is binding upon East or any of its Subsidiaries or assets, except, in the case of clause (B) or (C) above, for any breach, violation, termination, default, creation, acceleration or change that would not, individually or in the aggregate, reasonably be expected to prevent the ability of East or Merger Sub to consummate the Merger and the other transactions contemplated by this Agreement.

(f)    East Reports; Financial Statements.

(i)    East has made available to West each registration statement, report, proxy statement or information statement prepared by it since December 31, 2004 (the "East Audit Date") and filed with the SEC, including East's Annual Report on Form 10-K for the year ended December 31, 2004, each in the form (including exhibits, annexes and any amendments thereto) filed with the SEC. East has filed or furnished all forms, statements, schedules, reports and documents required to be filed or furnished by it with the SEC pursuant to applicable securities statutes, regulations, policies and rules since the East Audit Date (the forms, statements, schedules, reports and documents filed or furnished with the SEC since the East Audit Date and those filed or furnished with the SEC subsequent to the date of this Agreement, if any, including any amendments thereto, the "East Reports"). Each of the East Reports, at the time of its filing, complied in all material respects with the applicable requirements of the Exchange Act and the rules and regulations thereunder and complied in all material respects with the then applicable accounting standards. As of their respective dates (or, if amended, as of the date of such amendment), the East Reports did not, and any East Reports filed with the SEC subsequent to the date hereof will not, contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances in which they were made, not misleading. The East Reports included or will include all certificates required to be included therein pursuant to Sections 302 and 906 of the SOX Act, and the internal

-33-

<PAGE>

control report and attestation of East's outside auditors required by Section 404 of the SOX Act.

(ii)    Each of the consolidated balance sheets included in or incorporated by reference into the East Reports (including the related notes and schedules) fairly presents, or, in the case of East Reports filed after the date hereof, will fairly present, in all material respects, the consolidated financial position of East and any other entity included therein and their respective Subsidiaries as of its date and each of the consolidated statements of income, shareholders' equity and cash flows included in or incorporated by reference into the East Reports (including any related notes and schedules) fairly presents, or in the case of East Reports filed after the date hereof, will fairly present, in all material respects, the net income, total shareholders' equity and net increase in cash and cash equivalents, as the case may be, of East and any other entity included therein and their respective Subsidiaries for the periods set forth therein (subject, in the case of unaudited statements, to notes and normal year-end audit adjustments that are

not expected to be material in amount or effect), in each case in accordance with GAAP consistently applied during the periods involved, except as may be noted therein and subject, in the case of any unaudited interim financial statements, to the absence of notes.

(iii)    The management of East has (x) established and maintains disclosure controls and procedures (as defined in Rule 13a-15(e) of the Exchange Act) designed to ensure that material information relating to East, including its consolidated Subsidiaries, is made known to the management of East by others within those entities, and (y) has disclosed, based on its most recent evaluation, to East's outside auditors and the audit committee of the Board of Directors of East (A) all significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting (as defined in Rule 13a-15(f) of the Exchange Act) which are reasonably likely to adversely affect East's ability to record, process, summarize and report financial data and (B) any fraud, whether or not material, that involves management or other employees who have a significant role in East's internal controls over financial reporting. Since the Audit Date, any material change in internal control over financial reporting required to be disclosed in any East Report has been so disclosed.

(iv)    Since the Audit Date, neither East nor any of its Subsidiaries nor, to East's Knowledge (as defined below), any director, officer, employee, auditor, accountant or representative of East or any of its Subsidiaries has received or otherwise had or obtained knowledge of any material complaint, allegation, assertion or claim, whether written or oral, regarding the accounting or auditing practices, procedures, methodologies or methods of East or any of its Subsidiaries or their respective internal accounting controls relating to periods after the Audit Date, including any material complaint, allegation, assertion or claim that East or any of its Subsidiaries has engaged in questionable accounting or auditing practices (except for any of the foregoing after the date hereof which have no reasonable basis), "East's Knowledge" shall mean the knowledge of the Chief Executive Officer and each Executive Vice President and Senior Vice President of East, after reasonable inquiry.

-34-

<PAGE>

(g)    Absence of Changes. Since the East Audit Date, East and its Subsidiaries have conducted their respective businesses only in accordance with, and have not engaged in any material transaction other than in accordance with, the orders of the Bankruptcy Court for the operation of East. Since the East Audit Date, there has not been any East Material Adverse Effect or any event, occurrence, discovery or development which would, individually or in the aggregate, reasonably be expected to result in an East Material Adverse Effect.

(h)    Litigation and Liabilities.

(i)    Other than the Cases and proceedings therein, or as otherwise disclosed on East's Annual Report on Form 10-K for the year ended December 31, 2004, or as set forth on Section 3.2(h)(i) of the East Disclosure Letter, there are no (A) civil, criminal or administrative actions, suits, claims, hearings, investigations or proceedings pending or, to East's Knowledge, threatened against East or its Subsidiaries or (B) litigations, arbitrations, investigations or other proceedings, or injunctions or final judgments relating to, pending or, to East's Knowledge, threatened against East or any of its Subsidiaries before any Governmental Entity, including without limitation the FAA, except in the case of either clause (A) or (B), for those that would not,

individually or in the aggregate, reasonably be expected to result in an East Material Adverse Effect. Other than any order of the Bankruptcy Court, none of East or any of its Subsidiaries is a party to or subject to the provisions of any judgment, order, writ, injunction, decree or award of any Governmental Entity which would, individually or in the aggregate, reasonably be expected to result in an East Material Adverse Effect.

        (ii)     Except as set forth in the Plan, there are no liabilities or obligations of East or any of its Subsidiaries, whether or not accrued, contingent or otherwise and whether or not required to be disclosed, or any other facts or circumstances that would reasonably be expected to result in any obligations or liabilities of, East or any of its Subsidiaries, other than:

        (A)     liabilities or obligations to the extent (I) reflected on the consolidated balance sheet of East or (II) disclosed in the notes thereto, in accordance with GAAP, in each case included in East's quarterly report on Form 10-Q for the period ended March 31, 2005 or in East's annual report on Form 10-K for the period ended December 31, 2004;

        (B)     liabilities or obligations incurred in the ordinary course of business since December 31, 2004;

        (C)     performance obligations under contracts required in accordance with their terms, or performance obligations, to the extent required under applicable Law, in each case to the extent arising after the date hereof; or

        (D)     liabilities or obligations that would not, individually or in the aggregate, reasonably be expected to result in an East Material Adverse Effect.

-35-

&lt;PAGE&gt;

        (i)     Employee Benefits.

        (i)     Section 3.2(i)(i) of the East Disclosure Letter contains a true and complete list of each material East Compensation and Benefit Plan. "East Compensation and Benefit Plan" means each bonus, deferred compensation, incentive compensation, stock purchase, stock option, severance pay, medical, life or other insurance, profit-sharing, or pension plan, program, agreement or arrangement, and each other employee benefit or compensation plan, program, agreement or arrangement, sponsored, maintained or contributed to or required to be contributed to by East or any of its Subsidiaries or by any trade or business, whether or not incorporated, that together with East or any of its Subsidiaries would be deemed a "single employer" under Section 414 of the Code (an "East ERISA Affiliate") or to which East or any East ERISA Affiliate is a party, for the benefit of, with or relating to any current or former employee, officer or director of East or any East ERISA Affiliate; provided, however, that "East Compensation and Benefit Plan" shall not include any plan, program or agreement that is, or has been, terminated or rejected at any time during the pendency of the Cases. Except as would not result in a material liability, neither East nor any of its Subsidiaries has any formal plan or commitment, whether legally binding or not, to create any additional plan or modify or change any existing East Compensation and Benefit Plan (excluding any severance or retention bonus plan) that would affect any employee or director or former employee or former director of East or any of its Subsidiaries.

        (ii)     With respect to each of the material East

Compensation and Benefit Plans, East has heretofore delivered or made available to West true and complete copies of each of the following documents: (A) the East Compensation and Benefit Plan and related trust agreements and insurance contracts (including all amendments thereto), if any; (B) the most recent annual report, actuarial report, and financial statement, if any; (C) the most recent Summary Plan Description, together with each Summary of Material Modifications, required under ERISA with respect to such East Compensation and Benefit Plan, if any; and (D) the most recent determination letter received from the IRS with respect to each East Compensation and Benefit Plan that is intended to be qualified under Section 401(a) of the Code.

          (iii)     Except with respect to claims covered by the Cases, and except as set forth on Section 3.2(i)(iii) of the East Disclosure Letter, (A) no liability under Title IV of ERISA, Section 302 of ERISA or Section 412 of the Code has been incurred by East or any of its Subsidiaries or any East ERISA Affiliate since the effective date of ERISA that has not been satisfied in full (or previously discharged under the Bankruptcy Code), and (B) no condition exists that presents a risk to East or any of its Subsidiaries or any East ERISA Affiliate of incurring a liability under such Title or such Sections, in each case, which would, individually or in the aggregate, reasonably be expected to have an East Material Adverse Effect.

          (iv)     Neither East, nor any of its Subsidiaries, nor any East ERISA Affiliate, nor any of the East Compensation and Benefit Plans, nor any trust created thereunder, nor, to East's Knowledge, any trustee or administrator thereof, has engaged in a prohibited transaction (within the meaning of Section 406 of ERISA and Section 4975

-36-

<PAGE>

of the Code) in connection with which East, any of its Subsidiaries, or any of the East Compensation and Benefit Plans would, individually or in the aggregate, reasonably be expected to have an East Material Adverse Effect.

          (v)     Except to the extent covered by the Plan or as would not, individually or in the aggregate, have an East Material Adverse Effect, and except as set forth on Section 3.2(i)(v) of the East Disclosure Letter, (A) all contributions required to have been made under the terms of any East Compensation and Benefit Plan have been timely made, and (B) all obligations in respect of each East Compensation and Benefit Plan have been properly accrued and reflected on the most recent consolidated statement of operations and consolidated balance sheet filed or incorporated by reference in the East Reports to the extent required by GAAP.

          (vi)     Except as set forth on Section 3.2(i)(vi) of the East Disclosure Letter, no East Compensation and Benefit Plan (other than any that is a "multiemployer plan" as such term is defined in Section 3(37) of ERISA) is subject to Section 412 of the Code or Section 302 of ERISA or Title IV of ERISA.

          (vii)     None of the East Compensation and Benefit Plans is a "multiple employer welfare arrangement," as such term is defined in Section 3(40) of ERISA, or single employer plan that has two or more contributing sponsors, at least two of whom are not under common control, within the meaning of Section 4063(a) of ERISA. With respect to any East Compensation and Benefit Plan that is a "multiemployer plan" as such term is defined in Section 3(37) of ERISA (each of which is identified in Section 3.2(i)(vii) of the East Disclosure Letter), (A) neither East, any of its Subsidiaries nor any East ERISA Affiliate has made or suffered a "complete withdrawal" or a "partial withdrawal," as such terms are respectively defined in Section 4203 and 4205 of ERISA, (B) no event

has occurred that presents a material risk of a partial withdrawal, (C) neither
East, any of its Subsidiaries nor any East ERISA Affiliate has any contingent
liability under Section 4204 of ERISA, and no circumstances exist that present a
material risk that any such plan will go into reorganization, and (D) neither
East, any of its Subsidiaries nor any East ERISA Affiliates would have any
material withdrawal liability if a complete withdrawal by East, its Subsidiaries
and the East ERISA Affiliates occurred under each such plan on the date hereof.

         (viii)   Except as set forth on Section 3.2(i)(viii) of the
East Disclosure Letter, the IRS has issued a favorable determination letter in
respect of each of the East Compensation and Benefit Plans that is intended to
be "qualified" within the meaning of Section 401(a) of the Code and neither East
nor any of its Subsidiaries is aware of any circumstances that could reasonably
be expected to result in the revocation of such letter. Each of the East
Compensation and Benefit Plans that is intended to satisfy the requirements of
Section 125 or 501(c)(9) of the Code satisfies such requirements in all material
respects, except as would not, either individually or in the aggregate,
reasonably be expected to have an East Material Adverse Effect. Each of the East
Compensation and Benefit Plans has been operated and administered in all
material respects in accordance with its terms and applicable laws, including
but not limited to ERISA and the Code,

                                   -37-

<PAGE>

except as would not, either individually or in the aggregate, reasonably be
expected to have an East Material Adverse Effect.

         (ix)   Except for claims filed in connection with the Cases,
there are no claims pending, or, to East's Knowledge, threatened or anticipated
(other than routine claims for benefits) against any East Compensation and
Benefit Plan, the assets of any East Compensation and Benefit Plan or against
East, any of its Subsidiaries or any East ERISA Affiliate with respect to any
East Compensation and Benefit Plan. Except in connection with the Cases, there
is no judgment, decree, injunction, rule or order of any court, governmental
body, commission, agency or arbitrator outstanding against or in favor of any
East Compensation and Benefit Plan or any fiduciary thereof (other than rules of
general applicability). There are no pending or, to East's Knowledge, threatened
audits or investigations by any governmental body, commission or agency
involving any East Compensation and Benefit Plan, that would, individually or in
the aggregate, reasonably be expected to have an East Material Adverse Effect.

         (x)   Except as will be disclosed in, or covered by, the
Plan, or as set forth on Section 3.2(i)(x) of the East Disclosure Letter, no
East Compensation and Benefit Plan provides benefits, including without
limitation death or medical benefits (whether or not insured), with respect to
current or former employees or directors of East or any of its Subsidiaries
after retirement or other termination of service (other than (A) coverage
mandated by applicable law, (B) death benefit or retirement benefits under any
"employee pension benefit plan," as that term is defined in Section 3(2) of
ERISA, (C) deferred compensation benefits accrued as liabilities on the books of
East, or (D) benefits, the full cost of which is borne by the current or former
employee or director (or his beneficiary)), which would, individually or in the
aggregate, reasonably be expected to result in an East Material Adverse Effect.

         (xi)   Except as set forth on Section 3.2(i)(xi) of the East
Disclosure Letter, East and its Subsidiaries have no unfunded liabilities with
respect to any East Compensation and Benefit Plan that is a "pension plan"
(within the meaning of Section 3(2) of ERISA) that covers current or former
non-U.S. employees of East or any of its Subsidiaries which, if funded, would,

individually or in the aggregate, reasonably be expected to have an East Material Adverse Effect.

        (j)      Compliance with Laws; Licenses.

        (i)      The businesses of each of East and its Subsidiaries have not been conducted in violation of any material federal, state, local or foreign Laws or any applicable operating certificates, common carrier obligations, ADs, FARs or any other rules, regulations, directives or policies of the FAA, DOT, FCC, DHS or any other Governmental Entity, except for such violations that would not, individually or in the aggregate, reasonably be expected to result in an East Material Adverse Effect. No investigation or review by any Governmental Entity with respect to East or any of its Subsidiaries is pending or, to East's Knowledge, threatened, nor has any Governmental Entity indicated an intention to conduct the same, except for any such investigations or reviews that would not, individually or in the aggregate, reasonably be expected to result in an East Material Adverse Effect. Each of East and its Subsidiaries has obtained and is in substantial compliance with all Licenses necessary to conduct its business as presently conducted, except for any failures to have or to be in compliance with such Licenses which would not, individually or in the aggregate, reasonably be expected to result

<div align="center">-38-</div>

&lt;PAGE&gt;

in an East Material Adverse Effect. The representations and warranties contained in this Section 3.2(j) shall not apply to the following applicable Laws to the extent applicable to East and its Subsidiaries (or Licenses required under such applicable Laws): (i) ERISA and other applicable Laws regarding employee benefit matters, which are exclusively governed by Section 3.2(i), (ii) applicable Laws regarding Taxes, which are exclusively governed by Section 3.2(o), (iii) Environmental Laws, which are exclusively governed by Section 3.2(n), and (iv) applicable Laws regarding labor matters, which are exclusively governed by Section 3.2(p).

        (ii)      Each of East and its Subsidiaries is in compliance with (A) its obligations under each of the Licenses and (B) the rules and regulations of the Governmental Entity issuing such Licenses, except in each instance for any failures to be in compliance which would not, individually or in the aggregate, reasonably be expected to result in an East Material Adverse Effect. There is not pending or, to East's Knowledge, threatened before the FAA, DOT or any other Governmental Entity any material proceeding, notice of violation, order of forfeiture or complaint or investigation against East or any of its Subsidiaries relating to any of the Licenses, except for any of the foregoing that would not, individually or in the aggregate, reasonably be expected to result in an East Material Adverse Effect. The actions of the applicable Governmental Entities granting all Licenses have not been reversed, stayed, enjoined, annulled or suspended, and there is not pending or, to East's Knowledge, threatened, any material application, petition, objection or other pleading with the FAA, DOT or any other Governmental Entity which challenges or questions the validity of or any rights of the holder under any License, except as set forth on Section 3.2(j)(ii) of the East Disclosure Letter and except, for any of the foregoing that would not, individually or in the aggregate, reasonably be expected to result in an East Material Adverse Effect.

        (k)      Material Contracts.

        (i)      As of the date of this Agreement, neither East nor any of its Subsidiaries is a party to or bound by any Contract, assumed or not rejected in connection with the Cases as of the date of this Agreement, required

pursuant to Item 601 of Regulation S-K under the Securities Act to be filed as
an exhibit to East's Annual Report on Form 10-K for the year ended December 31,
2004, or on any Quarterly Report on Form 10-Q or Current Report on Form 8-K
filed by East since December 31, 2004, which has not been so filed.

        (ii)    As of the date of this Agreement, neither East nor
any of its Subsidiaries is a party to or is bound by any non-competition
Contract or other Contract (other than the East CBAs, as defined below), assumed
or not rejected in connection with the Cases as of the date of this Agreement,
that (I) purports to limit in any material respect either the type of business
in which East or its Subsidiaries may engage or the manner or locations in which
any of them may so engage in any business, or (II) could

                              -39-

<PAGE>

require the disposition of any material assets or line of business of East or
any of its Subsidiaries.

        (iii)   All Contracts that have been filed as an exhibit to
East's Annual Report on Form 10-K for the year ended December 31, 2004, or on
any Quarterly Report on Form 10-Q or Current Report on Form 8-K filed by East
since December 31, 2004, and all Contracts listed on Section 3.2(k)(ii) of the
East Disclosure Letter, together with all exhibits and schedules to such
Contracts, shall constitute the "East Material Contracts".

        (iv)    A true and complete copy of each East Material
Contract has previously been delivered or made available to West (subject to
applicable confidentiality restrictions) and each such Contract is a valid and
binding agreement of East or one of its Subsidiaries, as the case may be, and is
in full force and effect, except to the extent they have previously expired in
accordance with their terms or if the failure to be in full force and effect,
individually or in the aggregate, would not, individually or in the aggregate,
reasonably be expected to have an East Material Adverse Effect. Neither East nor
any of its Subsidiaries is in default or breach under the terms of any such East
Material Contract which would, individually or in the aggregate, reasonably be
expected to result in an East Material Adverse Effect.

        (l)     Real Property.

        (i)     Except in any such case as would not, individually or
in the aggregate, reasonably be expected to result in an East Material Adverse
Effect, with respect to the real property, including the land and any and all
buildings, structures and other improvements located thereon, owned by East or
its Subsidiaries or as set forth in Section 3.2(l)(i) of the East Disclosure
Letter (the "East Owned Real Property"), (A) East, or any one of its
Subsidiaries, as applicable, has good and marketable title to the East Owned
Real Property, free and clear of any Encumbrance, and (B) there are no
outstanding options or rights of first refusal to purchase the East Owned Real
Property, or any portion thereof or interest therein.

        (ii)    Section 3.2(l)(ii) of the East Disclosure Letter sets
forth a true, correct and complete list of all the airport gates leased,
occupied or otherwise used by East or any of its Subsidiaries (the "East
Gates"), including, where applicable, the gate number and the airport and
terminal or concourse location of each such East Gate.

        (iii)   With respect to the real property leased or subleased
to East or its Subsidiaries as lessee, assumed or not rejected in connection
with the Cases as of the date of this Agreement, (the "East Leased Real

Property" and, together with the East Gates and East Owned Real Property, the "East Real Property"), (A) the lease or sublease for such property is valid, legally binding, enforceable in accordance with its terms and in full force and effect, and none of East or any of its Subsidiaries is in breach of or default under such lease or sublease, and no event has occurred which, with notice, lapse of time or both, would constitute a breach or default by any of East or its Subsidiaries or permit termination, modification or acceleration by any third party thereunder, and (B) no third

-40-

<PAGE>

party lessor has repudiated or has the right to terminate or repudiate such lease or sublease (except for the normal exercise of remedies in connection with a default thereunder or any termination rights set forth in the lease or sublease) or any provision thereof, except in each case, for such invalidity, failures to be binding, unenforceability, ineffectiveness, breaches, defaults, terminations, modifications, accelerations, repudiations and rights to terminate or repudiate that would not, individually or in the aggregate, reasonably be expected to result in an East Material Adverse Effect.

(iv)     Section 3.2(l)(iv) of the East Disclosure Letter contains a true, correct and complete list of all material East Real Property, including the name of the owner of record thereof, a brief description of the use of such East Real Property, a list of any leases, subleases or other agreements, pursuant to which East or its Subsidiaries lease any East Real Property as lessor, in each case including identification of the lease expiration date, and a description of the lease, sublease or other agreement for all East Leased Real Property. Except as would not, individually or in the aggregate, reasonably be expected to have an East Material Adverse Effect, or as set forth in Section 3.2(l)(iv) of the East Disclosure Letter, no third party occupies or uses or has the right to occupy or use all or any part of any East Real Property.

(v)     Except as would not, individually or in the aggregate, reasonably be expected to result in an East Material Adverse Effect, all water, gas, electrical, steam, compressed air, telecommunication, sanitary and storm sewage lines and systems and other similar systems currently serving the East Real Property are installed and operating and are sufficient to enable the East Real Property to continue to be used and operated in the manner currently being used and operated, and to East's Knowledge there is no factor or condition that could result in the termination or material impairment of the furnishing thereof.

(vi)     All Licenses required to have been issued to East to enable any East Real Property to be lawfully occupied and used for all of the purposes for which they are currently occupied and used have been lawfully issued and are in full force and effect, except as would not, individually or in the aggregate, reasonably be expected to result in an East Material Adverse Effect.

(vii)     East has not received any notice, nor to East's Knowledge is there any pending, threatened or contemplated condemnation or eminent domain proceeding affecting any East Real Property or any part thereof, or any proposed termination or impairment of any parking at any such East Real Property or denial of access to any such East Real Property from any current point of public access, or of any sale or other disposition of any such East Real Property or any part thereof in lieu of condemnation, except as would not, individually or in the aggregate, reasonably be expected to result in an East Material Adverse Effect.

(viii)    Except as set forth on Section 3.2(l)(viii) of the East Disclosure Letter, no portion of any East Real Property has suffered any damage by fire or other casualty loss which has not heretofore been completely repaired and restored to its

-41-

<PAGE>

original condition (ordinary wear and tear excepted), except as would not, individually or in the aggregate, reasonably be expected to result in an East Material Adverse Effect.

(ix)    For purposes of this Section 3.2(l) only, "Encumbrance" means any mortgage, lien, pledge, charge, security interest, easement, covenant, or other restriction or title matter or encumbrance of any kind in respect of such asset except for (A) specified encumbrances described in Section 3.2(l)(i) of the East Disclosure Letter; (B) leases or subleases by East or its Subsidiaries as lessor as described in Section 3.2(l)(iv) of the East Disclosure Letter; (C) encumbrances for current Taxes or other governmental charges not yet due and payable; (D) mechanics', carriers', workmen's, repairmen's or other like encumbrances arising or incurred in the ordinary course of business consistent with past practice relating to obligations as to which there is no default on the part of East, or the validity or amount of which is being contested in good faith by appropriate proceedings; and (E) other encumbrances that do not, individually or in the aggregate, materially impair the continued use, operation, value or marketability of the specific parcel of East Owned Real Property or East Leased Real Property to which they relate or the conduct of the business of East and its Subsidiaries as presently conducted.

(m)    Takeover Statutes. The Board of Directors of East and Merger Sub have approved this Agreement and the transactions contemplated hereby as required to render inapplicable to such agreements and transactions DGCL Section 203. No other Takeover Statute is applicable to East, Merger Sub, the Shares, the Merger or the other transactions contemplated by this Agreement.

(n)    Environmental Matters. (i) (i) East and its Subsidiaries have complied at all times with all applicable Environmental Laws except for such matters as would not, individually or in the aggregate, reasonably be expected to result in an East Material Adverse Effect; (ii) no property currently owned, leased or operated by East or any of its Subsidiaries (including soils, groundwater, surface water, buildings or other structures) is contaminated with any Hazardous Substance in a manner that is or could reasonably be expected to be required to be Remediated or Removed, that is in violation of any Environmental Law, or that is reasonably likely to give rise to any Environmental Liability except for any Environmental Liability that would not, individually or in the aggregate, reasonably be expected to result in an East Material Adverse Effect; (iii) East and its Subsidiaries have no information that any property formerly owned, leased or operated by East or any of its Subsidiaries was contaminated with any Hazardous Substance during or prior to such period of ownership, leasehold, or operation; (iv) neither East nor any of its Subsidiaries nor any prior owner or operator has incurred in the past or is now subject to any Environmental Liabilities except for such matters as would not, individually or in the aggregate, reasonably be expected to result in an East Material Adverse Effect; (v) except as set forth on Section 3.2(n) of the East Disclosure Letter, and except for such matters as would not, individually or in the aggregate, reasonably be expected to result in an East Material Adverse Effect, in the past five (5) years neither East nor any of its Subsidiaries has received any notice, demand, letter, claim or request for information alleging that East or any of its Subsidiaries may be in violation of

or subject to liability under any Environmental Law; (vi) neither East nor any

-42-

<PAGE>

of its Subsidiaries is subject to any order, decree, injunction or agreement
with any Governmental Entity, or any indemnity or other agreement with any third
party, concerning liability or obligations relating to any Environmental Law or
otherwise relating to any Hazardous Substance or any environmental matter; (vii)
there is no Removal, Remediated or Required Action being undertaken on any
property currently owned, leased or operated by East or any of its Subsidiaries;
and (viii) there are no other circumstances or conditions involving East or any
of its Subsidiaries that could reasonably be expected to result in any
Environmental Liability except for such matters as would not, individually or in
the aggregate, reasonably be expected to result in an East Material Adverse
Effect.

         (o)      Taxes. Except as would not, individually or in the
aggregate, reasonably be expected to result in an East Material Adverse Effect:
East and each of its Subsidiaries (i) have prepared in good faith and duly and
timely filed (taking into account any extension of time within which to file)
all Tax Returns required to be filed by any of them and all such filed Tax
Returns are complete and accurate in all material respects; and (ii) have paid
all Taxes that are required to be paid or that East or any of its Subsidiaries
are obligated to withhold from amounts owing to any employee, creditor or third
party, except with respect to matters contested in good faith or for which
adequate reserves have been established on the most recent consolidated balance
sheet included in or incorporated into the East Reports. As of the date hereof,
except as would not, individually or in the aggregate, reasonably be expected to
result in an increase in Taxes that is material to East, there are no audits,
examinations, investigations or other proceedings, in each case, pending or
threatened in writing, in respect of Taxes or Tax matters. East has made
available to West true and correct copies of the United States federal income
Tax Returns filed by East and their respective Subsidiaries for each of the
fiscal years ended December 31, 2003 and 2002. None of East or its Subsidiaries
has been a "distributing corporation" or "controlled corporation" in any
distribution occurring during the last 30 months that was purported or intended
to be governed by Section 355 of the Code (or any similar provision of state,
local or foreign law). Neither East nor any of its Subsidiaries has taken any
action or knows of any fact, agreement, plan or other circumstance that is
reasonably likely to prevent the Merger from qualifying as a reorganization with
the meaning of Section 368(a) of the Code. There are no Liens for Taxes on any
asset of East or any of its Subsidiaries, except for Liens for Taxes not yet due
and payable and Liens for Taxes that would not, individually or in the
aggregate, reasonably be expected to result in an East Material Adverse Effect.

         (p)      Labor Matters.

         (i)      East has made available to West true and complete
copies of all collective bargaining agreements and other labor union contracts
(including all amendments thereto) applicable to any employees of East or any of
its Subsidiaries (the "East CBAs").

         (ii)      No labor union, labor organization or group of
employees of East or any of its Subsidiaries has made a pending demand for
recognition or certification, and there are no representation or certification
proceedings or petitions seeking a

-43-

<PAGE>

representation proceeding presently pending or threatened in writing to be brought or filed with any labor relations tribunal or authority. To East's Knowledge, there are no labor union organizing activities pending or threatened with respect to any employees of East or any of its Subsidiaries.

(iii)    There is no labor dispute, strike, slowdown, work stoppage or lockout, or to East's Knowledge, threat thereof by or with respect to any employee of East or any of its Subsidiaries.

(iv)    There are no arbitrations, written grievances or written complaints outstanding or, to East's Knowledge, threatened against East or any of its Subsidiaries under any East CBAs, except for such matters as would not, individually or in the aggregate, reasonably be expected to result in an East Material Adverse Effect. Neither East nor any of its Subsidiaries is in receipt of written notice of any material statutory disputes or unfair labor practice charges.

(q)    Intellectual Property and IT Assets. Except for such matters as would not, individually or in the aggregate, reasonably be expected to result in an East Material Adverse Effect:

(i)    All patents, patent applications, trademark and copyright registrations and applications for registration, and Internet domain name registrations claimed to be owned by East or its Subsidiaries are owned exclusively by East or such Subsidiaries and are subsisting and, to East's Knowledge, valid and enforceable.

(ii)    Except as set forth on Section 3.2(q)(ii) of the East Disclosure Letter, East and/or each of its Subsidiaries owns, or is licensed or otherwise possesses legally enforceable rights to use, all Intellectual Property necessary to conduct the business of East and its Subsidiaries as currently conducted, all of which rights shall in all materials respects survive unchanged the execution and delivery of this Agreement and the consummation of the Merger and the other transactions contemplated hereunder.

(iii)    Except as set forth on Section 3.2(q)(iii) of the East Disclosure Letter, the conduct of the business as currently conducted by East and its Subsidiaries does not infringe, misappropriate or otherwise violate the Intellectual Property rights of any third Person and in the three (3) year period immediately preceding the date of this Agreement, there has been no such claim, action or proceeding asserted, or to East's Knowledge threatened against East or its Subsidiaries or any indemnitees thereof. There is no claim, action or proceeding asserted, or to East's Knowledge threatened, against East or its Subsidiaries or any indemnitees thereof concerning the ownership, validity, registerability, enforceability, infringement, use or licensed right to use any Intellectual Property claimed to be owned or held by East or its Subsidiaries or used or alleged to be used in the business of East or its Subsidiaries.

(iv)    To East's Knowledge, no third Person has, in the three (3) year period immediately preceding the date of this Agreement, infringed, misappropriated or otherwise violated the Intellectual Property rights of East or its Subsidiaries. There are

-44-

<PAGE>

no claims, actions or proceedings asserted or threatened by East, or decided by East to be asserted or threatened, that (A) a third Person infringes, misappropriates or otherwise violates, or in the three (3) year period

immediately preceding the date of this Agreement, infringed, misappropriated or otherwise violated, the Intellectual Property rights of East or its Subsidiaries; or (B) a third Person's owned or claimed Intellectual Property interferes with, infringes, dilutes or otherwise harms the Intellectual Property rights of East or its Subsidiaries.

(v)      East and its Subsidiaries have taken reasonable measures to protect the confidentiality of all material Trade Secrets that are owned, used or held by East and its Subsidiaries and, to East's Knowledge, such material Trade Secrets have not been used, disclosed to or discovered by any Person except pursuant to valid and appropriate non-disclosure and/or license agreements which have not been breached.

(vi)      Except as set forth on Section 3.2(q)(vi) of the East Disclosure Letter ,the IT Assets of East and its Subsidiaries operate and perform in all material respects in accordance with their documentation and functional specifications and otherwise as required by East and its Subsidiaries for the operation of their respective businesses, and have not malfunctioned or failed within the three (3) year period immediately preceding the date of this Agreement. To East's Knowledge, no Person has gained unauthorized access to such IT Assets. Except as set forth on Section 3.2(q)(vi) of the East Disclosure Letter, East and its Subsidiaries have implemented and maintained for the three (3) year period immediately preceding the date of this Agreement reasonable and sufficient backup and disaster recovery technology consistent with industry practices.

(r)      Foreign Corrupt Practices Act. Except for such matters as would not, individually or in the aggregate, reasonably be expected to result in a material adverse impact on the ability of East and its Subsidiaries to conduct their operations in the ordinary course of business:

(i)      East and its Subsidiaries have developed and implemented a compliance program which includes corporate policies and procedures to ensure compliance with the Foreign Corrupt Practices Act.

(ii)      In connection with its compliance with the Foreign Corrupt Practices Act, there are no adverse or negative past performance evaluations or ratings by the U.S. Government, or any voluntary disclosures under the Foreign Corrupt Practices Act, any enforcement actions or threats of enforcement actions, or any facts that, in each case, could result in any adverse or negative performance evaluation related to the Foreign Corrupt Practices Act.

(iii)      Neither the U.S. Government nor any other Person has notified East or its Subsidiaries in writing of any actual or alleged violation or breach of the Foreign Corrupt Practices Act.

(iv)      None of East or its Subsidiaries has undergone and is undergoing any audit, review, inspection, investigation, survey or examination of records relating to

-45-

<PAGE>

East's or any of its Subsidiaries' compliance with the Foreign Corrupt Practice Act, and, to East's Knowledge, there is no basis for any such audit, review, inspection, investigation, survey or examination of records.

(v)      East and its Subsidiaries have not been and are not now under any administrative, civil or criminal investigation, charge or

indictment involving alleged false statements, false claims or other improprieties relating to East's or any of its Subsidiaries' compliance with the Foreign Corrupt Practices Act, nor, to East's Knowledge, is there any basis for any such investigation or indictment.

(vi)     None of East or its Subsidiaries has been and is not now a party to any administrative or civil litigation involving alleged false statements, false claims or other improprieties relating to East's or any of its Subsidiaries' compliance with the Foreign Corrupt Practices Act, nor, to East's Knowledge, is there any basis for any such proceeding.

(s)     Aircraft.

(i)     Section 3.2(s)(i) of the East Disclosure Letter sets forth a true and complete list of all aircraft owned or leased by East or any of its Subsidiaries as of March 31, 2005 (the "East Aircraft"), including a description of the type and aircraft number of each such East Aircraft and the date East placed such East Aircraft in service or proposes to place such East Aircraft in service. All East Aircraft owned or leased by East or any of its Subsidiaries are in airworthy condition and are being maintained according to applicable FAA regulatory standards and the FAA-approved maintenance program of East and its Subsidiaries. East and its Subsidiaries have implemented maintenance schedules with respect to their respective East Aircraft and engines that, if complied with, would result in the satisfaction of all requirements under all applicable ADs and FARs required to be complied with in accordance with the FAA-approved maintenance program of East and its Subsidiaries, and East and its Subsidiaries are in compliance with such maintenance schedules in all material respects and currently have no reason to believe that they will not satisfy any component of such maintenance schedules on or prior to the dates specified in such maintenance schedules.

(ii)     Section 3.2(s)(ii) of the East Disclosure Letter sets forth a true and complete list, as of the date hereof, containing all Contracts, assumed or not rejected in connection with the Cases as of the date of this Agreement, (other than existing aircraft leases) pursuant to which East or any of its Subsidiaries may purchase or lease aircraft, including the manufacturer and model of all aircraft subject to each Contract. East has delivered or made available to West true and complete copies of all Contracts listed on Section 3.2(s)(ii) of the East Disclosure Letter, including all amendments thereto.

(iii)     Except as set forth on Section 3.2(s)(iii) of the East Disclosure Letter, each East Aircraft has a validly issued, current individual aircraft FAA Certificate of Airworthiness with respect to such East Aircraft which satisfies all requirements for the effectiveness of such FAA Certificate of Airworthiness.

-46-

<PAGE>

(iv)     Each East Aircraft's structure, systems and components are functioning in accordance with its intended use as set forth in FAA-approved documentation, including any applicable manuals, technical standard orders or parts manufacturing approval certificates.

(v)     All deferred maintenance items and temporary repairs with respect to each such East Aircraft have been or will be made materially in accordance with FAA, manufacturer's and East's maintenance programs.

(vi)     Each East Aircraft is properly registered on the FAA aircraft registry.

        (vii)    East is not a party to any interchange or pooling agreements with respect to its East Aircraft.

        (viii)   No East Aircraft is subleased to or otherwise in the possession of another air carrier or other Person other than East or any of its Subsidiaries, to operate such East Aircraft in air transportation or otherwise.

        (t)     Slots. Section 3.2(t) of the East Disclosure Letter sets forth a true, correct and complete list of all takeoff and landing slots and other similar takeoff and landing rights ("East Slots") used by East or any of its Subsidiaries on the date hereof at any domestic or international airport, including a true, correct and complete list of all East Slot lease agreements. East and its Subsidiaries will have complied in all material respects with the requirements of the regulations issued under the Federal Aviation Act and any other Laws with respect to the East Slots. Neither East nor any of its Subsidiaries has received any notice of any proposed withdrawal of the East Slots by the FAA, the DOT or any other Governmental Entity. The East Slots have not been designated for the provision of essential air services in accordance with the regulations issued under the Federal Aviation Act, were not acquired pursuant to 14 C.F.R. Section 93.219 and have not been designated for international operations, as more fully detailed in 14 C.F.R. Section 93.217. To the extent covered by 14 C.F.R. Section 93.227, East and its Subsidiaries have used each East Slot either at least 80% of the maximum amount that each East Slot could have been used during each full and partial reporting period (as described in 14 C.F.R. Section 93.227(i)) or such greater or lesser amount of minimum usage as may have been required to protect such East Slot's authorization from termination or withdrawal under regulations established by any Governmental Entity or airport authority. All reports required by the FAA or any Governmental Entity relating to the East Slots have been filed in a timely manner. Neither East nor any of its Subsidiaries has agreed to any East Slot slide, East Slot trade, East Slot purchase, East Slot sale or other transfer of any of the East Slots.

-47-

&lt;PAGE&gt;

        (u)     Equipment. Section 3.2(u) of the East Disclosure Letter sets forth a true, correct and complete list of all passenger loading bridges owned or utilized by East or any of its Subsidiaries.

        (v)     U.S. Citizen; Air Carrier. East's primary subsidiary, US Airways, Inc., is a "citizen of the United States" as defined in the Federal Aviation Act and is an "air carrier" within the meaning of such Act operating under certificates issued pursuant to such Act (49 U.S.C. Sections 41101-41112).

        (w)    Insurance. Section 3.2(w) of the East Disclosure Letter lists and briefly describes (including name of insurer, agent or broker, coverage and expiration date) each insurance policy maintained by, at the expense of or for the benefit of East or any of the Subsidiaries with respect to its properties and assets and describes any material claims made thereunder. All such insurance policies are in full force and effect and neither East nor any Subsidiary is in default with respect to its obligations under any such insurance policy. The insurance coverage of East and the Subsidiaries is customary for corporations of similar size engaged in similar lines of businesses. East has not received any notice or other communication regarding any actual or possible (a) cancellation or invalidation of any insurance policy, (b) refusal of any coverage or rejection of any material claim under any insurance policy or refusal of any coverage or rejection of any claim under any insurance policy or (c) material adjustment in the amount of premiums payable

with respect to any insurance policy.

        (x)     Brokers and Finders. Neither East nor any of its officers, directors or employees has employed any broker or finder or incurred any liability for any brokerage fees, commissions or finders, fees in connection with the Merger or the other transactions contemplated in this Agreement, except that East has employed, and is solely responsible for the fees and expenses of, Seabury Group, LLC as its financial advisor, and a copy of the engagement letter with such financial advisor has been provided to West prior to the date hereof.

        (y)     Merger Sub Constituent Documents. True, correct and complete copies of the articles of incorporation and by-laws of Merger Sub have been made available to West.

<center>ARTICLE IV</center>

<center>Covenants</center>

        4.1     Interim Operations.

        (i)     West shall not knowingly take or permit any of its Subsidiaries to take any action or refrain from taking any action the result of which would be reasonably expected to result in any of the closing conditions set forth in Sections 5.1 and 5.3 hereof not to be satisfied. West covenants and agrees as to itself and its Subsidiaries that, after the date hereof and prior to the Effective Time, unless East shall otherwise approve in writing (such approval not to be unreasonably withheld or delayed), and except as

<center>-48-</center>

&lt;PAGE&gt;

otherwise expressly contemplated by this Agreement or as required by applicable Laws, its business and that of its Subsidiaries shall be conducted in the ordinary and usual course and, to the extent consistent therewith, it shall, and shall cause its Subsidiaries to, use their respective reasonable best efforts to preserve their business organizations intact and maintain existing relations and goodwill with Governmental Entities, customers, suppliers, distributors, creditors, lessors, employees and business associates and keep available the services of the present employees and agents of West and its Subsidiaries. Without limiting the generality of the foregoing and in furtherance thereof, from the date of this Agreement until the Effective Time, except (A) as otherwise expressly required by this Agreement or applicable Laws, (B) as East may approve in writing (such approval not to be unreasonably withheld or delayed) or (C) as set forth in Section 4.1(i) of the West Disclosure Letter, West will not and will not permit its Subsidiaries to:

        (a)     adopt or propose any change in its certificate of incorporation or by-laws or other applicable governing instruments or amend any term of the Shares;

        (b)     merge or consolidate West or any of its Subsidiaries with any other Person, except for any such transactions among wholly-owned Subsidiaries of West that are not obligors or guarantors of third-party indebtedness, or adopt a plan of liquidation;

        (c)     acquire assets outside of the ordinary course of business with a value or purchase price in excess of $10,000,000 in the aggregate, other than acquisitions pursuant to Contracts to the extent in effect immediately prior to the execution of this Agreement and as otherwise set forth in Section 4.1(i)(c) of the West Disclosure Letter, and other than capital

expenditures within West's capital expenditure budget as set forth in Section 4.1(i)(j) of the West Disclosure Letter;

(d)        other than as set forth in Section 4.1(i)(d) of the West Disclosure Letter and other than the issuance of shares or options pursuant to West Stock Plans, West Awards, West Warrants or West Convertible Debt, issue, sell, pledge, dispose of, grant, transfer, lease, license, guarantee, encumber, or authorize the issuance, sale, pledge, disposition, grant, transfer, lease, license, guarantee or encumbrance of, any shares of capital stock of West or any its Subsidiaries (other than the issuance of shares by a wholly owned Subsidiary of West to West or another wholly owned Subsidiary), or securities convertible or exchangeable into or exercisable for any shares of such capital stock, or any options, warrants, conversion rights, stock appreciation rights, redemption rights, repurchase rights, agreements, arrangements, calls, commitments or other rights of any kind to acquire any shares of such capital stock or such convertible or exchangeable securities;

(e)        other than (A) specified encumbrances described in Section 4.1(i)(e) of the West Disclosure Letter; (B) encumbrances for current Taxes or other governmental charges not yet due and payable; (C) mechanics', carriers', workmen's, repairmen's or other like encumbrances arising or incurred in the ordinary course of business consistent with past practice relating to obligations as to which there is no default on the part of West, or the validity or amount of which is being contested in good faith by appropriate proceedings; and (D) other encumbrances that do not, individually or

-49-

<PAGE>

in the aggregate, materially impair the continued use, operation, value or marketability of any West Aircraft, West Slots, West Gates or West Real Property or the conduct of the business of West and its Subsidiaries as presently conducted; create or incur any Lien material to West or any of its Subsidiaries on any assets of West or any of its Subsidiaries having a value in excess of $10,000,000;

(f)        other than as set forth in Section 4.1(i)(f) of the West Disclosure Letter, make any loans, advances or capital contributions to or investments in any Person (other than West or any direct or indirect wholly-owned Subsidiary of West) in excess of $10,000,000 in the aggregate;

(g)        declare, set aside or pay any dividend or distribution (whether in cash, stock or property or any combination thereof) on (i) any Shares or West Preferred Shares, or (ii) any shares of capital stock of any Subsidiary (other than wholly-owned Subsidiaries and pro rata dividends payable to holders of interests in non wholly-owned Subsidiaries);

(h)        reclassify, split, combine, subdivide or repurchase, redeem or otherwise acquire, directly or indirectly, any of its capital stock or securities convertible or exchangeable into or exercisable for any shares of its capital stock;

(i)        other than as set forth on Section 4.1(i)(i) of the West Disclosure Letter, incur any indebtedness for borrowed money or guarantee such indebtedness of another Person, or issue or sell any debt securities or warrants or other rights to acquire any debt security of West or any of its Subsidiaries, except for (i) indebtedness for borrowed money incurred in the ordinary course of business not to exceed $10,000,000 in the aggregate, (ii) indebtedness for borrowed money in replacement of existing indebtedness for borrowed money on customary commercial terms, (iii) guarantees by West of