# EXHIBIT 17 – PART 3

indebtedness of wholly-owned Subsidiaries of West or guarantees by Subsidiaries of indebtedness of West, or (iv) interest rate swaps on customary commercial terms consistent with past practice and not to exceed $10,000,000 of notional debt in the aggregate in addition to notional debt currently under swap or similar arrangements;

(j)    except as set forth in Section 4.1(i)(j) of the West Disclosure Letter, make or authorize any capital expenditure;

(k)    other than in the ordinary course of business, enter into any Contract that would have been a West Material Contract had it been entered into prior to the date of this Agreement (other than as permitted by Section 4.1(i)(d), (e), (i) or (j));

(l)    make any changes with respect to accounting policies or procedures, except as required by changes in GAAP or by applicable Law or except as West, after consultation with East and each party's independent auditors, determines in good faith is preferable;

(m)    settle any litigation or other proceedings before or threatened to be brought before a Governmental Entity for an amount to be paid by West or any of its

-50-

<PAGE>

Subsidiaries in excess of $10,000,000 or which would be reasonably likely to have a material adverse impact on the operations of West or any of its Subsidiaries;

(n)    other than in the ordinary course of business, (i) amend or modify in any material respect, or terminate or waive any material right or benefit under, any West Material Contract, or (ii) cancel, modify or waive any debts or claims held by it or waive any rights having in each case a value in excess of $10,000,000;

(o)    except as required by Law or by any currently effective tax sharing agreement listed in Section 4.1(i)(o) of the West Disclosure Letter, make any material Tax election or take any material position on any material Tax Return filed on or after the date of this Agreement or adopt any method therefor that is inconsistent with elections made, positions taken or methods used in preparing or filing similar Tax Returns in prior periods.

(p)    sell, lease, license, leaseback, abandon, or otherwise dispose of any assets of West or its Subsidiaries except (i) in the ordinary course of business or obsolete assets or (ii) sales, leases, licenses, leasebacks, abandonments or other dispositions of assets with a fair market value not in excess of $10,000,000 in respect of any one asset and not in excess of $15,000,000 in the aggregate other than (x) as set forth in Section 4.1(i)(p) of the West Disclosure Letter and (y) any dispositions of assets to the extent used as consideration for acquisitions that are permitted pursuant to Section 4.1(i)(c);

(q)    except in connection with the replacement of any existing employee, including any officer, on compensation terms that are not materially different from those of the replaced employee or officer, or except as required pursuant to existing written, binding agreements in effect prior to the date of this Agreement that have been provided to East, or except as West, based upon advice of its counsel, determines in good faith is preferable for purposes of compliance with Section 409A of the Code, or as otherwise required

by applicable Law, (i) except with respect to any newly-hired employees (excluding officers), enter into any commitment to provide any severance or termination benefits to (or amend any existing arrangement with) any director, officer or employee of West or any of its Subsidiaries, (ii) increase the benefits payable under any existing severance or termination benefit policy or employment agreement, (iii) except with respect to any newly-hired employees (excluding officers), enter into any employment severance, change in control, termination, deferred compensation or other similar agreement (or amend any such existing agreement) with any director, officer or employee of West or any of its Subsidiaries, (iv) establish, adopt, amend or terminate any West Compensation and Benefit Plan, (v) increase the compensation, bonus or other benefits of, make any new awards under any West Compensation and Benefit Plan to, or pay any bonus to any director, officer, employee, consultant or independent contractor of West or any of its Subsidiaries, except for increases, new awards or payments in the ordinary course of business consistent with past practice for employees who are not among West's Section 16 Officers, (vi) take any action to fund or in any other way secure the payment of compensation or benefits under any West Compensation and Benefit Plan, except as required pursuant to the terms thereof, (vii) take any action to accelerate

<PAGE>

the vesting or payment of any compensation or benefits under any West Compensation and Benefit Plans, to the extent not already required in any such West Compensation and Benefit Plan, (viii) materially change any actuarial or other assumptions used to calculate funding obligations with respect to any West Compensation and Benefit Plan or change the manner in which contributions to such plans are made or the basis on which such contributions are determined, except as may be required by GAAP, (ix) amend the terms of any outstanding equity-based award, (x) provide for accelerated vesting, removal of restrictions or exercisability of any stock based or stock related awards (including stock options, stock appreciation rights, performance units and restricted stock units) upon a change in control occurring on or prior to the Effective Time, or (xi) enter into any new collective bargaining agreements (or material amendments to existing collective bargaining agreements);

(r) decrease or defer in any material respect the level of training provided to the employees of West or any of its Subsidiaries or the level of costs expended in connection therewith;

(s) fail to keep in effect any governmental route authority in effect and used by any Subsidiary of West as of the date of this Agreement, provided that the restrictions set forth in this Section 4.1(i)(s) shall not apply to any such failure if such failure occurs in the ordinary course of business consistent with past practice;

(t) make any material West Route changes, other than changes in the ordinary course of business consistent with past practice;

(u) fail to maintain insurance at levels at least comparable to current levels or otherwise in a manner inconsistent with past practice;

(v) take any action, or fail to take action, which action or failure could result in the loss of West Slots with an aggregate value in excess of $10,000,000;

(w) fail to notify East in writing of any incidents or accidents occurring on or after the date hereof involving any property owned or

operated by West that resulted or could reasonably be expected to result in damages or losses in excess of $10,000,000;

          (x)      fail to continue, in respect of all West Aircraft, all material maintenance programs consistent with past practice (except as required or permitted by applicable Law), including using reasonable best efforts to keep all such West Aircraft in such condition as may be necessary to enable to airworthiness certification of such West Aircraft under the Federal Aviation Act to be maintained in good standing at all times;

          (y)      agree or commit to do any of the foregoing.

          (ii)      East shall not knowingly take or permit any of its Subsidiaries to take any action or refrain from taking any action the result of which would be reasonably expected to result in any of the closing conditions set forth in Sections 5.1 and 5.2 not to be satisfied. East covenants and agrees as to itself and its Subsidiaries that, after the date

-52-

<PAGE>

hereof and prior to the Effective Time, unless West shall otherwise approve in writing (such approval not to be unreasonably withheld or delayed), and except as otherwise expressly contemplated by this Agreement or as required by applicable Laws, its business and that of its Subsidiaries shall be conducted in the ordinary and usual course and, to the extent consistent therewith, it shall, and shall cause its Subsidiaries to, use their respective reasonable best efforts to preserve their business organizations intact and maintain existing relations and goodwill with Governmental Entities, customers, suppliers, distributors, creditors, lessors, employees and business associates and keep available the services of the present employees and agents of East and its Subsidiaries. Without limiting the generality of the foregoing and in furtherance thereof, from the date of this Agreement until the Effective Time, except (A) as otherwise expressly required by this Agreement or applicable Laws, (B) as West may approve in writing (such approval not to be unreasonably withheld or delayed) or (C) as set forth in Section 4.1(ii) of the East Disclosure Letter, East will not and will not permit its Subsidiaries to:

          (a)      adopt or propose any change in its certificate of incorporation or by-laws or other applicable governing instruments or amend any term of the East Common Stock;

          (b)      merge or consolidate East or any of its Subsidiaries with any other Person, except for any such transactions among wholly-owned Subsidiaries of East that are not obligors or guarantors of third-party indebtedness, or adopt a plan of liquidation;

          (c)      acquire assets outside of the ordinary course of business with a value or purchase price in excess of $10,000,000 in the aggregate, other than acquisitions pursuant to Contracts to the extent in effect immediately prior to the execution of this Agreement and as otherwise set forth in Section 4.1(ii)(c) of the East Disclosure Letter, and other than capital expenditures within East's capital expenditure budget as set forth in Section 4.1(ii)(j) of the East Disclosure Letter;

          (d)      other than as set forth in Section 4.1(ii)(d) of the East Disclosure Letter and other than the issuance of shares or options pursuant to stock-based benefit plans and under individual employment agreements to which East is a party, issue, sell, pledge, dispose of, grant, transfer, lease, license, guarantee, encumber, or authorize the issuance, sale, pledge,

disposition, grant, transfer, lease, license, guarantee or encumbrance of, any shares of capital stock of East or any its Subsidiaries (other than the issuance of shares by a wholly owned Subsidiary of East to East or another wholly owned Subsidiary), or securities convertible or exchangeable into or exercisable for any shares of such capital stock, or any options, warrants, conversion rights, stock appreciation rights, redemption rights, repurchase rights, agreements, arrangements, calls, commitments or other rights of any kind to acquire any shares of such capital stock or such convertible or exchangeable securities;

(e) other than (A) specified encumbrances described in Section 4.1(ii)(e) of the East Disclosure Letter; (B) encumbrances for current Taxes or other governmental charges not yet due and payable; (C) mechanics', carriers', workmen's, repairmen's or other like encumbrances arising or incurred in the ordinary course of

<PAGE>

business consistent with past practice relating to obligations as to which there is no default on the part of East, or the validity or amount of which is being contested in good faith by appropriate proceedings; and (D) other encumbrances that do not, individually or in the aggregate, materially impair the continued use, operation, value or marketability of any East Aircraft, East Slots, East Gates or East Real Property or the conduct of the business of East and its Subsidiaries as presently conducted; create or incur any Lien material to East or any of its Subsidiaries on any assets of East or any of its Subsidiaries having a value in excess of $10,000,000;

(f) other than as set forth in Section 4.1(ii)(f) of the East Disclosure Letter, make any loans, advances or capital contributions to or investments in any Person (other than East or any direct or indirect wholly-owned Subsidiary of East) in excess of $10,000,000 in the aggregate;

(g) declare, set aside or pay any dividend or distribution (whether in cash, stock or property or any combination thereof) on (i) any East Common Stock, or (ii) any shares of capital stock of any Subsidiary (other than wholly-owned Subsidiaries and pro rata dividends payable to holders of interests in non wholly-owned Subsidiaries);

(h) reclassify, split, combine, subdivide or repurchase, redeem or otherwise acquire, directly or indirectly, any of its capital stock or securities convertible or exchangeable into or exercisable for any shares of its capital stock;

(i) other than as set forth in Section 4.1(ii)(i) of the East Disclosure Letter, incur any indebtedness for borrowed money or guarantee such indebtedness of another Person, or issue or sell any debt securities or warrants or other rights to acquire any debt security of East or any of its Subsidiaries, except for (i) indebtedness for borrowed money incurred in the ordinary course of business not to exceed $10,000,000 in the aggregate, (ii) indebtedness for borrowed money in replacement of existing indebtedness for borrowed money on customary commercial terms, (iii) guarantees by East of indebtedness of wholly-owned Subsidiaries of East or guarantees by Subsidiaries of indebtedness of East, or (iv) interest rate swaps on customary commercial terms consistent with past practice and not to exceed $10,000,000 of notional debt in the aggregate in addition to notional debt currently under swap or similar arrangements;

(j) except as set forth in Section 4.1(ii)(j) of the East Disclosure Letter, make or authorize any capital expenditure;

(k)    other than in the ordinary course of business, enter into any Contract that would have been an East Material Contract had it been entered into prior to the date of this Agreement (other than as permitted by Section 4.1(ii)(d), (e), (i) or (j));

(l)    make any changes with respect to accounting policies or procedures, except as required by changes in GAAP or by applicable Law or except as East, after consultation with West and each party's independent auditors, determines in good faith is preferable;

-54-

<PAGE>

(m)    except as in connection with the Plan or as otherwise directed or authorized by the Bankruptcy Court, settle any litigation or other proceedings before or threatened to be brought before a Governmental Entity for an amount to be paid by East or any of its Subsidiaries in excess of $10,000,000 or which would be reasonably likely to have a material adverse impact on the operations of East or any of its Subsidiaries;

(n)    except as in connection with the Plan or as otherwise directed or authorized by the Bankruptcy Court, and other than in the ordinary course of business, (i) amend or modify in any material respect, or terminate or waive any material right or benefit under, any East Material Contract, or (ii) cancel, modify or waive any debts or claims held by it or waive any rights having in each case a value in excess of $10,000,000;

(o)    except as required by Law or by any currently effective tax sharing agreement listed in Section 4.1(ii)(o) of the East Disclosure Letter, make any material Tax election or take any material position on any material Tax Return filed on or after the date of this Agreement or adopt any method therefor that is inconsistent with elections made, positions taken or methods used in preparing or filing similar Tax Returns in prior periods.

(p)    sell, lease, license, leaseback, abandon, or otherwise dispose of any assets of East or its Subsidiaries except (i) in the ordinary course of business or obsolete assets or (ii) sales, leases, licenses, leasebacks, abandonments or other dispositions of assets with a fair market value not in excess of $10,000,000 in respect of any one asset and not in excess of $15,000,000 in the aggregate other than (x) as set forth in Section 4.1(ii)(p) of the East Disclosure Letter and (y) any dispositions of assets to the extent used as consideration for acquisitions that are permitted pursuant to Section 4.1(ii)(c);

(q)    other than as set forth in Section 4.1(ii)(q) of the East Disclosure Letter, or except in connection with the replacement of any existing employee, including any officer, on compensation terms that are not materially different from those of the replaced employee or officer, or except as required pursuant to existing written, binding agreements in effect prior to the date of this Agreement that have been provided to West, or except as East, based upon advice of its counsel, determines in good faith is preferable for purposes of compliance with Section 409A of the Code, or as otherwise required by applicable Law, or except as will be disclosed in, or covered by, the Plan, (i) with respect to any newly-hired employees (excluding officers), enter into any commitment to provide any severance or termination benefits to (or amend any existing arrangement with) any director, officer or employee of East or any of its Subsidiaries, (ii) increase the benefits payable under any existing severance or termination benefit policy or employment agreement, (iii) with respect to any newly-hired employees (excluding officers), enter into any

employment severance, change in control, termination, deferred compensation or other similar agreement (or amend any such existing agreement) with any director, officer or employee of East or any of its Subsidiaries, (iv) establish, adopt, amend or terminate any East Compensation and Benefit Plan, (v) increase the compensation, bonus or other benefits of, make any new awards under any East Compensation and Benefit

-55-

<PAGE>

Plan to, or pay any bonus to any director, officer, employee, consultant or independent contractor of East or any of its Subsidiaries, except for increases, new awards or payments in the ordinary course of business consistent with past practice for employees who are not among East's Section 16 Officers, (vi) take any action to fund or in any other way secure the payment of compensation or benefits under any East Compensation and Benefit Plan, except as required pursuant to the terms thereof, (vii) take any action to accelerate the vesting or payment of any compensation or benefits under any East Compensation and Benefit Plans, to the extent not already required in any such East Compensation and Benefit Plan, (viii) materially change any actuarial or other assumptions used to calculate funding obligations with respect to any East Compensation and Benefit Plan or change the manner in which contributions to such plans are made or the basis on which such contributions are determined, except as may be required by GAAP, (ix) amend the terms of any outstanding equity-based award, (x) provide for accelerated vesting, removal of restrictions or exercisability of any stock based or stock related awards (including stock options, stock appreciation rights, performance units and restricted stock units) upon a change in control occurring on or prior to the Effective Time, or (xi) enter into any new collective bargaining agreements (or material amendments to existing collective bargaining agreements);

(r)     decrease or defer in any material respect the level of training provided to the employees of East or any of its Subsidiaries or the level of costs expended in connection therewith;

(s)     other than as set forth in Section 4.1(ii)(s) of the East Disclosure Letter, fail to keep in effect any governmental route authority in effect and used by any Subsidiary of East as of the date of this Agreement, provided that the restrictions set forth in this Section 4.1(ii)(s) shall not apply to any such failure if such failure occurs in the ordinary course of business consistent with past practice;

(t)     make any material East Route changes, other than changes in the ordinary course of business consistent with past practice;

(u)     other than as set forth in Section 4.1(ii)(u) of the East Disclosure Letter, fail to maintain insurance at levels at least comparable to current levels or otherwise in a manner inconsistent with past practice;

(v)     other than as set forth in Section 4.1(ii)(v) of the East Disclosure Letter, take any action, or fail to take action, which action or failure could result in the loss of East Slots with an aggregate value in excess of $10,000,000;

(w)     fail to notify West in writing of any incidents or accidents occurring on or after the date hereof involving any property owned or operated by East that resulted or could reasonably be expected to result in damages or losses in excess of $10,000,000;

(x)     fail to continue, in respect of all East Aircraft,

all material maintenance programs consistent with past practice (except as required by applicable

<PAGE>

Law), including using reasonable best efforts to keep all such East Aircraft in such condition as may be necessary to enable to airworthiness certification of such East Aircraft under the Federal Aviation Act to be maintained in good standing at all times;

(y) agree or commit to do any of the foregoing.

4.2 Bankruptcy Filings, Covenants and Agreements.

(a) Within two (2) business days following execution of this Agreement, the Debtors shall file with the Bankruptcy Court a motion for an order (i) approving procedures for the consideration of Plan proposals, (ii) approving form and manner of notice of competing offer procedures, and (iii) approving break-up fee and related provisions (collectively, the "Bidding Procedures"), such order substantially in the form attached hereto as Exhibit E. The Debtors shall use their commercially reasonable efforts to obtain Bankruptcy Court approval of (x) the Bidding Procedures within eleven (11) days of the date of the filing of the Bidding Procedures and (y) the proposal it seeks to have determined to be the Approved Proposal (as defined in the Bidding Procedures) promptly following the Auction Termination Date (as defined in Section 4.2(b)). West agrees that it shall promptly take such actions as are reasonably requested by the Debtors to assist in obtaining approval of the Bidding Procedures and the Approved Proposal, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court; provided that West shall not be required to take any actions to amend or modify the Bidding Procedures or the order approving the Approved Proposal. If entry of the orders approving the Bidding Procedures or the Approved Proposal is appealed or otherwise challenged (including a petition for certiorari or motion for modification, reconsideration, rehearing or reargument), West and the Debtors shall each use their reasonable best efforts to defend such appeal or challenge unless West or East has validly terminated this Agreement pursuant to its terms.

(b) Until the earlier to occur of (i) the date that is thirty-five (35) days after entry of the order approving the Bidding Procedures and (ii) the date that this Agreement or any other proposal becomes the Approved Proposal (such earlier date, the "Auction Termination Date"), the Debtors shall be permitted to solicit inquiries, proposals, offers or bids from, and negotiate with, any Person regarding a Qualified Competing Plan Proposal (as defined in the Bidding Procedures) solely in accordance with the Bidding Procedures; provided, however, that none of the Debtors may enter into, or seek Bankruptcy Court approval of, any agreement with respect to such Qualified Competing Plan Proposal unless it has been determined to be the Best and Final Qualified Bid (as defined in the Bidding Procedures) pursuant to the Bidding Procedures and this Agreement has not become the Approved Proposal. Notwithstanding anything herein to the contrary, none of the Debtors shall offer, agree to, or seek approval from the Bankruptcy Court for, and shall use their best efforts to object to any request by any other party for, any break-up fee, work fee, expense reimbursement or any other benefit or protection for any Person other than West in connection with any proposed acquisition of or investment in any of the Debtors other than in connection with the Financing Commitments. East shall notify West in writing within one (1) Business Day following

<PAGE>

East's determination that any Qualified Competing Plan Proposal is higher and better than this Agreement.

          (c)      Each of the Debtors agrees that if this Agreement becomes the Approved Proposal, it shall use its best efforts to cause any order approving the Approved Proposal to prohibit the Debtors (and any Person purporting to act on behalf of the estate of any Debtor) from violating the provisions of Section 4.4(a) or from otherwise pursuing in any way any East Acquisition Proposal other than this Agreement unless this Agreement shall have previously been terminated in accordance with its terms.

          (d)      In connection with any proceedings in the Bankruptcy Court related to the Bidding Procedures, the order approving the Approved Proposal or the transactions contemplated by this Agreement (or any Qualified Competing Plan Proposal) (a) East shall provide to West copies of all motions, objections, pleadings, notices, proposed orders and other documents that are filed by or on behalf of any Debtor as soon as reasonably practicable prior to filing thereof with the Bankruptcy Court and (b) West shall provide to East copies of all motions, objections, pleadings, notices, proposed orders and other documents that are filed by or on behalf of West as soon as reasonably practicable prior to filing thereof with the Bankruptcy Court.

          (e)      Each of the Debtors and West shall make all reasonable efforts to (i) obtain as soon as possible the approvals of the Plan by majorities of any class defined in the Plan, and (ii) cause the Confirmation Order to be entered and become a Final Order no later than September 1, 2005, and take such further steps as may be necessary or appropriate so that the Confirmation Order shall become a Final Order of the Bankruptcy Court. Upon request of East, West agrees (x) to assist and cooperate with the Debtors in their negotiations with, and solicitation of approvals from, holders of Claims and Interests (as such terms are defined in the Plan) for the purpose of obtaining the approvals of majorities of any class defined in the Plan and/or (y) to assist the Debtors in obtaining entry of the Confirmation Order.

          For purposes of this Agreement, "Final Order" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket in the Cases or the docket of any other court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek reargument, reconsideration, or certiorari has expired and no appeal, motion for reconsideration or reargument or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari, motion for reconsideration or reargument that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed or from which reargument, reconsideration, or certiorari was sought and the time to take any further appeal, petition for certiorari or move for reargument shall have expired.

                                  -58-

<PAGE>

     4.3     West Acquisition Proposals.

          (a)      West agrees that, except as permitted by Section 4.1 hereof, neither it nor any of its Subsidiaries nor any of the officers and directors of it or any of its Subsidiaries shall, and that it shall not authorize or permit its and its Subsidiaries' employees, agents and representatives, including any investment banker, attorney or accountant retained by it or any of its Subsidiaries ("Representatives"), to, directly or indirectly, initiate, solicit or knowingly encourage or facilitate any inquiries

or the making of any proposal or offer with respect to (1) a merger, reorganization, share exchange, consolidation or similar transaction involving the purchase or acquisition of West, (2) any purchase of an equity interest or interests in West or (3) any purchase of assets, securities or ownership interests of West and its Subsidiaries (any such inquiry, proposal or offer being hereinafter referred to as a "West Acquisition Proposal"). West further agrees that neither it nor any of its Subsidiaries nor any of the officers and directors of it or any of its Subsidiaries shall, and that it shall cause its and its Subsidiaries' Representatives not to, directly or indirectly, provide any confidential information or data to, or engage in any negotiations with, any Person relating to a West Acquisition Proposal, or otherwise knowingly encourage or facilitate any effort or attempt by any Person other than East and Merger Sub to make or implement a West Acquisition Proposal; provided, however, that, subject to Section 6.4(a) hereof, nothing contained in this Agreement shall prevent West or its Board of Directors from (i) complying with its disclosure obligations under applicable Law (including under Sections 14d-9 and 14e-2 of the Exchange Act) with regard to a West Acquisition Proposal; and (ii) at any time prior to, but not after, the time this Agreement is adopted by the West Requisite Vote, (A) provide information in response to a request therefor by a Person who has made an unsolicited bona fide written West Acquisition Proposal if the Board of Directors of West receives from the Person so requesting such information an executed confidentiality agreement (excluding standstill provisions) on customary terms; (B) engage in any discussions or negotiations with any Person who has made an unsolicited bona fide written West Acquisition Proposal if the Board of Directors of West receives from such Person an executed confidentiality agreement (excluding standstill provisions) on customary terms; or (C) recommend such an unsolicited bona fide written West Acquisition Proposal to the shareholders of West, if and only to the extent that, (x) in each such case referred to in clause (A) or (B) above, the Board of Directors of West reasonably determines such West Acquisition Proposal constitutes or is reasonably likely to lead to a West Superior Proposal (as defined below) (without having to take the actions referred to in clause (z) below); (y) in the case referred to in clause (C) above, the Board of Directors of West determines in good faith (after consultation with its financial advisor and outside counsel), taking into account all legal, financial and regulatory aspects of the proposal, the likelihood of obtaining financing, and the Person making the proposal, that such West Acquisition Proposal, if consummated, is more favorable, from a financial point of view (taking into account the likelihood of consummation), to West's shareholders than the transactions contemplated by this Agreement, in each case taking into account any revisions to the terms of the transactions contemplated by this Agreement pursuant to Section 4.3(c); and (z) East shall have had written notice of West's intention to take the action referred to in clause (C) (a "Notice of West Superior Proposal") at least five business days prior to the taking of such action by West and West

<PAGE>

shall have complied with the provisions of Section 4.3(c); provided, that any more favorable West Acquisition Proposal referred to in clause (y) above must involve at least 50% of the assets or equity securities of West (any such more favorable West Acquisition Proposal being referred to in this Agreement as a "West Superior Proposal").

(b) West agrees that it will immediately cease and cause to be terminated any existing activities, discussions or negotiations with any Person conducted heretofore with respect to any West Acquisition Proposal. West will promptly request each Person that has heretofore executed a confidentiality agreement in connection with its consideration of a transaction with West to return or destroy all confidential information furnished prior to the execution

of this Agreement to or for the benefit of such Person by or on behalf of West or any of its Subsidiaries. West agrees that it will take the necessary steps to promptly inform its Representatives of the obligations undertaken in this Section 4.3.

(c) West agrees that it will notify East as promptly as practicable (and, in any event, within 24 hours) if any inquiries, proposals or offers with respect to any West Acquisition Proposal or potential West Acquisition Proposal are received by, any such information is requested from, or any such discussions or negotiations are sought to be initiated or continued with, it or any of its Representatives, indicating, in connection with such notice, the name of such Person and the material terms and conditions of any proposal or offer and thereafter shall keep East informed, on a current basis, on the status and terms of any such proposal or offer and the status of any such discussions or negotiations. West agrees that (i) during the five business day period prior to its taking any action referred to in clause (ii)(C) of the proviso in Section 4.3(a) with respect to a West Acquisition Proposal, West and its Representatives shall negotiate in good faith with East and its Representatives regarding any revisions to the terms of the transaction contemplated by this Agreement proposed by East and (ii) West may take any such action with respect to a West Acquisition Proposal that was a West Superior Proposal only if such West Acquisition Proposal continues to be a West Superior Proposal in light of any revisions to the terms of the transaction contemplated by this Agreement to which East shall have agreed prior to the expiration of such five business day period. West agrees that it will deliver to East a new Notice of West Superior Proposal with respect to each West Acquisition Proposal that has been materially revised or modified prior to taking any action to recommend or agreeing to recommend such West Acquisition Proposal to the shareholders of West and that a new five business day period shall commence, for purposes of this Section 4.3(c), with respect to each such materially revised or modified West Acquisition Proposal from the time East receives a Notice of West Superior Proposal with respect thereto. West also agrees to provide any information to East that it is providing to another Person pursuant to this Section 4.3 at the same time it provides it to such other Person.

4.4 East Acquisition Proposals.

(a) From and after the Auction Termination Date, each of the Debtors agrees that, except as permitted by Section 4.1 hereof, neither it nor any of its officers and directors shall, and that it shall not authorize or permit its employees, agents and

<PAGE>

representatives, including any investment banker, attorney or accountant retained by it ("Representatives"), to, directly or indirectly, initiate, solicit or knowingly encourage or facilitate any inquiries or the making of any proposal or offer with respect to (1) a merger, reorganization, share exchange, consolidation or similar transaction involving the purchase or acquisition of any Debtor, (2) any purchase of an equity interest or interests in any Debtor or (3) any purchase of assets, securities or ownership interests of any Debtor, (any such inquiry, proposal or offer being hereinafter referred to as an "East Acquisition Proposal"). Each Debtor further agrees that neither it nor any of its officers and directors shall, and that it shall cause its Representatives not to, directly or indirectly, provide any confidential information or data to, or engage in any negotiations with, any Person relating to an East Acquisition Proposal, or otherwise knowingly encourage or facilitate any effort or attempt by any Person other than West to make or implement an East Acquisition Proposal; provided, however, that, subject to Section 6.3(a) hereof, nothing contained in

this Agreement shall prevent East or its Board of Directors from (i) complying
with its disclosure obligations under applicable Law (including under Sections
14d-9 and 14e-2 of the Exchange Act) with regard to an East Acquisition
Proposal.

(b)     Each Debtor agrees that from and after the Auction
Termination Date, if this Agreement is the Approved Proposal, it will cease and
cause to be terminated any existing activities, discussions or negotiations with
any Person other than West with respect to any East Acquisition Proposal. Upon
this Agreement becoming the Approved Proposal, the Debtors will promptly request
each Person that has heretofore executed a confidentiality agreement in
connection with its consideration of a transaction with any Debtor to return or
destroy all confidential information furnished prior thereto. Each Debtor agrees
that it will take the necessary steps to promptly inform its Representatives of
the obligations undertaken in this Section 4.4.

(c)     East agrees that it will notify West as promptly as
practicable (and, in any event, within 24 hours) if any inquiries, proposals or
offers with respect to any East Acquisition Proposal or potential East
Acquisition Proposal are received by, any such information is requested from, or
any such discussions or negotiations are sought to be initiated or continued
with, it or any of its Representatives, indicating, in connection with such
notice, the name of such Person and the material terms and conditions of any
proposal or offer and thereafter shall keep West informed, on a current basis,
on the status and terms of any such proposal or offer and the status of any such
discussions or negotiations. Each Debtor agrees that if, notwithstanding the
provisions of Section 4.4(a) and 4.4(b), it becomes legally obligated to
consider or enter into any discussions of any kind regarding an East Acquisition
Proposal, it and its representatives shall negotiate in good faith with West and
its Representatives to provide West with an opportunity to revise the terms of
the transaction contemplated by this Agreement such that the Debtors and their
Representatives agree that this Agreement (as so revised) constitutes the best
transaction available to the Debtors and their estates. Each Debtor also agrees
to provide any information to West that it is providing to another Person at the
same time it provides it to such other Person.

-61-

<PAGE>

4.5     Information Supplied. Each of West and East agrees
that none of the information supplied or to be supplied by it or any of its
Subsidiaries for inclusion or incorporation by reference in (i) the Registration
Statement on Form S-4 to be filed with the SEC by East in connection with the
issuance of the shares of East Common Stock in the Merger (including the
prospectus and proxy statement (the "Prospectus/Proxy Statement") constituting a
part thereof) (the "S-4 Registration Statement") and any amendment or supplement
thereto will, at the time the S-4 Registration Statement becomes effective under
the Securities Act, contain any untrue statement of a material fact or omit to
state any material fact required to be stated therein or necessary to make the
statements therein, in light of the circumstances under which they were made,
not misleading, and (ii) the Prospectus/Proxy Statement and any amendment or
supplement thereto will, at the date of mailing to shareholders of West and at
the time of the Shareholders Meeting (as defined in Section 4.6), contain any
untrue statement of a material fact or omit to state any material fact required
to be stated therein or necessary in order to make the statements therein, in
light of the circumstances under which they were made, not misleading. West and
East will cause the S-4 Registration Statement to comply as to form in all
material respects with the applicable provisions of the Securities Act and the
rules and regulations thereunder.

4.6      Shareholders Meeting. West will take, in accordance with applicable Law and its certificate of incorporation and by-laws, all lawful and reasonable action necessary to call, give notice of, convene and hold a meeting of holders of Shares (the "Shareholders Meeting") as promptly as practicable after the S-4 Registration Statement is declared effective, and in any event will use its reasonable best efforts to convene the Shareholders Meeting not later than 120 days after the date of this Agreement (or, if later, not more than 60 days after effectiveness of the S-4 Registration Statement), to consider and vote upon the adoption of this Agreement. Subject to its fiduciary duties under applicable Law, the Board of Directors of West shall make the Directors' Recommendation, the Directors' Recommendation shall be included in the Prospectus/Proxy Statement and the Board of Directors of West shall take all lawful and reasonable action to solicit the adoption of this Agreement by the holders of Shares. In the event that subsequent to the date of this Agreement the Board of Directors of West determines after consultation with outside counsel that its fiduciary duties under applicable Law require it to withdraw, modify or qualify its adoption of this Agreement or the Directors' Recommendation in any manner, the Board of Directors of West may, subject to the requirements of Section 4.3, so withdraw, modify or qualify its adoption of this Agreement or the Directors' Recommendation, provided, however, that West shall nevertheless submit this Agreement to the holders of Shares for adoption at the Shareholders Meeting and shall use its reasonable best efforts to do so within the time period prescribed herein.

4.7      Filings; Other Actions; Notification.

(a)      East and West shall promptly after the date of this Agreement prepare and East shall file with the SEC the S-4 Registration Statement as promptly as practicable thereafter. East shall use its reasonable best efforts to have the S-4 Registration Statement declared effective under the Securities Act as promptly as practicable after

-62-

<PAGE>

such filing, and in any event not later than 120 days after the date of this Agreement and West shall promptly thereafter mail the Prospectus/Proxy Statement to the holders of Shares. The parties shall notify each other promptly of the receipt of any comments from the SEC or the staff of the SEC and of any request by the SEC or the staff of the SEC for amendments or supplements to the Prospectus/Proxy Statements or the S-4 Registration Statement or for additional information and shall supply each other with copies of (i) all correspondence between it or any of its representatives, on the one hand, and the SEC or the staff of the SEC, on the other hand, with respect to the Prospectus/Proxy Statement, the S-4 Registration Statement or the Merger, and (iii) all orders of the SEC relating to the S-4 Registration Statement.

(b)      West and East shall cooperate with each other and use (and shall cause their respective Subsidiaries to use) their respective reasonable best efforts to take or cause to be taken all actions, and do or cause to be done all things, necessary, proper or advisable on its part under this Agreement and applicable Laws to consummate and make effective the Merger and the other transactions contemplated by this Agreement as soon as practicable, including preparing and filing as promptly as practicable all documentation to effect all necessary notices, reports and other filings and to obtain as promptly as practicable all consents, registrations, approvals, permits and authorizations necessary or advisable to be obtained from any third party and/or any Governmental Entity in order to consummate the Merger or any of the other transactions contemplated by this Agreement. Subject to applicable Laws relating to the exchange of information, East and West shall have the right

to review in advance, and to the extent practicable each will consult the other on, all of the information relating to East or West, as the case may be, and any of their respective Subsidiaries, that appears in any filing made with, or written materials submitted to, any third party and/or any Governmental Entity in connection with the Merger and the other transactions contemplated by this Agreement (including the S-4 Registration Statement). To the extent permitted by Law, each party shall provide the other with copies of all correspondence between it (or its advisors) and any Governmental Entity relating to the transactions contemplated by this Agreement and, to the extent reasonably practicable, all telephone calls and meetings with a Governmental Entity regarding the transactions contemplated by this Agreement shall include Representatives of East and West. In exercising the foregoing rights, each of West and East shall act reasonably and as promptly as practicable.

(c) To the extent permitted by applicable Law, West and East each shall, upon request by the other, furnish the other with all information concerning itself, its Subsidiaries, directors, officers and stockholders and such other matters as may be reasonably necessary or advisable in connection with the S-4 Registration Statement or any other statement, filing, notice or application made by or on behalf of East, West or any of their respective Subsidiaries to any third party and/or any Governmental Entity in connection with the Merger and the transactions contemplated by this Agreement.

(d) Subject to applicable Laws and the instructions of any Governmental Entity, West and East each shall keep the other apprised of the status of matters relating to completion of the transactions contemplated hereby, including promptly furnishing the other with copies of notices or other communications received by East or West, as the

<PAGE>

case may be, or any of its Subsidiaries, from any third party and/or any Governmental Entity with respect to the Merger and the other transactions contemplated by this Agreement. West shall give prompt notice to East of any change, fact or condition of which, to West's Knowledge, is reasonably expected to result in a West Material Adverse Effect or of any failure of any condition to East's obligations to effect the Merger. East shall give prompt notice to West of any change, fact or condition of which, to East's Knowledge, is reasonably expected to result in an East Material Adverse Effect or of any failure of any condition to West's obligations to effect the Merger.

(e) East's and West's obligations under this Section 4.7(e) shall include, without limitation, the obligation to use their respective reasonable best efforts to defend any lawsuits or legal proceedings, whether judicial or administrative, or any actions by a Governmental Entity, challenging the consummation of the Merger or the other transactions contemplated hereby, including using reasonable best efforts to seek to have any stay or other injunctive relief which would prevent or materially delay or impair the consummation of the transactions contemplated by this Agreement entered by any court or other Governmental Entity reversed on appeal or vacated. For purposes of this Section 4.7(e), "reasonable best efforts" shall include each of East's and West's agreement to (i) sell, hold separate or otherwise dispose of its assets or the assets of its Subsidiaries or conduct its business in a specified manner, or (ii) permit its assets or the assets of its Subsidiaries to be sold, held separate or disposed of or permit its business to be conducted in a specified manner; provided however, that nothing in this Agreement will require, or be deemed to require, East or West to agree to or effect any divestiture or take any other action if doing so would, individually or in the aggregate, reasonably be expected to result in a Newco Material Adverse Effect. "Newco

Page 64 of 83

Material Adverse Effect" means a material adverse effect on the financial condition, assets, liabilities, business or results of operations of Newco and its Subsidiaries taken as a whole. "Newco" refers to East after the Effective Time.

(f) Each of West and East will promptly notify the other if it becomes aware of any significant deficiencies in its internal control over financial reporting that, alone or combined with other significant deficiencies, would constitute a material weakness in its internal control over financial reporting.

(g) Each of East and West agree that, without the prior consent of the other party, it will not enter into, amend, modify or waive any of its rights under (i) any definitive agreements relating to the Financing Commitments, (ii) any agreements with the ATSB (other than the Undertaking, dated as of January 18, 2002, among West, the ATSB and TPG Partners, L.P. and certain of its affiliates) or (iii) any agreements with General Electric Company or any of its Subsidiaries.

4.8 Access and Reports. Subject to applicable Law, upon reasonable notice, each Party shall (and shall cause its Subsidiaries to) afford the other party's officers and other authorized Representatives (including environmental consultants) reasonable access, during normal business hours throughout the period prior to the Effective Time, to its properties, books, contracts and records and, during such period, each Party shall (and shall cause its Subsidiaries to) furnish promptly to the other party

<PAGE>

all information concerning its business, properties and personnel as may reasonably be requested.

4.9 Publicity. The initial press release disclosing this Agreement shall be a joint press release and thereafter West and East each shall consult with each other prior to issuing any press releases or otherwise making public announcements with respect to the Merger and the other transactions contemplated by this Agreement and prior to making any filings with any third party or any Governmental Entity (including any national securities exchange) with respect thereto, except as may be required by applicable Law or by obligations pursuant to any listing agreement with or rules of any national securities exchange or by the request of any Governmental Entity.

4.10 Employee Benefits.

(a) East shall cause the Surviving Corporation to honor all West Compensation and Benefit Plans in accordance with their terms as in effect immediately before the Effective Time, subject to any amendment or termination thereof that may be permitted by the terms of such plan and applicable Law.

(b) Subject to the terms of any applicable collective bargaining agreement, East shall cause any East Compensation and Benefit Plans that cover the employees of West and its Subsidiaries who are employed by East or any of its Subsidiaries at or after the Effective Time (the "Continuing Employees") to treat the employment and service of the Continuing Employees with West and its Subsidiaries and any predecessor employers through the Closing Date as employment and service with East and its Subsidiaries for eligibility and vesting purposes (but not benefit accrual purposes under any defined benefit pension plan) under the East Compensation and Benefit Plans. Subject to the

Page 65 of 83

terms of any applicable collective bargaining agreement, the Continuing Employees and their dependents and beneficiaries shall not be required for the calendar year that includes the Closing Date to satisfy any deductible, co-payment, out-of pocket maximum or similar requirements under any East Compensation and Benefit Plan that provides medical, dental and other welfare benefits to the Continuing Employees (and their beneficiaries) to the extent of amounts previously credited for such purposes under the medical, dental and other welfare benefit plans of West and its Subsidiaries that covered the Continuing Employees prior to the Closing Date, and any waiting periods, pre-existing condition exclusions and requirements to show evidence of good health contained in such East Compensation and Benefit Plan shall not apply with respect to the Continuing Employees and their dependents and beneficiaries (except to the extent such waiting periods, exclusions or requirements were applicable under the West Compensation and Benefit Plans at the Effective Time).

(c) No provision of this Section 4.10 shall create any third party beneficiary rights in any Continuing Employee or any other employee or former employee (including any beneficiary or dependent of any Continuing Employee or other employee or former employee) of West or any of its Subsidiaries in respect of continued employment (or resumed employment) or any other matter.

<PAGE>

4.11 Expenses. Except as otherwise provided in Section 6.5, whether or not the Merger is consummated, all costs and expenses incurred in connection with this Agreement and the Merger and the other transactions contemplated by this Agreement shall be paid by the party incurring such expense; provided, however, that East and West shall each be responsible for half of the costs and expenses incurred in connection with any filings required to be made under the HSR Act, as contemplated by Sections 3.1(d)(i)(B) and 3.2(e)(i)(B) hereof.

4.12 Indemnification; Directors' and Officers' Insurance.

(a) From and after the Effective Time, each of East and the Surviving Corporation agrees that it will jointly and severally indemnify and hold harmless each present director and officer of West or any of its Subsidiaries (in each case, for acts or failures to act in such capacity), determined as of the Effective Time (the "Indemnified Parties"), against any costs or expenses (including reasonable attorneys' fees), judgments, fines, losses, claims, damages or liabilities (collectively, "Costs") incurred in connection with any claim, action, suit, proceeding or investigation, whether civil, criminal, administrative or investigative, arising out of matters existing or occurring at or prior to the Effective Time, whether asserted or claimed prior to, at or after the Effective Time (including any matters arising in connection with the transactions contemplated by this Agreement), to the fullest extent permitted by applicable Law (and East or the Surviving Corporation shall also advance expenses as incurred to the fullest extent permitted under applicable Law, provided that the Person to whom expenses are advanced provides an undertaking to repay such advances if it is ultimately determined that such Person is not entitled to indemnification); and provided, further, that any determination as to whether an Indemnified Person is entitled to indemnification or advancement of expenses hereunder shall be made by independent counsel selected by East or the Surviving Corporation and such Person.

(b) Any Indemnified Party wishing to claim indemnification under paragraph (a) of this Section 4.12, upon learning of any

such claim, action, suit, proceeding or investigation, shall promptly notify East thereof, but the failure to so notify shall not relieve East of any liability it may have to such Indemnified Party except to the extent such failure materially and actually prejudices the indemnifying party. In the event of any such claim, action, suit, proceeding or investigation (whether arising before or after the Effective Time), (i) East or the Surviving Corporation shall have the right to assume the defense thereof and East shall not be liable to such Indemnified Parties for any legal expenses of other counsel or any other expenses subsequently incurred by such Indemnified Parties in connection with the defense thereof, except that if East or the Surviving Corporation does not elect to assume such defense or counsel for the Indemnified Parties advises that there are issues which raise conflicts of interest between East or the Surviving Corporation and the Indemnified Parties, the Indemnified Parties may retain counsel satisfactory to them, and East and the Surviving Corporation shall jointly and severally be obligated to pay all reasonable fees and expenses of such counsel for the Indemnified Parties promptly as statements therefor are received; provided, however, that East and the Surviving Corporation shall be obligated pursuant to this paragraph (b) to pay for only one firm of counsel for all Indemnified Parties in any

<PAGE>

jurisdiction unless the use of one counsel for such Indemnified Parties would present such counsel with a conflict of interest; (ii) the Indemnified Parties will use their reasonable efforts to cooperate in the defense of any such matter, and (iii) East and the Surviving Corporation shall not be liable for any settlement effected without their prior written consent (such consent not to be unreasonably withheld or delayed); and provided, further, that East and the Surviving Corporation shall not have any obligation under this Agreement to any Indemnified Party if and when a court of competent jurisdiction shall ultimately determine, and such determination shall have become final, that the indemnification of such Indemnified Party in the manner contemplated hereby is prohibited by applicable law.

(c) The Surviving Corporation shall, and East shall cause the Surviving Corporation to, maintain West's existing officers' and directors' liability insurance ("D&O Insurance") (including for acts or omissions occurring in connection with this Agreement and the consummation of the transactions contemplated hereby) covering each such Indemnified Person covered as of the Effective Time by West's officers' and directors' liability insurance policy on terms with respect to coverage and amount no less favorable than those of such policy in effect on the date hereof, for a period of six years after the Effective Time; provided, however, that in no event shall the Surviving Corporation be required to expend in any one year an amount in excess of 150% of the current annual premium paid by West (which annual premium is set forth in Section 4.12(c) of the West Disclosure Letter) for such insurance (such 150% amount, the "Maximum Annual Premium"); provided, further, that if the annual premiums of such insurance coverage exceed such amount, the Surviving Corporation shall be obligated to obtain a policy with the greatest coverage available for a cost not exceeding the Maximum Annual Premium. In addition, West may purchase a six-year "tail" prepaid policy prior to the Effective Time on terms and conditions no less advantageous to the Indemnified Parties than the existing directors' and officers' liability insurance maintained by West; provided, that the amount paid by West shall not exceed six times the Maximum Annual Premium. If such "tail" prepaid policy has been obtained by West prior to the Closing, the Surviving Corporation shall, and East shall cause the Surviving Corporation to, maintain such policy in full force and effect, for its full term, and continue to honor their respective obligations thereunder, and all other obligations under this Section 4.12(c) shall terminate.

(d) The obligations of East and the Surviving Corporation under this Section 4.12 shall not be terminated or modified by such parties in a manner so as to adversely affect any Indemnified Party to whom this Section 4.12 applies without the consent of such affected Indemnified Party. If East or the Surviving Corporation or any of their respective successors or assigns (i) shall consolidate with or merge into any other corporation or entity and shall not be the continuing or surviving corporation or entity of such consolidation or merger or (ii) shall transfer all or substantially all of its properties and assets to any individual, corporation or other entity, then, and in each such case, proper provisions shall be made so that the successors and assigns of East or the Surviving Corporation, as the case may be, shall assume all of the obligations set forth in this Section.

<PAGE>

(e) The provisions of this Section 4.12 are intended to be for the benefit of, and shall be enforceable by, each of the Indemnified Parties and their heirs and legal representatives.

(f) The rights of the Indemnified Parties and their heirs and legal representatives under this Section 4.12 shall be in addition to any rights such Indemnified Parties may have under the certificate of incorporation or by-laws of West or any of its Subsidiaries, or under any other applicable Laws.

4.13 Takeover Statutes. If any Takeover Statute becomes applicable to the Merger or the other transactions contemplated by this Agreement, each of East and West and their respective Board of Directors shall grant such approvals and take such actions as are necessary so that such transactions may be consummated as promptly as practicable on the terms contemplated by this Agreement and by the Merger and otherwise act to eliminate or minimize the effects of such statute or regulation on such transactions.

4.14 Transfer Taxes. Each of East, West, Merger Sub and the shareholders of West shall pay any sales, use, ad valorem, property, transfer (including real property transfer) and similar Taxes imposed on such Person as a result of or in connection with the Merger and the other transactions contemplated hereby, except to the extent such taxes may not be assessed pursuant to section 1146(c) of the Bankruptcy Code; provided, however, that West shall be liable for any such Tax that is imposed on its shareholders in respect of assets that are owned directly or indirectly by West.

4.15 Taxation. The parties intend that the Merger qualify as a reorganization within the meaning of Section 386(a) of the Code and shall use their reasonable best efforts (and shall cause their respective Subsidiaries to use their reasonable best efforts) to cause the Merger to so qualify. Neither East nor West shall take, cause or permit to be taken, or fail to take, any action, whether before or after the Effective Time, which action or failure to act would disqualify the Merger as a reorganization within the meaning of Section 368(a) of the Code. Each of East, Merger Sub and West shall cooperate with each other in obtaining opinions of Skadden, Arps, Slate, Meagher & Flom LLP, counsel to West, and Arnold & Porter LLP, counsel to East and Merger Sub, to satisfy the conditions set forth in Sections 5.2(e) and 5.3(e). In connection therewith, each of East, Merger Sub and West shall deliver to such counsel customary representation letters in form and substance reasonably satisfactory to such counsel.

4.16 Stock Exchange Listing and De-listing. East shall use

its reasonable best efforts to cause the shares of East Common Stock to be issued in the Merger to be authorized for listing or quotations, as applicable, on the NYSE or the NASDAQ Stock Market upon official notice of issuance, prior to the Closing Date. The Surviving Corporation shall use its best efforts to cause the Shares to be no longer listed on the NYSE and de-registered under the Exchange Act as soon as practicable following the Effective Time.

<PAGE>

4.17 Affiliates. West shall deliver to East prior to the Closing Date a letter identifying all persons who are, at the time this Agreement is submitted for adoption by the stockholders of West, "affiliates" of West for purposes of Rule 145 of the rules and regulations promulgated under the Securities Act. West shall use reasonable best efforts to cause each such person to deliver to East on or prior to the Closing Date a written agreement substantially in the form attached as Exhibit F hereto.

4.18 Section 16(b). East and West shall take all steps reasonably necessary to cause the transactions contemplated hereby and any other dispositions of Shares or acquisitions of East Common Stock in connection with this Agreement by each individual who is a director or officer of West to be exempt under Rule 16b-3 under the Exchange Act.

4.19 Compliance with Indenture and Warrant. As soon as practicable, East shall take or cause to be taken all actions, and do or cause to be done all things, necessary, proper or advisable on its part to comply with the terms of (i) the Indenture governing the 2009 Notes, dated January 18, 2002, between America West Airlines, Inc. and Wilmington Trust Company, as Trustee, (ii) the Guarantee of the 2009 Notes, dated January 18, 2002, by America West Airlines, Inc., (iii) the Indenture governing the 2023 Notes, dated July 30, 2003, between America West Airlines, Inc. and U.S Bank National Association, as Trustee, (iv) the Guarantee and Exchange Agreement governing the 2023 Notes, dated July 30, 2003, between West and U.S. Bank National Association, as Exchange Agent and Trustee, and (v) the Warrant to Purchase Class B Common Stock issued to the ATSB on January 18, 2002, including preparing, executing and delivering as promptly as practicable all documentation to effect all necessary notices, supplements, amendments, reports and other documents.

4.20 Adjustment for Increase in Pre-Investment Valuation of East.

(a) In the event that, prior to the Effective Time, East enters into an Alternative Transaction in connection with the Merger, the parties shall cause this Agreement to be amended to adjust the Class A Merger Exchange Ratio and the Class B Merger Exchange Ratio appropriately such that 40% of the Additional Pre-Investment Value (the "West Additional Pre-Investment Value") will, in the aggregate, be allocated to (i) the aggregate Class A Per Share Merger Consideration, (y) the aggregate Class B Per Share Merger Consideration and (z) the value of the Equity Participation, if any; provided, however, that any adjustments to the Class A Merger Exchange Ratio and the Class B Merger Exchange Ratio shall be made on a proportionate basis. In the event that, prior to the Effective Time, East enters into an Alternative Transaction other than the Merger with respect to which West or one of its affiliates is a party or otherwise involved, the parties shall cause the applicable agreement relating to such Alternative Transaction to provide for the allocation of such portion of the West Additional Pre-Investment Value as is necessary to fully satisfy the value of the Equity Participation. At West's request, East shall cause this Agreement or, in the case of an Alternative Transaction other than the Merger, such other applicable agreement, or the Plan to provide that at the

Effective Time (or at the closing of such other Alternative Transaction, as the case may be) shares of East Common Stock representing 28% (or such other

<PAGE>

percentage as West may advise East in writing prior to the Effective Time or such closing) of the West Additional Pre-Investment Value be delivered to such Person or Persons as West may designate in its sole discretion (the "Equity Participation").

(b) For purposes of this Agreement:

(i) "Additional Pre-Investment Value" means the excess of (A) the pre-investment equity valuation of East pursuant to such Alternative Transaction (after giving effect to the Plan and the closing of such Alternative Transaction (which, in the case of the Merger, would include the value of West) and determined on the same basis as the Financing Commitments) over (B) $500,000,000.

(ii) "Alternative Transaction" means a reorganization, sale, merger, consolidation, joint venture, recapitalization, stand-alone plan, sale of assets or equity interests, or other combination or disposition or similar transaction (including the Merger) involving East as part of the Plan with respect to which the pre-investment equity valuation of East (after giving effect to the Plan and the closing of such Alternative Transaction (which, in the case of the Merger, would include the value of West) and determined on the same basis as the Financing Commitments) exceeds $500,000,000.

ARTICLE V

Conditions

5.1 Conditions to Each Party's Obligation to Effect the Merger. The respective obligation of each party to effect the Merger is subject to the satisfaction or waiver at or prior to the Effective Time of each of the following conditions:

(a) Shareholder Approval. This Agreement shall have been duly adopted by holders of Shares constituting the West Requisite Vote in accordance with applicable Law and West's certificate of incorporation and by-laws.

(b) Regulatory Consents. The waiting period (and any extension thereof) applicable to the consummation of the Merger under the HSR Act shall have expired or been earlier terminated, (ii) all approvals and authorizations required to be obtained from the ATSB, DOT and FAA for the consummation of the Merger shall have been obtained, (iii) all approvals and authorizations required to be obtained for the consummation of the Merger from the foreign Governmental Entities set forth on Section 5.1(b)(iii) of the East Disclosure Letter shall have been obtained, (iv) all other Governmental Consents (as defined below) required to be obtained from any Governmental Entities for the consummation of the Merger shall have been obtained, except for any failures to obtain such consents that would not, individually or in the aggregate, reasonably be expected to result in a Newco Material Adverse Effect, and (v) all other Governmental Consents the failure of which to make or obtain would, individually or in the aggregate, provide a reasonable basis to conclude that West or its directors or officers would be subject to the risk of criminal liability, shall have been

<PAGE>

made or obtained. For purposes of this Agreement, the term "Governmental Consents" shall mean all notices, reports, filings, consents, registrations, approvals, permits or authorizations required to be made prior to the Effective Time by West, East or any of their respective Subsidiaries with, or obtained prior to the Effective Time by West, East or any of their respective Subsidiaries from, any Governmental Entity in connection with the execution and delivery of this Agreement and the consummation of the Merger and the other transactions contemplated hereby. All Governmental Consents that have been obtained shall have been obtained without the imposition of any term, condition or consequence the acceptance of which would, individually or in the aggregate, reasonably be expected to have or result in a Newco Material Adverse Effect.

(c) Orders. No Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Law (whether temporary, preliminary or permanent) that is in effect and restrains, enjoins, makes illegal or otherwise prohibits consummation of the Merger or the other transactions contemplated by this Agreement (collectively, an "Order"), except for such Orders of Governmental Entities outside the United States as would not, individually or in the aggregate, reasonably be expected to have a Newco Material Adverse Effect and which do not provide a reasonable basis to conclude that West, East or their respective directors or officers would be subject to the risk of criminal liability.

(d) Bankruptcy. The Plan, in form and substance reasonably acceptable to each of East and West, shall have been confirmed by the Bankruptcy Court pursuant to a Confirmation Order in form and substance reasonably acceptable to each of East and West, and such Confirmation Order shall have become a Final Order.

(e) S-4 Registration Statement. The S-4 Registration Statement shall have become effective under the Securities Act. No stop order suspending effectiveness of the S-4 Registration Statement shall have been issued, and no proceedings for that purpose shall have been initiated or threatened, by the SEC.

(f) Listing. The shares of East Common Stock to be issued in the Merger shall have been authorized for listing or quotation, as applicable, on the NYSE or NASDAQ Stock Market upon official notice of issuance.

(g) Additional East Equity. In connection with the emergence of East from bankruptcy and the consummation of the Plan, East will have received from the Equity Investors on or before the Effective Time cash equity investments of not less than $375,000,000 on a pre-investment value of not less than $500,000,000, such equity investments to be made substantially on the basis set forth in the Financing Commitments.

(h) Further Agreements. All agreements and Bankruptcy Court orders entered into, modified or otherwise effected pursuant to or in connection with this Agreement or the Plan shall be in form and substance reasonably acceptable to each of East and West.

<PAGE>

5.2 Conditions to Obligations of East and Merger Sub. The obligations of East and Merger Sub to effect the Merger are also subject to the satisfaction or waiver by East at or prior to the Effective Time of the

following conditions:

(a) Representations and Warranties.

(i) Each of the representations and warranties of West set forth in this Agreement (without giving effect to any materiality or West Material Adverse Effect qualifications contained therein) shall be true and correct in all respects as of the date of this Agreement and as of the Closing Date as though made on and as of the Closing Date (except to the extent any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date), except where the failure of such representations and warranties to be true and correct would not, individually or in the aggregate, reasonably be expected to have a West Material Adverse Effect; and

(ii) East shall have received a certificate signed on behalf of West by the Chief Executive Officer or Chief Financial Officer of West as to the matters set forth in clause (i) of this Section 5.2(a).

(b) Performance of Obligations of West. West shall have performed in all material respects all obligations required to be performed by it under this Agreement at or prior to the Closing Date, and East shall have received a certificate signed on behalf of West by the Chief Executive Officer or Chief Financial Officer of West to such effect.

(c) Certain Litigation. No Governmental Entity of competent jurisdiction shall have instituted (or if instituted, shall not have withdrawn) any suit, action or proceeding seeking any Order which would, in the reasonable judgment of East, individually or in the aggregate, be reasonably likely to result in a failure of the condition set forth in Section 5.1(c).

(d) Consents Under Agreements. West shall have obtained the consent or approval of each Person whose consent or approval shall be required under any West Material Contract to which West or any of its Subsidiaries is a party in connection with the transactions contemplated by this Agreement, except where the failure to obtain such consents or approvals would not, individually or in the aggregate, reasonably be expected to have a West Material Adverse Effect.

(e) Tax Opinion. East shall have received the opinion of Arnold & Porter LLP, counsel to East, in form and substance reasonably satisfactory to East, dated the Closing Date, substantially to the effect that, on the basis of facts, representations and assumptions set forth or referred to in such opinion which are consistent with the state of facts existing at the Effective Time, the Merger will be treated for United States federal income tax purposes as a reorganization within the meaning of Section 368(a) of the Code. In rendering the opinion described in this Section 5.2(e), Arnold & Porter LLP

<PAGE>

may rely on customary representation letters as provided by East, Merger Sub and West, in form and substance reasonably satisfactory to Arnold & Porter LLP.

5.3 Conditions to Obligation of West. The obligation of West to effect the Merger is also subject to the satisfaction or waiver by West at or prior to the Effective Time of the following conditions:

(a) Representations and Warranties.

(i) Each of the representations and warranties of East and Merger Sub set forth in this Agreement (without giving effect to any materiality or East Material Adverse Effect qualifications contained therein) shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date as though made on and as of the Closing Date (except to the extent any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date), except where the failure of such representations and warranties to be true and correct would not, individually or in the aggregate, reasonably be expected to have an East Material Adverse Effect; and

(ii) West shall have received a certificate signed on behalf of East and Merger Sub by the Chief Executive Officer or Chief Financial Officer of East as to the matters set forth in clause (a) of this Section 5.3.

(b) Performance of Obligations of East and Merger Sub. Each of East and Merger Sub shall have performed in all material respects all obligations required to be performed by it under this Agreement at or prior to the Closing Date, and West shall have received a certificate signed on behalf of East and Merger Sub by the Chief Executive Officer or Chief Financial Officer of East to such effect.

(c) Certain Litigation. No Governmental Entity of competent jurisdiction shall have instituted (or if instituted, shall not have withdrawn) any suit, action or proceeding seeking any Order which would, in the reasonable judgment of West, individually or in the aggregate, be reasonably likely to result in a failure of the condition set forth in Section 5.1(c).

(d) Consents Under Agreements. East shall have obtained the consent or approval of each Person whose consent or approval shall be required under any East Material Contract to which East or any of its Subsidiaries is a party in connection with the transactions contemplated by this Agreement, except where the failure to obtain such consents or approvals would not, individually or in the aggregate, reasonably be expected to have an East Material Adverse Effect.

(e) Tax Opinion. West shall have received the opinion of Skadden, Arps, Slate, Meagher & Flom LLP, counsel to West, in form and substance reasonably satisfactory to West, dated the Closing Date, substantially to the effect that, on the basis of facts, representations and assumptions set forth or referred to in such opinion which are consistent with the state of facts existing at the Effective Time, the Merger will be treated for United States federal income tax purposes as a reorganization within the

<PAGE>

meaning of Section 368(a) of the Code. In rendering the opinion described in this Section 5.3(e), Skadden, Arps, Slate, Meagher & Flom LLP may rely on customary representation letters provided by East, Merger Sub and West, in form and substance reasonably satisfactory to Skadden, Arps, Slate, Meagher & Flom LLP.

(f) Immediately prior to the Effective Time there shall not exist more than $5,000,000 of administrative claims (including contingent liabilities) arising out of or related to (i) any East Compensation and Benefit Plan that is subject to Section 302 of ERISA or Section 412 of the Code, other than any claims relating to amounts incurred in the ordinary course of East's business including, but not limited to, plan contributions or (ii) any East

Compensation and Benefit Plan not listed in Section 3.2(i)(i) of the East Disclosure Letter.

ARTICLE VI

Termination

6.1 Termination by Mutual Consent. This Agreement may be terminated and the Merger may be abandoned at any time prior to the Effective Time, whether before or after the adoption of this Agreement by the shareholders of West referred to in Section 5.1(a) or the entry of the Confirmation Order, by mutual written consent of West and East by duly authorized action.

6.2 Termination by Either East or West. This Agreement may be terminated and the Merger may be abandoned at any time prior to the Effective Time by duly authorized action of either East or West if (a) the Merger shall not have been consummated by October 31, 2005, whether such date is before or after the date of the adoption of this Agreement by the shareholders of West referred to in Section 5.1(a) or the entry of the Confirmation Order, provided, however, that in the event that, as of October 31, 2005, the conditions set forth in Sections 5.1(b), (d) and (e) have not been satisfied, the termination date may be extended from time to time by East or West one or more times to a date not beyond December 31, 2005 (such date, including any such extensions thereof, the "Termination Date"), (b) the adoption of this Agreement by the shareholders of West referred to in Section 5.1(a) shall not have been obtained at the Shareholders Meeting or at any adjournment or postponement thereof, (c) any Order permanently restraining, enjoining or otherwise prohibiting consummation of the Merger shall become final and non-appealable, except for any Orders the existence of which would not result in the failure of the condition set forth in Section 5.1(c) (whether before or after the adoption of this Agreement by the shareholders of West referred to in Section 5.1(a)), (d) the Bidding Procedures shall not have been approved by the Bankruptcy Court within fifteen (15) days of the date of this Agreement, or (e) the Merger and the transactions contemplated under this Agreement shall not have been determined by the Bankruptcy Court to be the Approved Proposal within forty-five (45) days after the entry of the order approving the Bidding Procedures by the Bankruptcy Court; provided, however, that the right to terminate this Agreement pursuant to this Section 6.2 shall not be available to any party that has breached its obligations under this Agreement in any manner that shall have proximately contributed to the occurrence of

<PAGE>

the failure of a condition to the consummation of the Merger; provided, further, that in the case of clauses (d) and (e) of this Section 6.2, each of East and West shall have the right, but not the obligation, to terminate this Agreement for up to five (5) business days following the time period specified in such clause, after which time, if this Agreement is not terminated by either East or West, the time period for obtaining approval of the Bidding Procedures in clause (d) of this Section 6.2 and the time period for receiving a determination that the Merger and transactions contemplated under this Agreement constitute the Approved Proposal in clause (e) of this Section 6.2 shall be extended for ten (10) business days, during which time this Agreement may not be terminated. If, upon the expiration of the extension period contemplated in the preceding sentence, the Bidding Procedures shall not have been approved by the Bankruptcy Court or the Merger and the transactions contemplated under this Agreement shall not have been determined by the Bankruptcy Court to be the Approved Proposal, then this Agreement shall be deemed to have terminated pursuant to Section 6.2(d) or (e), as applicable.

6.3 Termination by West. This Agreement may be terminated and the Merger may be abandoned at any time prior to the Effective Time, whether before or after the adoption of this Agreement by the shareholders of West referred to in Section 5.1(a), by action of the Board of Directors of West if (a) without the consent of West, East shall have entered into or seeks authority from the Bankruptcy Court to enter into (or does not object to efforts by any other party to have East enter into) a binding written agreement concerning any Qualified Competing Plan Proposal, (b) the Board of Directors of West authorizes West, subject to complying with the terms of this Agreement, to enter into a binding written agreement concerning a transaction that constitutes a West Superior Proposal, (c) there has been a breach of any representation, warranty, covenant or agreement made by East, any other Debtor or Merger Sub in this Agreement, or any such representation or warranty shall have become untrue or incorrect after the execution of this Agreement, such that Section 5.3(a) or 5.3(b), as the case may be, would not be satisfied and such breach or failure to be true and correct is not curable within sixty (60) days of West providing written notice of such breach or failure to East, (d) East shall have knowingly and materially and not inadvertently breached any of its obligations under Section 4.4 of this Agreement, or (e) East withdraws the Plan after it has been filed with the Bankruptcy Court, East ceases to seek actively to have the Plan confirmed by the Bankruptcy Court (or does not actively contest efforts by another Person to cause the Plan not to be so confirmed) or twenty days after the Bankruptcy Court enters an order denying confirmation of the Plan.

6.4 Termination by East. This Agreement may be terminated and the Merger may be abandoned at any time prior to the Effective Time, whether before or after the adoption of this Agreement by the shareholders of West referred to in Section 5.1(a), by duly authorized action of East if (a) the Board of Directors of West shall have withdrawn, modified or qualified, or shall have agreed to withdraw, modify or qualify, in fact or in substance, its adoption of this Agreement or the Directors' Recommendation in a manner adverse to East, (b) West shall have entered into a binding written agreement concerning a transaction that constitutes a West Superior Proposal, (c) East, by duly authorized action, is authorized to enter into a binding written agreement concerning a transaction that constitutes an Approved Proposal, (d) there has been a

<PAGE>

breach of any representation, warranty, covenant or agreement made by West in this Agreement, or any such representation or warranty shall have become untrue or incorrect after the execution of this Agreement, such that Section 5.2(a) or 5.2(b), as the case may be, would not be satisfied and such breach or failure to be true or correct is not curable within sixty (60) days of East providing written notice of such breach or failure to West, (e) by the later of 120 days after the date of this Agreement or 60 days after effectiveness of the S-4 Registration Statement, the Shareholders Meeting shall not have been held, or the vote of West's shareholders contemplated by Section 4.6 has not been taken, unless West has used its reasonable best efforts to convene the Shareholders Meeting and hold such vote by the later of such dates, or (f) West shall have knowingly and materially and not inadvertently breached any of its obligations under Section 4.3 of this Agreement.

6.5 Effect of Termination and Abandonment.

(a) In the event of termination of this Agreement and the abandonment of the Merger pursuant to this Article VI, this Agreement (other than as set forth in Section 7.1) shall become void and of no effect with no

liability on the part of any party hereto (or of any of its directors, officers or other Representatives).

(b) In the event that (i) a bona fide West Acquisition Proposal relating to at least 40% of the assets or equity interests of West and its Subsidiaries taken as a whole (a "Covered Proposal") shall have been made to West or any of its Subsidiaries or its shareholders and shall have become publicly known or any Person shall have publicly announced an intention (whether or not conditional) to make a Covered Proposal with respect to West or any of its Subsidiaries (and such Covered Proposal or publicly announced intention shall not have been withdrawn at the time of the Shareholders Meeting) and thereafter this Agreement is terminated by either East or West pursuant to Section 6.2(b), (ii) this Agreement is terminated by East pursuant to Section 6.4(e), (iii) this Agreement is terminated by East (A) pursuant to Section 6.4(a), (b) or (f) or (B) pursuant to Section 6.4(d) with respect to any knowing, material and not inadvertent breach of any covenant or agreement made by West or (iv) this Agreement is terminated by West pursuant to Section 6.3(b), then West shall promptly, but in no event later than two days after the date of such termination, pay East a termination fee of $15,000,000 (the "East Termination Fee"), payable by wire transfer of same day funds; provided, however, that no East Termination Fee shall be payable to East pursuant to clause (i) of this paragraph (b) unless and until (I) any Person (other than East) (a "West Acquiring Party") has acquired, by purchase, sale, assignment, lease, transfer or otherwise, in one transaction or any series of related transactions within 18 months of such termination, a majority of the voting power of the outstanding securities of West or all or substantially all of the assets of West or shall have entered into an agreement with West for such an acquisition within 18 months of such termination or (II) there has been consummated a merger, consolidation or similar business combination between West or one of its Subsidiaries and a West Acquiring Party within such 18 month period. West acknowledges that the agreements contained in this Section 6.5(b) are an integral part of the transactions contemplated by this Agreement, and that, without these agreements, East and Merger Sub would not enter into this Agreement; accordingly, if West fails to promptly pay any amount due pursuant to this Section 6.5(b), and, in order to obtain such

<PAGE>

payment, East or Merger Sub commences a suit which results in a judgment against West for the fee, charges or expenses to which reference is made in this paragraph (b), West shall pay to East or Merger Sub its costs and expenses (including attorneys' fees) in connection with such suit, together with interest on the amount of the fee at the prime rate of Citibank, N.A. in effect on the date such payment was required to be made. Notwithstanding anything to the contrary in this Agreement, the parties hereby acknowledge that payment of the East Termination Fee shall be the sole and exclusive remedy available to East, Merger Sub or any of the Debtors' or their estates under this Agreement and none of such parties shall have any other rights or remedies in law or equity against West. Notwithstanding anything to the contrary in this Agreement, no East Termination Fee (when payable under this Agreement) shall be payable under any circumstances unless and until the order approving the Bidding Procedures is entered by the Bankruptcy Court and has become final and non-appealable.

(c) In the event that this Agreement is terminated (i) by West pursuant to Section 6.3(a), (d) or (e), (ii) pursuant to Section 6.2(e), (iii) by East pursuant to Section 6.4(c), or (iv) by West pursuant to Section 6.3(c) with respect to any knowing, material and not inadvertent breach of any covenant or agreement by East, then East shall, promptly, but in no event later than two days after the date of such termination, pay to West a termination fee